# No. 24-4193

# United States Court of Appeals
## *for the*
# Fourth Circuit

UNITED STATES OF AMERICA,

*Plaintiff/Appellee,*

— v. —

JESSIE LEROY GLASS, JR.,

*Defendant/Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT STATESVILLE

# JOINT APPENDIX
# VOLUME I OF V (PAGES 1-427)

MELISSA S. BALDWIN
Assistant Federal Public Defender
JOSHUA B. CARPENTER
Assistant Federal Public Defender
FEDERAL PUBLIC DEFENDER
 FOR THE WESTERN DISTRICT
 OF NORTH CAROLINA
1 Page Avenue, Suite 210
Asheville, NC 28801
(828) 232-9992

*Counsel for Appellant*

AMY ELIZABETH RAY
Assistant U.S. Attorney
OFFICE OF THE
 UNITED STATES ATTORNEY
United States Courthouse
100 Otis Street, Room 233
Asheville, NC 28801
(828) 271-4661

*Counsel for Appellee*

CP COUNSEL PRESS    (800) 4-APPEAL • (810977)

# TABLE OF CONTENTS
## VOLUME I OF V

<u>Appendix Page</u>

Docket Entries.................................................................................................JA1

(3)    Indictment
      filed August 17, 2021 .......................................................................JA15

(34)    Government's Notice of Intent to Use Evidence
      filed September 26, 2022...................................................................JA18

(35)    Government's Notice of Intent to Use Evidence
      filed September 26, 2022...................................................................JA24

(36)    Government's Notice of Intent to Use Evidence
      filed September 26, 2022...................................................................JA31

(38)    Government's Notice of Intent to Introduce Expert Testimony
      filed September 28, 2022...................................................................JA35

(42)    Government's Notice of Intent to Introduce Evidence
      filed November 29, 2022 ...................................................................JA42

(43)    Defendant's Motion to Suppress Evidence
      filed November 30, 2022 ...................................................................JA49

(47)    Government's Response in Opposition to Motion to Suppress Evidence
      filed December 28, 2022.................................................................JA106

(48)    Defendant's Reply to Response to Motion to Suppress Evidence
      filed January 9, 2023 ......................................................................JA128

(49)    Government's Supplemental Response in Opposition to Motion to
      Suppress Evidence
      filed January 11, 2023 ....................................................................JA138

Transcript of Motion Hearing before
The Honorable Kenneth D. Bell
on January 12, 2023.......................................................................................JA140

Transcript of Franks Hearing before
The Honorable Kenneth D. Bell
on February 7, 2023 ........................................................................JA156

Government Exhibits:

1. Interview Summary with Sandra Cox ......................................JA306

2. Interview Summary with April Glass......................................JA307

3. Interview Summary with Jessie Glass, Jr. ................................JA309

4. Email Regarding Anonymous Crime Tip ................................JA314

5. Report from Wythe County ...................................................JA317

Defense Exhibits:

1. State of North Carolina, Iredell County Residential Search Warrant .....JA319

2. State of North Carolina, Iredell County Personal Property
   Search Warrant ......................................................................JA335

3. Virginia State Police Investigative Report ................................JA338

4. NCIC Report – Jessie Glass, Jr. ...............................................JA346

5. State of North Carolina, Iredell County Search Warrant ........................JA355

7. Wythe County, Virginia Order of Dismissal for Jessie Glass, Jr. ............JA361

8. Iredell County, NC Sheriff's Office Investigation Report ......................JA362

9. State of North Carolina, Iredell County Notice of Hearing on Violation of
   Unsupervised Probation for April Dawn Glass........................................JA373

10. NCIC Report – April Dawn Glass............................................JA390

11. Iredell County, NC Case Supplemental Report........................................JA395

12. Federal Bureau of Investigation 302 Report for Jason Lowrance..........JA397

13. Commonwealth of Virginia Search Warrant – Personal Property of
    Jessie Glass, Jr. .....................................................................JA398

14. Iredell County, NC Investigation Report ................................JA402

15. Email Regarding Anonymous Tip............................................JA406

18. Handwritten Statement of April Glass .....................................JA407

19. Email Regarding Report of Suspicious Activity by April Glass .............JA409

20. Email between Jason Lowrance and April Glass.....................................JA412

21. Email from April Glass to Jason Lowrance ..............................................JA413

22. Email from April Glass to Jason Lowrance ..............................................JA414

23. CJLEADS, North Carolina Department of Information Technology
     Report for Jessie Leroy Glass, Jr...............................................................JA415

24. Email from April Glass to Jason Lowrance (not admitted) ....................JA422

25. Virginia State Police Activity Report, dated December 27, 2017 ..........JA423

26. Virginia State Police Activity Report, dated December 11, 2017 ..........JA424

27. Iredell County Sheriff's Office Investigation Report,
     dated December 27, 2019.........................................................................JA425

# TABLE OF CONTENTS
# VOLUME II OF V

Appendix Page

(56) Defendant's Memorandum in Support of Motion to Suppress
filed March 20, 2023 ..........................................................................JA428

(57) Government's Notice of Expert
filed March 27, 2023 ..........................................................................JA452

(59) Government's Response in Opposition to Defendant's Memorandum in
Support to Motion to Suppress
filed March 29, 2023 ..........................................................................JA459

(62) Order Denying Motion to Suppress
filed April 7, 2023 ..............................................................................JA472

(63) Government's Supplemental Notice and Request for Defendant Expert
Disclosure
filed May30, 2023 ..............................................................................JA489

(64) Government's Notice of Intent to Use Evidence
filed June 2, 2023 ...............................................................................JA491

(65) Defendant's Motion in Limine and Proposed Stipulations
filed June 5, 2023 ...............................................................................JA502

(66) Defendant's Motion in Limine to Exclude 404(b) Evidence
filed June 5, 2023 ...............................................................................JA508

(67) Government's Response in Opposition to Defendant's Motion in Limine
and Proposed Stipulations
filed June 9, 2023 ...............................................................................JA520

(68) Defendant's Response in Opposition to Government's Notice of Intent
to Use Evidence (Dkt. 64)
filed June 9, 2023 ...............................................................................JA532

(69) Government's Notice of Intent to Use Evidence
filed June 12, 2023 .............................................................................JA540

(72)     Defendant's Proposed Jury Instructions
          filed June 13, 2023 ...........................................................JA546

(74)     Government's Proposed Jury Instructions
          filed June 13, 2023 ...........................................................JA550

(75)     Defendant's Objections to the Government's Proposed Jury Instructions
          filed June 13, 2023 ...........................................................JA578

(76)     Order Granting Government's Notice of Intent to Introduce
          404(b) Evidence
          filed June 14, 2023 ...........................................................JA580

(78)     Defendant's Objection and Motion in Limine to Government's Intent to
          Admit Images of CP
          filed June 18, 2023 ...........................................................JA588

(79)     Defendant's Proposed Jury Instructions
          filed June 18, 2023 ...........................................................JA601

(82)     Government's Proposed Jury Instructions
          filed June 19, 2023 ...........................................................JA603

Transcript of Jury Voir Dire before
The Honorable Kenneth D. Bell
on June 20, 2023 .......................................................................JA605

Transcript of Jury Trial Volume I, before
The Honorable Kenneth D. Bell
on June 20, 2023 .......................................................................JA668

          Testimony of Tony Davis:

          Direct Examination by Ms. Ford...................................JA717
          Cross Examination by Mr. Johnson ...............................JA728

          Testimony of Jason Lowrance:

          Direct Examination by Ms. Spaugh................................JA736
          Voir Dire Examination by Mr. Johnson .........................JA756
          Cross Examination by Mr. Johnson ...............................JA768
          Redirect Examination by Ms. Spaugh ............................JA778

<u>Testimony of John Aponik:</u>

Direct Examination by Ms. Spaugh.................................................JA779
Cross Examination by Mr. Davis..................................................JA785

<u>Testimony of Sharlene Choyce:</u>

Direct Examination by Ms. Spaugh.................................................JA787

<u>Testimony of Christopher Decarlo:</u>

Direct Examination by Ms. Ford..................................................JA792
Cross Examination by Mr. Davis..................................................JA807

<u>Testimony of Kelly Matthewman:</u>

Direct Examination by Ms. Ford..................................................JA812
Voir Dire Examination by Mr. Davis..............................................JA823
Direct Examination by Ms. Ford..................................................JA825

# TABLE OF CONTENTS
## VOLUME III OF V

Appendix Page

Government Exhibits:

1A.  Photo from Search Warrant Execution .................................................JA868

1B.  Photo from Search Warrant Execution .................................................JA869

1C.  Photo from Search Warrant Execution .................................................JA870

1D.  Photo from Search Warrant Execution .................................................JA871

1E.  Photo from Search Warrant Execution .................................................JA872

2.  Samsung Galaxy J7 cell phone [physical exhibit] ..................................JA873

3.  LG LS777 cell phone [physical exhibit]..................................................JA874

4.  Samsung Galaxy S9 cell phone [physical exhibit]..................................JA875

5.  Glass Text Messages with Links.............................................................JA876

6.  IMAGE ..................................................................................................JA877

7.  IMAGE ..................................................................................................JA878

8A.  Clip: Lowrance Interview with Jessie Leroy Glass, Jr. (video)..............JA879

8B.  Physical Exhibit: CD with Clip from Lowrance Interview of
Jessie Leroy Glass, Jr..............................................................................JA880

49.  IMAGE..................................................................................................JA881

52.  Picture of Jessie Leroy Glass, Jr. NC Driver's License..........................JA882

54.  Pay slip to Print – Report Design, 11/30/2019 ....................................JA883

56.  Photo 20200107_192105.......................................................................JA884

63.  Employment Record for Jessie Leroy Glass, Jr.....................................JA885

64.  CenturyLink Business Records...............................................................JA887

68.  Jessie Leroy Glass, Jr. Birth Certificate.................................................JA890

74.  Visits to Mega on 2/5/2020 ..................................................................JA891

Defense Exhibits:

15. Photograph – LG Phone Under Mattress with Adult Magazines........JA892

16. Photograph – Close up of LG phone under mattress..........................JA893

Transcript of Jury Trial Volume II, before
The Honorable Kenneth D. Bell
on June 21, 2023 .........................................................................................JA894

Testimony of Kelly Matthewman:

Direct Examination by Ms. Ford.................................................................JA897
Cross Examination by Mr. Davis................................................................JA941
Redirect Examination by Ms. Ford.............................................................JA989

Testimony of Jessie Leroy Glass, Sr.:

Direct Examination by Mr. Davis..............................................................JA1001
Cross Examination by Ms. Spaugh...........................................................JA1018
Redirect Examination by Mr. Davis ..........................................................JA1024

Government Exhibits:

10. Video Clip: IMG_20200202-142955_118_s01 ..............................JA1097

11. Screenshot (showing file path, creation dates)......................................JA1098

13. Video Clip: VID-20170103-WA0252 .............................................JA1099

14. Screenshot (showing file path, creation dates)......................................JA1100

16. Video Clip (2)......................................................................................JA1101

19. Video Clip..........................................................................................JA1102

20. Screenshot (showing file bath, creation dates)......................................JA1103

21a. Image Thumbdata4-1763508120_embedded_150 ..............................JA1104

24. Video Clip..........................................................................................JA1105

28. Video Clip 2 of 2 from Baile.................................................................JA1106

31. Video Clip from 1_5033059723625103486 .........................................JA1107

33a. Image 9061932012806349336...........................................................JA1108

37. Video Clip from mg14........................................................................JA1109

39a. Image Thumbdata-1763508120_embedded_58 ................................JA1110

41.  Clip from Vid-20170103-WA0112 ........................................JA1111

43a. Image 891371463055921074 ...............................................JA1112

44a. Image 3921493999278617279.0 ..........................................JA1113

45a. Image imgcache.0_embedded_6 ...........................................JA1114

46a. Image 16667052765331839777.0 .........................................JA1115

47a. Image imgcache.0_embedded_63 .........................................JA1116

50.  Screenshot LF Download Folder ...........................................JA1117

51.  Screenshot: LG MEGA Downloads ........................................JA1118

55.  Text Message on February 4, 2020, at 21:30:16 .................................JA1119

66.  LG Business Records ......................................................JA1120

67.  Photograph of location of LG manufacture ........................................JA1121

69.  Google Subscriber Information ...........................................JA1122

70.  Photograph of Phone Screens Side-by-Side ........................................JA1123

72.  Google Chrome Autofill ..................................................JA1124

76.  Partial Cellebrite timeline for LG .........................................JA1125

Defense Exhibits:

17A. LG Timeline ................................................................JA1136

17B. Excerpt of LG Timeline .....................................................JA1181

18A. Piece of Samsung Timeline ................................................JA1183

18B. Except from Samsung Timeline, Showing Autofill
     for April in 11/2019 ..........................................................JA1209

18C. Excerpt from Samsung with Additional Autofill for
     April in 11/2019 ..............................................................JA1211

18D. Excerpt from Samsung Timeline with Email/Spam mail addressed to
     April ...........................................................................JA1213

19.  Copy of Contact List in D's Samsung .....................................JA1215

31.  D's Employment Records for Amesbury ...............................JA1217

32. Additional Google Subscriber Information for Randyday, Including IP Activity ..................................................................................JA1219

33. Records from Charter Communications, RE: Internet at 740 Shiloh .......................................................................................JA1221

34A. Phone Records for 704-500-7746..........................................................JA1223

34B. Affidavit from Sprint/T-Mobile Re: Records for 704-500-7746 ...........................................................................................JA1239

34C. Screenshot of Outgoing Records on Calls from 704-500-7746 Jan/Feb ....................................................................................JA1240

(86) Jury Verdict
filed June 21, 2023 ......................................................................JA1241

Transcript of Sentencing Hearing before
The Honorable Kenneth D. Bell
on March 28, 2024....................................................................................JA1243

Testimony of Brandon Peeler:

Direct Examination by Ms. Ford..............................................JA1264
Cross Examination by Mr. Johnson ...........................................JA1283

Defense Exhibit:

1. Undated Letter of April Glass................................................JA1313

(107) Judgment
filed April 1, 2024....................................................................JA1314

(109) Notice of Appeal
filed April 1, 2024....................................................................JA1323

# TABLE OF CONTENTS
## VOLUME IV OF V – UNDER SEAL

Appendix Page

(21)  Probation Bond Violation
      filed December 3, 2021 ...................................................................JA1324

(92)  Defendant's Objections to Presentence Investigation Report
      filed October 17, 2023...................................................................JA1329

(93)  Final Presentence Investigation Report
      filed November 21, 2023 ...............................................................JA1334

(95)  Probation Bond Violation
      filed March 18, 2024.....................................................................JA1358

(98)  Defendant's Sentencing Memorandum
      filed March 21, 2024.....................................................................JA1363

(99)  Supplement to Presentence Investigation Report
      filed March 25, 2024.....................................................................JA1376

(100) Government's Motion for Upward Variance
      filed March 25, 2024.....................................................................JA1378

(102) Defendant's Supplemental Sentencing Memorandum
      filed March 26, 2024.....................................................................JA1401

(103) Government's Supplement to Sentencing Memorandum
      filed March 26, 2024.....................................................................JA1403

(108) Statement of Reasons
      filed April 1, 2024........................................................................JA1415

TABLE OF CONTENTS
VOLUME V OF V – DIGITAL MEDIA[1]

Appendix Page

Government's Exhibit from Jury Trial before
The Honorable Kenneth D. Bell
on June 20, 2023:

Exhibit 8A.  Clip: Lowrance Interview with Jessie Leroy Glass, Jr............JA1419

---

[1] This Digital Media is compatible with Windows Media Player and contains one MP4 file. This media has been confirmed to be virus-free through Vipre Virus Protection, EndpointSecurity, version 13.1.8510 virus scan.

# U.S. District Court
# Western District of North Carolina (Statesville)
# CRIMINAL DOCKET FOR CASE #: 5:21-cr-00060-KDB-SCR All Defendants

Case title: USA v. Glass

Date Filed: 08/17/2021

Date Terminated: 03/28/2024

---

Assigned to: District Judge Kenneth D. Bell
Referred to: US Magistrate Judge Susan C. Rodriguez

Appeals court case number: 24-4193 Fourth

### Defendant (1)

**Jessie Leroy Glass, Jr**
*TERMINATED: 03/28/2024*

represented by **W. Kelly Johnson**
Federal Public Defender
129 W. Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720
Fax: 704-374-0722
Email: W_Kelly_Johnson@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**John Parke Davis**
Federal Defenders of Western North Carolina
129 West Trade Street
Suite 300
Charlotte, NC 28202
704-374-0720
Fax: 704-374-0722
Email: jp_davis@fd.org
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

### Pending Counts

18:2252A(a)(2) and (b)(1) - ACTIVITIES RE MATERIAL CONSTITUTING/CONTAINING CHILD PORNO
(1)

18:2252A(a)(2) and (b)(1) - ACTIVITIES RE MATERIAL

### Disposition

180 months imprisonment concurrent, life supervised release concurrent, $100 special assessment, $5,000 AVAA assessment total, $6,000 restitution total

180 months imprisonment concurrent, life supervised release concurrent, $100 special

JA1

CONSTITUTING/CONTAINING CHILD PORNO
(2)

assessment, $5,000 AVAA assessment total, $6,000 restitution total

18:2252A(a)(2) and (b)(1) - ACTIVITIES RE MATERIAL CONSTITUTING/CONTAINING CHILD PORNO
(3)

180 months imprisonment concurrent, life supervised release concurrent, $100 special assessment, $5,000 AVAA assessment total, $6,000 restitution total

18:2252A(a)(5)(B) and (b)(2) - ACTIVITIES RE MATERIAL CONSTITUTING/CONTAINING CHILD PORNO
(4)

180 months imprisonment concurrent, life supervised release concurrent, $100 special assessment, $5,000 AVAA assessment total, $6,000 restitution total

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

**Plaintiff**

| **USA** | represented by | **Kimlani Murray Ford** |
| --- | --- | --- |

U.S. Attorneys Office
227 West Trade Street, Suite 1650
Charlotte, NC 28202
704/ 344-6222
Fax: 704/ 344-6659
Email: kimlani.ford@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: Assistant US Attorney

**Benjamin Bain-Creed**
U.S. Attorney's Office
227 West Trade Street
Carillon Building, Suite 1650
Charlotte, NC 28202
704-338-3123
Fax: 704-344-6629
Email: benjamin.bain-creed@usdoj.gov
*ATTORNEY TO BE NOTICED*
Designation: Assistant US Attorney

**Stephanie Laboy Spaugh**
US Attorney's Office
227 W Trade Street
Suite 1650
Charlotte, NC 28202
704-344-6222
Email: stephanie.spaugh@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/17/2021 | 1 | MOTION to Seal Indictment by USA as to Jessie Leroy Glass, Jr. (mek) (Entered: 08/18/2021) |
| 08/17/2021 | 2 | **ORDER granting 1 Motion to Seal Indictment as to Jessie Leroy Glass Jr (1). Signed by Magistrate Judge David Keesler on 8/17/2021. (mek)** (Entered: 08/18/2021) |
| 08/17/2021 | 3 | SEALED INDICTMENT as to Jessie Leroy Glass, Jr (1) count(s) 1-3, 4. (Attachments: # 1 Unredacted Signature Page, # 2 Cover Sheet) (mek) (Entered: 08/18/2021) |
| 08/17/2021 | 4 | Arrest Warrant Issued *(Sealed - Case Participants)* in case as to Jessie Leroy Glass, Jr. (Attachment: # 1 Warrant Page Identifier)(mek) (Entered: 08/18/2021) |
| 09/01/2021 | | Arrest of Jessie Leroy Glass, Jr (mek) (Entered: 09/01/2021) |
| 09/01/2021 | | Set Hearings as to Jessie Leroy Glass, Jr: Initial Appearance set for 9/1/2021 11:00 AM in Courtroom #1B, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David S. Cayer. (mek) (Entered: 09/01/2021) |
| 09/01/2021 | | ORAL MOTION to Unseal Case by USA as to Jessie Leroy Glass, Jr. (mek) (Entered: 09/01/2021) |
| 09/01/2021 | | **ORAL ORDER granting [] Oral Motion to Unseal Case as to Jessie Leroy Glass Jr (1). Entered by Magistrate Judge David S. Cayer on 9/1/2021. (mek)** (Entered: 09/01/2021) |
| 09/01/2021 | | Minute Entry: INITIAL APPEARANCE as to Jessie Leroy Glass, Jr held before Magistrate Judge David S. Cayer. Defendant advised of rights & charges. Defendant moved for appointment of counsel. Defendant filed a financial affidavit. Court approved appointment of counsel. Government moved for detention. Defendant detained pending detention hearing. Arraignment and Detention hearing set for 9/7/2021 10:05 AM in Courtroom #1B, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David S. Cayer.Government attorney: Lambert F. Guinn. Defendant attorney: W. Kelly Johnson. Court Reporter: DCR. (mek) (Entered: 09/01/2021) |
| 09/01/2021 | 5 | CJA 23 (Ex Parte) Financial Affidavit by Jessie Leroy Glass, Jr (mek) (Entered: 09/01/2021) |
| 09/01/2021 | | **ORAL ORDER as to Jessie Leroy Glass, Jr granting Oral Motion to Appoint Counsel. Entered by Magistrate Judge David S. Cayer on 9/1/2021. (mek)** (Entered: 09/01/2021) |
| 09/01/2021 | | Attorney update in case as to Jessie Leroy Glass, Jr. Attorney W. Kelly Johnson for Jessie Leroy Glass, Jr added. (mga) (Entered: 09/01/2021) |

| | | |
|---|---|---|
| 09/03/2021 | 7 | PRETRIAL REPORT *(SEALED - Attorney)* as to Jessie Leroy Glass, Jr (available to USA, Jessie Leroy Glass, Jr) (Amanda Martin - lhc) (Entered: 09/03/2021) |
| 09/07/2021 | | NOTICE of Cancellation of Arraignment and Detention Hearing scheduled for 9/7/2021 as to Jessie Leroy Glass, Jr. per USMS and MCJ (mek) (Entered: 09/07/2021) |
| 09/07/2021 | 8 | Arrest Warrant Returned Executed on 8/31/2021 in case as to Jessie Leroy Glass, Jr. (tlj) (Entered: 09/07/2021) |
| 09/08/2021 | 9 | Unopposed MOTION for Bond by Jessie Leroy Glass, Jr. Responses due by 9/15/2021 Motions referred to David S. Cayer (Davis, John) (Entered: 09/08/2021) |
| 09/09/2021 | | NOTICE OF HEARING as to Jessie Leroy Glass, Jr: Detention Hearing set for 9/10/2021 10:00 AM in Courtroom #1B, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David S. Cayer. *This is your only notice - you will not receive a separate document.* (mek) (Entered: 09/09/2021) |
| 09/10/2021 | | NOTICE OF HEARING as to Jessie Leroy Glass, Jr: Detention Hearing RESET for 9/10/2021 10:15 AM in Courtroom #1B, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David S. Cayer. *This is your only notice - you will not receive a separate document.*(mek) (Entered: 09/10/2021) |
| 09/10/2021 | | Minute Entry: DETENTION HEARING as to Jessie Leroy Glass, Jr held before Magistrate Judge David S. Cayer. Defendant not present at hearing (not transported by USMS and MCJ). Government and Probation agreed to conditions of release. Defendant released on conditions. Bond papers sent to USMS and Federal Coordinator at MCJ for defendant's signature. Arraignment set for 9/17/2021.Government attorney: Kimlani Murray Ford. Defendant attorney: Kevin Tate. Court Reporter: DCR. (mek) (Entered: 09/10/2021) |
| 09/10/2021 | | NOTICE OF HEARING as to Jessie Leroy Glass, Jr: Arraignment RESET for 9/17/2021 10:35 AM in Courtroom #1A, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David Keesler. *This is your only notice - you will not receive a separate document.* (mek) (Entered: 09/10/2021) |
| 09/15/2021 | 11 | **Appearance Bond Entered *(Restricted)* as to Jessie Leroy Glass, Jr in amount of $ 25,000. Signed by Magistrate Judge David S. Cayer on 9/10/2021. (mek)** (Entered: 09/15/2021) |
| 09/15/2021 | 12 | **ORDER *(Restricted)* Setting Conditions of Release as to Jessie Leroy Glass Jr (1) 25KU. Signed by Magistrate Judge David S. Cayer on 9/10/2021. (Attachment: # 1 Additional Conditions) (mek)** (Entered: 09/15/2021) |
| 09/15/2021 | 13 | WAIVER of Personal Appearance at Arraignment and Entry of Plea of Not Guilty by Jessie Leroy Glass, Jr (Johnson, W.) (Entered: 09/15/2021) |
| 09/17/2021 | | Minute Entry: ARRAIGNMENT as to Jessie Leroy Glass Jr (1) Count 1-3,4 held before Magistrate Judge David Keesler. Defendant pled not guilty. Government attorney: Cortney Randall. Defendant attorney: Erin Taylor. Court Reporter: DCR. (mga) (Entered: 09/17/2021) |
| 09/17/2021 | | **SCHEDULING ORDER as to Jessie Leroy Glass, Jr. (Click on this link to obtain the Standard Arraignment Order) . Motion to Continue deadline due by 10/4/21. Status Conference set for 10/7/2021 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Docket Call set for 10/18/2021 09:30 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D. Bell. Entered by Magistrate Judge David Keesler on 9/17/21. (mga)** (Entered: 09/17/2021) |

| | | |
|---|---|---|
| 09/17/2021 | | **Standard Discovery Order in case as to Jessie Leroy Glass, Jr. (Click on this link to obtain the <u>Standard Criminal Discovery Order</u>) . Entered by Magistrate Judge David Keesler on 9/17/21. (mga)** (Entered: 09/17/2021) |
| 09/17/2021 | 14 | **ORDER pursuant to the Due Process Protection Act as to Jessie Leroy Glass, Jr. Signed by Magistrate Judge David Keesler on 9/17/21. (mga)** (Entered: 09/17/2021) |
| 09/20/2021 | 16 | NOTICE OF ATTORNEY APPEARANCE Benjamin Bain-Creed appearing for USA. (Bain-Creed, Benjamin) (Entered: 09/20/2021) |
| 09/29/2021 | 17 | Unopposed MOTION to Continue Docket Call/Trial by Jessie Leroy Glass, Jr. Responses due by 10/6/2021 (Johnson, W.) (Entered: 09/29/2021) |
| 09/29/2021 | 18 | **ORDER granting <u>17</u> Motion to Continue Docket Call/Trial as to Jessie Leroy Glass Jr (1). Motion to Continue deadline due by 11/29/2021. Status Conference set for 12/2/2021 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Docket Call set for 12/13/2021 09:30 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D. Bell. Signed by District Judge Kenneth D. Bell on 9/29/2021. (tms)** (Entered: 09/29/2021) |
| 11/18/2021 | 19 | Unopposed MOTION to Continue Docket Call/Trial by Jessie Leroy Glass, Jr. Responses due by 11/26/2021 (Johnson, W.) (Entered: 11/18/2021) |
| 11/18/2021 | 20 | **ORDER granting <u>19</u> Motion to Continue Docket Call/Trial as to Jessie Leroy Glass Jr (1). Motion to Continue deadline due by 2/7/2022. Status Conference set for 2/10/2022 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Docket Call set for 2/22/2022 09:30 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D. Bell. Signed by District Judge Kenneth D. Bell on 11/18/2021. (tms)** (Entered: 11/18/2021) |
| 12/03/2021 | 21 | **US PROBATION Bond Violation Report *(Sealed - Attorney)* as to Jessie Leroy Glass, Jr. Warrant issued. Signed by Magistrate Judge David S. Cayer on 12/3/2021. (mek)** Modified access on 1/4/2022 (mek). (Entered: 12/03/2021) |
| 01/04/2022 | | NOTICE OF HEARING as to Jessie Leroy Glass, Jr: Bond Revocation Hearing set for 1/10/2022 10:05 AM in Courtroom #1B, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David S. Cayer. *This is your only notice - you will not receive a separate document.*(mek) (Entered: 01/04/2022) |
| 01/10/2022 | | Minute Entry: BOND REVOCATION HEARING as to Jessie Leroy Glass, Jr held before Magistrate Judge David S. Cayer. Defendant found in violation. Government and Probation agreed to modified conditions of release. Bond was not revoked. The Court orders conditions be modified to include home incarceration. Government attorney: Kimlani Murray Ford. Defendant attorney: W. Kelly Johnson. Court Reporter: Digital Court Reporter. (mek) (Entered: 01/10/2022) |
| 01/10/2022 | 22 | **MODIFIED ORDER *(Restricted)* Setting Conditions of Release as to Jessie Leroy Glass Jr (1) 25KU re: hearing held 1/10/2022. Signed by Magistrate Judge David S. Cayer on 1/10/2022. (mek)** (Entered: 01/10/2022) |
| 01/12/2022 | 24 | Arrest Warrant Returned Executed re: Violation Petition *(Sealed - Court)* on 1/10/2022 in case as to Jessie Leroy Glass, Jr. (kab) (Entered: 01/12/2022) |
| 02/03/2022 | 25 | Unopposed MOTION to Continue Docket Call/Trial by Jessie Leroy Glass, Jr. Responses due by 2/10/2022 (Johnson, W.) (Entered: 02/03/2022) |

| | | |
|---|---|---|
| 02/03/2022 | 26 | **ORDER granting 25 Motion to Continue Docket Call/Trial as to Jessie Leroy Glass Jr (1). Motion to Continue deadline due by 4/4/2022. Status Conference set for 4/7/2022 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Docket Call set for 4/18/2022 09:30 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D. Bell. Signed by District Judge Kenneth D. Bell on 2/3/2022. (nvc)** (Entered: 02/03/2022) |
| 03/31/2022 | 27 | Unopposed MOTION to Continue Docket Call/Trial by Jessie Leroy Glass, Jr. Responses due by 4/7/2022 (Johnson, W.) (Entered: 03/31/2022) |
| 04/01/2022 | 28 | **ORDER granting 27 Motion to Continue Docket Call/Trial as to Jessie Leroy Glass Jr (1) Motion to Continue deadline due by 6/6/2022. Status Conference set for 6/9/2022 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Docket Call set for 6/21/2022 09:30 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D. Bell. Signed by District Judge Kenneth D. Bell on 03/31/2022. (thh)** Modified docket text to add MTC deadline on 4/6/2022, NEF regenerated. (thh). (Entered: 04/01/2022) |
| 05/16/2022 | 29 | Unopposed MOTION to Continue Docket Call/Trial by Jessie Leroy Glass, Jr. Responses due by 5/23/2022 (Johnson, W.) (Entered: 05/16/2022) |
| 05/16/2022 | 30 | **ORDER granting 29 Motion to Continue Docket Call/Trial as to Jessie Leroy Glass Jr (1). Motion to Continue deadline due by 8/1/2022. Status Conference RESET for 8/4/2022 at 9:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Docket Call RESET for 8/15/2022 at 9:30 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D. Bell. Signed by District Judge Kenneth D. Bell on 5/16/2022. (ejb)** (Entered: 05/16/2022) |
| 07/18/2022 | 31 | Unopposed MOTION to Continue Docket Call/Trial by Jessie Leroy Glass, Jr. Responses due by 7/25/2022 (Johnson, W.) (Entered: 07/18/2022) |
| 07/18/2022 | 32 | **ORDER granting 31 Motion to Continue Docket Call/Trial as to Jessie Leroy Glass Jr. (1). Motion to Continue deadline due by 10/3/2022. Status Conference RESET for 10/6/2022 at 9:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Docket Call RESET for 10/17/2022 at 9:30 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D. Bell. Signed by District Judge Kenneth D. Bell on 7/18/2022. (ejb)** (Entered: 07/18/2022) |
| 09/26/2022 | 33 | NOTICE OF ATTORNEY APPEARANCE Stephanie Laboy Spaugh appearing for USA. (Spaugh, Stephanie) (Entered: 09/26/2022) |
| 09/26/2022 | 34 | GOVERNMENT's NOTICE of Intent to Use Evidence by USA as to Jessie Leroy Glass, Jr (Attachments: # 1 Exhibit, # 2 Exhibit)(Ford, Kimlani) (Entered: 09/26/2022) |
| 09/26/2022 | 35 | GOVERNMENT's NOTICE of Intent to Use Evidence by USA as to Jessie Leroy Glass, Jr (Attachments: # 1 Exhibit)(Ford, Kimlani) (Entered: 09/26/2022) |
| 09/26/2022 | 36 | GOVERNMENT's NOTICE of Intent to Use Evidence by USA as to Jessie Leroy Glass, Jr (Attachments: # 1 Exhibit)(Ford, Kimlani) (Entered: 09/26/2022) |
| 09/26/2022 | 37 | Request for reciprocal discovery by USA as to Jessie Leroy Glass, Jr. (Spaugh, Stephanie) (Entered: 09/26/2022) |
| 09/28/2022 | 38 | NOTICE of Intent to Introduce Expert Testimony by USA as to Jessie Leroy Glass, Jr (Attachments: # 1 Exhibit)(Ford, Kimlani) (Entered: 09/28/2022) |

| 10/03/2022 | [39](#) | Unopposed MOTION to Seal *Motion to Continue Trial/Docket Call* by Jessie Leroy Glass, Jr. Responses due by 10/11/2022 Motions referred to David S. Cayer (Johnson, W.) (Entered: 10/03/2022) |
|---|---|---|
| 10/03/2022 | [40](#) | SEALED MOTION *(Sealed - Attorney)* Continuance of Trial/Docket Call filed by Defendant; (available to: USA, Jessie Leroy Glass, Jr) (Johnson, W.). Modified on 10/3/2022 to remove referral (mek). (Entered: 10/03/2022) |
| 10/03/2022 | | **TEXT-ONLY ORDER granting [39](#) Motion to Seal Motion to Continue Trial/Docket Call as to Jessie Leroy Glass Jr. So Ordered. Entered by Magistrate Judge David S. Cayer on 10/3/2022. (KCA)** (Entered: 10/03/2022) |
| 10/03/2022 | [41](#) | **ORDER granting [40](#) Sealed Motion to Continue Docket Call/Trial as to Jessie Leroy Glass, Jr. Status Conference reset for 12/8/2022 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Docket Call reset for 12/19/2022 09:30 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D. Bell. Signed by District Judge Kenneth D. Bell on 10/3/2022. (mek)** (Entered: 10/03/2022) |
| 11/29/2022 | [42](#) | GOVERNMENT's NOTICE of Intent to Use Evidence by USA as to Jessie Leroy Glass, Jr (Attachments: # [1](#) Exhibit, # [2](#) Exhibit)(Ford, Kimlani) (Entered: 11/29/2022) |
| 11/30/2022 | [43](#) | MOTION to Suppress *Evidence* by Jessie Leroy Glass, Jr. Responses due by 12/7/2022 (Attachments: # [1](#) Exhibit House Search Warrant, # [2](#) Exhibit Phone Search Warrant, # [3](#) Exhibit VA Report, # [4](#) Exhibit 2017 Iredell Warrant, # [5](#) Exhibit Dismissal of Charges, # [6](#) Exhibit April Glass Conviction) (Johnson, W.) (Entered: 11/30/2022) |
| 12/01/2022 | [44](#) | Unopposed MOTION to Continue Docket Call/Trial by Jessie Leroy Glass, Jr. Responses due by 12/8/2022 (Johnson, W.) (Entered: 12/01/2022) |
| 12/02/2022 | [45](#) | **ORDER granting [44](#) Motion to Continue Docket Call/Trial as to Jessie Leroy Glass Jr (1). Motion to Continue deadline 2/6/2023. Status Conference reset for 2/9/2023 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Docket Call reset for 2/21/2023 09:30 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D. Bell. Signed by District Judge Kenneth D. Bell on 12/2/2022. (mek)** (Entered: 12/02/2022) |
| 12/02/2022 | [46](#) | MOTION for Extension of Time to File Response/Reply by USA as to Jessie Leroy Glass, Jr. Motions referred to David S. Cayer (Ford, Kimlani) (Entered: 12/02/2022) |
| 12/02/2022 | | **TEXT-ONLY ORDER granting Government's [46](#) Motion for Extension of Time to File Response/Reply as to Jessie Leroy Glass Jr (1). Responses due by 12/28/2022. Entered by District Judge Kenneth D. Bell on 12/2/2022. (mek)** (Entered: 12/02/2022) |
| 12/28/2022 | [47](#) | RESPONSE in Opposition by USA as to Jessie Leroy Glass Jr re [43](#) MOTION to Suppress *Evidence* (Ford, Kimlani) (Entered: 12/28/2022) |
| 01/03/2023 | | NOTICE OF HEARING ON MOTION in case as to Jessie Leroy Glass, Jr. [43](#) MOTION to Suppress *Evidence* : Motion Hearing set for 1/12/2023 03:00 PM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. *This is your only notice - you will not receive a separate document.*(mek) (Entered: 01/03/2023) |
| 01/09/2023 | [48](#) | REPLY TO RESPONSE to Motion by Jessie Leroy Glass, Jr re [43](#) MOTION to Suppress *Evidence* (Johnson, W.) (Entered: 01/09/2023) |
| 01/11/2023 | [49](#) | Supplement to Opposition by USA as to Jessie Leroy Glass, Jr re [43](#) MOTION to Suppress *Evidence* (Ford, Kimlani) Modified text on 1/13/2023 (mek). (Entered: 01/11/2023) |

| | | |
|---|---|---|
| 01/12/2023 | | Minute Entry: MOTION HEARING as to Jessie Leroy Glass, Jr. held before District Judge Kenneth D. Bell. Re 43 MOTION to Suppress *Evidence*. A Franks Hearing will be set a later date to be determined by the Court. Government attorneys: Kimlani Murray Ford, Stephanie Laboy Spaugh. Defendant attorneys: W. Kelly Johnson, John Parke Davis. Court Reporter: Cheryl Nuccio. (mek) (Entered: 01/12/2023) |
| 01/30/2023 | | NOTICE OF HEARING ON MOTION in case as to Jessie Leroy Glass, Jr 43 MOTION to Suppress *Evidence* (Franks Hearing): Motion Hearing set for 2/7/2023 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. *This is your only notice - you will not receive a separate document.*(brl) (Entered: 01/30/2023) |
| 01/31/2023 | 50 | TRANSCRIPT of Motion Hearing as to Jessie Leroy Glass, Jr held on 1/12/23 before Judge Bell. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 4/28/2023. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 01/31/2023) |
| 02/01/2023 | 51 | Unopposed MOTION to Continue Docket Call/Trial by Jessie Leroy Glass, Jr. Responses due by 2/8/2023 (Johnson, W.) (Entered: 02/01/2023) |
| 02/02/2023 | 52 | **ORDER granting 51 Motion to Continue Docket Call/Trial as to Jessie Leroy Glass Jr (1). Motion to Continue deadline 4/3/2023. Status Conference RESET for 4/6/2023 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Docket Call RESET for 4/17/2023 09:30 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D. Bell. Signed by District Judge Kenneth D. Bell on 2/2/2023. (mek) (Entered: 02/02/2023)** |
| 02/02/2023 | 53 | Joint MOTION Consent Order to Produce Documents by Jessie Leroy Glass, Jr. Responses due by 2/9/2023 (Attachments: # 1 Exhibit Subpoena and Exhibit 1, # 2 Exhibit Objections) (Johnson, W.) (Entered: 02/02/2023) |
| 02/03/2023 | 54 | **ORDER granting 53 Joint Motion for an Order to Produce Documents as to Jessie Leroy Glass Jr (1). Signed by District Judge Kenneth D. Bell on 2/3/2023. (mek)** (Entered: 02/03/2023) |
| 02/07/2023 | | Minute Entry: MOTION HEARING as to Jessie Leroy Glass, Jr. held before District Judge Kenneth D. Bell. Re 43 MOTION to Suppress Evidence. Counsel to file further briefs. Government attorney: Kimlani Murray Ford, Stephanie Laboy Spaugh. Defendant attorney: W. Kelly Johnson, John Parke Davis. Court Reporter: Cheryl Nuccio. (mek) (Entered: 02/07/2023) |
| 02/07/2023 | | **ORAL ORDER as to Jessie Leroy Glass, Jr. directing Defendant's brief due fourteen (14) days after receipt of transcript. Government's response due ten (10) after filing of Defendant's brief. Re Hearing held on 43 MOTION to Suppress Evidence. Entered by District Judge Kenneth D. Bell on 2/7/2023. (mek) (Entered: 02/07/2023)** |
| 03/05/2023 | 55 | TRANSCRIPT of Franks Hearing as to Jessie Leroy Glass, Jr held on 2/7/23 before Judge Bell. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before** |

| | | |
|---|---|---|
| | | **the 90 day deadline. After that date it may be obtained through PACER. Policy at** www.ncwd.uscourts.gov Release of Transcript Restriction set for 5/31/2023. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 03/05/2023) |
| 03/20/2023 | 56 | MEMORANDUM in Support by Jessie Leroy Glass, Jr re 43 MOTION to Suppress *Evidence* (Attachments: # 1 Exhibit 28 - Brown Memo, # 2 Exhibit 29)(Johnson, W.) (Entered: 03/20/2023) |
| 03/27/2023 | 57 | NOTICE *of Expert* by USA as to Jessie Leroy Glass, Jr (Attachments: # 1 Envelope A) (Ford, Kimlani) (Entered: 03/27/2023) |
| 03/28/2023 | 58 | Unopposed MOTION to Modify Conditions of Release by Jessie Leroy Glass, Jr. Responses due by 4/4/2023 (Attachments: # 1 Exhibit A - Consent Order)Motions referred to David S. Cayer (Johnson, W.) (Entered: 03/28/2023) |
| 03/29/2023 | 59 | RESPONSE in Opposition by USA as to Jessie Leroy Glass, Jr re 56 Memorandum in Support (Ford, Kimlani) (Entered: 03/29/2023) |
| 03/30/2023 | 60 | Unopposed MOTION to Continue Docket Call/Trial by Jessie Leroy Glass, Jr. Responses due by 4/6/2023 (Johnson, W.) (Entered: 03/30/2023) |
| 03/30/2023 | | **TEXT-ONLY ORDER granting 58 Motion to Modify Conditions of Release as to Jessie Leroy Glass Jr (1). Without objection from the Government, the Motion is granted. So Ordered. Entered by Magistrate Judge David S. Cayer on 3/30/2023. (DLG)** (Entered: 03/30/2023) |
| 03/31/2023 | 61 | **ORDER granting 60 Motion to Continue Docket Call/Trial as to Jessie Leroy Glass Jr (1). Motion to Continue deadline 6/5/2023. Status Conference RESET for 6/8/2023 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Docket Call RESET for 6/20/2023 09:30 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D. Bell. Signed by District Judge Kenneth D. Bell on 3/31/2023. (mek)** (Entered: 03/31/2023) |
| 04/05/2023 | | Case as to Jessie Leroy Glass, Jr reassigned to Magistrate Judge Susan C. Rodriguez. Magistrate Judge David S. Cayer no longer assigned to the case. *This is your only notice - you will not receive a separate document.* (mek) (Entered: 04/05/2023) |
| 04/07/2023 | 62 | **ORDER denying Defendant's 43 Motion to Suppress Evidence as to Jessie Leroy Glass Jr. (1). Signed by District Judge Kenneth D. Bell on 4/6/2023. (mek)** (Entered: 04/07/2023) |
| 05/11/2023 | | Reset Hearings as to Jessie Leroy Glass, Jr: Status Conference **RESET** for 6/6/2023 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. (mek) (Entered: 05/11/2023) |
| 05/30/2023 | 63 | NOTICE *of Expert and Request for Defendant Expert Disclosure* by USA as to Jessie Leroy Glass, Jr (Ford, Kimlani) (Entered: 05/30/2023) |
| 06/02/2023 | 64 | GOVERNMENT's NOTICE of Intent to Use Evidence by USA as to Jessie Leroy Glass, Jr (Spaugh, Stephanie) (Entered: 06/02/2023) |
| 06/05/2023 | 65 | MOTION in Limine *CJ Images and Stipulation* by Jessie Leroy Glass, Jr. Responses due by 6/12/2023 (Attachments: # 1 Exhibit A -DOJ Judicial Guide to CP images) (Johnson, W.) (Entered: 06/05/2023) |
| 06/05/2023 | 66 | MOTION in Limine *To Exclude 404(b) Evidence* by Jessie Leroy Glass, Jr. Responses due by 6/12/2023 (Johnson, W.) (Entered: 06/05/2023) |
| 06/06/2023 | | Minute Entry: STATUS CONFERENCE as to Jessie Leroy Glass, Jr. held before District Judge Kenneth D. Bell. Jury Selection/Trial set for 6/20/2023 at 9:30am in Statesville. |

| | | |
|---|---|---|
| | | Government attorneys: Kimlani Murray Ford, Stephanie Laboy Spaugh. Defendant attorneys: W. Kelly Johnson, John Parke Davis. Court Reporter: Cheryl Nuccio. (mek) (Entered: 06/06/2023) |
| 06/06/2023 | | **ORAL ORDER as to Jessie Leroy Glass, Jr. directing that responses to 64 Notice of Intent to Use Evidence, 65 Motion in Limine *CJ Images and Stipulation*, and 66 Motion in Limine *To Exclude 404(b) Evidence* are due by 11:00am on Friday, 6/9/2023. Entered by District Judge Kenneth D. Bell on 6/6/2023. (mek)** (Entered: 06/06/2023) |
| 06/06/2023 | | NOTICE OF HEARING as to Jessie Leroy Glass, Jr: Jury Selection/Trial set for 6/20/2023 09:30 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D. Bell. *This is your only notice - you will not receive a separate document.*(mek) (Entered: 06/06/2023) |
| 06/09/2023 | 67 | RESPONSE in Opposition by USA as to Jessie Leroy Glass, Jr re 65 MOTION in Limine *CJ Images and Stipulation* (Ford, Kimlani) (Entered: 06/09/2023) |
| 06/09/2023 | 68 | RESPONSE in Opposition by Jessie Leroy Glass, Jr re 64 Notice of Intent to Use Evidence - Government (Johnson, W.) (Entered: 06/09/2023) |
| 06/12/2023 | 69 | GOVERNMENT's NOTICE of Intent to Use Evidence by USA as to Jessie Leroy Glass, Jr (Attachments: # 1 Exhibit business record, # 2 Exhibit Declaration)(Spaugh, Stephanie) (Entered: 06/12/2023) |
| 06/13/2023 | 70 | Proposed Voir Dire by Jessie Leroy Glass, Jr (Johnson, W.) (Entered: 06/13/2023) |
| 06/13/2023 | 71 | Proposed Jury Verdict by USA as to Jessie Leroy Glass, Jr (Spaugh, Stephanie) (Entered: 06/13/2023) |
| 06/13/2023 | 72 | Proposed Jury Instructions by Jessie Leroy Glass, Jr (Johnson, W.) (Entered: 06/13/2023) |
| 06/13/2023 | 73 | Proposed Voir Dire by USA as to Jessie Leroy Glass, Jr (Spaugh, Stephanie) (Entered: 06/13/2023) |
| 06/13/2023 | 74 | Proposed Jury Instructions by USA as to Jessie Leroy Glass, Jr (Spaugh, Stephanie) (Entered: 06/13/2023) |
| 06/13/2023 | 75 | Proposed Jury Instructions by Jessie Leroy Glass, Jr (Johnson, W.) (Entered: 06/13/2023) |
| 06/14/2023 | 76 | **ORDER granting the United States' 64 Notice of Intent to Admit Evidence under Rule 404(b); denying Defendant's 65 Motion in Limine; and granting Defendant's 66 Motion in Limine as to Jessie Leroy Glass Jr (1). Signed by District Judge Kenneth D. Bell on 6/13/2023. (mek)** (Entered: 06/14/2023) |
| 06/14/2023 | 77 | NOTICE *of Filing of Declaration of Authentication of Business Records* by Jessie Leroy Glass, Jr. (Attachments: # 1 Exhibit A - Amesbury Truth Work Records, # 2 Exhibit B-Dowdell Certifiacte)(Johnson, W.) (Entered: 06/14/2023) |
| 06/18/2023 | 78 | MOTION in Limine *to Admit CP Images* by Jessie Leroy Glass, Jr. Responses due by 6/26/2023 (Johnson, W.) (Entered: 06/18/2023) |
| 06/18/2023 | 79 | Proposed Jury Instructions by Jessie Leroy Glass, Jr (Johnson, W.) (Entered: 06/18/2023) |
| 06/19/2023 | 80 | WITNESS LIST *(Sealed - Participants)* by Jessie Leroy Glass, Jr (Johnson, W.) (Entered: 06/19/2023) |
| 06/19/2023 | 81 | WITNESS LIST *(Sealed - Participants)* by USA as to Jessie Leroy Glass, Jr (Spaugh, Stephanie) (Entered: 06/19/2023) |

| 06/19/2023 | 82 | Proposed Jury Instructions by USA as to Jessie Leroy Glass, Jr (Ford, Kimlani) (Main Document 82 replaced on 6/19/2023) (mek). (Entered: 06/19/2023) |
|---|---|---|
| 06/20/2023 | 83 | EXHIBIT LIST by USA as to Jessie Leroy Glass, Jr (Ford, Kimlani) (Entered: 06/20/2023) |
| 06/20/2023 | 84 | EXHIBIT LIST by Jessie Leroy Glass, Jr (Johnson, W.) (Entered: 06/20/2023) |
| 06/20/2023 | 85 | **ORDER RETURNING TRIAL EXHIBITS as to Jessie Leroy Glass, Jr. Signed by District Judge Kenneth D. Bell on 6/20/2023. (mek)** (Entered: 06/20/2023) |
| 06/20/2023 | | **ORAL ORDER granting in part and denying in part Defendant's 78 Motion in Limine as to Jessie Leroy Glass Jr (1). Entered by District Judge Kenneth D. Bell on 6/20/2023. (mek)** (Entered: 06/20/2023) |
| 06/20/2023 | | Minute Entry: JURY TRIAL as to Jessie Leroy Glass, Jr held before District Judge Kenneth D. Bell. Jury selected and sworn. Opening Statements. Evidence Introduced. Evidence continued. Jury Trial set for 6/21/2023 09:00 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Kenneth D. Bell.Government attorney: Kimlani Murray Ford, Stephanie Laboy Spaugh. Defendant attorney: W. Kelly Johnson, John Parke Davis. Court Reporter: Cheryl Nuccio. (mek) (Entered: 06/20/2023) |
| 06/21/2023 | | Minute Entry: JURY TRIAL as to Jessie Leroy Glass, Jr held before District Judge Kenneth D. Bell. Evidence continued. Government rested. Oral Rule 29 Motion by defendant is denied by court Defendant rested. Closing arguments. Oral Renewed Rule 29 Motion is Denied by Court. Courts charge. Jury retired to deliberate. Jury returns verdict of guilty. The Court finds exceptional circumstances for release and the Defendant is continued on current conditions of release. Government attorney: Kimlani Murray Ford, Stephanie Laboy Spaugh. Defendant attorney: W. Kelly Johnson, John Parke Davis. Court Reporter: Cheryl Nuccio. (mdp) Modified text on 6/21/2023 (mek). (Entered: 06/21/2023) |
| 06/21/2023 | 86 | JURY VERDICT as to Jessie Leroy Glass Jr (1) Guilty on Counts 1, 2, 3, 4. (Attachments: # 1 Unredacted Signature Page)(mek) (Entered: 06/21/2023) |
| 06/21/2023 | 88 | Notice of PSI Interview Preference as to Jessie Leroy Glass, Jr. (mek) (Entered: 06/21/2023) |
| 08/22/2023 | 90 | PRESENTENCE INVESTIGATION REPORT (Draft Report) *(SEALED - Attorney)* as to Jessie Leroy Glass, Jr. Objections to PSI due 09/05/2023. (available to USA, Jessie Leroy Glass, Jr) (Brittany Scruggs - arw) (Entered: 08/22/2023) |
| 08/31/2023 | 91 | Unopposed MOTION for Extension of Time to File Objections to PSR by Jessie Leroy Glass, Jr. (Johnson, W.) (Entered: 08/31/2023) |
| 08/31/2023 | | **TEXT-ONLY ORDER granting Defendant's 91 Motion for Extension of Time to File Objections to PSR as to Jessie Leroy Glass Jr (1). Objections to PSR due 10/17/2023. Entered by District Judge Kenneth D. Bell on 8/31/2023. (mek)** (Entered: 08/31/2023) |
| 10/17/2023 | 92 | OBJECTION TO PRESENCE INVESTIGATION REPORT *(Sealed - Attorney)* by Defendant; (available to: USA, Jessie Leroy Glass, Jr) (Attachments: # 1 Exhibit A - Dismissal Entry)(Johnson, W.) (Entered: 10/17/2023) |
| 11/21/2023 | 93 | PRESENTENCE INVESTIGATION REPORT (Final Report) *(SEALED - Attorney)* as to Jessie Leroy Glass, Jr. (available to USA, Jessie Leroy Glass, Jr) Schedule for Sentence on or after 11/28/2023. (Brittany Scruggs - arw) (Entered: 11/21/2023) |
| 03/01/2024 | | NOTICE OF HEARING as to Jessie Leroy Glass, Jr: Sentencing set for 3/28/2024 01:30 PM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge |

| | | |
|---|---|---|
| | | Kenneth D. Bell. *This is your only notice - you will not receive a separate document.* (mek) (Entered: 03/01/2024) |
| 03/14/2024 | | NOTICE OF HEARING as to Jessie Leroy Glass, Jr: Sentencing **RESET as to time only** for 3/28/2024 09:50 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. *This is your only notice - you will not receive a separate document.*(mek) (Entered: 03/14/2024) |
| 03/18/2024 | 95 | **US PROBATION Bond Violation Report** *(Sealed - Attorney)* **as to Jessie Leroy Glass, Jr. Warrant issued. Signed by US Magistrate Judge Susan C. Rodriguez on 3/18/2024. (brl)** Modified access and regenerated NEF on 3/20/2024 (mga). (Entered: 03/18/2024) |
| 03/20/2024 | | Arrest of Jessie Leroy Glass, Jr (mga) (Entered: 03/20/2024) |
| 03/21/2024 | 96 | Arrest Warrant Returned Executed re: Violation Petition *(Sealed - Court)* on 3/20/2024 in case as to Jessie Leroy Glass, Jr. (tlj) (Entered: 03/21/2024) |
| 03/21/2024 | 97 | Unopposed MOTION to Seal *Sentencing Memorandum* by Jessie Leroy Glass, Jr. Responses due by 3/28/2024 Motions referred to Susan C. Rodriguez (Johnson, W.) (Entered: 03/21/2024) |
| 03/21/2024 | 98 | SEALED SENTENCING MEMORANDUM *(Sealed - Attorney)* (available to: USA, Jessie Leroy Glass, Jr) (Johnson, W.) (Entered: 03/21/2024) |
| 03/22/2024 | | **TEXT-ONLY ORDER granting 97 Motion to Seal as to Jessie Leroy Glass Jr (1). So Ordered. Entered by US Magistrate Judge Susan C. Rodriguez on 3/22/2024. (NSG)** (Entered: 03/22/2024) |
| 03/25/2024 | 99 | PRESENTENCE INVESTIGATION REPORT (Supplement) *(SEALED - Attorney)* as to Jessie Leroy Glass, Jr. (available to USA, Jessie Leroy Glass, Jr) (Lindsay Golding - arw) (Entered: 03/25/2024) |
| 03/25/2024 | 100 | SEALED SENTENCING MEMORANDUM *(Sealed - Attorney)* (available to: USA, Jessie Leroy Glass, Jr) (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Ford, Kimlani) (Entered: 03/25/2024) |
| 03/25/2024 | 101 | MOTION for Forfeiture of Property by USA as to Jessie Leroy Glass, Jr. Responses due by 4/1/2024 (Bain-Creed, Benjamin) (Entered: 03/25/2024) |
| 03/25/2024 | 102 | SENTENCING MEMORANDUM by Jessie Leroy Glass, Jr (Attachments: # 1 Exhibit Character Letters, # 2 Exhibit Character Letter, # 3 Exhibit Character Letter)(Johnson, W.) (Entered: 03/25/2024) |
| 03/26/2024 | 103 | SEALED SENTENCING MEMORANDUM *(Sealed - Attorney)* by USA; (available to: USA, Jessie Leroy Glass, Jr) (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Ford, Kimlani) (Entered: 03/26/2024) |
| 03/26/2024 | 104 | MOTION to Seal Document by USA as to Jessie Leroy Glass, Jr. Responses due by 4/2/2024 Motions referred to Susan C. Rodriguez (Ford, Kimlani) (Entered: 03/26/2024) |
| 03/27/2024 | | **TEXT-ONLY ORDER granting 104 Motion to Seal Document as to Jessie Leroy Glass Jr (1). The subject documents are Victim Impact Statements. So Ordered. Entered by US Magistrate Judge Susan C. Rodriguez on 3/27/2024. (DLG)** (Entered: 03/27/2024) |
| 03/28/2024 | | Minute Entry: SENTENCING as to Jessie Leroy Glass, Jr held before District Judge Kenneth D. Bell. Factual Basis Found. Government attorney: Kimlani Murray Ford, Stephanie Laboy Spaugh. Defendant attorney: W. Kelly Johnson, John Parke Davis. Court Reporter: Cheryl Nuccio. (mek) (Entered: 03/28/2024) |

| | | |
|---|---|---|
| 03/28/2024 | 105 | **ORDER granting 101 Motion for Forfeiture of Property as to Jessie Leroy Glass Jr (1). Signed by District Judge Kenneth D. Bell on 3/28/2024. (mek)** (Entered: 03/28/2024) |
| 03/29/2024 | 106 | SEALED DOCUMENT *(Sealed - Attorney)*: Victim restitution information referenced during sentencing hearing by USA; (available to: USA, Jessie Leroy Glass, Jr) (Ford, Kimlani) Modified text on 3/29/2024 (mek). (Entered: 03/29/2024) |
| 04/01/2024 | 107 | **JUDGMENT as to Jessie Leroy Glass, Jr (1), Count(s) 1, 2, 3, 4, 180 months imprisonment concurrent, life supervised release concurrent, $400 special assessment, $5,000 AVAA assessment, $6,000 restitution. Signed by District Judge Kenneth D. Bell on 4/1/2024. (mek)** (Entered: 04/01/2024) |
| 04/01/2024 | 108 | **STATEMENT OF REASONS** *(Sealed - Attorney)* **re: 107 Judgment (available to: USA, Jessie Leroy Glass, Jr). Signed by District Judge Kenneth D. Bell on 4/1/2024. (mek)** (Entered: 04/01/2024) |
| 04/01/2024 | 109 | NOTICE OF APPEAL by Jessie Leroy Glass, Jr. *Use this link www.ca4.uscourts.gov to retrieve 4th Circuit case opening documents, i.e. Appearance of Counsel, Docketing Statement, Disclosure Statement, Transcript Order Form, and CJA 24 Vouchers.* Note: Your Transcript Order Form (and CJA 24 if applicable) must be served on the District Court as well as the Circuit Court. (IFP/CJA) (Johnson, W.) (Entered: 04/01/2024) |
| 04/02/2024 | 110 | Transmission of Notice of Appeal as to Jessie Leroy Glass, Jr to US Court of Appeals re 109 Notice of Appeal, (brl) (Entered: 04/02/2024) |
| 04/04/2024 | 111 | USCA Case Number as to Jessie Leroy Glass, Jr 24-4193 for 109 Notice of Appeal, USCA Case Manager: Karen Stump. (nvc) (Entered: 04/04/2024) |
| 04/04/2024 | 112 | ORDER of USCA as to Jessie Leroy Glass, Jr appointing the Federal Defender for the Western District of North Carolina as counsel on 109 Notice of Appeal [24-4193]. (nvc) (Entered: 04/04/2024) |
| 04/08/2024 | 113 | Disposition Notice Regarding US Passport *(Sealed - Attorney)* as to Jessie Leroy Glass, Jr; (available to: USA, Jessie Leroy Glass, Jr) (James Peeler - arw) (Entered: 04/08/2024) |
| 04/19/2024 | 114 | USCA TRANSCRIPT ORDER ACKNOWLEDGMENT as to Jessie Leroy Glass, Jr re 109 Notice of Appeal [24-4193]. Court Reporter: Cheryl Nuccio; Current Deadline: 05/28/2024; Proceedings: Trial held on 06/20/2023 and 06/21/2023 (including voir dire, opening statements, testimony, closing arguments, jury instructions); Sentencing held on 03/28/2024; Ordering Party(ies): Jessie Leroy Glass, Jr. (Attachments: # 1 Transcript Order Form)(nvc) (Entered: 04/19/2024) |
| 04/26/2024 | 115 | TRANSCRIPT of Voir Dire *(Restricted)* as to Jessie Leroy Glass, Jr before Judge Bell. Partial Release of Transcript Restriction set for 7/22/2024. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 04/26/2024) |
| 04/26/2024 | 116 | TRANSCRIPT of Trial Proceedings, Volume I as to Jessie Leroy Glass, Jr held on 6/20/23 before Judge Bell. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a** *Notice of Intent to Request Redaction* **and 21 calendar days to file a** *Redaction Request.* **If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** *(Does this satisfy all appellate orders for this reporter? - No.)* Release of Transcript Restriction set for 7/22/2024. (Reporter: Cheryl Nuccio, cheryl_nuccio@ncwd.uscourts.gov) (Entered: 04/26/2024) |

| 04/26/2024 | 117 | TRANSCRIPT of Trial Proceedings, Volume II as to Jessie Leroy Glass, Jr held on 6/21/23 before Judge Bell, **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov *(Does this satisfy all appellate orders for this reporter? - No.)* ** Release of Transcript Restriction set for 7/22/2024. (Reporter: Cheryl Nuccio, cheryl_nuccio@ncwd.uscourts.gov) (Entered: 04/26/2024) |
|---|---|---|
| 04/26/2024 | 118 | TRANSCRIPT of Sentencing as to Jessie Leroy Glass, Jr held on 3/28/24 before Judge Bell, **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov *(Does this satisfy all appellate orders for this reporter? - Yes.)* ** Release of Transcript Restriction set for 7/22/2024. (Reporter: Cheryl Nuccio, cheryl_nuccio@ncwd.uscourts.gov) (Entered: 04/26/2024) |
| 05/15/2024 | 119 | Service/Declaration of Publication by USA as to Jessie Leroy Glass, Jr re 105 Order on Motion for Forfeiture of Property (Attachments: # 1 Exhibit A (Declaration of Publication))(Bain-Creed, Benjamin) (Entered: 05/15/2024) |
| 05/22/2024 | 120 | USCA TRANSCRIPT ORDER ACKNOWLEDGMENT as to Jessie Leroy Glass, Jr re 109 Notice of Appeal [24-4193]. Court Reporter: Cheryl Nuccio; Current Deadline: 06/28/2024; Proceedings: Status Conference held on 06/06/2023; Ordering Party: Jessie Leroy Glass, Jr. (Attachments: # 1 Transcript Order Form) (cjb) (Entered: 05/22/2024) |
| 05/30/2024 | 121 | TRANSCRIPT of Status Conference as to Jessie Leroy Glass, Jr held on 6/6/23 before Judge Bell, **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov *(Does this satisfy all appellate orders for this reporter? - Yes.)* ** Release of Transcript Restriction set for 8/26/2024. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 05/30/2024) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/22/2024 15:12:09 | | |
| **PACER Login:** | jcarpenter4220 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:21-cr-00060-KDB-SCR |
| **Billable Pages:** | 14 | **Cost:** | 1.40 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Always |

"UNDER SEAL"

FILED
CHARLOTTE, NC

**AUG 1 7 2021**

US DISTRICT COURT
WESTERN DISTRICT OF NC

**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **DOCKET NO. 5:21-CR-**ᴵ⁰⁰⁻ᴷᴰᴮ |
| | ) | |
| v. | ) | **BILL OF INDICTMENT** |
| | ) | |
| | ) | **Violations:** |
| JESSIE LEROY GLASS, JR. | ) | **18 U.S.C. § 2252A(a)(2)** |
| | ) | **18 U.S.C. § 2252A(a)(5)** |
| | ) | |

### THE GRAND JURY CHARGES:

#### COUNT ONE

On or about February 4, 2020, in Iredell County, within the Western District of North Carolina and elsewhere, the defendant,

**JESSIE LEROY GLASS, JR.,**

knowingly received any child pornography, as defined in Title 18, United States Code, Section 2256(8), that has been shipped and transported in and affecting interstate and foreign commerce by any means, including by computer, and that has been shipped and transported using any means and facility of interstate and foreign commerce.

All in violation of Title 18, United States Code, Section 2252A(a)(2) and (b)(1).

#### COUNT TWO

Between on or about January 8, 2020, and February 4, 2020, in Iredell County, within the Western District of North Carolina and elsewhere, the defendant,

**JESSIE LEROY GLASS, JR.,**

knowingly received any child pornography, as defined in Title 18, United States Code, Section 2256(8), that has been shipped and transported in and affecting interstate and foreign commerce by any means, including by computer, and that has been shipped and transported using any means and facility of interstate and foreign commerce.

All in violation of Title 18, United States Code, Section 2252A(a)(2) and (b)(1).

JA15

## COUNT THREE

Between on or about January 8, 2020, and on or about February 5, 2020, in Iredell County, within the Western District of North Carolina and elsewhere, the defendant,

**JESSIE LEROY GLASS, JR.,**

knowingly received any child pornography, as defined in Title 18, United States Code, Section 2256(8), that has been shipped and transported in and affecting interstate and foreign commerce by any means, including by computer, and that has been shipped and transported using any means and facility of interstate and foreign commerce.

All in violation of Title 18, United States Code, Section 2252A(a)(2) and (b)(1).

## COUNT FOUR

On or about February 11, 2020, in Iredell County, within the Western District of North Carolina, and elsewhere, the defendant,

**JESSIE LEROY GLASS, JR.,**

knowingly possessed, and accessed with intent to view, any material that contained an image of child pornography, as defined in Title 18, United States Code, Section 2256(8)(A), that involved a prepubescent minor and a minor who had not attained 12 years of age, and that has been mailed, and shipped and transported using any means and facility of interstate and foreign commerce, and in and affecting interstate and foreign commerce by any means, including by computer, and that was produced using materials that have been mailed, and shipped and transported in and affecting interstate and foreign commerce by any means, including by computer.

All in violation of Title 18, United States Code, Section 2252A(a)(5)(B) & (b)(2).

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. § 2253. The following property is subject to forfeiture in accordance with Section 2253:

a. Any visual depiction or book, magazine, periodical, film, videotape, or other matter which contains any such depiction, which was produced, transported, mailed, shipped, or received during the violations set forth in this bill of indictment;

b. Any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from proceeds of the violations;

c. Any property, real or personal, used or intended to be used to commit or promote the violations.

JA16

The Grand Jury finds probable cause to believe that the following property that was seized on or about February 11, 2020, during the investigation of the offense herein is subject to forfeiture one or more of the grounds stated above:

a.     A Samsung Galaxy S9 cell phone
b.     An LG model LS777 cell phone

WILLIAM T. STETZER
ACTING UNITED STATES ATTORNEY

A TRUE BILL

*Kimlani M. Ford*

KIMLANI M. FORD
ASSISTANT UNITED STATES ATTORNEY

JA17

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO.: 5:21CR00060-KDB |
| | ) | |
| v. | ) | GOVERNMENT'S NOTICE OF |
| | ) | INTENT TO OFFER |
| JESSIE LEROY GLASS, JR. | ) | EVIDENCE PURSUANT TO FED. R. |
| | ) | EVID. 803(6), 902(11), AND 807 |

NOW COMES the United States of America, by and through William T. Stetzer, Acting United States Attorney for the Western District of North Carolina, and hereby gives notice of its intention to offer into evidence business records by declaration pursuant to Federal Rules of Evidence 803(6) and 902(11). Federal Rule of Evidence 902(11) permits parties to introduce certified copies of domestic business records pursuant to Rule 803(6). This rule obviates the need to call witnesses merely to authenticate domestic business records. Rule 902(11) requires the proponent to "give an adverse party reasonable written notice of the intent to offer the record — and must make the record and certification available for inspection — so that the party has a fair opportunity to challenge them."

The United States hereby gives written notice to the defendant that the United States intends to offer the following certified record pursuant to Rule 902(11):

1. A record from LG Electronics concerning the LG model LS777 cellular telephone seized as part of the case. The record is attached as Exhibit 1 and the declaration of Hyojin Park is attached hereto as Exhibit B.

The custodian has signed a sworn declaration that meets the requirements of Rules 803(6) and 902(11).

Additionally, pursuant to Federal Rule of Evidence 807, the government hereby provides notice of its intent to introduce the following trade inscription on the LG model LS777 seized as

1

JA18

part of the above-referenced case as evidence that the phone was assembled in China:



<u>LG contact</u>:

Lisa Cho
Senior Paralegal
LG Electronics U.S.A., Inc.
111 Sylvan Avenue, Englewood Cliffs, NJ 07632
201-266-2483

2

**RESPECTFULLY SUBMITTED**, this 26th day of September 2022.

DENA J. KING
UNITED STATES ATTORNEY


**s/ Kimlani M. Ford**
Assistant United States Attorney
NC Bar Number: 25426
Attorney for the United States
United States Attorney's Office
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, North Carolina 28202
Telephone: 704.344.6222
Fax: 704.344.6629
E-mail: kimlani.ford@usdoj.gov

JA20



| ESN | MODEL | TEMP41 | SITE |
|---|---|---|---|
| 35423408703240 | LGLS777 | 712CYFT0676435 | YT |

Site = Place of Manufacture

YT = Yantai, China



GOVERNMENT
EXHIBIT
B

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, Hyojin Park, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by LG Electronics U.S.A, and my title is Senior Manager of Production Engineering. I am qualified to authenticate the records produced to the United States by LG Electronics U.S.A. on July 15, 2022 (the "Records") because I am familiar with how the Records were created, managed, stored, and retrieved. I state that the Records are true duplicates of the original records in the custody of LG Electronics U.S.A. I further state that:

a. The Records were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of LG Electronics U.S.A., and they were made by LG Electronics U.S.A. as a regular practice; and

b. The Records were generated by electronic process or system that produces an accurate result, to wit:

1. the Records were copied from electronic device(s), storage medium(s), or file(s) in the custody of LG Electronics U.S.A. in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by LG Electronics U.S.A. , and at all times pertinent to the records certified here the process and system functioned properly and normally.

JA22

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_9/21 / 2022_
Date

_[signature]_
Signature

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 5:21CR00060-KDB |
| | ) | |
| | ) | **NOTICE OF FILING OF** |
| v. | ) | **DECLARATION OF** |
| | ) | **AUTHENTICATION OF BUSINESS** |
| | ) | **RECORDS** |
| JESSIE LEROY GLASS, JR. | ) | |
| | ) | |

The United States, pursuant to Rules 803(6), 902(11), 902(13), and/or 902(14) of the Federal Rules of Evidence, hereby files the attached declaration of authentication of business records that it plans to offer into evidence at the trial in this case. These business records include the following:

1. Records from Google LLC concerning the Gmail account randyday794@gmail.com. The declaration of Victor Ameen is attached hereto as Exhibit D.

In filing this notice and the attached declaration, and serving same upon the defendant in this case, the United States hereby provides notice that it intends to offer one or more records identified in the declaration into evidence at trial in this case, pursuant to Rules 803(6), 902(11), 902(13), and/or 902(14) of the Federal Rules of Evidence. Said records are in the United States's possession and have been provided to the defendant.

WHEREFORE, the evidence described and referenced in this notice should be admitted at trial pursuant to Rules 803(6), 902(11), 902(13), and/or 902(14) of the Federal Rules of Evidence.

JA24

RESPECTFULLY SUBMITTED this 26th day of September 2022.

> DENA J. KING
> UNITED STATES ATTORNEY
>
> /s/ Kimlani M. Ford
> Kimlani M. Ford
> Assistant United States Attorney
> United States Attorney's Office
> 227 West Trade Street, Suite 1650
> Charlotte, North Carolina 28202
> Telephone: (704) 338-3178
> E-mail: Kimlani.Ford@usdoj.gov

JA25



Google LLC
1600 Amphitheatre Parkway
Mountain View, California 94043

USLawEnforcement@google.com
www.google.com



GOVERNMENT
EXHIBIT
D

04/11/21

Special Agent Tristan Stewart
Federal Bureau of Investigation
7915 Microsoft Way
Charlotte, NC 28273

**Re: Search Warrant dated March 15, 2021 (Google Ref. No. 5522100)**

Dear Special Agent Stewart:

Pursuant to the Search Warrant issued in the above-referenced matter, we have conducted a diligent search for documents and information accessible on Google's systems that are responsive to your request. Our response is made in accordance with state and federal law, including the Electronic Communications Privacy Act. See 18 U.S.C. § 2701 et seq.

Accompanying this letter is responsive information to the extent reasonably accessible from our system associated with the Google account(s), *RANDYDAY794@GMAIL.COM*, as specified in the Search Warrant. We have also included a signed Certificate of Authenticity which includes a list of hash values that correspond to each file contained in the production. Google may not retain a copy of this production but does endeavor to keep a list of the files and their respective hash values. To the extent any document provided herein contains information exceeding the scope of your request, protected from disclosure or otherwise not subject to production, if at all, we have redacted such information or removed such data fields.

To the extent that you have requested data related to the Google Chat service, and the target account participated in a Chat Room owned and controlled by a Google Workspace customer, included in the production is information sufficient to identify (a) the Workspace customer domain that owns and controls the Chat Room and records associated with the same; (b) the Workspace-owned Chat Room in which the target account participated; and (c) the date the target account joined the Workspace-owned Chat Room. [1]

To the extent that the Google account(s) targeted in the legal request have associated Google Pay profile(s), included in the production is the target's Google Pay Customer Info, which includes the billing instrument number in the format Visa-DEBIT-1234. If you wish to

---

1    See the UserInfo.zip file, where [obfuscated_customer_id] indicates if a Chat Room is owned and controlled by a Workspace customer, and the domain of the [inviter_user] identifies the Workspace customer. If you wish to obtain Chat records associated with the target account that are owned and controlled by the Workspace customer, please use the information provided in this production to either request that information directly from the Workspace customer, *see Seeking Enterprise Customer Data Held by Cloud Service Providers*, U.S. Dep't of Justice (Dec. 2017), https://www.justice.gov/criminal-ccips/file/1017511/download, or to obtain appropriate legal process that identifies the Workspace-owned Chat Room and the Workspace customer domain for those records.

JA26

# Google

obtain the full billing instrument number associated with the target account(s), please email uslawenforcement@google.com (a) with the Google Reference Number, (b) the target account(s) for which additional records are requested, and (c) the specific request language that you believe entitles the legal process to such records. We will review your request promptly upon receiving additional information from you and provide you with any responsive information. Please note that Google does not store unmasked billing records for Google accounts without Google Pay profiles.

      For a Google Custodian of Records, we will require a subpoena and confirmation from you of the time and date of the appearance, the scope of testimony, any Google Reference Number(s) associated with the case, and the travel for the appearance at least one week in advance in order to identify, make the appropriate plans for, and prepare a custodian for trial

      Finally, in accordance with Section 2706 of the Electronic Communications Privacy Act, Google may request reimbursement for reasonable costs incurred in processing your request.

      Regards,

      Victor Ameen
      Google Legal Investigations Support

JA27



Google LLC
1600 Amphitheatre Parkway
Mountain View, California 94043

USLawEnforcement@google.com

www.google.com

## CERTIFICATE OF AUTHENTICITY

I hereby certify:

1.      I am authorized to submit this affidavit on behalf of Google LLC ("Google"), located in Mountain View, California. I have personal knowledge of the following facts, except as noted, and could testify competently thereto if called as a witness.

2.      I am qualified to authenticate the records because I am familiar with how the records were created, managed, stored and retrieved.

3.      Google provides Internet-based services.

4.      Attached is a true and correct copy of records pertaining to the Google account-holder(s) identified with account(s) *RANDYDAY794@GMAIL.COM*, with Google Ref. No. 5522100 ("Document"). Accompanying this Certificate of Authenticity as Attachment A is a list of hash values corresponding to each file produced in response to the Search Warrant.

5.      The Document is a record made and retained by Google. Google servers record this data automatically at the time, or reasonably soon after, it is entered or transmitted by the user, and this data is kept in the course of this regularly conducted activity and was made by regularly conducted activity as a regular practice of Google.

6.      The Document is a true duplicate of original records that were generated by Google's electronic process or system that produces an accurate result. The accuracy of Google's electronic process and system is regularly verified by Google.

7.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


\_\_\_/s\_Victor Ameen_____          Date: 04/11/21
(Signature of Records Custodian)


    Victor Ameen
(Name of Records Custodian)



Google LLC
1600 Amphitheatre Parkway
Mountain View, California 94043

USLawEnforcement@google.com

www.google.com

**Attachment A: Hash Values for Production Files (Google Ref. No. 5522100)**

randyday794.Chats.zip:

MD5- 2af1a96fe1e12821bbe97e66c35a7fe4
SHA512-
abbd1917da2e5de18cce5b65a5b26af8d152023aa4f9519b9f192fc72a23e0442adde0513582dccda3
86ebf4585ca1babed2b4832e76505e65b40882a86b295b

randyday794.Gmail.Contacts.vcf:

MD5- d41d8cd98f00b204e9800998ecf8427e
SHA512-
cf83e1357eefb8bdf1542850d66d8007d620e4050b5715dc83f4a921d36ce9ce47d0d13c5d85f2b0ff
8318d2877eec2f63b931bd47417a81a538327af927da3e

randyday794@gmail.com.1071732646952.Calendar.Calendars_001.zip:

MD5- e051e489bd399bf2cc61db1d90cd3060
SHA512-
8d1c5a8dfe81f036efa433af9b8761d3d2c38ceeac31d870c435435956f96cdb3460d78ad5aaddb1da
10bf663b2fffa43b17924e112d6a0456adf09622a04223

randyday794@gmail.com.1071732646952.GoogleAccount.SubscriberInfo_001.zip:

MD5- dc0772793c699ff85808d5a8837bfb5b
SHA512-
497aefe939bba85ab01c7d68379a3019992f4a723f0459c53f88c05b82387a06feddd7e2682bfb9874
beb51be0507420ab64316fc4a9d8581abe895ce3cc6588

randyday794@gmail.com.1071732646952.GoogleChat.GroupInfo_001.zip:

MD5- 2b5ca9c28c1bf3b2a7c072b893d3c266
SHA512-
6766c9ce41c2c892fda0bebe5c9375afabb0cb2d8761df7862226ab8f88841b163e5b8716e6d50a18
59ae241467ead8b0ccb6191da10696055f4440d3a852475

randyday794@gmail.com.1071732646952.GoogleChat.GroupTasks_001.zip:

MD5- 70924cf6a498a04366bce958e97746cf
SHA512-
f8d10fcc1a57c502d23875f0b40c277cc8bc7652a0a4c2398f761fb1b690eedc5d7c55847bacf2f6ba
58c5c9cc15f8592608f5184d94b90d396f8e59c8467ed9



randyday794@gmail.com.1071732646952.GoogleChat.Messages_001.zip:

MD5- ce652225272e7208270f6244ad3e83f9
SHA512-
9a8980f8dfcc346a47775576a1d43fb342f889d1dfef4a12514357a0d35d4cb1c246f301f273e09489
cfbfe86bfec567c9b90129fb204dd69d0f788e2f558319

randyday794@gmail.com.1071732646952.GoogleChat.UserInfo_001.zip:

MD5- 0baad35145e44abfd83eccdc1d194944
SHA512-
21e8279794d13aa460767474861fb10eeffdb1d86c2c2cc8f96f5d90cf9e592bf800ca5da97227495b
a038a798d7a7919f710a175bd04ef74fecd3ecca810621

randyday794@gmail.com.1071732646952.GooglePhotos.PhotoResource_001.zip:

MD5- cdfc23dbf715a057612b8d2af61ae817
SHA512-
b013a1f0a4cff5d993af798bd407cd02dad7ab83f91f2a52f245ece9df7b59bad1564cd20baa8eba205
34722508fce9320d01d3a3789e91af0431c739385ab7f

randyday794@gmail.com.1071732646952.Preserved_001.GoogleAccount.SubscriberInfo_001.zi
p:

MD5- bcff81921462990f0ec74caf96b8e073
SHA512-
4547afce24e16e4daee04a2ba3c7bd29f5fe8d29faef7f575f8a852d782ad3e0ca7a390b368cc0d697e
2c0d9beabc244971e7f9177771312169a16e330339e1b

randyday794@gmail.com.Gmail.Content.mbox:

MD5- 4fd413f1a4f04923c05ae8006e5d11b3
SHA512-
3058ec5924e9782c76c5406e72614f298536a4ea78a65cb908fec9986e18db408b89b5cdd9584a21d
bac67bac94a967d0de507f7c544bb4cc336f963d079fc65

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **DOCKET NO. 5:21CR00060-KDB** |
| | ) | |
| | ) | **NOTICE OF FILING OF** |
| **v.** | ) | **DECLARATION OF** |
| | ) | **AUTHENTICATION OF BUSINESS** |
| | ) | **RECORDS** |
| **JESSIE LEROY GLASS, JR.** | ) | |
| | ) | |

The United States, pursuant to Rules 803(6), 902(11), 902(13), and/or 902(14) of the Federal Rules of Evidence, hereby files the attached declaration of authentication of business records that it plans to offer into evidence at the trial in this case. These business records include the following:

1. Certain records from CenturyLink concerning phone number 276-699-0111. The declaration of Sharlene Choyce is attached hereto as Exhibit C.

In filing this notice and the attached declaration, and serving same upon the defendant in this case, the United States hereby provides notice that it intends to offer one or more records identified in the declaration into evidence at trial in this case, pursuant to Rules 803(6), 902(11), 902(13), and/or 902(14) of the Federal Rules of Evidence. Said records are in the United States's possession and have been provided to the defendant.

WHEREFORE, the evidence described and referenced in this notice should be admitted at trial pursuant to Rules 803(6), 902(11), 902(13), and/or 902(14) of the Federal Rules of Evidence.

JA31

RESPECTFULLY SUBMITTED this 26th day of September, 2022.

DENA J. KING
UNITED STATES ATTORNEY

*/s/ Kimlani M. Ford*
Kimlani M. Ford
Assistant United States Attorney
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 338-3178
E-mail: Kimlani.Ford@usdoj.gov

JA32


GOVERNMENT
EXHIBIT
C

### CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _SHARLENE CHOYCE__, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by CenturyLink, and my title is _SENIOR SECURITY SPECIALIST. I am qualified to authenticate the records produced to the United States by CenturyLink on March 12, 2020, which consist of five pages plus a fax cover sheet, because I am familiar with how the Records were created, managed, stored, and retrieved. I state that the Records are true duplicates of the original records in the custody of CenturyLink. I further state that:

      a.    The Records were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of CenturyLink, and they were made by Century Link as a regular practice; and

      b.    The Records were generated by CenturyLink's electronic process or system that produces an accurate result, to wit:

           1.    the Records were copied from electronic device(s), storage medium(s), or file(s) in the custody of CenturyLink in a manner to ensure that they are true duplicates of the original records; and

           2.    the process or system is regularly verified by CenturyLink and at all times pertinent to the records certified here the process and system functioned properly and normally.

JA33

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_09/19/2022_
Date

_[Signature]_
Signature

JA34

IN THE DISTRICT COURT OF THE UNITED STATES
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | DOCKET NO.: 5:21CR00060-KDB |
| | ) | |
| v. | ) | NOTICE OF EXPERT |
| | ) | |
| JESSIE LEROY GLASS, JR. | ) | |
| | ) | |

## GOVERNMENT'S RULE 16(A)(1)(G) NOTICE

The United States, by and through undersigned counsel, notices its intent under Federal

Rule of Criminal Procedure 16(a)(1)(G) to introduce expert testimony in the defendant's trial to

commence on October 17, 2022.[1]

### Introduction

As explained further below, the United States will call Computer Forensic Analyst (CFA)

Kelly Matthewman as a witness in the above-captioned case, and her testimony will involve her

specialized knowledge of the extraction of evidence from and examination of digital devices.

The witness will be asked to explain her training and background, the nature of the examinations

she conducted in this case, and the methods and software they used to assist the examinations.

The government submits that CFA Matthewman will testify in the nature of a fact witness, but

out of an abundance of caution the United States notices her as an expert.

---

[1] The United States reserves its right to supplement this Notice.

JA35

As described more fully below, this Notice sets forth a summary of the bases for CFA

Matthewman's expected testimony and qualifications.[2]

## A.    Background and Qualifications[3]

CFA Matthewman has been employed as a computer forensic analyst by Homeland

Security Investigations since June 2019.  CFA Matthewman has specialized training and

experience operating a variety of forensic examination tools, including tools used in this case,

such as Cellebrite and Axiom.  CFA Matthewman is authorized by Homeland Security

Investigations to use these and other tools to conduct digital device extractions, engage in

analysis of such extractions, and generate reports about such extractions.  Through her training

and experience, CFA Matthewman has used Cellebrite, Axiom, and other forensic examination

tools to extract and analyze data from numerous digital devices and has reviewed the data

extracted to assist in investigations.

## B.    Anticipated Testimony

CFA Matthewman examined multiple mobile electronic devices during the investigation

of this case. The United States expects that the bulk of her testimony will be related to her

examination of a Samsung Galaxy S9, an LG model LS777, and a Samsung Galaxy J7 cellular

telephone.

Generally, CFA Matthewman will testify about

---

[2] The government has provided defense counsel with parts of the extractions that do not contain child pornography as well as CFA Matthewman's reports regarding her analysis of the extractions.  Extractions and reports of extractions that contain child pornography have been made available for review at HSI in accordance with the requirements of Federal Rule of Criminal Procedure 16(a)(1)(F).

[3] CFA Matthewman's CV is attached to this Notice as Exhibit A.

- how data is stored and transferred via the internet to and from devices

- how files, images, videos, documents, and other data are deleted and stored on cell phones

- thumbnails, sd cards, and cache

- forensic hashing, which is the process of using a mathematical function, often called an algorithm, to generate a numerical identifier for data (such as a particular file). If the data is changed, even very slightly (such as the addition or deletion of a comma or a period), the identifier should change. A hash value can be thought of as a "digital fingerprint" for data

- the operating system, files, software, applications, and programs located on the devices

- the set up of the devices, including user accounts/profiles, contact lists, and passwords

As to all the phones, the government expects CFA Matthewman will testify that she used forensic tools to extract data from the devices and examined the data for and may have found evidence of: child pornography and images of the sexual exploitation of minors; device information; user attribution such as accounts, documents, and pictures; information associated with relevant files, including dates, times, metadata, sources, their locations on the phones, and the significance of the locations.

As to the Samsung Galaxy S9, the government expects CFA Matthewman will testify to the following: through her examination of the phone extraction, she found approximately 395 images that the government alleges constitute child pornography and that these images had been

deleted. CFA Matthewman may testify as to the properties of the images, including file names, sources, paths, creation dates, dates modified, location data, and other metadata.

In addition to the photos and videos described in CFA Matthewman's reports, she will also discuss that she found links to the website "Mega" that were sent by the phone and the approximately 377 videos depicting child pornography to which the links led once CFA Matthewman followed the links.

As to the LG phone, the United States expects CFA Matthewman to testify to the following: through her examination of the phone extraction, she found approximately 72 images and 21 videos that the government alleges constitute child pornography. CFA Matthewman may to testify as to the properties of the photos and videos, including file names, sources, paths, creation dates, dates modified, location data, and other metadata. She may testify also about what applications on the phone were associated with the photos and videos.

As to the Samsung Galaxy J7 phone, the government expects that CFA Matthewman may testify about photos that were on the phone as well as evidence of user attribution and evidence not found on the phone.

Additionally, CFA Matthewman may testify about the cloud storage service Mega, including but not limited to: how it operates, where it is based, its features, how it functions, and that it is used to store and share child pornography.

Respectfully submitted,

DENA J. KING
UNITED STATES ATTORNEY

**s/ Kimlani M. Ford**
Assistant United States Attorney
NC Bar Number: 25426

JA38

Attorney for the United States
United States Attorney's Office
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, North Carolina 28202
Telephone: 704.344.6222
Fax: 704.344.6629
E-mail: kimlani.ford@usdoj.gov

JA39



Kelly D. Matthewman

Computer Forensic Analyst

Education:

- Liberty University – Pursing Doctorate of Philosophy in Criminal Justice
  - 18 credit hours currently received.
- Troy University
  - Master's degree: Criminal Justice with a concentration in Security Studies
  - Graduated: 09/2018
- Notre Dame College of Ohio
  - Bachelors of Criminal Justice
  - Graduated: 05/2014

Certifications:

- COMPTIA A+ - 1001 & 1002; Certified, August 2019.
- BCERT (Basic Computer Evidence Recovery Training), Certified, August 2019.
- Forensic Explorer – Certified Examiner, August 2019.
- Access Data – FTK, Trained, August 2019.
- Griffeye Analyze, Trained, August 2019.
- Magnet Axiom, Trained, August 2019.
- Cellebrite UFED Physical Analyzer & UFED4PC, Trained, August 2019.
- H.E.R.O Corps – Human Exploitation Rescue Operative – Certified by HSI; Graduated September 2019

Work Experience:

Computer Forensic Analyst, Homeland Security Investigations

June 2019 – Present

- Computer Forensic Analyst - Performs independent forensic examinations and analysis of seized digital storage and live devices, recovering data from computer hard drives, various media devices, mobile phones, as well as Apple/MAC products. Uses all available digital evidence recovery techniques to preserve item's authenticity and integrity while upholding a strict chain of custody. Disassembles and assembles computer systems for hardware access and restoration. Additionally, conducts numerous on-site forensic previews of digital media during execution of search warrants, and undercover trafficking operations. Ensures image integrity through Message Digest Algorithm 5 (MD5) and Secure Hash Algorithm 1 (SHA 1) hash values. Implements Griffeye technology in all child exploitation cases to intensify rescue probabilities. Prepares forensically-clean media to receive data and images of seizedS evidence. Manages a network system of internal databases ensuring continuous connectively and confidential data storage efficiency. Sets up and maintains software virtual system that allows for multiple forensic applications to host on one computer tower. Continuously tests and

validates forensic equipment. Duties extend to the Charlotte Douglas International airport as digital devices progress though international arrival flights. Functions also include writing and reviewing Report of Investigations (ROIs).

- Selected by HSI Cyber Crimes Center to assist HSI Honolulu with a digital forensics audit which included but is not limited to: Examining previous device extractions, the imaging of multiple devices, conducting an in-depth forensic exam on multiple devices, and writing reports of investigations.

JA41

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) **DOCKET NO.: 5:21CR00060-KDB** |
| | ) |
| **v.** | ) **GOVERNMENT'S NOTICE OF** |
| | ) **INTENT TO OFFER** |
| **JESSIE LEROY GLASS, JR.** | ) **EVIDENCE PURSUANT TO FED. R.** |
| | ) **EVID. 803(6), 902(11), AND 807** |

NOW COMES the United States of America, by and through Dena J. King, United States Attorney for the Western District of North Carolina, and hereby gives notice of its intention to offer into evidence business records by declaration pursuant to Federal Rules of Evidence 803(6) and 902(11). Federal Rule of Evidence 902(11) permits parties to introduce certified copies of domestic business records pursuant to Rule 803(6). This rule obviates the need to call witnesses merely to authenticate domestic business records. Rule 902(11) requires the proponent to "give an adverse party reasonable written notice of the intent to offer the record — and must make the record and certification available for inspection — so that the party has a fair opportunity to challenge them."

The United States hereby gives written notice to the defendant that the United States intends to offer the following certified record pursuant to Rule 902(11):

1. A record from Samsung Electronics America, Inc., concerning the Samsung Model SM-G960U cellular telephone seized as part of the case. The record is attached as Exhibit 4 and the declaration of Shanna Blair is attached hereto as Exhibit E.

The custodian has signed a sworn declaration that meets the requirements of Rules 803(6) and 902(11). In filing this notice and the attached declaration, and serving same upon the defendant in this case, the United States hereby provides notice that it intends to offer one or more

1

JA42

records identified in the declaration into evidence at trial in this case, pursuant to Rules 803(6), 902(11), 902(13), and/or 902(14) of the Federal Rules of Evidence. Said records are in the United States's possession and have been provided to the defendant.

Additionally, pursuant to Federal Rule of Evidence 807, the government hereby provides notice of its intent to introduce the following trade inscription on the Samsung Model SM-G960U phone seized as part of the above-referenced case as evidence that the phone was assembled in Korea:



2



Samsung contact:

Shanna Blair
Forensic Examiner
Samsung Electronics America, Inc.
6625 Excellence Way, Plano, TX 75023
972-761-7386
Shanna.blair@sea.samsung.com

3

**RESPECTFULLY SUBMITTED**, this 29th day of November 2022.

DENA J. KING
UNITED STATES ATTORNEY


**s/ Kimlani M. Ford**
Assistant United States Attorney
NC Bar Number:  25426
Attorney for the United States
United States Attorney's Office
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, North Carolina 28202
Telephone: 704.344.6222
Fax: 704.344.6629
E-mail: kimlani.ford@usdoj.gov

4

JA45


GOVERNMENT
EXHIBIT
4

| Manufacture Location | Samsung Electronics Co., LTD<br>129, Samsung-Ro, Yeongtong-Gu<br>Suwon 16677<br>Gyeonggi-Do South Korea |
|---|---|
| **Production Date (on or around)** | 12/19/2018 |
| **Sold to vendor** | IMM / 1451 ALL POINTS COURT / PLAINFIELD IN 46168 |
| **Delivery Date (on or around)** | 12/31/2018 |
| **Model** | SM-G960U |
| **IMEI** | **358212099477308** |



GOVERNMENT
EXHIBIT
E

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _SHANNA BLAIR_, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Samsung Electronics America, Inc., and my title is _Forensic Examiner_. I am qualified to authenticate the Records produced to the United States by Samsung Electronics America, Inc., on June 23 2021, because I am familiar with how the Records were created, managed, stored, and retrieved. I state that the Records are true duplicates of the original records in the custody of Samsung Electronics America, Inc. I further state that:

    a.    The Records were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Samsung Electronics America, Inc., and they were made by Samsung Electronics America, Inc., as a regular practice; and

    b.    The Records were generated by Samsung Electronics America, Inc.'s, electronic process or system that produces an accurate result, to wit:

        1.    the Records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Samsung Electronics America, Inc., in a manner to ensure that they are true duplicates of the original records; and

JA47

2.    the process or system is regularly verified by Samsung Electronics America, Inc., and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

30 Oct 22
_____
Date

_____
Signature

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| vs. | **Case No.: 5:21-cr-60-KDB** |
| JESSIE LEROY GLASS, JR., | |
| Defendant. | |

## <u>MOTION TO SUPPRESS EVIDENCE</u>

Police violated Mr. Glass's Fourth Amendment rights in three ways when they executed two search warrants—one for his home and one for a cell phone. First, the warrants relied on false and misleading information. Police relied upon previous tips and investigations of Mr. Glass but omitted information establishing that each of those investigations had been dismissed as unfounded. Police also omitted information that the informant in the instant case—Mr. Glass's estranged wife, April Glass, neé Nester—was the same informant whose allegations had been deemed unfounded in the past. Police also omitted information that Ms. Glass had been arrested for larceny in 2019—the year before she made the allegations in this case. Police also made false representations regarding their seizure of Mr. Glass's cell phone.

Second, the evidence in the warrants lacked probable cause because they were based on allegations by Ms. Glass, who was unreliable, and based upon information that was inaccurate and incomplete.

JA49

## I.    Factual Background

A grand jury returned an indictment against Mr. Glass, charging three counts of receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1); and one count of possessing with intent to view child pornography that involved a prepubescent minor and a minor who had not attained 12 years of age, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). *See* Dkt. No. 3.

The charges in the instant case arose from a tip reported by Mr. Glass's estranged wife, April Glass. Ms. Glass submitted a report on the Iredell County Sheriff's Office website on January 2, 2020. In her report, she claimed that she saw images of child pornography on her estranged husband's cell phone. Exhibit 1 at 585. She alleged he kept the files in his Google trash bin, and she provided his email account and password. She also stated she left the home at the end of December.

Detective Sergeant Jason Lowrance searched for Mr. Glass on LINX (Law Enforcement Information Exchange) "and learned that [he] had been investigated in Virginia for similar reports in 2012 and 2016." Exhibit 1 at 585. He also spoke to Ms. Glass, who advised him she had last seen the images in late December 2019. She described the images as involving juveniles 10 years old and younger, who were nude or were involved in sex acts. Exhibit 1 at 585.

Detective Lowrance contacted Agent Heather Brown with the Virginia State Police regarding an investigation she did involving Mr. Glass and alleged possession of pornography in 2016. Agent Brown agreed to assist Detective Lowrance by obtaining a statement from Ms. Glass.

Agent Brown interviewed Ms. Glass in person in Virginia. She asked Ms. Glass to provide details regarding the images she had seen on the cell phone in December 2019. Exhibit 1 at 585-586. Ms. Glass claimed to have seen at least 50 images.

Ms. Glass also advised Agent Brown that Mr. Glass had a Samsung Galaxy S9 cell phone, and two laptops, although one was shared with Mr. Glass and his father. Exhibit 1 at 586.

Based on Ms. Glass's information alone, Detective Lowrance obtained a warrant to search Mr. Glass's home and to seize "the premises, vehicle, person and other place or item described in the application for the property and person in question." Exhibit 1 at 582. Detective Lowrance's application, in turn, sought to seize:

> Computers, tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disks drives, data disks, system disk operating systems, magnetic media floppy disks, secure digital disks, USB drives, solid state drives, digital cameras, cellular phones, hardware and software operating manuals, tape systems, hard drives, any any/all devices or equipment that could be used to store images, photos or video files. Also any evidence of the crime at this time unknown.

Exhibit 1 at 582, 584.

After searching Mr. Glass's home, police seized four cell phones, including an LG cell phone, and two laptop computers. Exhibit 1 at 596. Mr. Glass was at work when the warrant was served on his home. Exhibit 2. Detective Aponik and Homeland Security Agent John Pavlovic went to Mr. Glass's workplace and spoke with him. Exhibit 2 at 608. According to the affidavit, Mr. Glass "volentary [sic] turned his cell phone over to Detective Aponik to be searched." Exhibit 2 at 608. The law enforcement officers did not read Mr. Glass his *Miranda* rights nor did they advise him that they did not have a warrant for the cell phone.

Detective Lowrance applied for a second warrant to search Mr. Glass's cell phone. The magistrate issued the warrant to "search the premises, vehicle, person and other place or item described in the application for the property and person in question." Exhibit 2 at 603. Detective Lowrance's application, in turn, sought to seize:

> Cellular telephone's internal, removable, or other memory held within; to include, but not limited to all data, subscriber information, email addresses, text messages made or received, outbound and inbound call detail, all call information, contacts, photographs, digital images, voice mails, videos, applications, social media content and messages, and all stored communications or files on the device as well as information stored from the

> cellular telephone in a secondary location, such as the Cloud; Any
> and all records that may relate to the crime of N.C.G.S. 14-190.17
> or 14-190.17A.

Exhibit 2 at 605. The warrant relied upon the same probable cause statement used to justify the

search of the house—namely Ms. Glass's allegations. Exhibit 2 at 606-607.

Forensic Analyst Kelly Matthewman ultimately recovered thumbnail and cache drive data

reflecting alleged child pornography on the LG cellphone seized at Mr. Glass's home and the black

Samsung they seized at his workplace.

## II. Officers violated Mr. Glass's Fourth Amendment rights.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures" and states that "no

Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly

describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend.

IV. And "when it comes to the Fourth Amendment, the home is first among equals." *Florida v.

Jardines*, 569 U.S. 1, 6 (2013). The "'basic purpose of this Amendment,' . . . 'is to safeguard the

privacy and security of individuals against arbitrary invasions by governmental officials.'"

*Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting *Camara v. Municipal Court of

City and County of San Francisco*, 387 U.S. 523, 528 (1967)).

The "ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v.

Stuart*, 547 U.S. 398, 403 (2006). The Supreme Court has determined that "[w]here a search is

undertaken by law enforcement officials to discover evidence of criminal wrongdoing, ...

reasonableness generally requires the obtaining of a judicial warrant." *Vernonia School Dist. 47J v.

Acton*, 515 U.S. 646, 653 (1995). "Such a warrant ensures that the inferences to support a search

are 'drawn by a neutral and detached magistrate instead of being judged by the officer engaged in

the often competitive enterprise of ferreting out crime.'" *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)).

### A.      Standing

Mr. Glass has a reasonable expectation of privacy in his own home and, thus, that he has standing to challenge the February 2020 search of his home, located at ███████., Statesville, NC. *Collins v. Virginia*, 138 S.Ct. 1663, 1670 (2018) ("At the Fourth Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion.") (Internal quotations omitted); *cf. Payton v. New York*, 445 U.S. 573 (1980) ("It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.")

He also has a reasonable expectation of privacy in his own home and, thus, that he has standing to challenge the February 2020 search of his cell phones. *See Riley v. California*, 573 U.S. 373, 391, 393-403 (2014) (because cell phones hold "the privacies of life," police must get a warrant before searching the contents of the phone).

### B.      The search warrants are invalid because police omitted material information.

Detective Lowrance's omission of material information from and his inclusion of false information in his applications and affidavits require his presence at a *Franks* hearing. In *Franks v. Delaware*, 438 U.S. 154, 156 (1978), the Supreme Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." The Fourth Circuit addressed when a Franks hearing is required based on the theory that the officer's affidavit "omit[ted] material facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading." *United*

*States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (citing *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir.1986)). Under *Colkley*, the defendant must show (1) that the officer deliberately or recklessly omitted the information at issue and (2) that the inclusion of this information would have defeated probable cause. See 899 F.2d at 301. The doctrine applies to both false statements and omissions. *Id.* at 300 (internal citations omitted). And, the *Franks* test applies "when affiants omit material facts 'with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading.'" *Colkley*, 899 F.2d at 300 (quoting *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986)).

"If a *Franks* hearing is appropriate and an affiant's material perjury or recklessness is established by a preponderance of the evidence, the warrant 'must be voided' and evidence or testimony gathered pursuant to it must be excluded." Id. at 300 (quoting Franks, 438 U.S. at 156). "This is a burden of production. Proof by a preponderance of the evidence is not required until the *Franks* hearing itself." *United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014).

Here, Mr. Glass can make the required substantial preliminary showing as the warrants omitted material facts and contained false information that would have defeated probable cause.

> **1. The warrants omitted material facts that would have defeated probable cause.**

First, Detective Lowrance omitted information that the 2012 allegation was dismissed and "nolle prossed." Exhibit 5. That information would have been readily available to him in the same LINX system.[1]

Second, Detective Lowrance omitted information that Ms. Glass had previously submitted allegations that Mr. Glass possessed child pornography and both times her allegations were deemed

---

[1] *See* https://www.ncis.navy.mil/Mission/Partnership-Initiatives/LInX-D-Dex/#:~:text=Users%20can%20find%2C%20identify%20and,not%20only%20possible%2C%20but%20easier.

JA54

unfounded. Her first complaint came in 2016, after moving out of the home she shared with her husband in North Carolina. Agent Heather Brown with the Virginia State Police investigated the tip but ultimately closed the case because the alleged actions occurred in North Carolina and she "was unable to get anyone in North Carolina to take the case." Exhibit 2. Detective Lowrance omitted the fact that Ms. Glass had been the previous complainant. He also omitted the fact that Agent Brown "was unable to get anyone in North Carolina to take the case."

Ms. Glass made another complaint in May 2017, this time to North Carolina authorities. At that time, North Carolina (Iredell Co.) police obtained a warrant to search Mr. Glass's electronic tablet. During a search of the tablet, police located lawful pornography but no child pornography. Exhibit 4. As a result, the police returned the tablet to Mr. Glass and "clos[ed] the case as unfounded." *Id.* Despite the 2017 complaint being investigated by the *same* law enforcement agency as the instant case, i.e. the Iredell County Sheriff's Office, Detective Lowrance omitted information that the previous investigation by his own agency deemed Ms. Glass's complaints against Mr. Glass "unfounded."

Based on information and belief, Mr. Glass also alleges that Iredell County Sheriff's Office arrived at his home earlier in 2017 and asked to search his electronic devices based on an anonymous tip. Police again did not find any incriminating evidence on the devices and did not seize them. Detective Lowrance omitted information that, not only had his agency investigated Mr. Glass a third time, it also deemed the tip unfounded.

Third, Detective Lowrance knew that Ms. Glass had been arrested for larceny in April 2019 and he omitted that information. Exhibit 6 (printout obtained by Det. Lowrance on Jan. 20, 2020).[2] The North Carolina courts have explained that crimes of "larceny and possession of stolen property [are] crimes which implicate dishonesty and moral turpitude." *State v. Joyner*, 777 S.E.2d 332, 336

---

[2] She was convicted in October 2020.

(N.C. App. 2015); *see also State v. Shelly*, 627 S.E.2d 287, 295 (N.C. App. 2006) (noting that "common law robbery, felonious larceny and credit card fraud, [are] crimes which have long been recognized to implicate dishonesty, deceit and moral turpitude."). *Cf. United States v. Kelly*, 510 F.3d 433, 438 (4th Cir. 2007) (quoting *United States v. Cunningham*, 638 F.2d 696, 698 (4th Cir. 1981)) (ruling that the "knowing" mens rea for a worthless check offense may have required admission of a prior conviction under Fed. R. Evid. 609 but defendant did not object below and any error was harmless.)

Detective Lowrance's warrant applications relied exclusively on the credibility of Ms. Glass as an informant to establish probable cause. And he failed to include *any* of the adverse information regarding Ms. Glass's credibility and reliability in his warrant applications. *See United States v. Clark*, 935 F.3d 558, 565 (7th Cir. 2019) (where police failed to include "*any* of the substantial adverse information" about the informant, a *Franks* hearing was warranted.) Under similar circumstances, the Fourth Circuit concluded a *Franks* hearing was warranted. *United States v. Lull*, 824 F.3d 109, 116-120 (4th Cir. 2016). In concluding the district court erred in not holding a *Franks* hearing, the court considered the "obvious impact of the informant's misconduct on any assessment of his reliability," and the officer's failure to include that information in the warrant application was "at least reckless[ ]." *Id.* at 116-117. Likewise, the evidence was material where "[m]uch of the information included in [the] affidavit came solely from the informant." *Id.* at 118. Where the informant's "veracity and reliability are critical to the totality of the circumstances test," the omitted information "prevented a neutral magistrate from being able to assess the reliability" of the allegations. *Id.* So too here, Detective Lowrance's omissions of material evidence that undermines Ms. Glass's credibility and that proved the prior investigations were dismissed or unfounded would have defeated a probable cause determination for both warrants. Mr. Glass has

established a violation of his Fourth Amendment rights under *Franks* and this Court should hold a hearing.

### 2. The warrant for the Samsung S9 contained false and misleading information.

Besides omitting material facts from both warrants, Detective Lowrance also included false and misleading material information in his warrant to search the Samsung S9 cellphone. The affidavit supporting the warrant represented that Detectives Aponik and Homeland Security Officer Jon Pavlovic went to Mr. Glass's place of employment. Exhibit 2 at 608. Mr. Glass alleges upon information and belief that his supervisor came to get him from the factory floor and brought him to the conference room where at least four, uniformed, and armed officers were present. The affidavit represents that officers "were able to speak with him concerning the investigation [sic] and the search warrant at his residence." Exhibit 2 at 608. And the affidavit avers that "Jessie volentarly [sic] turned his cell phone over to Detective Aponik to be searched." Mr. Glass alleges upon information and belief that officers told him they had a search warrant for his residence that included electronics. They then asked him if he had his cell phone, and when he replied in the affirmative, officers told him "we need your phone. We're going to take a look at it." Mr. Glass was not informed that the warrant for his home did not cover his cell phone seized at work, and he did not voluntarily turn over the cell phone and instead was directed to do so. Detective Lowrance made a false affirmative statement in the warrant application for the Samsung S9 when he asserted that Mr. Glass voluntarily turned over his phone to authorities. Detective Lowrance also omitted information regarding the number of armed uniformed officers that descended on Mr. Glass's worksite to seize the cell phone without a warrant.

The false statements were presented to the judge in support of the warrant to search Mr. Glass's cell phone. Mr. Glass has established a violation of his Fourth Amendment rights under *Franks* and this Court should hold a hearing.

JA57

**C.     The warrants were not based upon probable cause and therefore violated Mr. Glass's Fourth Amendment rights.**

When evaluating whether probable cause supported the issuance of a warrant, a court is to assess the "totality-of-the-circumstances" including the "'veracity' and 'basis of knowledge' of persons supplying hearsay information." *Illinois v. Gates*, 462 U.S. 213, 238–39, (1983). A court's review should be "flexible" and not "hypertechnical," but the affidavit "must provide the magistrate with a substantial basis for determining the existence of probable cause." *Id*. at 236, 239. Sufficient information must be presented to the magistrate to allow for the exercise of independent judgment; the magistrate cannot simply ratify the bare conclusions of others. *Gates*, 462 U.S. at 239. "When reviewing the probable cause supporting a warrant, a reviewing court must consider only the information presented to the magistrate who issued the warrant." *United States v. Wilhelm*, 80 F.3d 116, 118 (4th Cir. 1996).

Here, the Court issued two warrants—one for Mr. Glass's home and another for his cell phone—based upon essentially two pieces of information in Detective Lowrance's affidavit: (1) a tip from Ms. Glass; and, (2) previous investigations of Mr. Glass "for similar reports in 2012 and 2016." As described below, this information does not establish probable cause of criminal activity and cannot support the issuance of the tracking orders and subsequent search warrants. Thus, this Court should suppress all evidence obtained from the unlawful searches.

**1.     Ms. Glass's tips were unreliable and did not provide probable cause to issue the warrant.**

Police may base reasonable suspicion on information provided by an informant only if it bears sufficient indicia of reliability. *Adams v. Williams*, 407 U.S. 143, 147 (1972). A tip must be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Florida v. J.L.*, 529 U.S. 266, 272 (2000). In the "classic case" of corroborating an informant's information, police receive a tip reporting a suspect's future movements and are able to confirm

that those movements are taking place. *See Illinois v. Gates*, 462 U.S. 213, 242 (1983) (citing *Draper v. United States*, 358 U.S. 307, 309 (1959), where police received a tip providing a detailed physical description of defendant, predicted what he would be wearing, that he would be walking "real fast," that he would arrive in Denver on a train from Chicago on one of two days, and that he would be carrying heroin).

In *Gates*, the Supreme Court addressed "the application of the Fourth Amendment to a magistrate's issuance of a search warrant on the basis of a partially corroborated anonymous informant's tip." 462 U.S. at 217. An Illinois police department received an anonymous letter alleging that a Bloomington couple was involved in drug dealing; the letter specifically detailed how the couple travelled to Florida to buy drugs. *Id*. at 225. The police surveilled the couple and substantially corroborated the information in the letter. *Id.* at 225–27. The Supreme Court agreed with the Illinois Supreme Court that the letter standing alone could not provide probable cause to believe that drugs could be found in the couple's car and home: "The letter provides virtually nothing from which one might conclude that its author is either honest or his information reliable; likewise, the letter gives absolutely no indication of the basis for the writer's predictions regarding the Gateses' criminal activities." *Id.* at 227. The Court then adopted a "totality-of-the-circumstances" test to determine whether probable cause supported a search warrant. *Id.* at 238. Two factors are key to this analysis: the informant's "veracity" or "reliability" and his or her "basis of knowledge." *Id*. at 233. The Court emphasized the importance of "accurate information as to the travel plans" of the defendants, because "[i]f the informant had access to accurate information of this type . . . a magistrate could properly conclude that it was not unlikely that he also had access to reliable information of the Gates' alleged illegal activities." *Id*. at 245.

Although the Fourth Circuit has stated that an "unverified tip from a known informant may alone justify a reasonable suspicion of criminal activity," *see United States v. Singh*, 363 F.3d 347,

355 (4th Cir. 2004), it has also held that "corroboration is required with no track record of reliability." *United States v. Gondres-Medrano*, 3 F.4th 708, 716 (4th Cir. 2021) (citing *Adams*, 407 U.S. at 146 and *United States v. Miller*, 925 F.2d 695, 698 (4th Cir. 1991)). The Fourth Circuit noted the importance of confirming the reliability of an informant whose identity is known but whose credibility is unknown. *Id.* Reliability can be established through corroboration, such as looking to the "informant's track record" of providing reliable information or by "independent police work" that corroborates the informant's tip. *Id.* at 716-717.

In *Gondres-Mondrano*, the Fourth Circuit considered whether a tip provided by a known informant provided probable cause to search the defendant's car. Relevant to the inquiry was the fact that the informant had a "long-standing" relationship with police and his information previously had been reliable, leading to several arrests. *Id.* at 711. In addition, police were able to independently corroborate details from the tipster, including meeting with the informant and "evaluat[ing] his demeanor"; discovering the defendant had a prior drug conviction; listening to a recorded phone conversation between the informant and the defendant; based on that phone call, obtaining a search warrant to track the defendant's cell phone; and conducting surveillance to confirm that the defendant lived at the house associated with the tracked phone number and to watch him place drugs in a car belonging to the informant. *Id.* at 711, 717. Based on that evidence, and most importantly that police "relied on a known informant with a track record of providing reliable information, the court upheld the search. *Id.* at 718.

The evidence here demonstrates that Ms. Glass's tips were unreliable. First, Detective Lowrance made no mention of Ms. Glass's history as an informant, and there was no information that she had previously provided accurate information to officers as to establish her credibility, veracity, and reliability as an informant. Rather, as outlined in detail above, *supra* section II(B), Detective Lowrance withheld information that Ms. Glass was *not* a reliable informant. Her

previous tips to police had proved unfounded—even after police obtained a warrant and searched Mr. Glass's cell phone. Exhibits 5, 6.

Second, Ms. Glass's tips were not sufficiently corroborated by law enforcement. In "evaluating whether an informant's tip establishes probable cause, the degree to which the report is corroborated is an important consideration." *See Wilhelm*, 80 F.3d at 119. In *Wilhelm*, an officer obtained a warrant after an anonymous caller informed the officer she had "personally observed" a quantity of unsold marijuana and marijuana being sold in the defendant's residence within the previous 48 hours. The officer's only corroborating information was (1) confirmation of directions to the defendant's home; (2) confirmation that the substance described by the informant was an accurate description of marijuana; and (3) confirmation that the caller's description of the marijuana transactions was consistent with the officer's personal knowledge of marijuana transactions generally. *Id*. at 117-18.

The court explained that the "affidavit fell far short of providing probable cause for a search warrant." *Id.* at 120. The court discounted "easily obtained facts and conditions existing at the time of the tip" finding that "anyone can give directions to a particular house without knowing anything of substance about what goes on inside." *Id*. at 119. Because there was no verifiable predictive information given and no corroboration of the future actions of the defendant, the court found the minimal corroboration provided was insufficient to support probable cause. *Id*. at 120. Similarly here, police failed to corroborate any future (or past) action. Detective Lowrance determined that there were previous investigations against Mr. Glass, but as outlined above and below, he omitted the fact that each of those investigations resulted in a dismissal. And, Detective Lowrance failed to corroborate other information provided by Ms. Glass, such as confirming that Mr. Glass had a Tumblr account and a Wickr account. *See* Exhibit 1 and 2.

2. **The previous investigations against Mr. Glass did not provide probable cause to issue the warrants.**

While some weight may normally be given to the fact of prior convictions of similar crimes, criminal history standing alone cannot sustain a finding of probable cause. *United States v. Melvin*, 419 F.2d 136, 141 (4th Cir. 1969). This is especially true when, as here, Detective Lowrance knew the prior investigations had been dismissed as unfounded or not prosecuted.

Here, as outlined above, *supra* section II(B), Detective Lowrance relied on information that Mr. Glass "had been investigated in Virginia for similar reports in 2012 and 2016." Exhibit 1 at 585, Exhibit 2 at 606. But Detective Lowrance omitted information that the 2012 investigation had been dismissed (Exhibit 5) and that the 2016 investigation had also been abandoned because no law enforcement agency in North Carolina would pick up the case. Exhibit 3. This evidence cannot support a finding of probable cause for either warrant.

3. **The Samsung S9 cell phone**

When police claim to have authority to search, "he announces in effect that the occupant has no right to resist the search." *Bumper v. North Carolina,* 391 U.S. 543 (1968). In *Bumper*, the police approached a home and spoke to the owner, claiming to have a search warrant. In response the owner said to "come on in and go ahead and search." *Id.* at 547. At the suppression hearing, the State declined to rely on any warrant, instead relying on the owner's consent to the search. The Supreme Court held that "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion – albeit colorably lawful coercion. Where there is coercion there cannot be consent" *Id.* at 550.

Here, as in *Bumper,* police officers made clear that a search was inevitable based upon the warrant to search his home. Police also told Mr. Glass they "need[ed] his phone" and they "were going to take a look at it" before any search warrant was obtained. Police misrepresented to the

judge the basis for seizing the phone and included that misrepresentation as part of their probable cause presentation. Under the totality of the circumstances, the warrant for the cell phone lacked probable cause given this false representation regarding the seizure of the phone.

### 4. Totality of the circumstances

The Fourth Circuit has recognized that "'[P]olice may rely on the totality of facts available to them in establishing probable cause', but they cannot 'disregard facts tending to dissipate probable cause.'" *United States v. Brinkley*, 980 F.3d 377, 387 (4th Cir. 2020) (citing and quoting *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988); *accord Hernandez v. United States*, 939 F.3d 191, 201 (2d Cir. 2019)). In *Brinkley*, the Fourth Circuit faulted officers for only investigating the one address they believed the defendant lived when there were other addresses where he also could have resided. The court found that further "investigation was necessary to establish probable cause that Brinkley resided there." *Id*. Similarly here, Detective Lowrance focused only on his conclusory hunch and disregarded the "facts available" to him "tending to dissipate probable cause." Ms. Glass had previously provided unreliable information to police in 2016 and 2017. She had been arrested for larceny in 2019. The 2012 Virginia charges against Mr. Glass had been dismissed. Police conducted no further investigation to corroborate any of Ms. Glass's information.

Under the totality of the circumstances described above, the search warrants for Mr. Glass's home and his cell phone were issued without probable cause. Accordingly, the evidence obtained and the fruits therefrom as a result of these unlawful searches and seizures must be suppressed.

### D. All evidence seized subsequent to the illegal search and seizure must be suppressed as fruit of the poisonous tree.

All evidence seized subsequent to the illegal searches and seizures must be suppressed as fruit of the poisonous tree. As the Supreme Court has held, evidence seized in violation of a defendant's Fourth Amendment rights are inherently tainted "fruit of the poisonous tree," and

therefore subject to being suppressed. *Wong Sun v United States*, 371 U.S. 471, 488 (1963). Whether evidence obtained through a chain of causation that began with a Fourth Amendment violation is admissible is determined by "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of primary taint." *Id.* at 488 (quoting Maguire, Evidence of Guilt, 221 (1959)).

In this case, the causal connection between the illegal searches and seizures and the subsequent seizure of the evidence was not sufficiently attenuated to dissipate the taint of the illegal police conduct. The evidence the government obtained came directly from the Fourth Amendment violations and must be suppressed. All evidence obtained after these Fourth Amendment violations including must also be suppressed as fruit of the poisonous tree.

**III. Mr. Glass requests an evidentiary hearing.**

Mr. Glass requests an evidentiary hearing on this motion. To the extent the government argues the evidence should not be suppressed, there are "material facts that affect the resolution of" this motion, and the "appropriate way to resolve the conflict is by holding an evidentiary hearing." *United States v. Taylor*, 13 F.3d 786, 789 (4th Cir. 1994).

**CONCLUSION**

For the reasons stated above, Mr. Glass respectfully requests that this Court suppress as evidence all property seized as a result of the illegal searches, seizures, and arrest, any subsequent evidence, and any statements resulting from the Fourth Amendment violations, or alternatively hold a hearing.

Respectfully submitted:

 s/ W. Kelly Johnson
W. Kelly Johnson

JA64

Assistant Federal Public Defender
Federal Public Defender, Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
(704) 374-0720 (phone)
(704) 374-0722 (fax)
W_Kelly_Johnson@fd.org

Counsel for JESSIE GLASS

DATE: November 30, 2022

JA65

Case 5:21-cr-00060-KDB-DSC   Document 43-1   Filed 11/30/22   Page 1

File No. _____

# STATE OF NORTH CAROLINA

Iredell _____ County

In The General Court Of Justice
District/Superior Court Division

## SEARCH WARRANT

IN THE MATTER OF

Residence located at ▮▮▮▮▮▮ Statesville, NC
28677

To any officer with authority and jurisdiction to conduct the search authorized by this Search Warrant:

I, the undersigned, find that there is probable cause to believe that the property and person described in the application on the reverse side and related to the commission of a crime is located as described in the application.

You are commanded to search the premises, vehicle, person and other place or item described in the application for the property and person in question. If the property and/or person are found, make the seizure and keep the property subject to Court Order and process the person according to law.

You are directed to execute this Search Warrant within forty-eight (48) hours from the time indicated on this Warrant and make due return to the Clerk of the Issuing Court.

This Search Warrant is issued upon information furnished under oath or affirmation by the person(s) shown.

| Name Of Applicant | Date Issued | Time Issued | AM ☑ PM | Name Of Magistrate (type or print) |
|---|---|---|---|---|
| Detective Sgt. Jason Lowrance | 02/10/2020 | 2:20 | | J. Caswell |

Name Of Additional Affiant(s)

Signature Of Magistrate ☑ Signing Ct. Judge

NOTE: *When issuing a search warrant, the issuing official must retain a copy of the warrant and warrant application and must promptly file them with the clerk. G.S. 15A-246(b).*

This Search Warrant was delivered to me on the date and at the time shown below when the Office of the Clerk of Superior Court is closed for the transaction of business. By signing below, I certify that I will deliver this Search Warrant to the Office of the Clerk of Superior Court as soon as possible on the Clerk's next business day.

| Date | Time | AM PM | Name Of Clerk (type or print) | Signature Of Clerk | ☐ Dep. CSC ☐ Asst. CSC |
|---|---|---|---|---|---|

## RETURN OF SERVICE

I certify that this Search Warrant was received and executed as follows:

| Date Received | Time Received | AM ☑ PM |
|---|---|---|
| 02/10/2020 | 1500 | |

| Date Executing | Time Executed | ☐ AM ☑ PM |
|---|---|---|
| 2/11/2020 | 0907 | |

☑ I made a search of Residence located
at ▮▮▮▮▮▮ Statesville.
NC 28677 as commanded.

☑ I seized the items listed on the attached inventory.

☐ I did not seize any items.

☐ This Warrant WAS NOT executed within forty-eight (48) hours of the date and time of issuance and I hereby return it not executed.

This Search Warrant was returned to the undersigned clerk on the date and time shown below.

| Date | Time | AM PM | Name Of Clerk (type or print) | Signature Of Clerk | ☐ Dep. CSC ☐ Asst. CSC |
|---|---|---|---|---|---|
| 2/12/2020 | 9:43 | | Lori A. Goff | | |

| Name Of Officer Making Return (type or print) |
|---|
| Detective/Sgt. Jason Lowrance |

Signature Of Officer Making Return

| Department Of Agency Of Officer | Incident Number |
|---|---|
| Iredell County Sheriff's Office | 2020-00024 |

AOC-CR-119, Rev. 6/19
© 2019 Administrative Office of the Courts

Original - File   Copy - For Search of a Person, to Person from Whom Items Taken
Copy - For Search of Vehicle/Premises, to Owner or Person in Apparent Control, if No Such Person Present, Leave Copy Affixed Thereon
(Over)

DEFENSE EXHIBIT
1

000187

USA-00000582

JA66

# APPLICATION FOR SEARCH WARRANT

I, Detective Sergeant Jason Lowrance with Iredell County Sheriff's Office

*(Insert name and address; or if law enforcement officer, name, rank and agency)*

being duly **sworn**, request that the Court issue a warrant to search the person, place, vehicle, and other items described in this application and to find and seize the property and person described in this application. There is probable cause to believe that *(Describe property to be seized; or if search warrant is to be used for searching a place to serve an arrest warrant or other process, name person to be arrested)*

☑ See attachments

_____
_____
_____
_____
_____
_____
_____
_____
_____

constitutes evidence of a crime and the identity of a person participating in a crime. *(Name crime)* NCGS 14-190.17. Second Degree Sexual Exploitation of a Minor; NCGS 14-190.17A Third Degree Sexual Exploitation of a Minor

and is located *(Check appropriate box(es) and fill in specified information)*

☑ in the following premises *(Give address and, if useful, describe premises)*
See Attachment

_____
_____
_____
_____

*(and)*

☐ on the following person(s) *(Give name(s) and, if useful, describe person(s))*

_____
_____
_____
_____

*(and)*

☐ in the following vehicle(s) *(Describe vehicle(s))*

_____
_____
_____
_____

*(and)*

☑ *(Name and/or describe other places or items to be searched, if applicable)*
See attachment

_____
_____

The applicant swears or affirms to the following facts to establish probable cause for the issuance of a search warrant:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

☐ In addition to the affidavit included above, this application is supported by additional affidavits, attached, made by _____

SWORN/AFFIRMED AND SUBSCRIBED TO BEFORE ME:

| Name Of Applicant *(type or print)* |
|---|
| Detective Sgt Jason Lowrance |

Signature Of Applicant

| Date | Date |
|---|---|
| 02/10/2020 | 02/10/2020 |

Signature

☐ Magistrate  ☐ Dep. CSC  ☐ Asst. CSC  ☐ Clerk Of Superior Court  ☑ Judge

☐ In addition to the affidavit included above, this application is supported by sworn testimony, given by _____

☐ This testimony has been *(check appropriate box)*  ☐ reduced to writing
☐ recorded,     and I have filed any such writing/recording with the clerk.

**NOTE:** *If more space is needed for any section, continue the statement on an attached sheet of paper with a notation saying "See attachment." Date the continuation and include on it the signatures of applicant and issuing official.*

AOC-CR-119, Side Two, Rev. 6/19
© 2019 Administrative Office of the Courts

000188

USA-00000583

JA67

Continuation page attached to the SEARCH WARRANT application, dated Monday, February 10, 2020

**CONTINUATION OF "PROPERTY / EVIDENCE TO BE SEIZED"**

Computers, tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disks drives, data disks, system disk operating systems, magnetic media floppy disks, secure digital disks, USB drives, solid state drives, digital cameras, cellular phones, hardware and software operating manuals, tape systems, hard drives, any any/all devices or equipment that could be used to store images, photos or video files. Also any evidence of the crime at this time unknown.

**CONTINUATION OF "PREMISES, PERSON, VEHICLE, OR OTHER ITEM (S) TO BE SEARCHED"**

Residence located at ▮▮▮▮▮ Statesville, NC 28677. The residence appears to be a single wide mobile home, beige in color with white under penning. The residence has a driveway on the right side of the residence which leads to the residence. The residence also appears to have covered shed in front of the residence. See attached photos.

The affiant would also like to search the person Jessy Leroy Glass Jr (North Carolina Driver's License # ▮▮67, DOB: ▮▮▮1973, White, Male) as well as any persons, vehicles and outbuildings located within the curtilage.

**CONTINUATION OF "PROBABLE CAUSE AFFIDAVIT"**

The affiant, Detective Sergeant Jason Lowrance, has been employed with the Iredell County Sheriff's office for thirteen years and is currently assigned as a Detective Sergeant to the Special Victims Unit. The affiant has logged in excess of 1,616 hours of continuing education and holds an Advanced Certificate from the NC Criminal Justice Training and Standards Division. In addition, the affiant worked at Alexander County Sheriff's office for seven years prior to current employment and has been a member of the FBI Cyber Task force for ten years. The affiant was awarded in 2018 a Professional Certificate in Digital Forensics through Central Piedmont Community College. In addition the affiant is a member of the North Carolina ICAC Task Force. The affiant has conducted investigations of child pornography and sexual crimes against children.

As a Detective of the Iredell County Sheriff's Office, this Affiant is authorized to investigate crimes involving the sexual exploitation of children pursuant to North Carolina General Statute (NCGS) 14.190.16, 14 190.17, and 14 190.17A.

NCGS 14-190.17A, known as Third Degree Sexual Exploitation of a Minor make it unlawful for a person if, knowing the character or content of the material, he possesses material that contains visual representation of a minor engaged in sexual activity.

Minor. - An individual who is less than 18 years old and is not married or judicially emancipated.

Sexual Activity. - Any of the following acts:

Sexual Activity. - Any of the following acts:

a.    Masturbation, whether done alone or with another human or an animal.

b.    Vaginal, anal, or oral intercourse, whether done with another human or with an animal.

SWORN AND SUBSCRIBED TO BEFORE ME:

Judge / Magistrate _____

Date  2/10/20

000189

Applicant(s) _____

Date  2/10/20

Continuation page attached to the SEARCH WARRANT application, dated Monday, February 10, 2020

c.  Touching, in an act of apparent sexual stimulation or sexual abuse, of the clothed or unclothed genitals, pubic area, or buttocks of another person or the clothed or unclothed breasts of a human female.

d.  An act or condition that depicts torture, physical restraint by being fettered or bound, or flagellation of or by a person clad in undergarments or in revealing or bizarre costume.

e.  Excretory functions; provided, however, that this sub-subdivision shall not apply to G.S. 14-190.17A.

f.  The insertion of any part of a person's body, other than the male sexual organ, or of any object into another person's anus or vagina, except when done as part of a recognized medical procedure.

g.  The lascivious exhibition of the genitals or pubic area of any person.

NCGS 14-190.17. Known as Second degree sexual exploitation of a minor make it unlawful for a person if, knowing the character or content of the material, he:

(1) Records, photographs, films, develops, or duplicates material that contains a visual representation of a minor engaged in sexual activity; or

(2) Distributes, transports, exhibits, receives, sells, purchases, exchanges, or solicits material that contains a visual representation of a minor engaged in sexual activity.

On January 2, 2020, the affiant received a report that was filed on the Iredell County Sheriff's Office website by April Glass. In the report, April Glass wrote that Jessie L. Glass Jr, who lives at ████████ Statesville, has child pornography on his cell phone. In the report, April wrote that she picked up Jessie's cell phone recently and saw the images on his cell phone. She added that he keeps the images in his Google Photos trash bin, and Jessie's Google Account is ramsd4d@gmail.com and she thinks the password is LeeGlass2019$. April stated that she left around the end of December and went to an unknown location.

The affiant looked up information for Jessie L. Glass in LINX and learned that Jessie had been investigated in Virginia for similar reports in 2012 and 2016.

On January 22, 2020 the affiant spoke with April Glass concerning the report she had filed. April stated that when she was looking through Jessie's cell phone around the end of December of 2019, she discovered several images and videos of child pornography. April stated the juveniles appeared to around ten years old or younger and they were engaged in sex acts or they were nude.

The affiant spoke with Virginia State Police Agent Heather Brown concerning an investigation she had done involving Jessie L. Glass Jr having Child Pornographic images or videos back in 2016. Agent Brown agreed to help the affiant with the investigation by obtaining a statement from April Glass due to her living in Virginia.

On January 28, 2020, Agent Heather E. Brown with Virginia State Police interviewed April Glass in person at her mother's address in Virginia. Agent Brown met April Glass at ████████ Max Meadows, Virginia. Agent Brown interviewed April in her vehicle due to the nature of the complaint. Agent Brown asked April Glass to provide her as much detail as possible about the images she saw. April Glass stated she last saw the child pornography images on Jessie Glass' phone at the end of December 2019, and provided Agent Brown with the following descriptions of the images:

SWORN AND SUBSCRIBED TO BEFORE ME:

_____
Judge / Magistrate

_____
Date  2/10/20

4
_____
Applicant(s)

_____
Date  2/10/20

000190

USA-00000585

JA69

Continuation page attached to the SEARCH WARRANT application, dated Monday, February 10, 2020

1.) An image of a child 18 months-old or younger. There was a bag over the child's head and it looked like someone was touching the genital area.

2.) Photos of girls and boys described as 10 years-old or younger and the children were made to take their pants down.

3.) A photo depicting the completely nude vagina of a prepubescent girl.

4.) A video of an adult male making a prepubescent female appearing to be 8 or 9 years old put his penis in her vagina. They were on a bed.

5.) A photo of an infant child and an adult male forcing his penis in the infant's mouth. They were on a bed.

6.) Several photos of prepubescent females naked.

7.) A photo of a family. All family members were naked. The children were described as having "barely hit puberty."

April Glass stated that she saw at least 50 photos on Jessie Glass's phone. April said she was unsure how many because she didn't want to look anymore. April stated she was in his account more than one time and saw that new photos were added.

April said Jessie Glass, Jr. uses Tumblr and coaxes young girls onto Wickr and asks them for photos. April said she found the exchanges on his phone when he went into the store and Jessie left his phone in the car. April said Jessie makes up different emails by using weird letter and number combinations. She said in the aforementioned video, where the adult male was making an 8/9 year-old girl put his penis in her vagina, it appeared to be a video taken on a cell phone and she was concerned that Jessie, Jr. was the adult male in the video.

April said Jessie has a Samsung Galaxy S9 cell phone. There are also two laptops at the residence. The laptops are normally kept out in the open. She thinks both are silver/gray. There is one kept behind the couch on the table and that is used by Jessie Glass, Sr., but Jessie may use it as well. The other computer is used only by Jessie, Jr. as far as she knows. April Glass said she asked Jessie Glass, Jr. about the child pornography that was on his phone. She said Jessie told her that the photos downloaded to his phone for no reason. April said she knew that wasn't how it happened.

### PERSONS INVOLVED IN THE TRADING OF CHILD PORNOGRAPY

1. Based upon my training and experience in child sexual exploitation and child pornography investigations, and having worked with other experienced law enforcement officers in child exploitation investigations, I know the following:

SWORN AND SUBSCRIBED TO BEFORE ME:

Judge / Magistrate

Date 2/10/20

Applicant(s)

Date 2/10/20

000191

USA-00000586

JA70

a.       Persons who are involved with child pornography generally also have other sexually explicit materials related to their interest in children, which may consist of photographs, motion pictures, videos, text material, computer graphics and digital or other images of children.  Such persons may also have images of children or text writing that do not rise to the level of child pornography but nonetheless fuel their deviant sexual fantasies involving minors. Such persons have been known to take and maintain photographs and video recordings of fully clothed children, not just in sexually provocative poses, but in public places and elsewhere.  I am aware that this sort of material can be used to prove such things as the possessor's knowledge, intent, motive and identity, as well as to prove the person has a sexual interest in minors.

b.       Individuals who maintain images of children as described above and child pornography often maintain these images on cameras, film, video cameras, videos, photographic equipment, computers, and other electronic mobile devices, such as cellular phones, portable media players, personal digital assistants, and tablet computers, which include iPads.  Such individuals have been known to connect their cameras, video cameras, and other photographic equipment to their computers and other electronic mobile devices in an effort to create added storage space for their images of children.

c.       Individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica.  They do this to gain status, trust, acceptance and support and to increase their collection of illicit images and child erotica.  The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, P2P, chat, and file sharing programs, e-mail, e-mail groups, bulletin boards, Internet Relay Chat ("IRC"), newsgroups, Internet clubs, and various forms of Instant Messaging such as Yahoo Messaging, and "chat" that is sometimes saved on the users' computer or electronic mobile device or other digital storage media.

d.       Besides photos of minors and child erotica, such individuals often produce and/or collect other written material on the subject of sexual activities with minors, which range from fantasy stories to medical, sociological, and psychological writings, which they save to understand and justify their illicit behavior and desires.

e.       Individuals who collect child pornography often collect, read, copy or maintain names, addresses, including e-mail addresses, phone numbers, and lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests, or have child pornography and child erotica for sale or trade.  These contacts are maintained for personal referral, exchange or, sometimes, commercial profit.  They may maintain these names on computer and electronic mobile storage devices, web sites or other Internet addresses, and their discovery can serve as leads to assist law enforcement in proving the instant case and in apprehending others involved in the underground trafficking of child pornography.

f.       Individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials.  The known desire of such individuals to retain child pornography together with the sense of security afforded by using computers and electronic mobile devices, provides probable cause to believe that computer images, especially child pornography and erotic nudity involving minors, will be retained by the collector indefinitely.  These individuals may protect their illicit materials by passwords, encryption, and other security measures.

SWORN AND SUBSCRIBED TO BEFORE ME:

_____
Judge / Magistrate

Date  2/10/20

Applicant(s)

Date  2/10/20

000192

USA-00000587

JA71

These individuals may also protect their illicit materials by saving it on movable media such as memory cards, memory sticks, CD's, DVD's, flash memory, thumb drives, SIM cards, and removable hard drives, which can be very small in size, including as small as a postage stamp, and easily secreted, or sent to third party image storage sites via the Internet.

**COMPUTERS, ELECTONIC MOBILE DEVICES, CHILD PORNOGRAPHY, AND LAW ENFORCEMENT TOOLS**

2. Computers and Electronic Mobile Devices essentially serve four functions in connection with child pornography: (1) production; (2) communication; (3) distribution; and (4) storage.

i. Child pornographers can now easily transfer existing hard copy photographs into a computer-readable format with a scanner. With the advent of digital cameras, images can be transferred directly from the digital camera onto a computer. Moreover, a device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Through the Internet, electronic contact can be made to literally millions of computers around the world.

ii. The internet affords collectors of child pornography several different venues for obtaining viewing and distributing child pornography in a relatively secure and anonymous fashion. Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by internet portals such as Google, Yahoo!, and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in a variety of formats. A user can set up an online storage account from any computer with access to the internet. Evidence of such online storage of child pornography is often found in the user's computer.

iii. A computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store hundreds of thousands of images at very high resolution.

With the advent of smart phones and advanced technology, cellular telephones and other electronic mobile devices function as "computers" in the sense that they can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. In fact, some cellular telephones are equipped with memory or SIM cards, which are compact removable storage devices commonly used to store images and other electronic data that can be inserted into a telephone's camera as well as other small digital devices such as tablet devices or hand held computers. Much like "thumb drives," some memory cards have the ability to store large amounts of electronic data, including thousands of images or videos, and on occasion entire operating systems or other software programs. Moreover, cellular telephones offer a broad range of capabilities. In addition to enabling voice communications and containing a "call log" that records phone call details, cellular telephones offer the following capabilities: storing names and phone numbers in electronic "address books;" sending receiving, and storing text messages and e-mails; taking, sending, receiving, and storing still photographs and moving videos; storing and laying back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.

SWORN AND SUBSCRIBED TO BEFORE ME:

Judge / Magistrate _____

Date _2/10/20_

Applicant(s) _____

Date _2/10/20_

000193

USA-00000588

JA72

Tablets, another electronic mobile device, also function as mobile "computers." Tablets are typically larger than a phone yet smaller than a notebook and are primarily operated by touching a screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, "wi-fi" networks, or other similar networks. Tablets typically contain programs called "apps," which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving email, and participating in Internet social networks.

Communications made by way of computer or electronic mobile devices can be saved or stored on the items used for these purposes. Storing this information can be intentional, for example, by saving an e-mail as a file on the computer or electronic mobile device, or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally. For example, traces of the path of an electronic communication may be automatically stored in many places like temporary files or Internet Service Provider client software. In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner can often recover evidence which shows that a computer or electronic mobile device contains P2P software, when the computer was sharing files, and even some of the files which were uploaded or downloaded. Such information may be maintained indefinitely until overwritten by other data.

Computer and electronic mobile device users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer and electronic mobile device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer and electronic mobile device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."

By using steganography, a computer or electronic mobile device user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive or other electronic storage media, deleted or viewed via the Internet. Electronic files saved to a hard drive or electronic storage media can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer or electronic mobile device, the data contained in the file does not actually disappear; rather, that data remains on the hard drive or electronic storage media until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space (i.e., space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten).

SWORN AND SUBSCRIBED TO BEFORE ME:

Judge / Magistrate _____

Date 2/10/20

000194

Applicant(s) _____

Date 2/10/20

USA-00000589

JA73

In addition, a computer's (or electronic mobile device's) operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive or electronic storage media depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer or electronic mobile device habits. A substantial amount of time is necessary to extract and sort through data in this free or unallocated space.

Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), computers and electronic mobile devices can contain other forms of electronic evidence as well. In particular, records of how a computer or electronic mobile device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the computer and electronic mobile devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that can be neatly segregated from the hard drive image as a whole. Digital data on the hard drive or electronic storage media not currently associated with any file can provide evidence of a file that was once on the hard drive or electronic storage media but has since been deleted, edited, or deleted in part such as a word processing file with a deleted paragraph. Virtual memory paging systems can leave digital data on the hard drive or electronic storage media that show what tasks and processes on the computer or electronic storage media were recently used. Web browsers, e-mail programs, and chat programs store configuration data on the hard drive or electronic storage media that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer or electronic mobile device was in use. Computer file systems (or those on electronic mobile devices) can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.

### SPECIFICS OF SEARCH AND SEIZURE OF
### COMPUTER SYSTEMS AND OTHER ELECTRONIC DEVICES

Searches and seizures of evidence from computers and electronic mobile devices commonly require agents to download or copy information from the computers or electronic mobile devices and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others), as well as electronic mobile devices can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order and with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant.

SWORN AND SUBSCRIBED TO BEFORE ME:

Judge / Magistrate

Date  2/10/20

Applicant(s)

Date  2/10/20

000195

USA-00000590

JA74

This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this data search on site; and

Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis. The same applies for electronic mobile devices and electronic storage media.

In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit (CPU). In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. In addition, for both computers and electronic mobile devices, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media) as well as documentation, items containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate items, software or information seized or to activate specific equipment or software.

Your Affiant knows, from training and experience, that digital evidence is not limited to computers. Your Affiant has been involved in cases where persons with an interest in child exploitation materials can access the Internet, display and share images of child pornography and communicate with other individuals with the same interest using electronic mobile devices like cellular telephones, personal digital assistants (PDAs), and touch screen tablets, such as iPads. These devices are frequently found to contain chat communications in the form of short message service (SMS) messages as well as enabling Internet and digital cellular network access. Your Affiant also knows that there are P2P client applications for use on cellular telephones.

Your Affiant knows from training and experience that files related to the exploitation of children found on computers and other electronic storage media and mobile devices are usually obtained from the Internet or the wireless data networks using application software which often leaves files, logs or file remnants which would tend to show the method of location or creation of the images, search terms used, exchange, transfer, distribution, possession or origin of the files.

Your Affiant knows from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

Your Affiant knows from training and experience that computers and other electronic mobile devices used to access the Internet usually contain files, logs or file remnants which would tend to show ownership and use of the device as well as ownership and use of Internet service accounts used for the Internet or cellular data network access.

SWORN AND SUBSCRIBED TO BEFORE ME:

Judge / Magistrate _____

Date 2/10/20

000196

Applicant(s) _____

Date 2/18/20

USA-00000591

JA75

Cellphones currently hold data similar to a computer storage device. Cellphones allow for an individual to collect items and more easily hide their collection from others. Based upon my training and experience and consultations with other law enforcement officers who have been involved in the search of cellphones, computers, storage devices and retrieval of data from computer systems, I know that searching and seizing information from cellphones, computers and storage devices often requires law enforcement officers to seize all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. That process is lengthy and time consuming and takes days or even weeks.

This is true because cellphones and computer storage devices (like hard disks, diskettes, tapes, laser disks, CD-ROMS) can store the equivalent of hundreds of thousands of pages of information. Searching authorities will be required to examine all the stored data to determine which particular files are evidence or instrumentalities of a crime. This sorting process can take weeks to months, depending on the volume of data stored, and it would be impractical to attempt this kind of full data search on site.

In North Carolina, Search Warrants are required to be served within a timely period. Searching cellphones and computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment and that search has to take place over a longer period of time after the initial search and seizure of the computer itself. The vast array of cellphone and computer hardware and software available requires even cellphone and computer experts to specialize in some systems and applications, so it is often times difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search protocols are precise scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files.

Since cellphone and computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources and from destructive code embedded in the system as a "booby trap"), a controlled environment is essential for complete and accurate analysis.

Therefore, removal from the premises of some or all cellphone or computer equipment and related storage media will be required for proper analysis and specific permission by this search and seizure warrant to remove the cell phone and computer equipment and search at a later date is sought.

Based upon the above information, the Affiant believes that Probable Cause exists to search the residence and any computer, cell phone or digital storage devices found within the residence located at 749 Shiloh Rd Statesville, NC 28677, for evidence of violations of sexual exploitation of children pursuant to North Carolina General Statute (NCGS) 14-190.16, 14-190.17, and 14-190.17A.

SWORN AND SUBSCRIBED TO BEFORE ME:

Judge / Magistrate _____

Date 2/10/20

Applicant(s) _____

Date 2/10/20

000197

USA-00000592

JA76

Continuation page attached to the SEARCH WARRANT application, dated Monday, February 10, 2020

**Images of the residence located at ▮▮▮▮▮▮ Statesville, NC 28677 in Iredell County.**





SWORN AND SUBSCRIBED TO BEFORE ME:

Judge / Magistrate _____    12    Applicant(s) _____

Date 2/10/20 _____    Date 2/10/20 _____

000198

Continuation page attached to the SEARCH WARRANT application, dated Monday, February 10, 2020





SWORN AND SUBSCRIBED TO BEFORE ME:

Judge / Magistrate

Date  2/10/20

13

Applicant(s)

Date  2/10/20

000199

USA-00000594

JA78

Continuation page attached to the SEARCH WARRANT application, dated Monday, February 10, 2020



SWORN AND SUBSCRIBED TO BEFORE ME:

_____
Judge / Magistrate

2/10/20
_____
Date

_____
Applicant(s)

2/10/20
_____
Date

000200

Case 5:21-cr-00060-KDB-DSC   Document 43-1   Filed 11/30/22   Page 14 of 16

USA-00000595

JA79

**STATE OF NORTH CAROLINA**
**IREDELL COUNTY**

File No. _____

In The General Court Of Justice
☐ District ☐ Superior Court Division

IN THE MATTER OF

*Name*   Residence located at ████████
Statesville, NC 28677

**INVENTORY OF SEIZED PROPERTY**

*Date of Search*
02/11/2020

G.S. 15A-254,-

I, the undersigned officer, executed a search of:
Residence located at ████████ Statesville, NC 28677

This search was made pursuant to:

☒ a search warrant issued by Superior Court Judge Joe Crosswhite

☐ a consent to search given by:

☐ other legal justification for the search:

The following items were seized:

1. SAMSUNG CELL PHONE
2. HP LAPTOP MODEL 15-BW032WM
3. TOSHIBA LAPTOP MODEL C6550-5S338
4. LG CELL PHONE
5. LG TRACKPHONE
6. TCL CELL PHONE

000201

Seized Items Continued:

☒ I am leaving a copy of this inventory with the person named below, who is:
  ☒ the owner of the placed searched.
  ☐ the owner of the vehicle searched.
  ☐ the person in apparent control of the placed searched.
  ☐ the person in apparent control of the vehicle searched.
  ☐ the person from whom the items were taken.

☐ As no person was present, I am leaving a copy of this inventory:
  ☐ in the place searched, identified previously.
  ☐ in the vehicle searched, identified previously.

Name and Address Of Person To Whom A Copy Of This Inventory was Delivered:

JESSIE L GLASS

749 Shiloh Rd Statesville, NC 28677

The law enforcement agency identified below will hold the seized property subject to court order.

| SWORN AND SUBSCRIBED TO BEFORE ME | Signature Of Law Enforcement Officer |
|---|---|
| Date 2/2/20 | Title Of Law Enforcement Officer Detective Sgt |
| Signature *Lori a. Huff* | Name And Address Of Agency Iredell County Sheriff's Office 231 Constitution Ln Statesville NC 28677 |
| ☑ Deputy CSC ☐ Clerk Of Superior Court ☐ Assistant CSC ☐ Magistrate | |

ACKNOWLEDGEMENT OF RECEIPT

I, the undersigned, received a copy of this inventory

| Date | Signature Of Person Receiving Inventory |
|---|---|
| | |

000202

USA-00000597

JA81

# STATE OF NORTH CAROLINA

Iredell _____ County

In The General Court Of Justice
District/Superior Court Division

## SEARCH WARRANT

### IN THE MATTER OF

Black in color Samsung S9 cell phone Model:
SM-G960U1 From Jessie L. Glass Jr

To any officer with authority and jurisdiction to conduct the search authorized by this Search Warrant:

I, the undersigned, find that there is probable cause to believe that the property and person described in the application on the reverse side and related to the commission of a crime is located as described in the application.

You are commanded to search the premises, vehicle, person and other place or item described in the application for the property and person in question. If the property and/or person are found, make the seizure and keep the property subject to Court Order and process the person according to law.

You are directed to execute this Search Warrant within forty-eight (48) hours from the time indicated on this Warrant and make due return to the Clerk of the Issuing Court.

This Search Warrant is issued upon information furnished under oath or affirmation by the person(s) shown.

| Date Issued | Time Issued | | Name (type or print) | Signature |
|---|---|---|---|---|
| 02/11/2020 | 12:05 | ☑ AM ☐ PM | Crose Jr | |
| ☐ Deputy CSC ☐ Assistant CSC ☐ CSC ☐ Magistrate ☐ District Ct. Judge ☒ Superior Ct. Judge | | | | |

**NOTE:** When issuing a search warrant, the issuing official must retain a copy of the warrant and warrant application and must promptly file them with the clerk. G.S. 15A-245(b).

This Search Warrant was delivered to me on the date and at the time shown below when the Office of the Clerk of Superior Court is closed for the transaction of business. By signing below, I certify that I will deliver this Search Warrant to the Office of the Clerk of Superior Court as soon as possible on the Clerk's next business day.

| Date | Time | | Name Of Clerk (type or print) | Signature Of Clerk |
|---|---|---|---|---|
| 2/11/20 | 9:44 | ☒ AM ☐ PM | Lori A. GOFF | Lori A. Goff |

## RETURN OF SERVICE

I certify that this Search Warrant was received and executed as follows:

| Date Received | Time Received | | Date Executed | Time Executed | |
|---|---|---|---|---|---|
| 02/11/2020 | 12:27 | ☐ AM ☒ PM | 2/11/2020 | 12:41 | ☐ AM ☒ PM |

☒ I made a search of Black in color Samsung S9 Cell Phone Model SN-G960U1 From Jessie L. Glass Jr.

☒ I seized the items listed on the attached inventory.

☐ I did not seize any items.

☐ This Warrant WAS NOT executed within forty-eight (48) hours of the date and time of issuance and I hereby return it not executed.

as commanded.

This Search Warrant was returned to the undersigned clerk on the date and time shown below.

| Name Of Officer Making Return (type or print) | Date | Time | | Name Of Clerk (type or print) | Signature Of Clerk |
|---|---|---|---|---|---|
| Detective Sgt Jason Lowrance | 2/11/20 | 9:44 | ☒ AM ☐ PM | Lori A. Goff | Lori A. Goff |

| Name Of Applicant |
|---|
| Detective Sgt. Jason Lowrance |

| Name Of Additional Affiant(s) |
|---|

| Signature Of Officer Making Return | Department Or Agency Of Officer | Incident Number |
|---|---|---|
| Jason Lowrance | Iredell County Sheriff's Office | 2020-00024 |

☐ DepCAC
☒ DepCAC
☒ CSC
☐ AssiCAC

Original - File    Copy - For Search of a Person, to Person From Whom Items Taken
Copy - For Search of Vehicle/Premises, to Owner or Person In Apparent Control; If No Such Person Present, Leave Copy Affixed Thereon
(Over)

DEFENSE EXHIBIT 2

000203

# APPLICATION FOR SEARCH WARRANT

I, Detective Sergeant Jason Lowrance with Iredell County Sheriff's Office

*(Insert name and address, or if law enforcement officer, name, rank and agency)*

☒ *(and)* (Name and/or describe other places or items to be searched, if applicable)
See attachment

being duly sworn, request that the Court issue a warrant to search the person, place, vehicle, and other items described in this application and to find and seize the property and person described in this application. There is probable cause to believe that: *(Describe property to be seized, or if search warrant is to be used for searching a place to serve an arrest warrant or other process, name person to be arrested)*
See attachments

The applicant swears or affirms to the following facts to establish probable cause for the issuance of a search warrant:

constitutes evidence of a crime and the identity of a person participating in a crime. *(Name crime)*  NCGS 14-190.17, Third Degree Sexual Exploitation of a Minor; NCGS 14-190.17, Second Degree Sexual Exploitation of a Minor
and is located *(Check appropriate box(es) and fill in specified information)*

☒ in the following premises *(Give address and, if useful, describe premises)*
See Attachment

☐ *(and)*
on the following person(s) *(Give name(s) and, if useful, describe person(s))*

☐ *(and)*
in the following vehicle(s) *(Describe vehicle(s))*

---

**SWORN/AFFIRMED AND SUBSCRIBED TO BEFORE ME:**

Date _____    Date 02/11/2020

Signature _____    Name Of Applicant (type or print)
Detective Sgt. Jason Lowrance

☐ Magistrate  ☐ Dep. CSC  ☐ Asst. CSC  ☐ Clerk Of Superior Court  ☒ Judge

Signature Of Applicant

☐ In addition to the affidavit included above, this application is supported by additional affidavits, attached, made by _____

☐ In addition to the affidavit included above, this application is supported by sworn testimony, given by _____

This testimony has been *(check appropriate box)*  ☐ reduced to writing
☐ recorded,  and I have filed any such writing/recording with the clerk.

**NOTE:** If more space is needed for any section, continue the statement on an attached sheet of paper with a notation saying "see attachment". Date the continuation and include on it the signature of applicant and issuing official.

000209

USA-00000604

JA83

Continuation page attached to the SEARCH WARRANT application, dated Tuesday, February 11, 2020

**CONTINUATION OF "PROPERTY / EVIDENCE TO BE SEIZED"**

Cellular telephone's internal, removable, or other memory held within; to include but not limited to all data, subscriber information, email addresses, text messages made or received, outbound and inbound call detail, all call information, contacts, photographs, digital images, voice mails, videos, applications, social media content and messages, and all stored communications or files on the device as well as information stored from the cellular telephone in a secondary location, such as the Cloud; Any and all records and evidence that may relate to the crime of N.C.G.S. 14-190.17 or 14-190.17A.

Additionally, that item(s) seized may be submitted for analysis, examination, and comparison at a location to include but not limited to the Iredell County Sheriff's Office, N.C. S.B.I., F.B.I., Homeland Security and/or other designee.

**CONTINUATION OF "PREMISES, PERSON, VEHICLE, OR OTHER ITEM (S) TO BE SEARCHED"**

Black in color Samsung S9 cell phone Model: SM-G960U1 From Jessie L. Glass Jr

The above listed cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. In addition, cellular telephones offer a broad range of capabilities to include, but not limited to, the sending and receiving of text messages, the taking and storing of photographs and video, the accessing and downloading of information from the Internet, and the collection and storage of global positioning system (GPS) information.

**CONTINUATION OF "PROBABLE CAUSE AFFIDAVIT"**

The affiant, Detective Sergeant Jason Lowrance, has been employed with the Iredell County Sheriff's office for thirteen years and is currently assigned as a Detective Sergeant to the Special Victims Unit. The affiant has logged in excess of 1,616 hours of continuing education and holds an Advanced Certificate from the NC Criminal Justice Training and Standards Division. In addition, the affiant worked at Alexander County Sheriff's office for seven years prior to current employment and has been a member of the FBI Cyber Task force for ten years. The affiant was awarded in 2018 a Professional Certificate in Digital Forensics through Central Piedmont Community College. In addition the affiant is a member of the North Carolina ICAC Task Force. The affiant has conducted investigations of child pornography and sexual crimes against children.

As a Detective of the Iredell County Sheriff's Office, this Affiant is authorized to investigate crimes involving the sexual exploitation of children pursuant to North Carolina General Statute (NCGS) 14.190.16, 14 190.17, and 14 190.17A.

NCGS 14-190.17A, known as Third Degree Sexual Exploitation of a Minor make it unlawful for a person if, knowing the character or content of the material, he possesses material that contains visual representation of a minor engaged in sexual activity.

Minor. - An individual who is less than 18 years old and is not married or judicially emancipated.

Sexual Activity. - Any of the following acts:

SWORN AND SUBSCRIBED TO BEFORE ME:

Judge / Magistrate

Date     2/11/20

Applicant(s)

Date     2/11/20

000210

USA-00000605

JA84

Continuation page attached to the SEARCH WARRANT application, dated Tuesday, February 11, 2020

Sexual Activity. - Any of the following acts:

a.     Masturbation, whether done alone or with another human or an animal.

b.     Vaginal, anal, or oral intercourse, whether done with another human or with an animal.

c.     Touching, in an act of apparent sexual stimulation or sexual abuse, of the clothed or unclothed genitals, pubic area, or buttocks of another person or the clothed or unclothed breasts of a human female.

d.     An act or condition that depicts torture, physical restraint by being fettered or bound, or flagellation of or by a person clad in undergarments or in revealing or bizarre costume.

e.     Excretory functions; provided, however, that this sub-subdivision shall not apply to G.S. 14-190.17A.

f.     The insertion of any part of a person's body, other than the male sexual organ, or of any object into another person's anus or vagina, except when done as part of a recognized medical procedure.

g.     The lascivious exhibition of the genitals or pubic area of any person.

NCGS 14-190.17. Known as Second degree sexual exploitation of a minor make it unlawful for a person if, knowing the character or content of the material, he:

(1) Records, photographs, films, develops, or duplicates material that contains a visual representation of a minor engaged in sexual activity; or

(2) Distributes, transports, exhibits, receives, sells, purchases, exchanges, or solicits material that contains a visual representation of a minor engaged in sexual activity.


       On January 2, 2020, the affiant received a report that was filed on the Iredell County Sheriff's Office website by April Glass. In the report, April Glass wrote that Jessie L. Glass Jr, who lives at ███████ Statesville, has child pornography on his cell phone.  In the report, April wrote that she picked up Jessie's cell phone recently and saw the images on his cell phone.  She added that he keeps the images in his Google Photos trash bin, and Jessie's Google Account is ramsd4d@gmail.com and she thinks the password is LeeGlass2019$.  April stated that she left around the end of December and went to an unknown location.

       The affiant looked up information for Jessie L. Glass in LINX and learned that Jessie had been investigated in Virginia for similar reports in 2012 and 2016.

       On January 22, 2020 the affiant spoke with April Glass concerning the report she had filed.  April stated that when she was looking through Jessie's cell phone around the end of December of 2019, she discovered several images and videos of child pornography.  April stated the juveniles appeared to around ten years old or younger and they were engaged in sex acts or they were nude.

       The affiant spoke with Virginia State Police Agent Heather Brown concerning an investigation she had done involving Jessie L. Glass Jr having Child Pornographic images or videos back in 2016.  Agent Brown agreed to help the affiant with the investigation by obtaining a statement from April Glass due to her living in Virginia.


SWORN AND SUBSCRIBED TO BEFORE ME:

_____                    _____
Judge / Magistrate        8/11/20                    Applicant(s)        2/11/20

Date                                                Date
000211

USA-00000606

JA85

Continuation page attached to the SEARCH WARRANT application, dated Tuesday, February 11, 2020

On January 28, 2020, Agent Heather E. Brown with Virginia State Police interviewed April Glass in person at her mother's address in Virginia. Agent Brown met April Glass at ███████████ Max Meadows, Virginia. Agent Brown interviewed April in her vehicle due to the nature of the complaint. Agent Brown asked April Glass to provide her as much detail as possible about the images she saw. April Glass stated she last saw the child pornography images on Jessie Glass' phone at the end of December 2019, and provided Agent Brown with the following descriptions of the images:

1.) An image of a child 18 months-old or younger. There was a bag over the child's head and it looked like someone was touching the genital area.

2.) Photos of girls and boys described as 10 years-old or younger and the children were made to take their pants down.

3.) A photo depicting the completely nude vagina of a prepubescent girl.

4.) A video of an adult male making a prepubescent female appearing to be 8 or 9 years old put his penis in her vagina. They were on a bed.

5.) A photo of an infant child and an adult male forcing his penis in the infant's mouth. They were on a bed.

6.) Several photos of prepubescent females naked.

7.) A photo of a family. All family members were naked. The children were described as having "barely hit puberty."

April Glass stated that she saw at least 50 photos on Jessie Glass's phone. April said she was unsure how many because she didn't want to look anymore. April stated she was in his account more than one time and saw that new photos were added.

April said Jessie Glass, Jr. uses Tumblr and coaxes young girls onto Wickr and asks them for photos. April said she found the exchanges on his phone when he went into the store and Jessie left his phone in the car. April said Jessie makes up different emails by using weird letter and number combinations. She said in the aforementioned video, where the adult male was making an 8/9 year old girl put his penis in her vagina, it appeared to be a video taken on a cell phone and she was concerned that Jessie, Jr. was the adult male in the video.

April said Jessie has a Samsung Galaxy S9 cell phone. There are also two laptops at the residence. The laptops are normally kept out in the open. She thinks both are silver/gray. There is one kept behind the couch on the table and that is used by Jessie Glass, Sr., but Jessie may use it as well. The other computer is used only by Jessie, Jr. as far as she knows. April Glass said she asked Jessie Glass, Jr. about the child pornography that was on his phone. She said Jessie told her that the photos downloaded to his phone for no reason. April said she knew that wasn't how it happened.

SWORN AND SUBSCRIBED TO BEFORE ME:

_____
Judge / Magistrate

2/11/20

_____
Date

5

_____        _____
Applicant(s)

2/11/20

_____
Date

000212

USA-00000607

JA86

Continuation page attached to the SEARCH WARRANT application, dated Tuesday, February 11, 2020
On February 10, 2020, the affiant typed up a search warrant for the residence located at ███████ Statesville NC 28677. The affiant went before Resident Superior Court Judge Joe Crosswhite where the search warrant was approved and signed at 14:20 hrs.

On February 11, 2020, the affiant along with other detectives with the Iredell County Sheriff's Office and Homeland Security executed the search warrant at the target residence located at ███████ atesville NC 28677. During the search of the residence, Jessie L. Glass Jr was found not at the property. It was learned that Jessie Glass Jr was at work at time per his father Jessie L. Glass at the residence. During he search of the residence, there were several cell phones and laptop computers found inside the residence that were seized.

Detective A. Aponik and Homeland Security Officer Jon Pavlovic went to Jessie Glass Jr's work place here in Statesville call AmesburyTruth. They were able to speak with Jessie Glass Jr. concerning the invesigation and the search warrant at his residence. Jessie volentarly turned his cell phone over to Detective Aponik to be searched. Jessie told detective Aponik that there should not be any child pornaraphy on his cell phone.

Cellular telephones are now being utilized by citizens, for the purposes of portable computing. Many cellular telephones have the ability to: type and store documents, take and store pictures/videos, access the Internet, deploy applications (which can be programmed to do almost anything), make phone calls, send and receive SMS/MMS messages, connect to social networks, remotely store data on the "cloud", store large amounts of data on the actual phone, sync with a computer, and show live video streaming. Once information is stored on a cellular phone or SD card, it can remain indefinitely.

There are three current processes for extracting information from cellular phones which have been described to me by forensic experts. First, by utilizing mobile device forensic software which is designed to extract data from certain devices by attaching a device to a data port in which the software communicates with the device and extracts its data. Second is a process commonly known as JTAG. This process involves removing the circuit board from the phone and soldering to points used by manufacturers. These points allow direct access to the memory on the phone. This process may cause damage to the phone, but typically the phone will remain intact and functional when put back together. The last method is a process commonly known as Chip-off. The process involves removing the flash memory chip on the phone that actually stores the data on the phone. Once the chip is removed, forensic experts can read the data directly from the chip. This process will result in the permanent destruction of the phone; however, it allows for access to the data that was located on the phone.

It is my training and experience that each of the methods described above for extraction will result in an accurate representation of some or all of the available data from the mobile device itself. The search will be conducted by a qualified computer examiner or designee to include, but not limited to, Iredell County Sheriff's Office, The NC State Bureau of Investigation, and/ or the FBI.

That I have recognized facts and circumstances indicating that evidence of a crime that took place at the above-described location can be found as described in this application. The affiant states that the information contained in this application for a search warrant are true and accurate to the best of the affiant's knowledge. The affiant prays that the court issue this search warrant to examine the above listed cell phone(s), furthermore authorize the search to be conducted by a law enforcement officer which is certified and/or trained to conduct such examinations. The affiant further prays that all items which tend to provide evidence of the crime(s), in violation of NCGS 14-190.17 and or 14-190.17A, and the identity of the crime and/or person(s) participating in a crime be seized and held subject to the disposition of the court

SWORN AND SUBSCRIBED TO BEFORE ME:

_____
Judge / Magistrate

_____
Date    2/11/20

_____
Applicant(s)

_____
Date    2/11/20

000213

USA-00000608

JA87

**STATE OF NORTH CAROLINA**
**IREDELL COUNTY**

File No.

In The General Court Of Justice
☐ District  ☐ Superior Court Division

**IN THE MATTER OF**

Name  Black in color Samsung S9 cell phone
Model: SM-G960U1 From Jessie L. Glass
Jr

Date of Search
02/11/2020

**INVENTORY OF SEIZED PROPERTY**

G.S. 15A-254,-

I, the undersigned officer, executed a search of:

Black in color Samsung S9 cell phone Model: SM-G960U1 From Jessie L. Glass Jr

This search was made pursuant to:

☒ a search warrant issued by Superior Court Judge Joe Crosswhite

☐ a consent to search given by:

☐ other legal justification for the search:

The following items were seized:

Cellular telephone's internal, removable, or other memory held within; to include but not limited to

all data, subscriber information, email addresses, text messages made or received, outbound and

inbound call detail, all call information, contacts, photographs, digital images, voice mails, videos,

applications, social media content and messages, and all stored communications or files on the

device as well as information stored from the cellular telephone in a secondary location, such as

the Cloud; Any and all records and evidence that may relate to the crime of N.C.G.S. 14-190.17 or

14-190.17A.

000214

USA-00000609

JA88

| Seized Items Continued |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

☐ I am leaving a copy of this inventory with the person named below, who is:
  ☐ the owner of the placed searched.
  ☐ the owner of the vehicle searched.
  ☐ the person in apparent control of the placed searched.
  ☐ the person in apparent control of the vehicle searched.
  ☐ the person from whom the items were taken.

☒ As no person was present, I am leaving a copy of this inventory:
  ☒ in the place searched, identified previously.
  ☐ in the vehicle searched, identified previously.

Name and Address Of Person To Whom A Copy Of This Inventory was Delivered:
Iredell County Sheriff's Office Evidence "With Cell Phone"
231 Constitution Ln
Statesville NC 28677

**The law enforcement agency identified below will hold the seized property subject to court order.**

| SWORN AND SUBSCRIBED TO BEFORE ME | Signature Of Law Enforcement Officer |
|---|---|
| Date  2/2/20 | Title Of Law Enforcement Officer  Detective Sgt. |
| Signature  *Lori A. Goff* | Name And Address Of Agency  Iredell County Sheriff's Office  231 Constitution Ln  Statesville NC 28677 |
| ☒ Deputy CSC   ☐ Clerk Of Superior  ☐ Assistant CSC   Court   ☐ Magistrate | |

**ACKNOWLEDGEMENT OF RECEIPT**

I, the undersigned, received a copy of this inventory

| Date | Signature Of Person Receiving Inventory |
|---|---|
|  |  |

000215

USA-00000610

JA89

**Virginia State Police Investigative Report – File No. 16-27159**

## 1   INVESTIGATIVE FILE
**Title:** CHILD PORNOGRAPHY-CARROLL COUNTY-JESSIE GLASS
**Status:** Closed - Service
**Investigation Start Date/Time:** 11/28/2016 03:11:11
**Lead Agency:** Virginia State Police
**Lead Unit:** BCI Division 4 GIS General Assignment
**File Manager:** Brown, Heather E SAGT
**Primary Incident Location:** 1160 East MAIN Street, Wytheville, Virginia 24382
**Jurisdiction:** Wythe

I REQUEST THIS CASE BE CLOSED. THE EVIDENCE HAS BEEN DESTROYED WITH
APPROVAL FROM CARROLL CO CA NATHAN LYONS. I WAS UNABLE TO GET
ANYONE IN NORTH CAROLINA TO TAKE THE CASE. THERE WERE NO
VIOLATIONS THAT OCCURRED IN VIRGINIA.

## 2   EVENTS
**Start Date/Time:** 11/27/2016  **End Date/Time:** 11/27/2016
**Statute:** 18.2-374.1:1(C)(i)
**Description:** CHILD PORN:REPRODUCE/TRANSMIT/SELL,ETC.,
**Status:** Pending
**Subject:** GLASS, JESSIE LEROY JR
**Property:** (Seized) Audio/Video/Digital Recording: SAMSUNG CELL PHONE GALAXY ,
$100.00; (Seized) Audio/Video/Digital Recording: SAMSUNG CELL PHONE GALAXY ...,
$100.00

## 3   PERSONS
**Person Role:** Subject
**Title/Name:** GLASS, JESSIE LEROY JR  **Race:** White **Sex:** Male
**DOB:** ███ 973 **Age:** 46 Years
**Ethnicity:** Non - Hispanic **Resident Status:** Resident
**SSN:** ███ 2932 **Driver's License Number:** ███ 6706 **Issuer:** Virginia (U.S. State)
**Expire: FBI Number: VA SID:**
**Residential Address:** 150 COTTONWOOD Lane, HILLSVILLE, Virginia 24343
**Height:** 5' 9" **Weight:** 225 lbs. **Build:** Size Small
**Hair Color:** Brown **Hair Length: Hair Style:**
**Eye Color:** Brown **Skin Tone: Facial Hair:**

CONFIDENTIAL

This document contains neither recommendations nor conclusions of the Virginia State Police. It is the property of
the Virginia State Police and is loaned to your agency; and its contents are not to be distributed outside your
agency.

020158

     01/27/2020 02:23 PM

Case 5:21-cr-00060-KDB-DSC    Filed 11/30/22   Page 1 of 3

DEFENSE EXHIBIT
3

JA90

USA-00000553

**Associations to Other Persons:** GLASS, APRIL DAWN, Spouse of

**Person Role:** Witness
**Title/Name:** COX, SANDRA KAY  **Race:** White **Sex:** Female
**DOB:** ███ 1961  **Age:** 58 Years
**Ethnicity:**   **Resident Status:**
**SSN:** ███ 7292  **Driver's License Number:**  **Issuer:**  **Expire:**  **FBI Number:**  **VA SID:**
**Residential Address:** ████████████
**Personal Telephone:** ██████ -8797
**Work Telephone:** ██████ 8770
**Height:**   **Weight:**   **Build:**
**Hair Color:**   **Hair Length:**   **Hair Style:**
**Eye Color:**   **Skin Tone:**   **Facial Hair:**
**Associations to Property:** Audio/Video/Digital Recording: SAMSUNG CELL PHONE
GALAXY , Owner of

**Person Role:** Witness
**Title/Name:** GLASS, APRIL DAWN  **Race:** Black **Sex:** Female
**DOB:** ███ 982  **Age:** 37 Years
**Ethnicity:**   **Resident Status:**
**SSN:**  **Driver's License Number:**  **Issuer:**  **Expire:**  **FBI Number:**  **VA SID:**
**Residential Address:** ████████████ Virginia 24343
**Personal Telephone:** ██████ -0542
**Height:**   **Weight:**   **Build:**
**Hair Color:**   **Hair Length:**   **Hair Style:**
**Eye Color:**   **Skin Tone:**   **Facial Hair:**
**Associations to Other Persons:** GLASS, JESSIE LEROY JR, Spouse of
**Associations to Property:** Audio/Video/Digital Recording: SAMSUNG CELL PHONE
GALAXY ..., Owner of

4   <u>**ORGANIZATIONS**</u>

5   <u>**PROPERTY**</u>
**Property Role:** Seized  **Type:** Audio/Video/Digital Recording
**Owner:** GLASS, APRIL DAWN
**Date Seized:** 11/29/2016  **Seized in Jurisdiction:** Wythe

CONFIDENTIAL

This document contains neither recommendations nor conclusions of the Virginia State Police. It is the property of the Virginia State Police and is loaned to your agency; and its contents are not to be distributed outside your agency.

000159

01/27/2020 02:23 PM

USA-00000554

JA91

# Virginia State Police Investigative Report – File No. 16-27159

**Property Role:** Seized  **Type:** Audio/Video/Digital Recording
**Owner:** COX, SANDRA KAY
**Date Seized:** 11/27/2016  **Seized in Jurisdiction:** Wythe

6   **TELEPHONE NUMBERS**

7   **INTERNET ADDRESSES**

8   **OTHER LAW ENFORCEMENT AGENCIES**

9   **PROFESSIONAL CONTACTS**

10   **EVIDENCE MANAGEMENT**
Evidence is stored in Evidence Management System.

11   **AVAILABLE ATTACHMENTS**
SP 165 EVIDENCE LOG.pdf  SP 165 EVIDENCE LOG.pdf

12   **SPECIALTY**

CONFIDENTIAL

This document contains neither recommendations nor conclusions of the Virginia State Police. It is the property of the Virginia State Police and is loaned to your agency; it and its contents are not to be distributed outside your agency.

000160

USA-00000555

JA92

Detective C.D. Lamberth - Case Notes

Iredell County Sheriff's Office Case Number:    2017-I02643

Dates Reported:                                 05/16/2017

Incident:                                        Possession of Child Pornography

Location of Incident:                            ███████████
                                                 Statesville, NC 28625

Victim Information:                              **State of North Carolina**

Suspect Information:                             Jessie Leroy Glass, Jr.
                                                 ██████████
                                                 Statesville, NC 28625

---

05/19/2017        10:22
I presented the **search warrant application to the Honorable Lori Hamilton and
she found probable cause to grant** the search warrant of the Pro-12 Tablet.  I
then delivered a copy to the Clerk of Court as well as Det. Lt. J. Wyatt, who
said that she would hand it over to Capt. J. Gibson.

05/23/2017        14:15
I was able to review the information that was pulled from the tablet and there
was pornography on it, but nothing that appeared to be of anyone under the age
of 18.  I will be making a return of service of the search warrant to the
Clerk's Office and notifying Mr. Glass that he can retrieve his tablet from the
Office.

05/23/2017        19:08
I made contact with Mr. Glass and notified him that he can pick up his tablet.
I thanked him for his cooperation and let him know that I did not find anything
**that I was concerned about.  I will be closing the case as unfounded.**

05/23/2017        19:15
Closed/Cleared            Unfounded

· 000027

DEFENSE EXHIBIT
4

USA-00000425

JA93

File No. _____

# STATE OF NORTH CAROLINA

Iredell _____ County

In The General Court Of Justice
District/Superior Court Division

## SEARCH WARRANT

### IN THE MATTER OF

Black in color Pro-12 tablet belonging to Jessie Glass, Jr.

| Date Issued | Time Issued | |
| --- | --- | --- |
| 5-19-2017 | 10:22 | ☒ AM ☐ PM |

Name Of Applicant
Detective C.D. Lamberth

Name Of Additional Affiant

Name Of Additional Affiant

To any officer with authority and jurisdiction to conduct the search authorized by this Search Warrant:

I, the undersigned, find that there is probable cause to believe that the property and person described in the application on the reverse side and related to the commission of a crime is located as described in the application.

You are commanded to search the premises, vehicle, person and other place or item described in the application for the property and person in question. If the property and/or person are found, make the seizure and keep the property subject to Court Order and process the person according to law.

You are directed to execute this Search Warrant and make due return to the Clerk of the Issuing Court.

This Search Warrant is issued upon information furnished under oath or affirmation by the person(s) shown.

| Date | Name (type or print) | |
| --- | --- | --- |
| 5-19-2017 | Kari J. Hamilton | Signature |
| ☐ Deputy CSC ☐ Assistant CSC ☐ CSC ☐ Magistrate ☐ District Ct. Judge ☒ Superior Ct. Judge | | |

NOTE: When issuing a search warrant, the issuing official must retain a copy of the warrant and warrant application and must promptly file them with the clerk. G.S. 15A-245(b).

### RETURN OF SERVICE

I certify that this Search Warrant was received and executed as follows:

| Date Received | Time Received | |
| --- | --- | --- |
| 05/19/2017 | 10:30 | ☒ AM ☐ PM |

| Date Executed | Time Executed | |
| --- | --- | --- |
| 05/19/2017 | 10:55 | ☒ AM ☐ PM |

☒ I made a search of the black in color ____ Pro-12 tablet belonging to Jessie Glass, Sr.

☒ I seized the items listed on the attached inventory.

☐ I did not seize any items.

☐ This Warrant WAS NOT executed within forty-eight (48) hours of the date and time of issuance and I hereby return it is not executed.

Name Of Officer Making Return (type or print)
Detective C.D. Lamberth

Signature Of Officer Making Return

Department Of Agency Of Officer

Iredell County Sheriff's Office

This Search Warrant was returned to the undersigned clerk on the date and time shown below.

This Search Warrant was delivered to me on the date and at the time shown below when the Office of the Clerk of Superior Court is closed for the transaction of business. By signing below, I certify that I will deliver this Search Warrant to the Office of the Clerk of Superior Court as soon as possible on the Clerk's next business day.

| Date | Time | | Name (type or print) | Signature Of Magistrate |
| --- | --- | --- | --- | --- |
| | | ☐ AM ☐ PM | | |

| Date | Time | | Name Of Magistrate (type or print) | Signature Of Magistrate |
| --- | --- | --- | --- | --- |
| | | ☐ AM ☐ PM | | |

| | Name Of Clerk (type or print) | Signature Of Clerk |
| --- | --- | --- |

| Incident Number | Date |
| --- | --- |
| 2017-I02643 | |

AOC-CR-119, Rev. 3/17
© 2017 Administrative Office of the Courts

Original - File   Copy - For Search of a Person, to Person from Whom Items Taken
Copy - For Search of Vehicle/Premises, to Owner or Person in Apparent Control, if No Such Person Present, Leave Copy Affixed Thereon
(Over)

☐ Dep. CSC
☐ Asst. CSC
☐ CSC

000028

USA-00000426

JA94

Case 5:21-cr-00060-KDB-DSC   Document 43-4   Filed 11/30/22   Page 3 of 7

# APPLICATION FOR SEARCH WARRANT

I, Detective C.D. Lamberth of the Iredell County Sheriff's Office

*(insert name and address, or if law enforcement officer, name, rank and agency)*

being duly **sworn**, request that the Court issue a warrant to search the person, place, vehicle, and other items described in this application and to find and seize the property and person described in this application. There is probable cause to believe that *(Describe property to be seized, or if search warrant is to be used for searching a place to serve an arrest warrant or other process, name person to be arrested)* See Attachment Page.

☒ *(Name and/or describe other places or items to be searched, if applicable)* See Attachment Page.

The applicant swears or affirms to the following facts to establish probable cause for the issuance of a **search warrant**: See Attachment Page.

constitutes evidence of a crime and the identity of a person participating in a crime, *(Name crime,)* Possession of Child Pornography

and is located *(Check appropriate box(es) and fill in specified information)*

☒ in the following premises *(Give address and, if useful, describe premises)* See Attachment Page.

**SWORN/AFFIRMED AND SUBSCRIBED TO BEFORE ME**

Date   5-10-2017

Signature (illegible)

☐ Magistrate   ☐ Dep. CSC   ☐ Asst. CSC   ☐ Clerk Of Superior Court   ☒ Judge

Name Of Applicant (type or print)
Detective C.D. Lamberth
Signature Of Applicant (illegible)

*(and)*

☒ on the following person(s) *(Give name(s) and, if useful, describe person(s))* See Attachment Page.

☐ In addition to the affidavit included above, this application is supported by additional affidavits, attached, made by _____

☐ In addition to the affidavit included above, this application is supported by sworn testimony, given by _____

*(and)*

☒ in the following vehicle(s) *(Describe vehicle(s))* See Attachment Page.

☐ This testimony has been *(check appropriate box)*   ☐ reduced to writing
☐ tape recorded and I have filed each with the clerk.

**NOTE:** *If more space is needed for any section, continue the statement on an attached sheet of paper with a notation saying "see attachment." Date the continuation and include on it the signatures of applicant and issuing official.*

AOC-CR-119, Side Two, Rev. 3/17
© 2017 Administrative Office of the Courts

000029

USA-00000427

JA95

Continuation page attached to the SEARCH WARRANT application, dated Thursday, May 18, 2017

**CONTINUATION OF "PROPERTY / EVIDENCE TO BE SEIZED"**

Any and all electronic data contained in the memory or call history of the tablet computer, including any names, phone numbers, addresses, contact information, data, text messages, images, voice memos, photographs, videos, internet sites, internet access documents or other information, contained in the tablet computer's internal, external or removable memory or memories, which includes any smart cards, SIM cards or flashcards.

**CONTINUATION OF "PREMISES, PERSON, VEHICLE, OR OTHER ITEM (S) TO BE SEARCHED"**

Black in color Pro-12 Model: CT9223W97 with S/N# R6GH8Z0170D1 obtained from Jessie Leroy Glass, Jr. under case number 2017-I02643

**CONTINUATION OF "PROBABLE CAUSE AFFIDAVIT"**

This applicant, Detective C.D. Lamberth, is currently employed by the Iredell County Sheriff's Office and has been a sworn Law Enforcement Officer since January 2007. Detective Lamberth is currently assigned to the Criminal Investigations Division. Before being assigned to Criminal Investigations, this applicant was a Patrol Deputy, a Field Training Officer, and was also a K9 handler of a drug detection K9 for the Iredell County Sheriff's Office from 2010 through 2013. Detective Lamberth graduated from Mitchell Community College in 2010 and earned an Associate's in Applied Science Degree in Criminal Justice Technologies. Detective Lamberth has successfully completed the North Carolina Basic Law Enforcement Training and has successfully completed over 2,000 hours of law enforcement training during his career at the North Carolina Justice Academy and various other colleges in North Carolina. Detective Lamberth was awarded a Basic, Intermediate, and Advanced Law Enforcement Certificate from the North Carolina Sheriff's Education and Training Standards Commission. Throughout his career, Detective Lamberth has worked numerous criminal cases and is familiar with the elements of this crime. Detective Lamberth has applied for and been granted search warrants during his career which resulted in the successful recovery of evidence in criminal investigations.

On May 18, 2017, I was requested by Detective Lieutenant B. Boyd to go to █████████ and make contact with Jessie Glass, Sr. and Jessie Glass, Jr. Upon my arrival, I met Jessie Glass, Jr. in the driveway. I told him that I was there because we received a tip that there is possibly a computer in the residence with child pornography on it. I then asked him if there are any computers in the house and he said that he owns a tablet. I asked him if I could search the tablet for any possible child pornography and he said that I could. He then went inside and got his tablet and brought it out to me. I asked him again if I could search it and he said that I could. I then began looking through the internet history on the device and located numerous pornography websites, and I saw one that read "young dominatrix". I felt that this could possibly be child pornography, so I informed Jessie that I was seizing the device for the possibility of there being child pornography on it. I also observed various other types on pornography titles on the computer including hentai and gore. There were also sites for purchasing adult sex toys in the history as well. Jessie then said that there should not be any underage pornography on it and if any had ever popped up on the screen that he did not dwell on it. This threw up a red flag for me, so I then asked him if there was anything on there that he wanted to tell me about and I could see tears welling up in his eyes and he said that there was not anything he wanted to tell me. I then filled out an evidence form and Jessie signed it, turning custody of the tablet over to me. There were children's toys and sex toys located in Jessie, Jr.'s bedroom.

I have recognized facts and circumstances indicating that evidence of a crime that took place at the above-described location can be found as described in this application. The affiant states that the information contained in this application for a search warrant is true and accurate to the best of the affiant's knowledge. The affiant prays that the court issue this search warrant to examine the above listed cell phone, furthermore authorize the search to be conducted by a law enforcement officer which is certified and/or trained to conduct such examinations. The affiant further prays that all items which tend to provide evidence of the crime(s) and the identity of the crime and/or person(s) participating in a crime be seized and held subject to the disposition of the court.

SWORN AND SUBSCRIBED TO BEFORE ME:

_(signature)_ _____     3   _(signature)_ _____

Judge / Magistrate                               Applicant(s)

5-18-2017   0C0030               05/18/2017

Date                                        Date

USA-00000428

JA96

**STATE OF NORTH CAROLINA**

_____ Iredell _____ County

File No.

In The General Court Of Justice
☐ District  ☐ Superior Court Division

**IN THE MATTER OF:**

Name

Black in color Pro-12 tablet belonging to Jessie Glass, Jr.

**INVENTORY OF ITEMS SEIZED
PURSUANT TO SEARCH**

G.S. 15A-223, -254, -257

I, the undersigned officer, executed a search of:

Person, Premises Or Vehicle Searched

Black in color Pro-12 tablet belonging to Jessie Glass, Jr.

Date Of Search

05/21/2017

This search was made pursuant to

☒ 1. a search warrant issued by: Superior Court Judge Lori I. Hamilton _____

☐ 2. consent to search given by: _____

☐ 3. other legal justification for the search: _____

The following items were seized:

Data contained in the tablet.  The tablet is being returned to the owner.

Original - File
Copy - For Search by Warrant of a Person, to Person from Whom Items Taken
Copy - For Search by Warrant of Vehicle/Premises, to Owner or Person in Apparent Control; if No Such Person Present, Leave Copy Affixed Thereon
Copies - For Search by Consent, to Person Giving Consent and Owner of Vehicle/Premises Searched, if Known
(Over)
AOC-CR-206, Rev. 3/16
© 2016 Administrative Office of the Courts

■ · OC0031

USA-00000429

JA97

Items Seized Continued:

☐ 1. I left a copy of this inventory with the person named below, who is:
  ☐ a. the owner of the premises searched.
  ☐ b. the owner of the vehicle searched.
  ☐ c. the person in apparent control of the premises searched.
  ☐ d. the person in apparent control of the vehicle searched.
  ☐ e. the person from whom the items were taken.
☐ 2. As no person was present, I left a copy of this inventory:
  ☐ a. in the premises searched, identified on the reverse.
  ☐ b. in the vehicle searched, identified on the reverse.

| *Name And Address Of Person To Whom A Copy Of This Inventory Was Delivered, If Any* |
| --- |
|  |

The law enforcement agency identified below will hold the seized property subject to court order.

| SWORN/AFFIRMED AND SUBSCRIBED TO BEFORE ME | *Name Of Law Enforcement Officer (type or print)* C.D. Lamberth |
| --- | --- |
| *Date* | *Name (type or print)* | *Signature Of Law Enforcement Officer* |
| ☐ Notary | *Signature* | *Title Of Law Enforcement Officer* Detective |
| **SEAL** | *Date My Commission Expires* | *Name And Address Of Agency* Iredell County Sheriff's Office |
|  | *County Where Notarized* | 230 North Tradd Street Statesville, North Carolina 28677 |

☐ *Deputy CSC*  ☐ *Assistant CSC*  ☐ *Clerk Of Superior Court*  ☐ *Magistrate*

**ACKNOWLEDGMENT OF RECEIPT**

I, the undersigned, received a copy of this inventory.

| *Date* | *Signature Of Person Receiving Inventory* |
| --- | --- |
|  |  |

AOC-CR-206, Side Two, Rev. 3/16
© 2016 Administrative Office of the Courts

0C0032

JA98

# IREDELL COUNTY SHERIFF'S OFFICE

☐ RECOVERED / ☐ FOUND PROPERTY REPORT

| AGENCY | ORI # | DATE/TIME REPORTED | 24 Hr. Clock | OCA FILE NO. |
|---|---|---|---|---|
| Iredell County Sheriff's Office | NC0490000 | 05 17 2017 MO DAY YR | | 2017-02643 |

**Owner** Jessie Leroy Glass, Jr.

**Found in possession of** SAMS

Phone 826-786-230-5104 Phone

Statesville NC SAMS SAMS

**Location from which property was obtained:** from person

**Collecting Officer** Det. C.D. Lamberth

| PROPERTY CONTROL NUMBER | DESCRIPTION OF ARTICLES (Include model, serial no., identifying marks, condition, etc.) | PROPERTY VALUE |
|---|---|---|
| | Item 1 - one Neo-R Nopec CT9223697 Tablet 2in1 S/N: R6GH8Z0170D9 | |

**Narrative** Hold for Identification

| OFFICER'S NAME 4269 | DATE/TIME SUBMITTED | SUPERVISOR'S NAME | CASE DISPOSITION | PAGE |
|---|---|---|---|---|
| Det. C.D. Lamberth | MO 05 DAY 17 YR 17 | Lt. B. Bean | ☐ UNFOUNDED | 1 |
| **OFFICER'S SIGNATURE** | 21:00 24 Hr. | **CASE STATUS** ☐ FURTHER INVESTIGATION ☐ INACTIVE ☐ CLOSED | ☐ CLEARED BY ARREST ☐ EXCEPTIONAL CLEARED - ADULT ☐ EXCEPTIONAL CLEARED - JUV. | OF 1 |

000033

FIRST COPY

USA-00000431

JA99

```
Reference: UNKNOWN
Msg Key  : CR
Date/Time: 20200131084741
Source   : NLETS

UNKNOWN.NLETS.CR.20200131084741.
  TO: IRA11   -038062 20200131 08:47:41   43802E6972
  FROM: NLETS          20200131 08:47:41
CR.VAIII0000
06:47  00000
 01/31/2020 23754 NC0490011

TXT


TXT
HDR/2L01149400338E2QR
ATN/DET J LOWRANCE
THE FOLLOWING RECORD PERTAINS TO FBI/255177RD2

                                VIRGINIA CRIMINAL RECORD          01/31/2020 PART  1

SID:     ███27E FBI: 255177RD2

NAMES RECORDED IN VIRGINIA FILES:                    SEX RACE DATE OF BIRTH
        GLASS              JESSIE      LEFROY     JR   M    W   ████1973
        GLASS              JESSIE      LEROY      JR   M    W   ████1973

HEIGHT  WEIGHT  EYES  HAIR  SCARS/MARKS/TATTOOS
5'10"   220     BRO   BRO

LAST REPORTED ADDRESS:  150 COTTONWOOD LN
                        HILLSVILLE, VA 24343

PLACE OF BIRTH: CARROLL CO

SOCIAL SECURITY NO(S): ██████2732

CONTRIBUTOR/CASE        DATE        CHARGE/DISPOSITION
=================      ==========   =======================================================
SO WYTHE CO VA         07/23/2012  FINGERPRINTED  PHOTO:Y
ORI:VA0970000
                       07/17/2012  CHARGED WITH
                            #001   FELONY 18.2-67.1                       RAP-1133-F9
OTN:197CR1200025001                SODOMY: VICTIM <13 YRS
                                   WYTHE CO              06/01/2008
WYTHE CO CIRCUIT CT 11/12/2013 NOLLE PROSSED                              RAP-1133-F9
ORI:VA097015J
CCN:197CR1200025001*
                                   NOT IMPNLD    RETAINED ATTY
DCN:P994877
--------------------
SO WYTHE CO VA         07/23/2012  FINGERPRINTED  PHOTO:Y
ORI:VA0970000
                       07/17/2012  CHARGED WITH
                            #002   FELONY 18.2-67.1                       RAP-1133-F9
OTN:197CR1200025000                SODOMY: VICTIM <13 YRS
                                   WYTHE CO              09/01/2008
WYTHE CO CIRCUIT CT 11/12/2013 DISMISSED                                  RAP-1133-F9
ORI:VA097015J
CCN:197CR1200025000*
                                   NOT IMPNLD    RETAINED ATTY
DCN:P994878
--------------------
=======================================
SO CARROLL CO VA       12/11/2015  FINGERPRINTED
ORI:VA0180000
                       10/29/2015  CHARGED WITH
                            #001   MSDMNR 18.2-137                        VAN-2922-M1
OTN:035GM1500004308                DESTRUCTION OF PROPERTY, MONUMENT
                                   CARROLL CO            10/28/2015
CARROLL CO GEN DIST 03/04/2016 DISMISSED
ORI:VA018013J                                                            VAN-2922-M1
CCN:035GC1502036700*
                                   RETAINED ATTY
DCN:J625851
--------------------

                              Page 1
```

000111

DEFENSE EXHIBIT 5

USA-00000506

JA100

*DISPOSITION ELECTRONICALLY TRANSFERRED BY COURT OF JURISDICTION

RECORD AUTOMATED: 07/23/2012   LAST RECORD UPDATE: 04/03/2016

ALL ARREST ENTRIES CONTAINED IN THIS RECORD ARE BASED ON FINGERPRINT COMPARISON
AND PERTAIN TO THE SAME INDIVIDUAL.

THIS INFORMATION MAY NOT CONTAIN THE CHARGE DATE AND/OR CHARGE ORI FOR FILES
SUBMITTED THROUGH THE SUPREME COURT OF VIRGINIA EMAGISTRATE INTERFACE.

*** CAUTION ***
 THIS RESPONSE IS BASED ON COMPARISON OF REQUESTOR FURNISHED INFORMATION
AGAINST DATA CONTAINED IN THE FILES OF THE VIRGINIA STATE POLICE CRIMINAL
RECORDS EXCHANGE ONLY AND DOES NOT PRECLUDE THE EXISTENCE OF OTHER CRIMINAL
HISTORY INFORMATION WHICH MAY BE CONTAINED IN THE REPOSITORY OF OTHER LOCAL,
STATE OR FEDERAL CRIMINAL JUSTICE AGENCIES.
 CHANGES TO THIS RECORD MAY BE IN PROCESS.  A NEW INQUIRY SHOULD BE MADE FOR
SUBSEQUENT USE.  THE RECIPIENT(S) IS RESPONSIBLE FOR MAINTAINING AN AUDIT
TRAIL OF ALL SECONDARY DISSEMINATION OF ANY OF THIS INFORMATION.
*** UNAUTHORIZED DISSEMINATION WILL SUBJECT THE DISSEMINATOR TO CRIMINAL AND
CIVIL PENALTIES. ***

THIS IS A SINGLE-SOURCE RECORD. NO ADDITIONAL CRIMINAL HISTORY INFORMATION IS
INDEXED IN NCIC-III FOR OTHER STATE OR FEDERAL OFFENSES.

END OF RECORD

*************************************************************************

Page 2

0^0112

USA-00000507

JA101

# Offender Address Summary



## APRIL DAWN GLASS

SSN: XXX-XX-2802     FBI ID:     SID:     **Age:** 37     DOC ID: 1622547     DL: ████4151     Reference #: 42088203

| Address | Source | Date |
|---|---|---|
| ████████ STATESVILLE NC 28677-1752 | DOC | 01/06/2020 |
| ████████ STATESVILLE NC 28677 | AOC | 09/09/2019 |

○  0C0074

**\*\*For use by authorized criminal justice professionals only. Unauthorized use or distribution is subject to legal action.**
Printed By:    Jason  Lowrance
Printed For:   Jason  Lowrance
Printed Reason:   Criminal Justice - Purpose

13:41 Wednesday, January 22, 2020    Page 1

DEFENSE EXHIBIT
6

USA-00000471

JA102

# Offender Phone Number Summary



## APRIL DAWN GLASS

SSN: XXX-XX-2802     FBI ID:     SID:     Age: 37     DOC ID: 1622547     DL: ████4151     Reference #: 42088203

| Phone Number | Source | Data Source Identifier |
|---|---|---|
| ████6818 | DOC | 1622547 |

• 000075

**For use by authorized criminal justice professionals only. Unauthorized use or distribution is subject to legal action.
Printed By:    Jason Lowrance
Printed For:   Jason Lowrance
Printed Reason:    Criminal Justice - Purpose

USA-00000472

JA103

## Offender Images



APRIL DAWN GLASS

SSN: XXX-XX-2802    FBI ID:    SID:    Age: 37    DOC ID: 1622547    DL ███ 4151    Reference #: 42088203



09/09/2019

**For use by authorized criminal justice professionals only. Unauthorized use or distribution is subject to legal action.
Printed By:    Jason Lowrance
Printed For:    Jason Lowrance
Printed Reason:    Criminal Justice - Purpose

№ 000076

13:41 Wednesday, January 22, 2020    Page 3



**APRIL DAWN GLASS**

SSN: XXX-XX-2802    FBI ID:    SID:    Age: 37    DOC ID: 1622547    DL [REDACTED]4151    Reference #: 42088203

| Offense Status | County | Court File # | Process Type | Offense Date | Charged Offense | Convicted Offense | Disposition | Disposition Date | Last Court Date |
|---|---|---|---|---|---|---|---|---|---|
| PENDING | IREDELL | 19CR704813 | Citation | 04/12/2019 | MISDEMEANOR LARCENY (2322) (M) | | DEFERRED PROSECUTION/ PROCEEDING | 09/09/2019 | 09/08/2020 |

000077

**For use by authorized criminal justice professionals only. Unauthorized use or distribution is subject to legal action.
Printed By:    Jason Lowrance
Printed For:    Jason Lowrance
Printed Reason:    Criminal Justice - Purpose

13:41 Wednesday, January 22, 2020    Page 4

USA-00000474

JA105

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **DOCKET NO. 5:21-cr-60-KDB** |
| | ) | |
| v. | ) | **OPPOSITION TO DEFENDANT'S** |
| | ) | **MOTION TO SUPPRESS AND FOR** |
| | ) | **FRANKS HEARING** |
| **JESSIE LEROY GLASS, JR.,** | ) | |
| | ) | |
| | ) | |

COMES NOW the United States of America, by and through Dena J. King, United States Attorney for the Western District of North Carolina, and files its opposition to Defendant Jessie LeRoy Glass, Jr.'s request for a *Franks* hearing and motion to suppress. Defendant has not made the "substantial preliminary showing" under *Franks v. Delaware*, 438 U.S. 154 (1978), that is required for him to obtain an evidentiary hearing challenging the integrity of affidavits submitted in support of the search warrants in this matter. Moreover, the search warrant affidavits provided ample probable cause to search the devices at issue which ultimately identified scores of child pornography files. And, at any rate, the detective reasonably relied on the judge's search warrant authorization; thus, the good faith exception applies. Consequently, this Court should deny Defendant's request for a *Franks* hearing and his motion to suppress.

**FACTUAL AND PROCEDURAL HISTORY**

On February 11, 2020, law enforcement officers from the Iredell County Sheriff's Office ("ICSO") and Homeland Security Investigations ("HSI") executed a state search warrant at Defendant's residence in Statesville, North Carolina. ICSO Detective Jason Lowrance drafted the search warrant affidavit which was based on, among other things, a tip from Defendant's sometimes-estranged-wife that she had seen child pornography on Defendant's phone, a Samsung

1

JA106

Galaxy S9, in late December 2019. The search warrant affidavit said that:

- April Glass filed a report with the ICSO on January 2, 2020, stating she had seen that child pornography images on Jessie Glass Jr.'s cell in December 2019.

- The report said that Jessie Glass Jr. lived at [a particular address] in Statesville and that Glass Jr. kept the images in his Google Photos trash bin, and she gave Glass Jr.'s email account and the password.

- April left [the area] around the end of December.

- Det. Lowrance learned that Glass Jr., had been investigated in Virginia for similar reports in 2012 and 2016.

- On January 22, 2020, Det. Lowrance spoke with April Glass, who said that she was looking through Glass Jr.'s cell phone around the end of December 2019 and she found several images and videos of child pornography depicting juveniles around 10 years old or younger who were nude or were engaged in sex acts.

- Det. Lowrance spoke with Virginia State Police Agent Heather Brown concerning her investigation of Glass Jr. in 2016 for possessing child pornography. Agent Brown agreed to interview April Glass in Virginia.

- On January 28, 2020, Agent Brown spoke with April Glass in person. Glass reiterated that she last saw child pornography images on Glass Jr's phone at the end of December 2019, and Glass provided the following descriptions of the

images:

1.) An image of a child 18 months-old or younger. There was a bag over the child's head and it looked like someone was touching the genital area.

2.) Photos of girls and boys described as 10 years-old or younger and the children were made to take their pants down.

3.) A photo depicting the completely nude vagina of a prepubescent girl.

4.) A video of an adult male making a prepubescent female appearing to be 8 or 9 years old put his penis in her vagina. They were on a bed.

5.) A photo of an infant child and an adult male forcing his penis in the infant's mouth. They were on a bed.

6.) Several photos of prepubescent females naked.

7.) A photo of a family. All family members were naked. The children were described as having "barely hit puberty."

- April told Agent Brown that she had seen at least 50 photos on Glass Jr.'s phone, and that she was in his account more than one time and saw that new photos were added.

- April said that Glass Jr. used Tumblr to coax young girls onto Wickr and ask them for photos and that she had seen "the exchanges" on his phone.

- April also reported that, in reference to video number four described above, it appeared to be a video taken on a cell phone, and she was concerned that Glass Jr. was the adult male in the video.

- April said that Glass Jr. had a Samsung Galaxy S9 cell phone, and that when she asked Glass about the child pornography on the phone, he said that the photos downloaded to his phone for no reason.

During the execution of the search warrant, law enforcement officials seized various electronic items, including an LG phone ("LG phone") that was on top of a bar in living room area.

3

JA108

Defendant was not present during the search of his home, but his father was, and his father told officers that Defendant was at work and that the LG phone belonged to Defendant.

Later on February 11, 2020, a detective with the ICSO and a federal agent approached Defendant at his workplace and told Defendant that law enforcement officials were executing a search warrant at his home. When the detective asked Defendant if he had a phone on him, Defendant responded by reaching into his pocket, pulling out his phone, giving it to the detective, and saying that law enforcement would not find anything on the phone. That same day, Detective Lowrance applied for and received a state search warrant to search this phone, a Samsung Galaxy S9, for evidence related to child pornography violations. The affidavit supporting this search warrant contained the same information as the residential search warrant affidavit plus information about the law enforcement officials' visit to Defendant's workplace.

An HSI Computer Forensic Analyst (CFA) processed both the Samsung phone seized from Defendant and the LG phone seized from Defendant's residence. On the Samsung, the CFA discovered hundreds of images depicting child pornography. The images had been present on the phone at one time but had been deleted and were no longer available to the phone's user. Some of these images showed:

a.  a nude prepubescent male who was standing next to an adult female and adult male. The adult female was on her knees while she appeared to be performing fellatio on both the adult male and child victim.

b.  a partially nude prepubescent female who was performing fellatio on what appeared to be an adult male.

Also on the Samsung phone, the CFA found several text messages sent from the phone to another phone number identified in the Samsung phone's contacts as "mom." Contained in

these text messages were eight links to the website Mega, which is a cloud storage and file hosting service offered by New Zealand based Mega Limited. Of the eight links, two were still active. When the CFA accessed the active links, they lead to approximately 377 child pornography videos. The CFA, using the two links, was able to download child pornography videos, some of which are described as follows:

       c.    File name: cp anal y vaginal.mp4. This video file is forty-five seconds in length and depicts a nude prepubescent female who was lying on her back while an adult male vaginally penetrates the child victim and continued to penetrate the prepubescent female for the duration of the video.

       d.    File name: living the dream fucking amazing.mp4. This video file is approximately two minutes and eleven seconds in length and depicts, among other things, two nude prepubescent females, victim one and victim two. The video begins with victim one lying nude on a couch on her back; victim two is also nude and lying on her back, on top of victim one. At approximately sixteen seconds the video panned down, both child victims were still lying on top of each other and have their legs separated in a lewd and lascivious manner. The video remains focused on both victim's genitalia, and at approximately twenty-one seconds the camera zooms in on the nude prepubescent female's genitalia. At approximately the twenty-two second mark, the adult male uses his hand to insert the tip of his penis into victim one's vagina.

On the LG phone, the CFA found approximately 72 images and 21 videos depicting child pornography on the phone, all of which were active on the phone and had not been deleted. Two

of the videos on the phone were the same cp anal y vaginal.mp4. and the living the dream fucking amazing.mp4 videos described above.

On August 17, 2021, the government presented evidence to a grand jury resulting in a true bill of indictment charging Defendant with receipt and possession of child pornography. ECF Doc. 3. Over a year later, on November 30, 2022, Defendant filed a motion to suppress and a request for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), challenging the search warrants for both the LG phone and the Samsung phone. ECF Doc. 43. In support of his request for a *Franks* hearing, Defendant argues that the affiant omitted key information from both search warrants, namely a) April's role as tipster in the 2016 and 2017 child pornography investigations of Defendant; b) the outcomes of these prior child pornography investigations as well as a 2012 investigation of Defendant where April was not the reporter; c) April's misdemeanor larceny case which was pending at the time Detective Lowrance swore to the affidavit.[1]  *Id.* pp. 5-9. In addition, with respect to the Samsung phone, Defendant claims that the affiant falsely represented or omitted  circumstances about its seizure from Defendant, thereby rendering the affidavit false and misleading. Finally, in support of his motion to suppress, Defendant contends that the search warrants at issue lacked the requisite probable cause because they were based on incomplete information and unreliable information from April. As fully developed below, however, all of Defendant's claims are unavailing and should be rejected by the Court.

<p align="center">**ARGUMENT**</p>

I.      **DEFENDANT CANNOT MEET THE HIGH THRESHOLD FOR A *FRANKS* HEARING**

        A.      **Legal Standard**

---

[1] Defendant claims, "on information and belief," that there was another occasion in 2017 when the Iredell County Sheriff's Office investigated him based on an anonymous tip and did not find any "incriminating evidence." ECF Doc. 43 p. 7. To the best of his recollection, Detective Lowrance was and is not aware of any such incident.

A *Franks* hearing allows a defendant, in "limited" circumstances, to challenge a search-warrant affidavit. *United States v. Moody*, 931 F.3d 366, 370 (4th Cir. 2019); *United States v. Tate*, 524 F.3d 449, 454 (4th Cir. 2008). The defendant's burden is high. To trigger a *Franks* hearing when the allegation is that the affidavit contains false statements, the defendant must make a "substantial preliminary showing" that the affiant made (1) a false statement, (2) "knowingly and intentionally, or with reckless disregard for the truth," that was (3) "necessary to the finding of probable cause." *United States v. White*, 850 F.3d 667, 673 (4th Cir. 2017) (citing *Franks v. Delaware*, 438 U.S. 154, 155 56 (1978)); *United States v. Moody*, 931 F.3d 366, 370 (4th Cir. 2019). A "presumption of validity" attaches to the affidavit under this analysis. *Tate*, 524 F.3d at 454 (citation omitted). To overcome that presumption, the defendant must offer proof. *Id*. (citation omitted). It is not enough to "point out specifically the portion of the affidavit that is claimed to be false and give reasons why it is false." *Id*. (citation omitted). Rather, the defendant must "furnish affidavits or sworn or otherwise reliable statements of witnesses or explain their absence." *Id*. (citation and alterations omitted). Nor is it sufficient to show "negligence or innocent mistake[s]." *Id.* With all these requirements, the "burden of making the necessary showing is thus a heavy one to bear." *Id*.

To obtain a *Franks* hearing based on an omission theory, a defendant is "required to make a 'substantial preliminary showing' that the omissions were intentional or reckless, and that the omitted information was material to the magistrate's probable cause determination." *United States v. Jones*, 942 F.3d 634, 640 (4th Cir. 2017) (citations omitted). "For the omitted statements to be deemed material, their inclusion must defeat probable cause." *Id*. Accordingly, when, as Defendant does here, a defendant bases his *Franks* request on an omission, the "burden increases yet more." *Id.* "Affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (citation and internal

quotation marks omitted). "An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Id.* Thus, to satisfy *Franks* based on an omission, "the defendant must show that facts were omitted with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading." *Tate*, 524 F.3d at 455 (citation and internal quotation marks omitted). The omissions, if included in the affidavit, "must be essential to the probable cause determination." *Colkley*, 899 F.2d at 300 (citation omitted).

Defendant has fallen considerably short of meeting this high burden. Defendant cannot point to any credible or competent evidence in support of his claim that the affiant omitted the claimed facts with the intent to mislead the magistrate or in reckless disregard for the truth. Similarly, with respect to the alleged false statement, Defendant points to no evidence that the affiant "knowingly and intentionally, or with reckless disregard for the truth" made an affirmative false statement. And in any event, Defendant is still not entitled to a *Franks* hearing because even if the omitted information was included in the affidavits, such information still would not have abrogated the probable cause supporting the search warrants' issuance. *United States v. Jones*, 942 F.3d 634, 640 (4th Cir. 2017) (noting that the materiality test under *Franks* simply entails inserting the "omitted facts into the warrant affidavit and, examining the information contained within the "revised" affidavit, [to] evaluate whether there nevertheless would have been probable cause to issue the warrant").

### B. Defendant Has Failed to Offer Evidence that Affiant Intended to Mislead the State Superior Court Judge or Omitted Information With Reckless Disregard of Whether it Would Make the Affidavit Misleading

Defendant claims that the Detective Lowrance omitted a) April's role as tipster in the 2016 and 2017 child pornography investigations of Defendant; b) the outcomes of these prior child pornography investigations as well as a 2012 investigation of Defendant where April was not the

reporter; and c) April's misdemeanor larceny case which was pending at the time Detective Lowrance swore to the affidavit. ECF Doc. 43 p. 5-9. With respect to a *Franks* claim based on alleged omissions, Defendant must show that "the omission is the product of a "deliberate falsehood or of reckless disregard for the truth." *Colkley,* 899 F.2d at 301. Put another way, Defendant is required to offer proof that the ICSO detective "had the requisite intent to mislead." *Id.* at 301. This rule makes good sense because to permit otherwise "potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *Id.* at 301. "Merely identifying [false statements or] factual omissions is insufficient." *United States v. Clenney*, 631 F.3d 658, 664 (4th Cir. 2011). Indeed, *Franks* contemplates that affiants will sometimes get things wrong: "This does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants." 438 U.S. at 165. As the *Franks* Court acknowledges, the information "sometimes must be garnered hastily." *Id.* Rather, *Franks* examines whether the information "is believed or appropriately accepted by the affiant as true." *Id.* Indeed, as noted by the Fourth Circuit: "*Franks*, by contrast, recognizes that the information an affiant reports from an informant may not ultimately be accurate, and is willing to tolerate such a result so long as the affiant did not mislead the magistrate." *Colkley*, 899 F.2d at 303 (citation omitted).

Here, Defendant has offered no evidence of an intent to mislead the state superior court judge. Defendant's motion does not include any supporting attachments containing affidavits or any other supporting evidence. Rather, like the *Colkey* defendant, Defendant asks the court to infer "intent or recklessness from the fact of the omission itself." *Id.* at 301. But reliance on such an inference is wholly insufficient because of "the potential for endless rounds of *Franks* hearings to

9

contest facially sufficient warrants" and especially "considering "the level of flagrant police action *Franks* is designed to prevent." *Id.* at 301 (affirming district court's denial of a *Franks* hearing based on a claim that affiant omitted purported exculpatory facts because defendant "made no showing and the district court possessed no evidence" of the agent's "requisite intent to mislead.").

Defendant's reliance on *United States v. Lull*, 824 F.3d 109, 117 (4th Cir. 2016) is misplaced. In *Lull,* the Fourth Circuit considered the District Court's *Franks* analysis arising from an affiant's omission of a confidential informant's misconduct during an undercover operation that served as the factual predicate for the charges brought against the defendant. Specifically, law enforcement used a confidential informant to conduct a controlled buy of cocaine with Lull. *Id.* at 112. To conduct the purchase, law enforcement provided the confidential informant with buy money. Following the controlled buy, law enforcement returned to the police department with the confidential informant and discovered a discrepancy in the amount of buy money remaining in the confidential informant's possession. When questioned about the discrepancy, the confidential informant falsely claimed that he gave the money to Lull. *Id.* at 112. Worse, when law enforcement searched the confidential informant, they discovered the missing money in his underpants. *Id.* at 112. Upon discovering the theft, law enforcement immediately terminated the informant as a confidential informant and thereafter charged him with a felony obtaining property by false pretenses. *Id.* Within "half an hour" after arresting the confidential information, law enforcement obtained a search warrant of Lull's home. In the affidavit, the agent recounted the controlled buy but failed to disclose the confidential informant's misconduct and subsequent arrest. *Id.*

On those facts, the Fourth Circuit reversed the District Court's denial of a *Franks* hearing, ruling that the omission was "at the least reckless" because of "(1) the decisiveness with which the Sheriff's Office acted in discharging and arresting the informant; (2) Investigator Welch's

knowledge of the consequences of the informant's crime; (3) the temporal proximity of the arrest to the decision to omit information from the affidavit; and (4) the obvious impact of the informant's misconduct on any assessment of his reliability." *Id.* at 116. Importantly, in reaching this conclusion, the Fourth Circuit noted the continued obligation to heed *Colkley's* concern that "inferring bad motive ... from the fact of an inference collapses into a single inquiry 'intentionality' and 'materiality'—which *Franks* states are independently necessary." *Id.* at 116 (*quoting Colkley*, 899 F.2d at 301). The *Lull* Court ensured that it complied with the *Colkley* guidance by conducting a fulsome examination of the "broader circumstances in which the affidavit was drafted" rather than basing its conclusion on the "fact of the omission alone." *Id.*

*Lull* is readily distinguishable from the facts here and does not support Defendant's request for a *Franks* hearing. Unlike the *Lull* confidential informant who lied to and was arrested by law enforcement for stealing money in the exact undercover operation targeting the defendant, Defendant has not and cannot make analogous credible allegations against April. Defendant does not offer any proof or make any non-conclusory argument that the affiant made omissions with the design to mislead or in reckless disregard of whether the omissions would mislead. To the contrary, Defendant asks this Court to impermissibly infer bad motive from an omission alone, an approach at odds with controlling Fourth Circuit precedent.

Defendant does not, and cannot, claim that the information about the prior investigations provided is false. The affidavits simply stated: "The affiant looked up information for Jessi L. Glass in LINX and learned that Jessie had been investigated in Virginia for similar reports in 2012 and 2016." ECF Doc. 43- page 4. Inclusion of the fact of the prior investigations could not have mislead the state superior court judge because as reflected above, it is hyper-factual, contains no suggestion that charges were brought, and, in fact, raises an inference that Defendant was not

11

convicted of any charges. Accordingly, based on a fulsome examination of the "broader circumstances in which the affidavit was drafted" the Court should deny Defendant's request for a *Franks* hearing. *Lull* at 116.

### C. The Alleged Omissions are Immaterial and Do Not Trigger a *Franks* Hearing

To satisfy the *Franks* materiality requirement, the Fourth Circuit has outlined a straight-forward test:

> We assess materiality using a simple test. We insert the omitted facts into the warrant affidavit and, examining the information contained within the "revised" affidavit, evaluate whether there nevertheless would have been probable cause to issue the warrant. If the revised affidavit still establishes probable cause, the defendant is not entitled to a *Franks* hearing

*United States v. Jones*, 942 F.3d 634, 640 (4th Cir. 2017) (citation omitted). As explained below, application of the foregoing test on each of the omitted "facts" shows that Defendant is not entitled to a *Franks* hearing. Defendant claims that the affiant omitted a) April's role in the 2016 and 2017 child pornography investigations of Defendant; b) the outcomes of these prior child pornography investigations as well as a 2012 investigation of Defendant where April was not the reporter; and c) that April had a pending misdemeanor larceny case at the time Detective Lowrance swore to the affidavits. ECF Doc. 43 pp. 5-9. Defendant asserts that such omissions, if included in the affidavits, undermine April's credibility and, consequently, defeat the probable cause set forth in the affidavit. ECF Doc. 43 p. 8.

However, probable cause would still exist even had Detective Lowrance included this information in the affidavit because the omitted "facts" are immaterial to probable cause. That April made prior reports that did not result in criminal charges or convictions does not mean that April previously was untruthful. Indeed, Defendant has not presented any evidence that either the Virginia or North Carolina detective closed their cases because April made false allegations

12

JA117

or Defendant had not committed child pornography offenses. The Virginia detective involved in the 2016 investigation did not conclude that April's claims were unfounded. Rather, she requested that the case be closed because she "was unable to get anyone in North Carolina to take the case," and "[t]here were no violations that occurred in Virginia." ECF Doc. 43-3 p. 1. As to the 2017 North Carolina investigation, the detective wrote that he would be "closing the case as unfounded." ECF Doc. 43-4 p. 1. Defendant presents no evidence that the detective closed the case because the tipster was not truthful or Defendant was innocent. Defendant's assertion that "both times [April's previous] allegations were deemed unfounded," is wrong, and his conclusory assumption that April is an unreliable reporter because her reports never resulted in convictions is unsupported. ECF Doc. 43 pp. 6-8. The reality is that multiple factors may inform a sovereign's decision not to seek charges against a target. Defendant's entire *Franks* request is based on a flatly wrong and faulty assumptions that since no charges were brought in these prior investigations, Defendant was innocent of the conduct and April is incredible. Likewise, including in the affidavit that authorities dismissed Defendant's 2012 sodomy case has no bearing on April's credibility or on whether Defendant possessed child pornography in 2020.

Regarding April's pending misdemeanor larceny charge, again, Defendant offers only conclusory assumptions about this misdemeanor larceny charge to argue that April is not credible. This is not sufficient proof to overcome the controlling Fourth Circuit standard that requires Defendant, in the *Franks* context, to make a "'substantial preliminary showing' that the omissions were intentional or reckless, and that the omitted information was material to the magistrate's probable cause determination." Additionally, "[f]or an omission to serve as the basis for a hearing under *Franks*, it must be such that its inclusion in the affidavit would defeat probable cause for arrest," and "[o]mitted information that is potentially relevant but not

dispositive is not enough to warrant a *Franks* hearing." *Colkley*, 899 F.2d at 301. In *Colkey*, the Fourth Circuit refused to extend *Brady* trial protections involving exculpatory evidence to the search warrant process in part "[b]ecause the consequences of arrest or search are less severe and irremediable than the consequences of an adverse criminal verdict, a duty to disclose potentially exculpatory information appropriate in the setting of a trial may be less compelling in the context of an application for a warrant." *Colkey*, 899 F.2d 297 at 302. This analysis should extend to impeachment evidence, too. *United States v. Indivior Inc.*, 448 F. Supp. 3d 587, 600 (W.D. Va. 2020)(rejecting defendant request for a *Franks* hearing and ruling not material the affiant's omission of impeachment material of informant who "filed a qui tam action against the defendants for substantially similar activity" because, the "level of detail provided in source's description of alleged wrongdoing by defendants" were based on personal observations).

Here, the inclusion of the pending charge in the affidavit would not have affected the judge's finding of probable cause. There is no "blanket" rule "that an informant's drug use, pending charges, or cooperation is so suspect that it necessarily vitiates probable cause." *United States v. Ketzeback*, 358 F.3d 987, 991 (8th Cir. 2004)(noting that issue of informant's credibility "is not, however an independent requirement 'to be rigidly exacted in every case…the existence of probable cause is instead a fluid, nontechnical judgement made after a 'practical commonsense' evaluation of the 'totality of the circumstances'")(citing cases). Indeed, none of the cases cited by Defendant—all of which considered the issue of whether the respective courts properly admitted the witness' or Defendant's prior *convictions at trial*--held that a citizen-informant with a pending misdemeanor larceny *charge* is per se unreliable and that law enforcement and judicial officials cannot rely on her to establish probable cause for a *search warrant*.

JA119

This information about the pending charge is not material because even had Detective Lowrance included it in the affidavits, there would still be probable cause to support the search warrants. As discussed more fully below, April met with law enforcement in person and provided an eyewitness account of a crime in which she had a personal interest in reporting. That April had a pending misdemeanor larceny charge when she told police about Defendant's child pornography activities in 2020 does not mean that she made up the information, especially given her detailed descriptions of the child pornography images and video. It is highly unlikely that a judge would have found there was no probable cause because of April's pending misdemeanor larceny charge. Therefore, because the omissions alleged by Defendant were not material to the probable cause finding, Defendant has not met his burden and is not entitled to a *Franks* hearing.

## D. Defendant Has Not Met His *Franks* Burden With Regard to the Samsung Phone.

Defendant claims that Detective Lowrance both omitted "information regarding the number" of officers present at Defendant's workplace and falsely stated in the search warrant affidavit that Defendant turned over his phone voluntarily. ECF Doc. 43 p. 9. As stated above regarding omissions and a *Franks* hearing, a defendant is "required to make a 'substantial preliminary showing' that the omissions were intentional or reckless, and that the omitted information was material to the magistrate's probable cause determination." *Jones*, 942 F.3d at 640. To trigger a *Franks* hearing when the issue is false statements, the defendant must make a "substantial preliminary showing" that the affiant made (1) a false statement, (2) "knowingly and intentionally, or with reckless disregard for the truth," that was (3) "necessary to the finding of probable cause." *United States v. White*, 850 F.3d at 673 (4th Cir. 2017).

JA120

As to the alleged omission and alleged false statement, Defendant claims "upon information and belief" that "at least four" law enforcement officials came to his workplace, told him they "need[ed]" his phone, and that he did not voluntarily turn over his phone. ECF Doc. 43 p. 9. Detective Lowrance wrote in the affidavit that "Detective A. Aponik and Homeland Security Officer Jon Pavlovic went to Jessie Glass Jr's work place here in Statesville call[sic] Amesbury Truth. They were able to speak with Jessie Glass Jr. concerning the investigation and the search warrant at his residence. Jessie volentary [sic] turned his cell phone over to Detective Aponik to be searched. Jessie told detective Aponik that there should not be any child pornography on his cell phone." ECF Doc. 43-2 p. 6. Based on the language he used in the affidavit, it is apparent that Detective Lowrance was not at Defendant's workplace and that he based this portion of the affidavit on a report or reports he received from the law enforcement officers who were there. Detective Lowrance had no reason not to rely on these officers and no reason not to represent that there were two officers at Defendant's workplace and that Defendant voluntarily provided his cell phone to them. Defendant's offer of facts "upon information and belief" is not sufficient proof that Detective Lowrance omitted any facts regarding the seizure of the Samsung phone and falls well short of the required "'substantial preliminary showing' that Detective Lowrance "knowingly and intentionally, or with reckless disregard for the truth" made a false statement," *White*, 850 F.3d at 673. Because Defendant cannot meet this prong, the question of materiality regarding the alleged false statement is moot and he is not entitled to a *Franks* hearing.

## II. This Court Should Not Grant Defendant's Motion to Suppress Because Probable Cause Supported Both Search Warrants and the Detective Relied on the Warrants in Good Faith.

This Court should deny the motion to suppress. First, there is ample probable cause to support the searches of the home and Samsung phone which was based on an in-person detailed tip. Alternatively, Detective Lowrance relied on the search warrants in good faith.

### A. The Search Warrants Are Supported by Probable Cause.

A judicial official may issue a search warrant only if it is supported by probable cause. Fed. R. Crim. P. 41(d)(1). But, "[p]robable cause is 'is not a high bar.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Kaley v. United States* 134 S. Ct. 1090, 1103 (2018)). The judicial official uses a "totality-of-the-circumstances analysis," and "[t]he task" of the official "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). A court reviewing a judicial official's finding of probable cause must afford that finding "great deference." *United States v. Hodge*, 354 F.3d 305, 309 (4th Cir.2004).

Probable cause may be founded upon hearsay information and information received from informants, including anonymous sources. *Franks*, 438 U.S. at 154. "However, there is no bright-line rule as to when such information may establish probable cause: 'Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. One simple rule will not cover every situation.'" *United States v. DeQuasie*, 373 F.3d 509, 518 (4th Cir. 2004) (quoting *Adams v. Williams*, 407 U.S. 143, 147 (1972)). And, "'[t]here is no set requirement that all tips be corroborated by subsequent police investigation in order to be

considered credible. Whether subsequent corroboration is necessary must be determined in the light of the totality of the circumstances presented by the particular set of facts.'" *DeQuasie*, 373 F.3d at 519 (citation omitted).

Courts have differentiated tips from anonymous sources and tips from known sources. "'[A]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity' or contains 'sufficient indicia of reliability' necessary to provide the reasonable suspicion necessary to justify a *Terry* stop and frisk. *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (quoting *White*, 496 U.S. at 327.). However, "courts generally presume that a citizen-informant or a victim who discloses his or her identity and basis of knowledge to the police is both reliable and credible." *United States v. Kehoe*, 893 F.3d 232, 238 (4th Cir. 2018). And, a tipster who also meets face-to-face with the police is even more credible because the officer has "an opportunity to observe their demeanor and assess their credibility, and they also expose[] themselves to potential criminal liability for filing a false report. *Dequasie,* 373 F.3d at 523.

Here, there was more than a substantial basis for the state superior court judge to rely on the information provided by Detective Lowrance and April and find probable cause. First, Detective Lowrance knew her name and how to get in touch with her, and he read her report and talked with her. Importantly, April met in person with the Virginia detective. Unlike the anonymous tips in a letter, a 911 call, or to a tip line, *see, e.g. Gates*, 462 U.S. at 255 (upholding a search warrant based in part of an anonymous handwritten letter), an interview allows a trained officer the opportunity to "assess [the source's] credibility and demeanor." *DeQuasie*, 373 F.3d at 523. Second, April's knowledge came not from hearsay but from her personal observations of child pornography images and video, and the information she provided about the locations of the images and videos and the descriptions she gave of them were "explicit and detailed." *Gates*, 462

U.S. at 234.  Third, the affidavits indicated that April "said in the aforementioned video, where the adult male was making an 8/9 year old girl put his penis in her vagina, it appeared to be a video taken on a cell phone and she was concerned that Jessie, Jr. was the adult male in the video."  ECF Doc. 43-1 p. 5.  April's personal interest in the safety of this child created "a strong motive to supply accurate information."  *United States v. Miller*, 925 F.2d 695, 699 (4th Cir. 1991); *see also United States v. Doyle*, 650 F.3d 460, 472-73 (4th Cir. 2011)("Moreover, Jones' concern for the safety of the children is an additional indication of his credibility"(citation omitted); *United States v. Perez*, 393 F.3d 457, 462 (4th Cir. 2004) (citing same).

Defendant's reliance on *Wilhelm* is unhelpful.  In that case, the affidavit was based on a phone call the detective received from an unnamed informant, and the affidavit contained the affiant's "conclusory descriptions apparently designed to establish the informant's trustworthiness."  *United States. v. Wihlem*, 80 F.3d 116, 120.  The Court was "particularly concerned with [the affiant's] statements that the informant was a "concerned citizen," and "a mature person with personal connections with the suspects," who "projected a truthfull [sic] demeanor."  *Id*.  To the contrary here, April's identity was known to law enforcement who interviewed her in person and could assess her credibility.  And, Detective Lowrance made no problematic conclusory statements about her demeanor in his affidavit.  Moreover, the detailed descriptions of the child pornography that April provided demonstrated that she had first-hand knowledge of the contraband and was not just someone who got her descriptions from "occasionally watch[ing] the evening news."  *Wilhelm*, 80 F.3d at 121. Thus, unlike the affidavit in *Wilhelm*, Detective Lowrance's affidavits includes ample probable cause, and Defendant's motion to suppress should not be granted.

19

JA124

**B.     Even if the Search Warrant Was Deficient in Some Manner, the Good Faith Exception Applies**.

"Evidence obtained in violation of the Fourth Amendment, of course, is generally subject to suppression under the exclusionary rule." *United States v. Perez*, 393 F.3d 457, 460 (4th Cir. 2004).   Although the Fourth Amendment does not "expressly preclude[] the use of evidence obtained in violation of its commands," courts have developed the exclusionary rule applicable to criminal trials as a "means of deterring illegal searches and seizures."  *United States v. Leon,* 468 U.S. 897, 906 (1984); *Pa. Bd. cf Prob. and Parole v. Scott,* 524 U.S. 357, 363 (1998).   The exclusionary rule is "'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search."  *Davis v. United States,* 564 U.S. 229, 236 (2011) (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976). The policy behind the rule is not furthered by excluding evidence "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Leon*, 468 U.S. at 920.  Courts considering whether good faith applies must ask whether a reasonable officer standing the detective's shoes could be expected to have known that the warrant was invalid.  *See United States v. Clutchette*, 24 F.3d 577, 582 (4th Cir. 1994).  In "the ordinary case, an officer cannot be expected to question the magistrate's probable cause determination or his judgment that the form of the warrant is technically sufficient."  *Leon*, 468 U.S. at 921.

However, the *Leon* Court noted four circumstances in which the good faith exception would not be available: 1) the magistrate was misled by false information knowingly or recklessly submitted by the affiant; 2) the magistrate abandoned his neutral and detached role and acted as a "rubber stamp" for the police; 3) the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or 4) the search warrant was "so facially

Case 5:21-cr-00060-KDB-DSC   Document 47   Filed 12/28/22   Page 20 of 22

JA125

deficient - i.e., in failing to particularize the place to be searched or the things to be seized - that the executing officers cannot reasonably presume it to be valid." *Id.* at 908-10.

In this case, none of the *Leon* exceptions apply. First, as discussed above, the findings of probable cause were not based on statements that were knowingly or recklessly false, and the judge was not materially misled by the affidavits supporting the search warrants. Second, the North Carolina Superior Court Judge who reviewed and authorized the search warrant affidavits can be presumed to have carefully assessed the facts in light of governing law in arriving at the conclusion that probable cause existed. The judge did not abandon their neutral role and act as a "rubber stamp" for the police—Detective Lowrance described the steps he took to investigate April's tip, and the affidavits contained sufficient details and the specific items to be searched and the items to be seized. Third, the affidavits on their faces clearly describe with specificity the data to be searched and collected and were not overboard

Finally, the affidavits were supported by a sufficient showing of probable cause. These were not "bare bones" affidavits "that 'depended on information from an unnamed informant and provided no indication of that informant's truthfulness or reliability.'" *DeQuasie*, 373 F.3d at 522 (quoting *Wilhelm*, 80 F.3d at 120). Detective Lowrance identified April as his source of information. He indicated that he talked to her and that April had met in person with the Virginia detective to make a report. This face-to-face meeting gave the Virginia detective, who had met April while investigating Defendant for similar crimes in 2016, the opportunity to assess April's credibility, and it exposed April to potential criminal liability if she gave false information. Additionally, April had a personal interest in making an accurate report because children were being victimized, possibly by Defendant. April Glass, based on their shared the same last name, had a relationship with Jessie Glass Jr. Because of that relationship, April was in a position to see,

21

Case 5:21-cr-00060-KDB-DSC   Document 47   Filed 12/28/22   Page 21 of 22

JA126

and did see, the child pornography. She gave detailed descriptions of the child pornography and where and how she saw it. The Superior Court judge could assess the reliability of the information based on who it came from and the how specific it was. The Superior Court judge was also aware that Defendant had been investigated twice before for similar incidents.

Detective Lowrance proffered his evidence to a state Superior Court judge. He reasonably relied on the authorization that probable cause existed to support the search warrants. For that reason, even if this Court deems the affidavits insufficient, suppression of evidence would not be the proper remedy.

## CONCLUSION

Based on the above, this Court should deny Defendant's untimely motions for a *Franks* hearing and to suppress.

Respectfully submitted, this the 28th day of December 2022.

DENA J. KING
UNITED STATES ATTORNEY

s/ KIMLANI M. FORD
NC Bar Number: 25426
Assistant United States Attorney
United States Attorney's Office - WDNC
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 338-3178
Facsimile: (704) 344-6629
E-mail: Kimlani.ford@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of December 2022, the foregoing document was served electronically on Defendant through ECF filing.

s/KIMLANI M. FORD
Assistant United States Attorney

22

JA127

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JESSIE LEROY GLASS, JR.,<br><br>Defendant. | **Case No.: 5:21-cr-60-KDB**<br><br>Hearing: January 12, 2022 @ 3:00 p.m. |

### REPLY TO GOVERNMENT'S OPPOSITION TO MR. GLASS'S MOTION TO SUPPRESS EVIDENCE

Mr. Glass alleges that police violated his Fourth Amendment rights when they executed two search warrants—one for his home and one for his cell phone. In response, the government opposes his motion arguing that Mr. Glass is not entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), that the search warrant affidavits provided probable cause to search, and that the good faith exception applies. The government's arguments are without merit.

First, this Court has granted Mr. Glass an evidentiary hearing on his motion to suppress, which included a request for a *Franks* hearing. *See* Dkt. Entry Jan. 3, 2023. The government's remaining arguments that Mr. Glass cannot establish a *Franks* violation are not supported by the record or the law.

Second, the government attempts to distinguish the cases cited by Mr. Glass to demonstrate that the warrants lacked probable cause. But its arguments assume Ms. April Glass is a known, reliable informant. As Mr. Glass outlined in detail in his motion, Ms. Glass may have been a known informant but she was certainly not a reliable one.

JA128

Third, the good faith exception does not apply here, because the officers could not act with "objective reasonableness" where the affidavits were based on knowingly false and misleading information.

This Court should grant Mr. Glass's motion to suppress and it should suppress all of the evidence obtained in violation of his Fourth Amendment rights.

## ARGUMENT

**I.      The search warrants are invalid under *Franks v. Delaware*.**

The government first argues that Mr. Glass cannot show that Detective Lowrance "intended to mislead" or "omitted information with reckless disregard" when he made material omissions in his warrant affidavits regarding Ms. Glass. Dkt. No. 47 at 8-11. The government attempts to pigeonhole Mr. Glass's argument as one that "[m]erely identif[ies false statements or] factual omissions" and fails to prove that Detective Lowrance's omissions and misstatements were "the product of a deliberate falsehood or of reckless disregard for the truth." *Id.* at 9 (citing *United States v. Clenney*, 631 F.3d 658, 664 (4th Cir. 2011)). These arguments miss the mark.

Mr. Glass does not "merely identify false statements or factual omissions" made by Detective Lowrance. Instead, he identifies false statements and factual omissions that were *known* to Detective Lowrance and which he failed to include in his affidavits. For example, Detective Lowrance attested in his affidavit that he ran a LInX search for Mr. Glass and discovered his previous "investigations."[1] Exhibit 1. That search included information that Mr. Glass's Virginia case was "nolle prossed"—a fact Detective Lowrance omitted. *See* https://cjin.nc.gov/infoSharing/Presentations/NC%20LINX%20Rules%20v3%20Final-1.pdf ("[LInX] includes collection and integration of all participating agencies' law enforcement

---

[1] The discovery indicates that Detective Lowrance, before obtaining the warrant, knew the previous case had been dismissed.

information relating to locations, crimes, suspects, associates, arrests, etc.");
https://cjin.nc.gov/infoSharing/Presentations/LInX%20NC%20FAQ%20(2)-1.pdf ("The LInX
System should contain all of the legally sharable information on: • Incidents – arrests, crimes,
contacts, weapons, field interviews, citations, etc.; • Mug shots and booking records; • All
investigative case reports, follow-up reports with available free text narratives."). Likewise,
Detective Lowrance knew that Agent Brown's Virginia investigation had been closed because not a
single agency in North Carolina would "take the case." Exhibit 2. He omitted this information from
his affidavits. And he knew that his own agency—the Iredell Sheriff's Office—obtained a warrant
to search Mr. Glass's tablet, searched it and found nothing illegal, and closed the case as
"unfounded." Exhibit 4. He omitted this information from his affidavits. He also omitted known
information that Ms. Glass had been arrested for larceny, as evidenced by the printout that predated
the warrant applications in his casefile. Exhibit 6.

When a law enforcement officer applies for a warrant and omits material facts *known* to
him in that application, the defendant can show a reckless disregard for the truth. In *United States
v. Lull*, police utilized a confidential informant to set up a controlled drug buy from Lull. 824 F.3d
109, 112 (4th Cir. 2016). However, after returning from the buy, the informant was missing $20
that was due to the sheriff. After a search of his person, police discovered the $20. *Id.* Officers
determined the informant was unreliable, and shortly thereafter, arrested him for obtaining money
under false pretenses. *Id.*

Nevertheless, the officer applying for a warrant to search Lull's residence relied on the
informant's buy but failed to include any information regarding the informant's unreliability, or
any of the facts that led to the ultimate arrest. *Id.* at 117. In so doing, the Fourth Circuit concluded
that the investigator "decided for himself that the informant was reliable for the purposes of the
controlled buy, usurping the magistrate's role." *Id.* That fact demonstrated that the officer "acted at

least recklessly." *Id.* What's more, he also acted recklessly when he "failed to inform the judicial officer of facts he knew would negate probable cause." *United States v. Lull*, 824 F.3d 109, 117 (4th Cir. 2016). *See also United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014) ("An officer's omission from the probable cause affidavit of known and substantial adverse information about the informant's credibility is sufficient to support a reasonable inference of recklessness.") (and cited favorably in *Lull*, 824 F.3d at 118). The relevance of the omission was "clearly relevant to the magistrate's probable cause determination, because:

> The trustworthiness of the confidential informant lies at the heart of the reliability determination, and so the relevance of this information should have been obvious to Investigator Welch. This is especially so because the affidavit contained no other statement concerning the informant's credibility or experience working as a confidential informant.

*Lull*, 824 F.3d at 116.

The government resists *Lull*'s application to Mr. Glass, by characterizing his claim as recklessness may be found based on the "fact of omission alone." Dkt. No. 47 at 11 (citing *Lull's* citation to *Colkley*). As an initial matter, the government's argument is premised on an incomplete citation to a footnote in *Lull*. The full footnote notes that the language relied on by the government in *Colkley* was "dicta." 824 F.3d at 117 n.2. Further, the footnote is careful to explain that the court did not rely solely "on the fact of omission alone." *Id.* Instead, the court looked to the "broader circumstances in which the affidavit was drafted."

As in *Lull*, the circumstances surrounding the affidavits here establish that Detective Lowrance deliberately at worst and recklessly at best omitted information from his affidavits that negated Ms. Glass's credibility and reliability. In so doing, Detective Lowrance "decided for himself that [Ms. Glass] was reliable for the purposes of [her tip], usurping the magistrate's role." *Id.* at 117. In addition, he acted recklessly when he "failed to inform the judicial officer of facts he knew would negate probable cause." *Id.* Detective Lowrance's case files contained the information

regarding Ms. Glass's credibility and reliability, which went to the heart of the probable cause determination. The facts were known to him and his failure to include that evidence in the warrant applications demonstrates that at the very least, he acted in reckless disregard for the truth. Like the Fourth Circuit concluded in *Lull*, this Court should hold that Mr. Glass "has satisfied the intentionality prong of the *Franks* test." *Id.*

Second, the government argues the omissions and false statements made by Detective Lowrance are not material to the probable cause determination. Dkt. No. 47 at 12-16. It argues that Mr. Glass has not alleged or presented evidence that either the Virginia or North Carolina cases were closed because April made false allegations. *Id.* at 11-13. With respect, the government is wrong. Mr. Glass does allege that at the very least the information provided by Ms. Glass in the North Carolina investigation was false. The investigation was dismissed as "unfounded." Exhibit 4. The Oxford Dictionary defines "unfounded" as "not based on reason or fact."[2] Similarly, the Cambridge Dictionary defines "unfounded" as: "If a claim or piece of news is unfounded, it is not based on fact."[3] A "fact," in turn, is defined as "a thing known to be true, especially when it can be proved."[4] If something is unfounded, then, it is not based on fact and is therefore not true, i.e. it is false. Therefore, Ms. Glass's unfounded allegations in North Carolina were determined to be false.

Likewise, the investigation in Virginia based on Ms. Glass's tips was apparently so lacking in probable cause that Agent Brown "was unable to get anyone in North Carolina to take the case." Exhibit 2. The fact that no law enforcement agency in North Carolina was willing to investigate Ms. Glass's serious allegations of child pornography belies belief and experience and instead

---

[2] https://www.oxfordlearnersdictionaries.com/us/definition/english/unfounded#:~:text=unfounded-,adjective,based%20on%20reason%20or%20fact.

[3] https://dictionary.cambridge.org/us/dictionary/english/unfounded

[4] https://www.oxfordlearnersdictionaries.com/us/definition/english/fact#:~:text=%2Ff%C3%A6kt%2F,when%20it%20can%20be%20proved

indicates a lack of credibility and reliability of the sole witness. Because the "trustworthiness of the confidential informant lies at the heart of the reliability determination," Ms. Glass's previous unfounded allegations against Mr. Glass, and her pending criminal charges, were material to any probable cause determination. *Lull*, 824 F.3d at 116.

Next, the government argues that Mr. Glass cannot demonstrate that Detective Lowrance intentionally or recklessly included false information in his affidavit to seize the Samsung S9. Dkt. No. 47 at 15-16. Of course, the same false information and material omissions regarding Ms. Glass were also present in the warrant for the Samsung S9 and that alone is sufficient to establish a *Franks* violation. *See* Exhibits 1 and 2. But the Samsung S9 affidavit contained additional false and misleading information. As to those allegations, the government claims that Mr. Glass cannot make the requisite intentionality showing because he states "upon information and belief." Dkt. No. 7 at 16. However, the government's own discovery reflects that Detective Aponik's report confirms Mr. Glass's allegation that officers told him they already had a warrant for his home and were searching it. Detective Aponic asked if Mr. Glass had his cell phone with him, and he handed it to the detective, who took it. *Id.*

The government also argues that because Detective Aponik was not with the other officers when they seized the phone, his affidavit could only rely on the other officers' representation of the seizure. This argument attempts to do an end-run around the requirement that a magistrate assess the "veracity" and "basis of knowledge" of the person supplying information in the warrant application. *Illinois v. Gates*, 462 U.S. 213, 238-239 (1983). If this Court were to adopt the government's rule, it would incentivize officers not involved in the drafting of a warrant application to present untruthful, misleading, and/or incomplete information to the affirming officer. *See Franks*, 438 U.S. at 168 (a warrant's probable cause requirement "would be reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable

cause.") Here, the evidence demonstrates that Mr. Glass turned over his phone to Detective Aponik only after he was told police already had a warrant and after they asked him to produce his phone. Under these circumstances, the reckless omission made the affidavit misleading. *Lull*, 824 F.3d at 115.

## II.    The search warrants are not supported by probable cause.

The government argues that Ms. Glass was a known informant and therefore reliable. *See* Dkt. No. 47 at 17-19 (Gov't. Br.).[5] It first relies on the fact that Detective Lowrance talked to Ms. Glass (by phone) and that, "[i]mportantly, April met in person with [Agent Brown]." Dkt. No. 47 at 18. That Detective Lowrance spoke with Ms. Glass by phone offers little to the reliability analysis where he was unable to observe her body language and demeanor. *United States v. Gr.,fin*, 589 F.3d 148, 152-153 (4th Cir. 2009) (noting, as a factor in assessing an informant's reliability, "whether the officer had the opportunity to observe the informant's credibility and demeanor.") That she met in person with Agent Brown also offers little support towards credibility: Agent Brown's previous investigation of Mr. Glass had to be shut down because no North Carolina jurisdiction was persuaded by Ms. Glass's reports to justify taking the case. Exhibit 2.

Indeed, the government offers no rebuttal to the requirement that a known informant's tip must still be corroborated where the informant has "no track record of reliability." *United States v. Gondres-Medrano*, 3 F.4th 708, 716 (4th Cir. 2021) (citing *Adams*, 407 U.S. at 146 and *United States v. Miller*, 925 F.2d 695, 698 (4th Cir. 1991)). In *Glover*, the Seventh Circuit considered whether an officer's "complete omission of known, highly relevant, and damaging information about [the informant's] reliability" was relevant to the probable cause inquiry for a warrant. 755

---

[5] Mr. Glass argues that the warrants were unlawful because (1) Ms. Glass's tips were unreliable; (2) the previous investigations did not provide probable cause; (3) under the totality of the circumstances there was no probable cause; and (4) that the warrant for the Samsung S9 phone was not based on informed consent.

F.3d at 817-818. The court concluded that the omissions "deprived the magistrate of highly relevant information that tends to undermine [the informant's] credibility and thus the probable cause determination." *Id.* Here, the fact remains that Detective Lowrance made no mention of the "highly relevant information" of Ms. Glass's previous unsuccessful history as an informant against Mr. Glass, and there was no information that she had previously provided accurate information to officers as to establish her credibility, veracity, and reliability as an informant. Rather, as outlined in detail in his motion, Dkt. No. 43 at 5-9, Detective Lowrance withheld information that Ms. Glass's previous tips to police had proved unfounded—even after police obtained a warrant and searched Mr. Glass's cell phone. Exhibits 5, 6.

Second, the government argues that Ms. Glass's tips were reliable because they were based on first-hand observation of the images. Dkt. No. 47 at 19. However, the government ignores that Ms. Glass's two previous reports had also purportedly been based on first-hand observation of the images. The first investigation was dismissed because no North Carolina law enforcement agency was persuaded by her evidence (Agent Brown noted she "was unable to get anyone in North Carolina to take the case") and the second was dismissed as unfounded. Exhibits 2 and 4.

Third, the government argues that Ms. Glass's tips were reliable because she was personally concerned for one particular child in the images. Dkt. No. 47 at 19. The case cited by the government does not aid its position. In *United States v. Miller*, the Fourth Circuit concluded that although the tip came from an unknown reliable informant, "[t]he informant's interest in obtaining leniency [for his own criminal acts] created a strong motive to supply accurate information." 925 F.2d 695, 699 (4th Cir. 1991). Here, there was no similar motive for leniency. Instead, when Ms. Glass was estranged from her husband, she had a history of making unfounded allegations against him. And although Detective Lowrance knew of Ms. Glass's pending arrest, the two never discussed it. *Miller* simply is inapposite. Similarly, in *United States v. Doyle*, cited by the

government, the Fourth Circuit concluded that a person who merely corroborated a victim's report was an "unquestionably honest citizen" without a motive to fabricate. 650 F.3d 460, 472-473 (4th Cir. 2011). And the person's "concern for the safety of the children" was directly related to the fact that he was the uncle of the victim. There is no similar direct relationship here between Ms. Glass and the child in the image.

Under the totality of the circumstances described above, the search warrants for Mr. Glass's home and his cell phone were issued without probable cause or informed consent. Accordingly, the evidence obtained and the fruits therefrom as a result of these unlawful searches and seizures must be suppressed.

## III. The good faith exception does not apply here.

If this Court determines that the warrants in this case violated *Franks*, the good faith exception does not apply. *See United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) ("A warrant that violates *Franks* is not subject to the good-faith exception to the exclusionary rule announced in" *United States v. Leon*, 468 U.S. 914 (1984)). *See also Leon*, 468 U.S. at 922 ("Suppression therefore remains an appropriate remedy if the magistrate or judge issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth.") (citing *Franks*, 438 U.S. 154).

If this Court determines probable cause is lacking, the evidence may still be admissible if the court determines that the searching officers relied in good faith on the issuing judge's finding of probable cause. *Leon*, 468 U.S. at 920-24. There are four situations in which an officer cannot be found to have acted with "objective reasonableness" such that the good faith exception does not apply: (1) when the affiant based his application on knowing or reckless falsity; (2) when the judicial officer wholly abandoned his role as a neutral and detached decision maker and served merely as a "rubber stamp" for the police; (3) when the affidavit supporting the warrant was so

lacking in indicia of probable cause as to render official belief in its existence entirely

unreasonable; and (4) when the warrant was so facially deficient that the executing officers could

not reasonably have presumed that the warrant was valid. *United States v. Doyle*, 650 F.3d 460,

467 (4th Cir. 2011) (quoting *United States v. DeQuasie*, 373 F.3d 509, 519–20 (4th Cir.2004)).

In *Wilhelm*, the Fourth Circuit cited favorably a case from the Sixth Circuit that held the

good faith exception did not apply because the detective "knew he needed to provide corroboration

of the tip, but did not." *Wilhelm*, 80 F.3d at 121 (citing *United States v. Leake*, 998 F.2d 1359, 1367

(6th Cir. 1993). *See also United States v. Helton*, 314 F.3d 812, 824 (6th Cir. 2003) (finding that

the good faith exception should not apply where "a reasonably prudent officer would have sought

greater corroboration to show probable cause."). Here, Detective Lowrance's material omissions

from the applications, the inclusion of false and misleading information in the applications, and the

lack of probable cause establish that the good faith exception should not apply.

## CONCLUSION

For the reasons stated above and in his motion, Mr. Glass respectfully requests that this

Court suppress as evidence all property seized as a result of the illegal searches, seizures, and

arrest, any subsequent evidence, and any statements resulting from the Fourth Amendment

violations, or alternatively hold a hearing.

Respectfully submitted:

 s/ W. Kelly Johnson
W. Kelly Johnson
Assistant Federal Public Defender
Federal Public Defender, Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
(704) 374-0720 (phone)
(704) 374-0722 (fax)
W_Kelly_Johnson@fd.org
Counsel for JESSIE GLASS

DATE: January 9, 2023

JA137

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **DOCKET NO. 5:21-cr-60-KDB** |
| | ) | |
| **v.** | ) | **SUPPLEMENT TO OPPOSITION TO** |
| | ) | **DEFENDANT'S MOTION TO** |
| | ) | **SUPPRESS AND FOR *FRANKS*** |
| **JESSIE LEROY GLASS, JR.,** | ) | **HEARING** |
| | ) | |
| _____ | ) | |

COMES NOW the United States of America, by and through Dena J. King, United States Attorney for the Western District of North Carolina, and files this Supplement to its Response in Opposition to Defendant's Motion to Suppress and for *Franks* Hearing so that the Court is aware of additional authority supporting the government's argument that Defendant is not entitled to a *Franks* hearing. In *United States v. Haas*, 986 F.3d 467 (4th Cir. 2021), Defendant twice asked for a *Franks* hearing because he claimed that the search warrant affiant "omitted three categories of information: (1) information about [the tipster's] criminal history, including that she was on probation during the relevant time, was arrested for providing a false name to…police during a traffic stop while working on Haas's case, and had previously been arrested for a prostitution-related offense; (2) information about [the tipster's] reliability as a confidential informant, including the (unidentified) outcomes that resulted from her prior work with the FBI; and (3) corroborating evidence of her claim that she saw child pornography on Haas's laptop. *Id.* at 474–75 (4th Cir.).

The Fourth Circuit affirmed the District Court's denial of the *Franks* hearing requests for several reasons. First, regarding category two above, it found that Defendant had not offered "specific information" about "the actual outcomes" of the tipster's work for the FBI, and even if

1

JA138

he had, Defendant would still have to supply additional information that "consistently showed that [the tipster] provided misinformation." *Id.* at 475. Second, the Court concluded that Defendant's claim about corroborating evidence related to the sufficiency or insufficiency of probable cause, which "is not the proper subject of a *Franks* hearing." *Id.* Finally, as to the tipster's criminal history, the Court stated that Defendant "failed to show that the agent acted with the requisite intent in omitting [the tipster's] criminal history from the warrant affidavits." *Id.* at 477. Based on the reasoning in *Haas*, this Court should deny Defendant's similar request for a *Franks* hearing.

<div style="margin-left: 50%;">

DENA J. KING
UNITED STATES ATTORNEY

s/ KIMLANI M. FORD
NC Bar Number: 25426
Assistant United States Attorney
United States Attorney's Office - WDNC
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 338-3178
Facsimile: (704) 344-6629
E-mail: Kimlani.ford@usdoj.gov

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of January 2023, the foregoing document was served electronically on Defendant through ECF filing.

<div style="margin-left: 30%;">

s/KIMLANI M. FORD
Assistant United States Attorney

</div>

JA139

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

UNITED STATES OF AMERICA    )    DOCKET NO. 5:21-CR-60
                              )
      vs.               )
                              )
JESSIE LEROY GLASS, JR.,    )
                              )
        Defendant.     )
_____)

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
JANUARY 12, 2023

APPEARANCES:

On Behalf of the Government:

    KIMLANI M. FORD, ESQ.
    STEPHANIE LABOY SPAUGH, ESQ.
    United States Attorney's Office
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    W. KELLY JOHNSON, ESQ.
    JOHN PARKE DAVIS, ESQ.
    Federal Public Defender's Office
    129 West Trade Street, Suite 300
    Charlotte, North Carolina

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

JA140

1                    P R O C E E D I N G S

2          THE COURT:  All right.  So our last matter is a

3    hearing on a motion to suppress in the case of U.S. versus

4    Glass, docket number 5:21-cr-60.  There was perhaps some

5    misreading of the Court's text order setting this hearing.  I

6    think it was represented, Mr. Johnson, that the Court had

7    already ordered a Franks hearing -- maybe not -- ordered a

8    hearing on the motion.  We'll see if we're going to have a

9    Franks hearing or not.  And I'm not going to cut short

10   whatever presentation you have in mind, but I will tell you

11   the things that I am interested in because some of the things

12   I'm probably not particularly interested in.

13          But I would like to know a few things about what the

14   affiant knew.  For instance, did he know Ms. Glass's

15   involvement in the 2016 investigation?  Was he aware of the

16   incorrect allegation by Ms. Glass in 2017?  What was available

17   in the LINX, L-I-N-X, System; not only what was available, but

18   what did the affiant actually know?  And what did he know of

19   the domestic situation between Mr. and Mrs. Glass at the time

20   the tip was reported?

21          With that guidance, you can talk about anything you

22   want.

23          MR. JOHNSON:  Thank you, Your Honor.

24          Your Honor, we believe that a Franks hearing is

25   appropriate in this matter and we've met the prima facie case

1   for having a further hearing.  And I will direct my comments
2   to some of the things that the Court is most interested in as
3   just indicated.

4          Your Honor, obviously, the case has been briefed
5   very well.  Ms. Hoffman from my office did the briefing and I
6   think she did an excellent job.  But let me just deal with a
7   couple of issues that you raised that I think are important.

8          One is the fact of what the affiant knew about the
9   2016 case.  Well, it's our understanding that he knew a lot
10  about the 2016 case.  He was in contact with the special agent
11  from the Virginia police -- state police.  She provided him,
12  according to the notes that are contained in the discovery
13  that was provided, with a copy of the complete file.  She gave
14  him either -- either a disk or a thumb drive that had all the
15  documents about that case in 2016.  So he had every bit of
16  information that the officer from Virginia had about the 2016
17  case.  He would have known who the affiant was -- he would
18  have known who the informant was.  He would have known about
19  information that was provided.

20         We don't have access to that information.  We're
21  just looking at the reports and the notes that came from the
22  2020 case where it's very clear that he worked very closely
23  with Special Agent Heather Brown and that she provided him
24  everything about the case.  So he wasn't operating in a
25  vacuum.  He knew a lot about the case.  As a matter of fact,

1  if you look at the notes from this case, you will find that
2  April Glass made this tip and then Officer -- excuse me,
3  Detective Lowrance had a difficult time finding Ms. Glass.
4  She disappeared.  And so how he found her was he went through
5  Special Agent Brown and with the authorities in White County,
6  Virginia, to actually locate her.  So he was completed with --
7  he was provided with complete information about the case.  So
8  he knew that when he was going in to write his affidavit.

9          Your Honor, talking about the 2017 case, Your Honor,
10 just this morning at 10:30 we received from the United States
11 a 302 form from an interview that occurred with Detective
12 Lowrance.  That interview occurred in November, November the
13 28th, and it was put into a memo on November the 29th, 2022.
14 And I'll read to you what the officer -- Officer Lowrance said
15 in his interview and as captured in the 302.

16         "Prior to speaking with Mitchell, Lowrance was
17 previously aware of an incident regarding Jessie Glass, Jr.,
18 in 2017.  During this incident Lowrance assisted former
19 Iredell County Sheriff's Deputy Chris Lamberth in the
20 reviewing of a computer seized from Jessie Glass, Jr.
21 Lowrance recalled while there was pornography observed on the
22 computer, no child pornography was observed during the
23 review."

24         Your Honor, we've also subpoenaed records from the
25 Iredell County Sheriff's Department for this 2017 case file.

1  We wanted to know that question ourselves.  We wanted to know
2  what Detective Lowrance knew about the investigation in 2017
3  that was being done by Detective Lamberth.  Unfortunately,
4  when we served the sheriff's office with a subpoena, they
5  advised us that they could not comply in time nor would they
6  comply without a court order.  But it was very concerning to
7  us that there's -- that Detective Lamberth and Detective
8  Lowrance didn't work on the case or didn't know about each
9  other.  They were in the same unit.  They were in the same
10 department.
11         And so we couldn't get the records about that 2017
12 investigation from the sheriff's office.  But just this
13 morning we received something from the sheriff's office --
14 excuse me, from the United States attorney that indicates that
15 Detective Lowrance worked on that case.  So I'm assuming -- I
16 have not had a chance to look at the file, but I'm assuming
17 that he knew about the investigation.  He knew about the
18 statements that Ms. Glass had made about the -- about the
19 statements.  We don't have those.  And that he used that
20 information to search the computer that was seized from
21 Mr. Glass.
22         THE COURT:  Now, make sure my memory of the facts
23 are correct.  It was a tablet rather than a computer, and it
24 was voluntarily surrendered rather than seized.  It was
25 searched pursuant to a search warrant, but it was seized upon

1   voluntary surrender, correct?

2        MR. JOHNSON: Your Honor, that's -- it's close to

3   that. I think what happened was the -- they did a -- talked

4   to Mr. Glass. He said, "Do you have a tablet? Do you have a

5   phone?" Whatever device that they want to have. And the

6   officer decided that he was going to take it with him, and

7   then got a warrant. But there was a warrant received and the

8   warrant was for specific information about the computer.

9        THE COURT: Well, as I remember the proffered

10   evidence, it was the officer asked to see it. He saw some

11   file titles that concerned him and -- but that it was shown to

12   him voluntarily. And then when he saw the file titles that

13   concerned him, then he got a warrant.

14        MR. JOHNSON: Then he got a warrant. And Detective

15   Lowrance who handled the 2020 case was -- participated in the

16   review of the tablet, computer, whatever it was, and found

17   nothing and it was returned back to Mr. Glass.

18        THE COURT: All right. Somebody educate me. What

19   is in the LINX System when an officer searches that system

20   about an individual? What's in there?

21        MR. JOHNSON: Your Honor, we -- we cited what we

22   could about the LINX System. I don't have any experience with

23   it. We cited something in our motion to suppress. And that's

24   the only information that we have.

25        We know from exhibits that are attached to the

1   motion to suppress that the -- that Detective Lowrance pulled
2   a copy of the record for Mr. Glass.  That's in Exhibit 5.  We
3   know -- because that exhibit has the date that the computer
4   search was run and the computer search was run on
5   January 31st, 2020, at 8:47:41 was the hour.  So when he wrote
6   the affidavit and submitted the affidavit on February 10th of
7   2020, he knew that the first charge was nolle'd and the second
8   charge was dismissed.  We have since been able to obtain, and
9   the United States provided to us in a different exhibit, the
10  fact that the second charge was actually -- it was dismissed,
11  but there was a bench trial and the Court found him --
12          THE COURT:  Which do you mean by second charge?
13          MR. JOHNSON:  There were two charges in the -- two
14  counts in the case that arose in 2012.  And the --
15          THE COURT:  Those weren't with respect to child
16  pornography, though, were they?
17          MR. JOHNSON:  They were both charges of sodomy of
18  victim under 13.
19          THE COURT:  And did they involve Mrs. Glass in any
20  way?
21          MR. JOHNSON:  They did not.
22          THE COURT:  See, that's why I'm not particularly
23  concerned about 2012 and what was said about 2012 in the
24  affidavit.  That any judge could -- he was investigated for
25  such and such in 2012 period, full stop sort of.  And any

1  reviewing magistrate, or in this case superior court judge,
2  would say, okay, nothing came of that.  So I don't think
3  that's much to concern the Court with.  But these other things
4  I am interested in.

5       MR. JOHNSON:  Your Honor, the 2017, I think, is
6  really the most problematic, especially now that we know that
7  Officer Lowrance or Detective Lowrance was involved in that
8  case.  He knew about it.  He was involved in the examination
9  of the computer.  I'm assuming he had access to the file of
10  the case and he didn't even mention it.  He knew that this was
11  a situation where a person's tablet had been seized.  That
12  they got a search warrant and that they checked it and they
13  found pornography but nothing that could be associated with
14  child pornography.  And, Your Honor, that's a situation where
15  they knew the information was bad and they didn't even mention
16  that case.

17       THE COURT:  I'm also interested with respect to the
18  2017 tip, how Mrs. Glass described what she said she saw and
19  how similar it is to what she said she saw in support of the
20  search warrant affidavit that's under examination here.

21       MR. JOHNSON:  Your Honor, and that's the problem is
22  I don't have that information because the Iredell County
23  Sheriff's Office did not provide it to us nor did it come to
24  us as part of discovery.  It could be a situation like we have
25  here where there was very specific details about where it was

1  located and what the pictures were or it could have just been
2  a general tip, we don't know.
3          THE COURT:  Well, if the Court orders Mr. Lowrance,
4  Detective -- I don't know if he's detective, lieutenant,
5  whatever, officer; take no offense if I don't know your
6  title -- to testify in a Franks hearing, would you want such
7  information available at such a hearing?
8          MR. JOHNSON:  I would, Your Honor.  I would love to
9  know what he knew in 2017 and what he looked at and what
10  information was there because it could be the same situation.
11  It could be a situation where it's just a general tip or it
12  could be a situation where there was specific information
13  listed about what the images were, where they were located,
14  and how she knew about it.  Right now I'm actually asking
15  questions in the dark.
16          THE COURT:  All right.  Let me hear from Ms. Ford.
17          MS. FORD:  About which?
18          THE COURT:  Any of the three you want to take up
19  first.
20          Here's what concerns the Court.  Depending upon what
21  Officer Lowrance knew -- but it seems to me there's a reason
22  to believe that he knew that with respect to the 2016
23  allegation, that Mrs. Glass was involved in it.  As I read
24  those papers, there were two phones of interest to the
25  investigators:  one possessed by Mrs. Glass and one possessed

1  by somebody else, some other woman. And what I have is only a
2  couple of pages, but it indicates that Mrs. Glass was again
3  involved in some sort of child porn alleged investigation. Of
4  course, that's not mentioned in the affidavit.

5          And with respect to 2017, apparently Mrs. Glass was
6  dead wrong about her allegation at that time of child
7  pornography on a device. And of course, that's not mentioned
8  in the affidavit that she's made an allegation like this
9  before and been proven wrong.

10          And I am interested to know, because the government
11  does rely for some of its argument that the -- Mrs. Glass had
12  been corroborated to a certain extent because of the detail of
13  her descriptions of what she says she saw in 2019. Well, is
14  that what she said she saw in 2017 or is this sort of new
15  information to her because she just recently saw something
16  that was child pornography? I don't know how much of that
17  would be revealed through the examination of the LINX
18  database, but it's of interest to me.

19          And then it wasn't raised by the defense, but it
20  looks to me like Mr. and Mrs. Glass have had quite an
21  on-again-off-again relationship. And although the affidavit
22  does say that she left the residence for the last time in
23  December, if the officer knew of some sort of domestic
24  intranquility that would have provided bias or prejudice or a
25  motive to Mrs. Glass to make such a tip, the Court would like

1  to know what he knew about that and why he saw fit not to put
2  that in the affidavit.

3  So I want to hear from you on those things. But as
4  you can tell, I'm leaning towards the necessity of a Franks
5  hearing.

6  MS. FORD: I understand, Your Honor.

7  THE COURT: There's just a lot of things here that I
8  don't know the answers to that if the answers are what they
9  might be, we'd have to give some real thought to this.

10  MS. FORD: Would you like me to proffer what I think
11  he would say?

12  THE COURT: Yes.

13  MS. FORD: In 2016 he did know a lot about that
14  investigation. He talked to Special Agent Brown up in
15  Virginia about it. She told him the details. She provided
16  him the file. She actually came down to Iredell County and
17  met with him in person. I believe she relayed to him that she
18  thought if there were any violations, they occurred in North
19  Carolina. She couldn't get anyone -- what she said in 2020 --
20  or what she wrote in her report was that she couldn't get
21  anyone in North Carolina to take the case in 2016.

22  Detective Lowrance will tell you that he didn't know
23  anything about the 2016 incident in Virginia when it occurred
24  in 2016. Agent Brown didn't reach out to him to see if he
25  would take it.

1       So he did know a lot about the allegations which

2 were, I think, that April had found a child pornography image

3 or video on Mr. Glass's phone.  She had sent it -- taken a

4 picture of it or sent it somehow to her mother.  And then they

5 later met with Special Agent Brown, turned over the image.  I

6 don't know much more than that, just that Special Agent Brown

7 thought that the violation had occurred in North Carolina and

8 she couldn't do anything about it in Virginia.

9       With regard to the 2017 incident, I know less about

10 that.  I don't have any documents either.  The documents that

11 Mr. Johnson is talking about, they were not part of my

12 discovery.

13       What I believe Special -- or Detective Lowrance

14 would say about that is that he is familiar with it.  It

15 wasn't his case.  It was Detective Lamberth's case and

16 Detective Lamberth handled the knock and talk, the search

17 warrant, but that Detective Lowrance -- he thinks he did the

18 forensic examination of the electronic device and did not find

19 any child pornography on it.

20       I do take exception to Your Honor's characterization

21 that she was dead wrong.  They had one device that they

22 examined, and Your Honor well knows that you can store child

23 pornography on a lot of different devices that can be hidden

24 very well.  So I think you can't with a hundred percent

25 certainty say that she was wrong or she lied.  You can say

1  that, yes, they didn't find anything.

2      THE COURT: Well, of course, I don't have a whole

3  lot of information about that either. My understanding was

4  that the tip related to child pornography on a tablet. And of

5  course, he could have had more than one tablet for all I know.

6  But that the investigating officer seemed to satisfy himself

7  that he had taken and searched the device being referred to by

8  the tipster, that is, Mrs. Glass.

9      MS. FORD: I don't know whether --

10     THE COURT: I'm just assuming, of course without

11 knowing, that if he thought, well, yeah, not here, but let's

12 see what else you got, they'd have looked.

13     MS. FORD: All I know about the incident, Your

14 Honor, is what's in the search warrant which is what Your

15 Honor knows. They took -- let's see. They took a tablet and

16 searched the tablet. I believe it also says that they went

17 in -- he allowed them to come into his home and search, but

18 they didn't have a search warrant for the house so they

19 weren't ripping it up and looking for electronics everywhere

20 in the house. They did their search, took this one tablet,

21 and got the search warrant for the tablet. So I --

22     THE COURT: Again, part of the problem here is,

23 frankly, we don't know what Mrs. Glass said in 2017, what

24 probable cause they had to get warrants for more than that

25 tablet or anything else. That's the problem here. We're

1  operating in the dark a little bit.  And also, with respect to
2  what Detective Lowrance knew about the domestic situation
3  between them and any motive Mrs. Glass might have had to give
4  a false tip.

5          I mean, I don't mean to cut anybody off, but it
6  seems unavoidable to me that we have to have a Franks hearing.
7  I mean, there's just too many unanswered questions here that
8  based upon a prima facie showing, that Detective Lowrance had
9  information that had it been included in the affidavit, may
10 have called into question the probable cause for it.  I'm not
11 making any rulings because I don't know the evidence.  But the
12 Court is duty bound, I think, upon this showing that we're
13 going to have to do some fact finding and do what -- do what's
14 right after that.

15         So since you need some additional materials you
16 think and the Court, of course, will allow for that -- I don't
17 know if you literally need a court order or whether the U.S.
18 Attorney's Office can help get what you need.

19         MR. JOHNSON:  Your Honor, we can do a court order or
20 we can do a consent agreement with the United States attorney
21 to have them turn over.  And we may want to expand our
22 subpoena to get more information at this point.

23         THE COURT:  All right.  Well, handle it however you
24 all figure out.  I know this is going to be on for trial in
25 February, I suppose, but it doesn't look like we're going to

1  make that because we'll have a hearing sometime in February.
2  The Court's not available for the next two weeks which gets us
3  through January.  So -- and I've got quite a few sentencings
4  the first week of February.  So we'll try to find a time, my
5  guess is the second week of February, to have the hearing.
6  Which even if the Court doesn't suppress the evidence, my
7  guess is that you would want a continuance to get ready for
8  trial based upon the Court's rulings of what's coming into
9  evidence.  Just guessing.  I'm not begging for a continuance;
10 I'm just predicting.
11         MR. JOHNSON:  Your Honor, I agree that if we don't
12 have a hearing until the second week in February, we would
13 very likely be asking for a continuance of the trial date.
14         THE COURT:  All right.  Well, anything anybody wants
15 to say about that proposal other than obviously you wish I
16 hadn't said, Ms. Ford, that we're going to have a hearing?
17         (No response.)
18         THE COURT:  All right.  Well, that's what we'll do.
19 Everybody will be notified of the court hearing.  Please work
20 diligently to gather whatever materials are needed for it so
21 that we can stay on course as best we can.
22         The Court will be in recess for a good long time.
23         (End of proceedings at 3:40 PM.)
24                       *****
25

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I, Cheryl A. Nuccio, Federal Official Realtime Court

7  Reporter, in and for the United States District Court for the

8  Western District of North Carolina, do hereby certify that

9  pursuant to Section 753, Title 28, United States Code, that

10 the foregoing is a true and correct transcript of the

11 stenographically reported proceedings held in the

12 above-entitled matter and that the transcript page format is

13 in conformance with the regulations of the Judicial Conference

14 of the United States.

15

16          Dated this 31st day of January 2023.

17

18

19                    s/Cheryl A. Nuccio

20                    Cheryl A. Nuccio, RMR-CRR
                      Official Court Reporter

21

22

23

24

25

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

UNITED STATES OF AMERICA    )    DOCKET NO. 5:21-CR-60
                        )
      vs.             )
                        )
JESSIE LEROY GLASS, JR.,    )
                        )
        Defendant.     )
_____)

TRANSCRIPT OF FRANKS HEARING
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
FEBRUARY 7, 2023

APPEARANCES:

On Behalf of the Government:

    KIMLANI M. FORD, ESQ.
    STEPHANIE LABOY SPAUGH, ESQ.
    United States Attorney's Office
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina 28202

On Behalf of the Defendant:

    W. KELLY JOHNSON, ESQ.
    JOHN PARKE DAVIS, ESQ.
    Federal Public Defender's Office
    129 West Trade Street, Suite 300
    Charlotte, North Carolina 28202

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

I N D E X

W I T N E S S E S

GOVERNMENT'S WITNESSES                                    PAGE

HEATHER BROWN
    Direct Examination By Ms. Spaugh                        4
    Cross Examination By Mr. Johnson                        23
    Redirect Examination By Ms. Spaugh                      42

CHRIS LAMBERTH
    Direct Examination By Ms. Ford                          44
    Cross Examination By Mr. Johnson                        52

JASON LOWRANCE
    Direct Examination By Ms. Ford                          63
    Cross Examination By Mr. Johnson                        92
    Redirect Examination By Ms. Ford                        140


E X H I B I T S

GOVERNMENT'S EXHIBITS

NUMBER                                                ADMITTED

1 ...........................................22
2 ...........................................22
3 ...........................................22
4 ...........................................45
5 ...........................................145

DEFENDANT'S EXHIBITS

NUMBER                                                ADMITTED

1 ...........................................73
2 ...........................................90
3 ...........................................140
4 ...........................................114
5 ...........................................140
7 ...........................................115
8 ...........................................140
9 ...........................................140
10 ..........................................140
11 ..........................................106
12 ..........................................140

JA157

1                          I N D E X

2    DEFENDANT'S EXHIBITS (Cont'd.)

3    NUMBER                                    ADMITTED

4    13 ................................................43
     14 ................................................61
5    15 ................................................61
     18 ...............................................140
6    19 ...............................................140
     20 ...............................................140
7    21 ...............................................140
     22 ...............................................140
8    23 ...............................................140
     25 ................................................39
9    26 ................................................40
     27 ...............................................140

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S
2  TUESDAY MORNING, FEBRUARY 7, 2023
3              (Court called to order at 9:28 AM.)
4              THE COURT:  All right.  We're here for a *Franks*
5  hearing in the matter of United States versus Glass, docket
6  number 5:21-cr-60.
7              You may call your first witness.
8              MS. SPAUGH:  Thank you, Your Honor.
9              The government calls Sergeant Heather Brown.
10             HEATHER BROWN, GOVERNMENT WITNESS, SWORN,
11                        DIRECT EXAMINATION
12  BY MS. SPAUGH:
13  Q.    When you're situated please state your name.
14  A.    My name is Heather Brown.
15  Q.    And what do you do for a living?
16  A.    I work for the Virginia State Police.
17  Q.    You said Virginia State Police?
18  A.    Yes.
19  Q.    How long have you been with them?
20  A.    Eighteen years.
21  Q.    And what's your current assignment?
22  A.    I'm a first sergeant.  I supervise the polygraph program
23  for the state.
24  Q.    What was your assignment in 2016?
25  A.    I was a special agent assigned to general investigations,

1  so we cover property crimes, crimes against persons, any kind
2  of investigation that isn't drug related.
3  Q.   You said that is not drug related?
4  A.   That is not drug related.
5  Q.   Did that include child abuse crimes?
6  A.   Yes.
7  Q.   Are you familiar with Jessie Glass, Jr.?
8  A.   I am.
9  Q.   Were you involved in an investigation of him in 2016?
10 A.   Yes.
11 Q.   And in 2020 did you agree to help Detective Lowrance of
12 the Iredell County Sheriff's Office with an investigation?
13 A.   I did.
14 Q.   Did you provide that detective with your case file from
15 your 2016 case?
16 A.   Yes.
17 Q.   Going back to 2016, who made the report to law
18 enforcement in that matter?
19 A.   The initial report came from Sandra Cox who was the
20 mother-in-law of Mr. Glass.
21 Q.   And what was her daughter's name?
22 A.   April Glass.
23 Q.   So how did you get involved?
24 A.   I received a call after hours from a trooper.  Ms. Cox
25 had arrived at the Wytheville State Police office and was very

1  upset because April had sent her some photos that were child
2  pornography and she was there to report that those photos had
3  been sent to her.
4  Q.   And were you at the office at that point?
5  A.   I wasn't.  I was called out and I went to meet with her
6  in person.
7  Q.   What happened when you met with her?
8  A.   When I arrived to meet with her, the trooper had brought
9  her to the division headquarters.  And she explained to me
10 that she had received some photos from April on her cell
11 phone.  They appeared to be pictures of a picture on a phone.
12 She stated that there was no context for these pictures coming
13 in other than a text message that April had sent saying,
14 "Brace yourself," and then the pictures started coming in.  So
15 she had no idea what was about to transpire.
16      Once she received the photos, she was obviously very
17 upset by the nature of them and that's why she came to report
18 that she had received the photos.
19 Q.   Did she say where April had taken the photo of the
20 photos?
21 A.   Yes.  April was in Statesville at her father-in-law's,
22 which would be Mr. Glass's father's house.  They were down
23 there visiting so she was not in Virginia at the time that it
24 occurred.  She had sent the photos from Statesville to her
25 mother who was in Wytheville, Virginia.  And from there,

1  that's where Sandra reported it to us.

2  Q.    Did Ms. Cox show you these photos?

3  A.    She did.

4  Q.    Do you remember how many there were?

5  A.    There were five total.

6  Q.    Did you notice anything about the photos?

7  A.    Yes.  They were children under the age -- some were, I

8  would say, 4 to 6.  Some were 10 to 12.  A couple of the

9  photos children were clothed, but they were bound and gagged

10  with something around their mouth, tied around, like a rope or

11  some type of fabric.  And then there were three photos that

12  were of nude children, children bound or engaged in sexual

13  acts.  One was a child with an adult.  One was two juveniles.

14  They were all prepubescent.  There was no body hair.  There

15  was no breasts or anything like that.  So it wasn't like a

16  teenager where it could have been mistaken that it was maybe

17  an 18-year-old.  They were definitely children.

18  Q.    And were you able to tell if these were screen shots or

19  pictures of something else?

20  A.    It appeared to be, from the photos that she had on her

21  phone, it was a picture of a phone screen.  And the

22  interesting thing about the picture was at the top right-hand

23  corner, almost like a header, there was the name Lee Glass and

24  it was, like, in a kind of a script writing right over top of

25  where you would see the battery life indicator, maybe how many

HEATHER BROWN - DIRECT

1  bars you had for service, that kind of thing.  You could see
2  that in four of the five photos that she showed me.  The other
3  one, that part was cut off, but it appeared to be the same
4  phone screen because it had the same type of icons across the
5  top.
6  Q.   Did Ms. Cox say anything else about April during your
7  meeting?
8  A.   She said that April had explained to her that she had
9  been looking through Jessie's phone when he had left his phone
10 behind.  And she had some concern's about April's safety.  She
11 expressed to me that she told April that she was going to
12 report this to the state police and that April said that she
13 was okay with her doing that.  She just didn't want her mother
14 to say that she had sent the photos.
15 Q.   And did you take anything from Ms. Cox?
16 A.   I did.  I took possession of the phone.  She signed a
17 consent to search because it was her phone, and we put it into
18 evidence.
19 Q.   And did you get April's contact information or anything
20 like that?
21 A.   I did.  We had to work a way out to get in contact with
22 her because obviously, given the situation, April did not want
23 me calling her.  So we worked out an email exchange that her
24 mother had passed on.  So she began emailing me to arrange for
25 a meeting.  Again, they were still in Statesville so at the

1   time she was -- there was a couple days' delay on when I was
2   going to be able to speak with her because she had a medical
3   appointment in Richmond that they were driving, I believe,
4   from Statesville straight to Richmond for.  And so when she
5   came back into the area a couple days later, she arranged to
6   speak with me; and she showed up.
7   Q.   When you say "they," who was they?
8   A.   She -- it was -- it was explained to me by Sandra that
9   Mr. Glass was taking April to this medical appointment in
10  Richmond.
11  Q.   When you spoke with April, do you know what the status of
12  her relationship with Mr. Glass was?
13  A.   They were still married, still together, still living
14  together.  She was somewhat dependent on him for medical
15  transportation.  She was in the midst of some pretty major
16  surgeries for, I believe she had cancer in her jaw and had to
17  have pretty drastic facial surgeries, and so he was driving
18  her to and from those appointments and things of that nature.
19  Q.   And while you were speaking with April to set up your
20  meeting, did she say anything about whether Mr. Glass knew
21  what was going on with law enforcement?
22  A.   Yes.  The evening before she had sent me an email stating
23  that he had found the text message between her and her mother
24  Sandra and kind of knew that Sandra had come to talk to me
25  about this, and she came up with this idea that she would tell

1  him that the website had reported him for downloading these

2  images and that's what she passed along to me.  And then she

3  stated that he had taken his phone somewhere and gotten rid of

4  it.

5  Q.  And were you able to meet April in person?

6  A.  I was.  I met her, it was the 29th of November, I

7  believe.  It was a couple days after I met her mother.  And

8  then she came to state police headquarters and spoke to me

9  about kind of what had led up to the photos being sent.

10  Q.  Do you remember if she referred to him as Jessie or Lee

11  or...

12  A.  She calls him Lee.

13  Q.  And what did she say when you met with her?

14  A.  She told me that she had been down at her father-in-law's

15  house visiting over the weekend.  That Lee had left with his

16  dad and left his phone behind.  She had had some suspicions

17  that Lee was cheating on her, having an affair, so she got

18  into his phone and started looking through it.  She saw a

19  website that -- it was chatstep.com, which she was curious

20  about.  She also found an email that was new to her that she

21  didn't know he had.  And during -- while she was looking

22  through his phone, she found his photos.  And that's when she

23  took a photo of the photos on his phone and sent them to her

24  mother.

25  Q.  Do you remember how she described to you what she saw?

1   A.   She described it was -- she described it as -- and if I
2   can look at the -- make sure I say correctly what she said.
3   Is that okay?
4   Q.   Would that help refresh your memory?
5   A.   Yes.
6           MR. JOHNSON:  Your Honor, I just want to clarify,
7   what is she referring to?  Is this a 302 that she got from the
8   FBI after she was interviewed?  Is it notes from her report?
9   There's been no exhibit that has been identified.
10          THE COURT:  If you would just flesh that out,
11  please.
12  BY MS. SPAUGH:
13  Q.   Are you looking at your summary of April's interview?
14  A.   Yes.  That would be dated 11/29 at 12:00.  She described
15  it as there -- the pictures were of naked kids and a 2- or
16  3-year-old tied up.
17  Q.   And did she say whether she had had a conversation with
18  Mr. Glass about her conversation with you?
19  A.   Again, she did reiterate that she told him the story
20  about the website reporting him and that he had had a
21  conversation with her about her saying that he had lost the
22  phone.
23  Q.   Was he telling her to tell you that?
24  A.   What she said was that "he said he wanted me to say he
25  lost his phone."

1   Q.   And then after you met with April, did you ever meet with
2   the defendant, Jessie Glass, Jr.?
3   A.   I did.
4   Q.   Where was that?
5   A.   That was at their residence in Hillsville.
6   Q.   Is that Virginia?
7   A.   Yes.
8   Q.   And when you were referring to Statesville, that was
9   North Carolina?
10  A.   That's correct.
11  Q.   And was anybody else there when you interviewed
12  Mr. Glass?
13  A.   Mr. Glass was there, April was there, and I had another
14  agent with me.
15  Q.   Can you give us an overview of what he had said happened.
16  A.   I explained why I was there.  Given the situation and the
17  fact that April at that time was not willing to be a
18  complainant and didn't want to say exactly where the photos
19  came from, I kind of went with her story about the photos
20  being downloaded.  So I explained I was there because there
21  had been some evidence that came up that some photos of nude
22  children, child pornography, had been downloaded to his phone.
23       So he invited us in, agreed to speak with us.  I
24  explained generally, you know, the context of how we received
25  the complaint and explained -- asked if he had ever seen

HEATHER BROWN - DIRECT

1  any -- any child pornography in his downloading of anything to
2  his phone.  And his explanation to me was that he had seen
3  different things of naked kids.  Some of them would be, like,
4  when kids would go -- like, if you were at a nude beach and
5  people were taking photos.  And then other things that he had
6  seen he described as quite disturbing.
7      I asked if he had ever seen any photos that he downloaded
8  that were children engaged in sexual acts.  He said he had
9  once or twice.  He admitted that he had seen photos with
10 adults, meaning kids and adults, one with a kid and a
11 vibrator.
12     He was referring to, like, barely legal, which would be,
13 like, more maybe teenage-type pornography.  And I explained to
14 him this was not what I was referring to.  The children in
15 these photos were well under the age of teenage.  They were,
16 again, prepubescent; some of them, you know, probably 5 or 6.
17 So I made it very clear that we were not referring to
18 something that could be confused as a teenage -- a teenager
19 that could have been an 18-year-old or a 15-year-old.
20     I asked him about the chatstep since that was what was
21 brought up with April.  He said he had been on there once or
22 twice and it was a bondage and humiliation site, that he
23 looked at pornography on there.
24     And that's -- I went back to kind of that was the nature
25 of some of the photos that I saw were bondage and

HEATHER BROWN - DIRECT

1 humiliation-type photos and that was the same type of thing
2 that he seemed to be showing some interest in on this
3 chatstep.com.
4 Q.   Did he tell you if he had seen these photos of children
5 on purpose?
6 A.   He was saying that he would download large files and
7 sometimes they would have, like, you know, a set of -- he
8 described it as a set of photos in there and then he would
9 have April look at them to see if she thought they were okay
10 for him to look at; and if she said they were okay, then he
11 would keep them.
12 Q.   And if she said they were not okay, did he --
13 A.   He said he would immediately get rid of them.
14      And he also said if he came across something that was
15 inappropriate as far as child pornography or something, that
16 he did not keep it.  That he would immediately get it off of
17 his phone.  That's what he told me.
18 Q.   Did he essentially say he was looking for adult
19 pornography and would accidentally download child pornography?
20 A.   That -- that was what he was explaining, yes.  That these
21 sets of -- sets of photos, sometimes that stuff would slip
22 into those files he would download.  That's the way he was
23 explaining it.
24 Q.   Did you find him credible?
25 A.   No.

HEATHER BROWN - DIRECT

1    MR. JOHNSON:  Objection, Your Honor.

2    THE COURT:  Overruled.

3    THE WITNESS:  No.

4   Q.   Why not?

5   A.   There were a lot of issues with what he was explaining to

6   me.  It kind of defied logic because he went -- he went

7   through talking about how much pornography he downloaded.

8   That he would go out, you know, to pay a bill and download

9   pornography and leave his phone in the Jeep to download it

10  while he was paying a bill.  But then he would wait and let

11  his wife look at it to make sure it was okay later.

12       You know, it's almost like an obsession-type thing.  It

13  didn't make sense that he would be so -- because he described,

14  you know, over 20 years of looking at pornography.  To me it

15  just doesn't make sense that you would be that interested in

16  it and then allow your wife to go through, decide what you can

17  look at and what you can't.

18       You know, April kind of told me, you know, the history of

19  finding things and him destroying them, like tablets or

20  computers or phones.

21       I found it very convenient that this phone disappeared

22  right as this investigation, he found out about it.

23    MR. JOHNSON:  Objection Your Honor.

24    THE COURT:  Overruled.

25    MR. JOHNSON:  Speculation.

JA170

1  Q.   Did he say anything to you about his phone?  Did you have
2  any discussion about that?
3  A.   I did.  He said that he knew he had the phone charging
4  Saturday night and he had it sometime on that Sunday, which
5  this was reported on that Sunday.  And then he didn't know
6  what happened to it.
7  Q.   So he essentially said his phone was lost.
8  A.   Yes, he was describing it as lost.
9  Q.   Okay.  And were you able to search any devices?
10  A.   I searched -- April had given -- during the interview
11  with April, she said there was a thumb drive that had 200-plus
12  gigs on it that he had gotten free with a phone; that when he
13  took one of the devices off to get rid of it, he had left that
14  behind.  She said she did not believe there was anything on
15  there, but she had it.  There was -- when she returned to get
16  it, she could not find it.  There was a period of a couple
17  weeks where she didn't know where it was.  Eventually she did
18  locate it and she turned it in to me from there.
19       I did do a search warrant on there.  There wasn't any
20  child pornography images or anything on there.
21  Q.   When you say thumb drive, are you referring to an SD card
22  or a SIM card?
23  A.   It's like a -- yes.
24  Q.   Some type of memory card?
25  A.   Yes.

1   Q.   Okay.  And when you met with April, did you find her
2   credible?
3   A.   I did.
4   Q.   Why was that?
5   A.   She explained to me the situation with, you know, kind of
6   the back story with how things had been progressing with him:
7   his patterns of having items, the items no longer being
8   available, whether they disappeared or got destroyed or
9   whatever.  She explained to me about the chatstep.com.
10  Initially during the interview with Mr. Glass, she actually
11  brought up the chatstep.com and he denied having done anything
12  on there.  And then later in the same interview he told me
13  that he had seen some things on there or downloaded some
14  things from there.
15       She also told me, you know, what he was going to say
16  about the phone being lost.  She told me he would say that
17  someone piggy backed off his account, which during the
18  interview with him he told me that somebody could buy a
19  scanner and hack into your phone.  So she told me kind of
20  what -- what he -- the history of how he was explaining these
21  things as they transpired over time.
22       If I contacted her, she made an effort to get back to me.
23  She never told me anything that I found not to be true.  There
24  were things that she told me, you know, I had these things,
25  but I don't have them anymore.  Or, you know, he did these

HEATHER BROWN - DIRECT

1  things, but I don't have any evidence of it.  So, I mean, she
2  was honest and straightforward about those items as well.
3  Q.   And as a polygrapher do you have any training on whether
4  someone is telling the truth?
5        MR. JOHNSON:  Objection, Your Honor.
6        THE COURT:  Overruled.
7        MR. JOHNSON:  Your Honor, she's giving an opinion as
8  a polygrapher of a person that she didn't give a polygraph to.
9        THE COURT:  I can parse the evidence just fine.
10        MR. JOHNSON:  Thank you, Your Honor.
11        THE COURT:  Go ahead.
12        THE WITNESS:  I do.  I mean, you're looking at --
13  obviously, with a polygraph you have two parts.  You have a
14  pretest and you have the actual scoring of charts later.
15        So in the -- in the pretest portion, you know,
16  you're assessing are people willing to tell you things that
17  are not necessarily either convenient or maybe don't paint
18  them in the best light.  And, you know, I felt like, you know,
19  there were a lot of things that Mr. Glass was saying that,
20  again, he tried to almost push this off on April, like April
21  was supposed to approve all the, you know, pornography
22  downloads; and if she approved it, it should have been fine.
23        I don't -- I also think, you know, in talking to
24  him, some of the things he said were inconsistent with what he
25  said in later interviews.  He made some statements that I

HEATHER BROWN - DIRECT

1  really felt were outside the realm of what I usually get when
2  you interview someone for a sexual -- whether it's child
3  pornography or sexual abuse or whatever.  I felt like he was
4  trying to convince me of something as opposed to telling me
5  what was -- what had really happened.  He would get off topic
6  when I would ask him something specifically and he would go
7  back -- or I'd have to go back and ask him again.  Or he
8  would, you know, "I'm not sure," "I don't remember," you know,
9  that kind of thing.
10  BY MS. SPAUGH:
11  Q.   Did you check April's criminal history?
12  A.   I did not.
13  Q.   Is that something that you usually do?
14  A.   I don't.
15  Q.   Why not?
16  A.   I don't generally check criminal histories of
17  complainants and victims.  It's just not my policy.  I feel
18  like it doesn't -- initially it has no value in taking the
19  complaint.  If someone has been incarcerated or charged or is
20  a felon, that does not mean they cannot be a victim, an actual
21  victim.  That does not mean they cannot be a complainant with
22  good information.  So I don't do it.  No one can say that I'm
23  making a decision on how to proceed with a case because of
24  someone's criminal history or because of somebody's, you know,
25  history with the police or anything like that.  If there was a

1  reason for doing it, like there had been some inconsistencies
2  or problems or I felt like there was some specific motive for
3  her having, you know, done something to get back at him or if
4  there was an officer safety issue, that's different.  But just
5  as a habit I do not -- I do not do that.
6  Q.   What happened with your 2016 case?
7  A.   2016, the only crime that occurred was actually these --
8  the sending -- April sending the photos to her mother as far
9  as Virginia is concerned.  So I took all the evidence and
10  tried to hold on to it.  I spoke with a Commonwealth attorney.
11  They declined to prosecute.  I understood kind of why she did
12  what she did even though it wasn't necessarily legal.  They
13  declined to prosecute that particular part of the case.
14      I held on to the phone and held the case open for a
15  couple years.  I called around.  I called Iredell County
16  Sheriff's Office.  I called the SBI here in North Carolina and
17  tried to see if anybody would take the phone and the case,
18  look at it, and I didn't have anybody that was interested in
19  it.  So I had it for, I think, approximately two years open,
20  but at that point no one would take the evidence and we had to
21  close the case out.
22  Q.   Do you know why they wouldn't take it?
23  A.   I didn't -- I explained the case facts.  I didn't get a
24  specific we're not going to take it because, so I can't say.
25  Q.   Did you talk to Detective Jason Lowrance with the Iredell

1  County sheriff's in 2016?

2  A.  No, I didn't talk to him until 2020.

3  Q.  And when you talked to him in 2020, did you ever tell him

4  that April was not credible?

5  A.  No, I did not.

6  Q.  Why did you agree to speak with him in 2020?

7  A.  Because I remembered this case and I held it open because

8  I was hoping that something could have been done with it even

9  though there wasn't anything I could particularly do.  I

10 remember this case.  I remember Mr. Glass.  And if there was

11 anything that I had that would help him or anything I could do

12 to help him, I wanted to.

13 Q.  Did you interview April in 2020 to assist Detective

14 Lowrance?

15 A.  I did.

16 Q.  Did you think she was credible then?

17 A.  I did.

18 Q.  And when you gave him your case file from your 2016 case,

19 did that include your interview summaries of Mr. Glass,

20 April's mother, and April?

21 A.  Yes, I gave him everything I still had.

22 Q.  I'm going to show you something on your screen.

23     Do you see a paper on your screen?

24 A.  I do.

25 Q.  I'm showing you what's been marked as Government's

HEATHER BROWN - DIRECT

1   Exhibit 1.  Do you recognize this document?

2   A.   Yes.

3   Q.   What is that?

4   A.   That was the interview that I did with Sandra Cox when we

5   initially got the complaint in 2016.

6   Q.   Was this your interview summary of that interview?

7   A.   Yes.

8   Q.   I'm going to show you what's been marked Government's

9   Exhibit 2.  It's two pages.

10       Do you recognize this document?

11  A.   Yes.  That's the interview summary with April Glass when

12  she came in 2016.

13  Q.   I'm going to show you what's been marked Government's

14  Exhibit 3, page 2, page 3, page 4, and page 5.

15       Do you recognize this document?

16  A.   I do.

17  Q.   What is that?

18  A.   That was the interview summary with Mr. Glass in 2016.

19  Q.   Did you provide these documents to Detective Lowrance as

20  part of your case file?

21  A.   I did.

22       MS. SPAUGH:  We move to admit Government's Exhibits

23  1 through 3.

24       THE COURT:  They're admitted.

25       (Government's Exhibits Nos. 1, 2, and 3 were

HEATHER BROWN - CROSS

1  received into evidence.)

2         MS. SPAUGH:  May I approach the Court with a copy?

3         THE COURT:  You may.

4         (Documents tendered to the Court.)

5         MS. SPAUGH:  I have no further questions.

6         THE COURT:  You may cross examine.

7         MR. JOHNSON:  Thank you.

8                    CROSS EXAMINATION

9  BY MR. JOHNSON:

10 Q.   Sergeant Brown, you are no longer involved in general

11 investigations with the Virginia State Police, correct?

12 A.   I supervise some folks that still work in general

13 investigations.  All of our polygraph folks are still in

14 general investigations, yes.

15 Q.   Okay.  So are you a polygrapher or do you just --

16 A.   Both.

17 Q.   You're both.

18 A.   Yeah.

19 Q.   You're a certified polygrapher --

20 A.   Yes.

21 Q.   -- and you supervise the polygraphers in your office.

22 A.   Yes.

23 Q.   And you'll agree with me, then, in this case you never

24 did a polygraph of April Glass.

25 A.   No.

HEATHER BROWN - CROSS

1  Q.   You never did a polygraph of Jessie Lee Glass, Jr.
2  A.   No.
3  Q.   You never did a polygraph of Ms. Cox --
4  A.   No.
5  Q.   -- April Glass's mother.
6  A.   That's correct.
7  Q.   Okay.  Let's start at the beginning.  In 2016 you
8  received a call from the Wytheville Police Department that
9  they had some information about child pornography.
10  A.   No, it was -- Wytheville is one of our state troopers.
11  Q.   Ah.
12  A.   So we have a satellite office in Wytheville and so she
13  had gone to that office as opposed to our headquarters.
14  Q.   Got you.  And that's what brought you into the case.
15  A.   Yes.  He called.
16  Q.   And before that time you had never had any contact with
17  Ms. Cox.
18  A.   No.
19  Q.   Had you ever had any contact with April Glass?
20  A.   No.
21  Q.   Or Jessie Lee Glass, Jr.?
22  A.   No.
23  Q.   We'll just call him Lee.
24  A.   Lee, okay.
25  Q.   And when you met with Ms. Cox, she told you about the

JA179

1  images that April had sent to her.

2  A.    That is correct.

3  Q.    Did you do -- you collected the images from the phone

4  that you got from Ms. Cox, correct?

5  A.    So we took the phone into evidence, yes, the whole phone.

6  Q.    And did you have a forensic analysis of that phone?

7  A.    The -- once the phone was taken into evidence, it was

8  held as evidence.  The issue being there was no crime in

9  Virginia as far as that was going to be prosecuted.  So it was

10  not -- as far as I recall, it was not sent for an actual

11  forensic analysis.

12  Q.    Okay.  So you seized --

13  A.    So I'm looking at only the photos that were on the phone.

14  Q.    Okay.

15  A.    Yes.

16  Q.    So you didn't ever send them to a forensic examiner and

17  say where was -- where were these pictures produced, correct?

18  A.    No.

19  Q.    You didn't -- you didn't send them out to see if they

20  were known images.

21  A.    No.

22  Q.    You didn't do any work or background on the source of the

23  phone -- source of the photos, correct?

24  A.    No.  I did not do anything other than document what was

25  on -- what the photos were of.

HEATHER BROWN - CROSS

1  Q.   Okay.  And that was never done on those photographs,
2  correct?
3  A.   As far as I know, no.  I don't have anything to indicate
4  that it was.  It was honestly a long time ago.  We would not
5  have entered, like, the actual photos or a report containing
6  the photos in our computer system because obviously it's child
7  pornography.  And anything along with that would have been
8  destroyed with the phone once it's not going to be prosecuted.
9  Q.   Okay.
10 A.   So I don't have anything, no.
11 Q.   So it's your understanding the phone has been destroyed.
12 A.   Yes.  We had an administrative destruction order that was
13 signed by the Commonwealth attorney and then my supervisor.
14 Q.   So that's not available for us to search now.
15 A.   No.
16 Q.   You -- you talked to Ms. Cox and she gave you information
17 about the case.
18 A.   Yes.
19 Q.   And that was all information that had been provided to
20 her by April Glass.
21 A.   The context of how the photos came in, yes.  The
22 interview of her reaction to the photos and how she got them,
23 yeah, that was her experience.
24 Q.   That was her experience.
25 A.   Yes.

HEATHER BROWN - CROSS

1  Q.   Because she just had images showing up on her phone and a

2  message that said, "Brace yourself."

3  A.   That was what she said, yes, sir.

4  Q.   Okay.  And so based upon your conversation with Ms. Cox,

5  Ms. Cox -- you decided you wanted to talk to April Glass.

6  A.   Sure.  Yes.

7  Q.   And it took you a while to get ahold of April, correct?

8  A.   No.  I can't say the exact date, but I spoke to her two

9  days later.  I know we emailed the next day.  So I can't say

10  that I talked to her that evening of the 27th after I talked

11  to Ms. Cox because I talked to Ms. Cox, it was late in the

12  day.  So Ms. Cox came in at 4:00 PM and I provided her with my

13  contact to pass along to April.  I don't know that I talked to

14  April particularly that day, but the next day I did have some

15  email exchanges with her because she was informing me about

16  the -- that Lee had found out about her mother coming to speak

17  with me.

18  Q.   Okay.  And just so we're clear, what you received were

19  photos of a cellular phone.

20  A.   It was photos of, like, a device.  Someone had taken

21  photos of that device with a picture on it.

22  Q.   Okay.  Do we know what kind of device that was?

23  A.   April described it as a -- I believe a --

24  Q.   Go ahead.

25  A.   A Samsung.  But no, I don't -- I never got the phone.

HEATHER BROWN - CROSS

1  Mr. Glass had lost it.

2  Q.    Well, from looking at those photographs, could we tell if

3  it was a tablet or --

4  A.    It was not a tablet; it was a phone.

5  Q.    It was a cell phone.

6  A.    Yes.

7  Q.    But we don't -- but those photos don't exist anymore so

8  we don't know what kind of phone it was other than what April

9  told you.

10 A.    That is correct.

11 Q.    Okay.  And then eventually you spoke to April Glass.

12 A.    Yes.

13 Q.    And when you started to talk to April Glass, you didn't

14 run a record check on her, did you?

15 A.    I did not.

16 Q.    Now, you talked during your direct examination about how

17 you don't usually run that background check or a record check

18 on somebody who's a victim, correct?

19 A.    As a victim or a complainant.

20 Q.    Okay.  Well, isn't that important information when you're

21 trying to determine whether someone is credible?

22 A.    At some point it may be, but not -- you can't not take a

23 complaint because someone is a -- has a criminal history.

24 Q.    No, I understand that completely.  But at some point when

25 you're determining whether you want to apply for a search

JA183

1  warrant, whether or not that person is reliable or credible is
2  important, correct?
3  A.   It could be.  It could be depending on the circumstances
4  of the situation.  If she had been inconsistent, yes.  But I
5  did not have any indication that she was inconsistent in her
6  statements to me.
7  Q.   And at some point in time, you filed an affidavit for a
8  search warrant based upon information that had been provided
9  to you by Ms. Glass, correct?
10  A.   Yes.
11  Q.   And you didn't get a search warrant -- you didn't get an
12  NCIC check or a background check on Ms. Glass before you
13  submitted that information, correct?
14  A.   No.
15  Q.   So let's go back to your interview with April Glass.  She
16  provided you information about how she got into Mr. Glass's
17  phone allegedly.
18  A.   Uh-huh.
19  Q.   And that she had been looking through his phone because
20  she thought that he had been unfaithful to her.
21  A.   That is what she said.
22  Q.   He was cheating.
23  A.   Uh-huh.
24  Q.   Okay.  When she provided you with the information, did
25  she tell you specifically where the images would be found?

HEATHER BROWN - CROSS

1  A.    She just said she found them in the phone.

2  Q.    Okay.  She didn't say that she found it in a certain

3  folder within the phone?

4  A.    She did not.

5  Q.    Or in the photo section of the phone?

6  A.    She did not.

7  Q.    Or anywhere?

8  A.    She did not.

9  Q.    Okay.  And did she tell you why she contacted and sent

10  these to her mother instead of why she went to the local

11  police department in Iredell County where she had allegedly

12  found these images?

13  A.    She did not tell me why she did that.

14  Q.    And did Ms. Cox, her mother, tell you that it was April's

15  idea that she contact the police?

16  A.    No.

17  Q.    Well, did she say -- did Ms. Cox say or did April say why

18  she sent five images of child pornography to her mother?

19  A.    No.  The only statement that was made by Ms. Cox about

20  what had happened was that she said -- Ms. Cox said, "I am

21  going to the state police."  That was -- it was non-negotiable

22  in her mind.  She was very upset by those photos.

23  Q.    Sergeant Brown, you eventually sought a search warrant

24  for an SD card involved in your 2016, 2017 investigation,

25  correct?

1  A.   That's correct.

2  Q.   Okay.  And let's give the Court some background on that.

3  At some point in time you were told by April Glass that

4  Mr. Glass had a -- some type of drive, a 200-gigabyte drive

5  that might contain images.

6  A.   She said that she wasn't sure that there was anything on

7  that phone anymore, but it was attached to one of the devices

8  that she claimed had some child pornography on it.

9  Q.   Okay.  So let's just be clear.  Is this a SIM card from

10  the phone that April Glass had taken photographs of and sent

11  to her mother?

12  A.   No, I don't believe it was a SIM card.  It was too large

13  to be a SIM card.  It was -- it was like a -- almost one like

14  you would put in a camera.  It wasn't -- it wasn't like the

15  small, tiny SIM card.

16  Q.   Okay.  So at some point in time, April Glass told you

17  about this -- how about a micro SD card?

18  A.   Yes.

19  Q.   Okay.  And did she tell you that she was going to take it

20  from Mr. Glass?

21  A.   She said that she had it, but when she went home she did

22  not have it anymore.

23  Q.   Okay.

24  A.   She could not find it.

25  Q.   So she had lost it.

1   A.   Yes.

2   Q.   But at some point in time, miraculously, she found it.

3   A.   She did find it.

4   Q.   Correct.

5        MR. JOHNSON:  Ms. Palmer, can you pull up Defense

6   Exhibit 13.

7   Q.   Now, in January of 2017 you eventually got a search

8   warrant to search that card, correct?

9   A.   That is correct.

10  Q.   And I've got before you Defense Exhibit 13.  And that is

11  the search warrant that you obtained for this card, correct?

12  A.   Correct.

13  Q.   And you swore out an affidavit as part of that process

14  indicating that you believed that that phone contained

15  evidence of child pornography offenses.

16  A.   Yes.  Based on her statements, yes.

17  Q.   Okay.  And you got the search warrant.

18  A.   I did.

19  Q.   And you had that SD card forensically evaluated, correct?

20  A.   I looked at the card myself.

21  Q.   Okay.

22  A.   Yes.

23  Q.   And you found nothing on that phone that would indicate

24  child pornography images.

25  A.   There wasn't anything on there.

HEATHER BROWN - CROSS

1  Q.   So that information that Ms. Glass provided you about the
2  existence of child pornographic images on that SD card was
3  incorrect, correct?
4  A.   Well, she told me when we originally mentioned this on
5  the 29th that she had this card; that she didn't believe there
6  was probably anything on there at the time, but she knew he
7  did used to have items on that phone.
8  Q.   Okay.  Did you send this card out for forensic evaluation
9  by a computer forensic examiner?
10 A.   No.
11 Q.   So all you did was put it in a device that could read it
12 and you looked at the photographs.
13 A.   I looked through them, yes.
14 Q.   Okay.  Now, as part of your investigation, you figured
15 out very quickly that nothing illegal had happened in Virginia
16 other than April Glass had sent images electronically to her
17 mother.
18 A.   That is correct.
19 Q.   Because to your understanding, Mr. Glass had not
20 committed any of the crimes that you were investigating him
21 for in Virginia.
22 A.   I did not have anything in Virginia.
23 Q.   And you knew your case was not going to go anywhere in
24 Virginia, correct?
25 A.   That is correct.

JA188

1  Q.   And so you reached out to officers in North Carolina to
2  see if they would become involved in the case, correct?
3  A.   If they were interested in the phone, yes.
4  Q.   Okay.  Who did you contact in North Carolina about --
5  about these -- about trying to -- becoming involved in the
6  case?
7  A.   Initially I made some calls just down to the sheriff's
8  office and to the SBI.  I spoke to someone at the SBI in ICAC
9  who said they were not interested.
10 Q.   Did they explain to you why they weren't interested in
11 your case?
12 A.   No.  I gave them the case facts and they just said they
13 weren't interested.
14 Q.   So North Carolina -- at least the SBI said it was not a
15 case that we're interested in.
16 A.   That's correct.
17 Q.   Okay.  Who else did you talk to?
18 A.   Later in 2017 I spoke to -- give me just a second and
19 I'll tell you the name.
20      In 2017 I spoke to Chris Lamberth at Iredell County, and
21 that would have been December of 2017.  And I also sent an
22 email to Lieutenant Brian Boyd in December of 2017 at Iredell
23 County.  I sent an email to the ICAC at SBI who covered
24 Iredell County.  I had the name, but I can't locate it.  But I
25 did not get a response from there.

1    MR. JOHNSON:  Your Honor, I don't believe that we've
2  received these notes in discovery.  Can we have an opportunity
3  to review her notes?  We would have been obviously very
4  interested in finding out that she went to Iredell County on
5  at least two occasions and they told her that the case didn't
6  have any merit.
7    THE COURT:  You can review whatever she is using to
8  refresh her recollection.
9    MR. JOHNSON:  May I approach?
10    THE COURT:  You may.
11    MR. JOHNSON:  I'm already there, sorry.
12    (Documents tendered to defense counsel.)
13    MR. JOHNSON:  Your Honor, if we can just have a
14  moment.  They're very short.
15    (Pause.)
16    MS. FORD:  Can I see them?
17    MR. JOHNSON:  Sure.
18    (Documents tendered to government counsel.)
19    MR. JOHNSON:  Thank you for the break, Your Honor.
20  BY MR. JOHNSON:
21  Q.   Sergeant Brown, do you have a copy -- is this the only
22  copy that you have?
23  A.   That's all I have.
24    MR. JOHNSON:  Your Honor, can I approach?  Maybe I
25  can look over her shoulder.

1    THE COURT:  Yes, that's the only way to do it.

2    THE WITNESS:  I'll do my best.

3    MS. FORD:  Your Honor, why don't we just put it on

4  the ELMO so we can all see --

5    THE WITNESS:  Yes, that works.

6    MS. FORD:  -- it on the screen.

7    MR. JOHNSON:  Okay.  Great.

8  BY MR. JOHNSON:

9  Q.   Sergeant Brown.

10  A.   Yes.

11  Q.   You provided -- just provided us with -- just provided to

12  us the contact that you had with Investigator Chris Lamberth

13  of the Iredell County Sheriff's Office, correct?

14  A.   That's correct.

15  Q.   And this contact occurred December 21st, 2017.

16  A.   That's correct.

17  Q.   And that was a year or more after you had contact with

18  April Glass, correct?

19  A.   That's correct.

20  Q.   And that was probably 11 months after you had gotten your

21  search warrant for the SD card, correct?

22  A.   Around about, yes, I believe so.

23  Q.   Because it's my understanding that that search warrant

24  was obtained in January --

25  A.   In January, yes.

1  Q.   -- of 2017.

2       What made you contact Officer Lamberth out of the blue 11

3  months later?

4  A.   In looking at -- in looking at this alone, I don't know

5  what initiated the contact.  I just added it to this file kind

6  of as my note that I was trying to pass along the information

7  the best I could.  I don't -- I can't remember with the

8  timeline being so long what initiated that.  I don't have any

9  notes about how this came into effect.  I just note that we

10  had the conversation.

11  Q.   Okay.  Well, let's just talk about the conversation.

12  A.   Sure.

13  Q.   In the second line it says, "Lamberth investigated

14  complaint that was sent in by April Glass anonymously."

15  A.   It's possible that he called me, but I honestly don't

16  know.

17  Q.   You don't remember.

18  A.   I don't.

19  Q.   Okay.  But at least at that point in time, you were aware

20  of the -- of an investigation that had begun at the Iredell

21  County Sheriff's Office.

22  A.   Uh-huh, yes.

23  Q.   And it had been based upon an anonymous complaint from

24  April Glass --

25  A.   Yes.

1 Q. -- correct?

2 And so you were told at that time that Lamberth went to

3 the home and got consent to search the house.

4 A. That is what he told me. I don't have any personal

5 knowledge other than what he said.

6 Q. And he identified a tablet which was seized and

7 downloaded; but, again, no pornography was found on that

8 device, correct?

9 A. That's correct.

10 Q. So you knew that the sheriff's department in -- the

11 Iredell County Sheriff's Department in 2017 had done an

12 investigation based upon April Glass's tip and that they had

13 found no pornographic images on the tablet --

14 A. Yes.

15 Q. -- that was seized.

16 A. Based on that conversation, that's what he told me.

17 Q. And you asked them if they would be interested in looking

18 in your file and pursuing your case further, correct?

19 A. I did.

20 Q. And he said that he does not regularly work in ICAC crime

21 and he would have somebody in that specialty contact you,

22 correct?

23 A. That's correct.

24 Q. Okay. Did -- so he didn't agree to pursue the 2016 case

25 in North Carolina.

1   A.   He did not.

2   Q.   Did anybody else from the Iredell County Sheriff's

3   Department ever contact you and -- about your investigation

4   after you had talked to Lamberth?

5   A.   The only contact at Iredell County -- I'm not sure the

6   nature of the other email with Lieutenant Boyd.  You have the

7   paper for that.  I don't think we ever corresponded

8   specifically.  But the only other person I know I spoke to

9   about it was Detective Lowrance and that was in 2020.

10           MR. JOHNSON:  Your Honor, just for the record, we're

11  going to mark this exhibit as Exhibit Number 25.

12           THE COURT:  Okay.

13           MR. JOHNSON:  And we'd like to introduce this

14  exhibit.

15           THE COURT:  You may.  It's admitted.

16           (Defendant's Exhibit Number 25 was received into

17  evidence.)

18  Q.   Now, the other piece of paper that you gave me, Sergeant

19  Brown, was a contact that you had with Lieutenant Brian Boyd

20  at Iredell County, correct?

21  A.   That is correct.

22  Q.   And this happened, it appears, on the same day about 30

23  minutes later -- no, I'm wrong.  No, I'm wrong.

24  A.   I think that was earlier.

25  Q.   This was earlier.  This was on April 11, 2017, correct?

1  A.   That's correct, yes.

2  Q.   And you sent an email to Lieutenant Brian Boyd at Iredell

3  County Sheriff's Office to see if he was familiar with

4  Mr. Glass.

5  A.   That is correct.

6  Q.   And you never heard back from North Carolina, correct?

7  A.   I did not.

8  Q.   And then you spoke to an ICAC agent when you first got

9  this case, but they declined to take the case after you went

10  over the facts.

11  A.   That's correct.

12  Q.   So you had multiple people look at your 2016 case in

13  North Carolina and nobody wanted to touch it, correct?

14  A.   No one actually looked at it, but I told them the nature

15  of the case.  They looked at the photos.  But I told them the

16  circumstances of how I got the case and no one took it, that's

17  correct.

18        MR. JOHNSON:  Your Honor, we would like to mark this

19  as Exhibit 26.

20        THE COURT:  All right.

21        MR. JOHNSON:  And introduce it into evidence.

22        THE COURT:  It's admitted.

23        (Defendant's Exhibit Number 26 was received into

24  evidence.)

25        MR. JOHNSON:  Your Honor, if I can have a moment.

JA195

1          (Defense counsel conferred.)

2     BY MR. JOHNSON:

3     Q.   Now, Sergeant Brown, just so I'm clear on something, when

4     you met with April Glass and interviewed her, she described

5     for you that she had access to Mr. Glass's phone, correct?

6     A.   Yes.

7     Q.   Was it limited or could she go into it any time that you

8     were aware?

9     A.   She described generally he had it with him.  There was

10    also a tablet that she said that she had accessed several

11    weeks earlier that used to have a passcode on there that he

12    got a little upset that she took the passcode off of.

13    Q.   Okay.

14    A.   So it depended on the device and maybe the situation.  I

15    really can't answer that.

16    Q.   So Ms. -- April Glass had the ability to go into, at

17    least I know, a phone and a tablet.

18    A.   To some extent.  I know she talked about it being

19    password protected at times so I'm not -- I can't say when she

20    did and when she didn't.

21    Q.   And she had the knowledge and ability to take off

22    passcodes on his devices.

23    A.   That's what she said that they had had an argument over,

24    yes.

25         MR. JOHNSON:  Your Honor, no further questions.

1       Thank you, Sergeant.

2       THE COURT:  Any redirect?

3       MS. SPAUGH:  Just briefly, Your Honor.

4                   REDIRECT EXAMINATION

5   BY MS. SPAUGH:

6   Q.   I'm going to show you what we just looked at as Defense

7   Exhibit 26.  I just want to make sure I understand the time on

8   this.  It states, "Activity date/time:  December 11, 2017."

9   A.   Yes.

10  Q.   And is that the date that you wrote this report or is

11  that when the interaction occurred?

12  A.   That would have been the time that the interaction

13  occurred.

14  Q.   Okay.  And then I'm going to show you what we've looked

15  at as Government's Exhibit 2.

16       And the final paragraph reads, "He had a big memory card

17  with a bunch of pictures on it.  It was over 200 gigabytes.

18  He got it free from Sprint with the phone.  I think it was

19  just quotes and older women he downloaded pictures of.  He

20  left it out and I got it.  I told him I took it down the road

21  and threw it out.  He thinks I'm covering for him.  I had the

22  memory card last night and I hid it, but when I got up I

23  couldn't find it.  I don't know if I dropped it somewhere or

24  if he got it.  He was up hours before me and it looks like my

25  stuff had been moved around.  I'm going to look for it and if

CHRIS LAMBERTH - DIRECT

1  I find it, I will get it to you."

2       Is that what we've been discussing as an SD card or SIM

3  card or some type of memory card?

4  A.   Right.  That is what she provided to me that she said was

5  associated with the phone that she provided a couple weeks

6  later at least.

7  Q.   And so she never told you that it would have child

8  pornography on it; is that correct?

9  A.   She didn't.

10          MS. SPAUGH:  I have no further questions.

11          THE COURT:  All right.  Thank you.  You may stand

12  down.

13          (Witness stepped down.)

14          MR. JOHNSON:  Your Honor, we failed to move to

15  introduce Defense Exhibit 13 which is the search warrant.  We

16  would like to have that admitted as evidence.

17          THE COURT:  It's admitted.

18          (Defendant's Exhibit Number 13 was received into

19  evidence.)

20          MS. SPAUGH:  Your Honor, may this witness be

21  released from her subpoena?

22          THE COURT:  Without objection she's released.

23          MR. JOHNSON:  No objection, Your Honor.

24          MS. FORD:  The government calls Chris Lamberth.

25          CHRIS LAMBERTH, GOVERNMENT WITNESS, SWORN,

CHRIS LAMBERTH - DIRECT

1       DIRECT EXAMINATION
2   BY MS. FORD:
3   Q.   Please tell us your name.
4   A.   Chris Lamberth.
5   Q.   And where do you currently work?
6   A.   O'Reilly Auto Parts.
7   Q.   How long have you worked at O'Reilly Auto Parts?
8   A.   About two years.
9   Q.   And at some point before you started working there, did
10  you work for the Iredell County Sheriff's Office?
11  A.   I did.
12  Q.   When did you work at the Iredell County Sheriff's Office?
13  A.   From January of 2007 through mid to late 2020.
14  Q.   So you were working there in 2017?
15  A.   Yes, ma'am.
16  Q.   And in 2017 what was your title at the sheriff's
17  department?
18  A.   At that point in time I was an investigator, detective.
19  Q.   And what types of cases did you investigate in 2017?
20  A.   Property crimes, fraud, anything that was assigned to me.
21  That could be anything that needed to be followed up on.
22  Q.   Did you normally investigate child abuse or child
23  pornography cases?
24  A.   Not on a routine basis; but if it was handed down to me,
25  I would assist in those or investigate them if I was directed

CHRIS LAMBERTH - DIRECT

 1  to.
 2  Q.   And in May of 2017 did you investigate a tip involving
 3  Jessie Glass, Jr.?
 4  A.   I did.
 5  Q.   Can you tell us how you got involved in that
 6  investigation.
 7  A.   My lieutenant at the time brought me a piece of paper
 8  that was a printed email that was a tip saying that there was
 9  possible child pornography in possession of Mr. Glass.
10  Q.   And did you read the tip?
11  A.   I did.
12  Q.   I'm showing you what I've marked as Government's Exhibit
13  4.
14       Do you recognize Government's Exhibit 4?
15  A.   I do.
16  Q.   And is it the email tip that you were just referencing?
17  A.   It is.
18           MS. FORD:   Your Honor, I'd move to introduce and
19  publish Government's Exhibit 4.
20           THE COURT:   It's admitted.
21           (Government's Exhibit Number 4 was received into
22  evidence.)
23  Q.   At the top there it says, "Andy Poteat."  Who's that?
24  A.   At that point in time he was my lieutenant's supervisor.
25  He would have been a captain, I believe.

CHRIS LAMBERTH - DIRECT

1  Q.   And who assigned this tip to you to investigate?
2  A.   My lieutenant at the time which would have been Brian
3  Boyd.
4  Q.   And there in the middle it says, "From:  April Nester."
5  Is that who the tip came from?
6  A.   Yes.
7  Q.   And it says it was sent on Tuesday May 16, 2017, at 3:16
8  PM.
9  A.   Yes.
10  Q.   And the subject says, "Anonymous tip."
11  A.   Correct.
12  Q.   And can you read the tip for us.
13  A.   "749 Shiloh Road, Statesville, VA.  There is marijuana
14  and possibly other meds non-prescribed and the tablets are
15  full of child porn.  They will be there about 7 PM.  Please
16  keep my email anonymous or he will come after me.  Jessie
17  Leroy Glass, Jr., is currently being investigated in the state
18  of Virginia on child porn charges and possible rape of my
19  daughter.  Again, please don't repeat my email.  He will come
20  after me."
21  Q.   And what did you do -- strike that.
22       This April Nester, do you know her?
23  A.   I do not.
24  Q.   Did you know her back in 2017?
25  A.   I did not.

1  Q.   Did you talk to her in 2017?

2  A.   Not at all.

3  Q.   Did you know anything about her in 2017?

4  A.   No.

5  Q.   Once you were assigned to investigate the tip, what did

6  you do?

7  A.   I gathered my binder and my belongings and I went out to

8  the residence.

9  Q.   Where was the residence?

10 A.   749 Shiloh Road.

11 Q.   Was anyone with you?

12 A.   Yeah, Detective Clodfelter and Detective Griffiths.

13 Q.   And did you go out there on May 18 of 2017?

14 A.   I believe that was the date.

15 Q.   So approximately two days after the tip came in.

16 A.   Yes.

17 Q.   And what happened once you got to 749 Shiloh Road?

18 A.   Mr. Glass met us outside kind of in like the driveway

19 area, I guess, and I informed him why we were there.

20 Q.   Let me stop you there.  When you say "Mr. Glass," are you

21 referring to Jessie Glass, Jr.?

22 A.   Yes.  Yes.

23 Q.   Okay.  What happened next?

24 A.   I informed him why I was there:  that we were given a tip

25 that he had possible child pornography on a tablet.  And I

CHRIS LAMBERTH - DIRECT

1  asked him if he had a tablet.  He said he did.  I asked him if
2  I could search the tablet.  He said I could.  He stepped
3  inside, retrieved the tablet.
4     With me standing there I asked him again if I could
5  search the tablet.  He said I could again.  I opened it up and
6  went into the web browser and there -- and looked for the
7  search history of the web browser and I saw a search for young
8  dominatrix.  And then at that point I notified him that I was
9  going to seize his tablet at that point as -- for the
10 potential that there could be possible child pornography on
11 it, and entered it into evidence and executed a search warrant
12 on it.
13 Q.   Did you talk to him further?
14 A.    Yeah, I talked to him for a few more minutes.  The other
15 two detectives -- we asked for consent to search the
16 residence, which he gave.  And I believe they did the search
17 of the residence while I stood there with him.  And then after
18 we finished up there, I left and went back to the office to
19 enter the tablet into evidence.
20 Q.   And the search, was it a long, short, medium length
21 search?
22 A.    It wasn't long.  I mean, we were there just for a little
23 while and we were gone.  We didn't spend a whole lot of time.
24 Q.   Do you know whether or not the other two detectives were
25 inside the residence flipping up couch cushions and things

CHRIS LAMBERTH - DIRECT

1  like that?

2  A.   No, they didn't destroy the house or anything.  They were

3  just in there -- it was more -- it was a light search.  It

4  wasn't an intense, in-depth.  They were just looking for any

5  other computer-type devices and they didn't see any.

6  Q.   Did you ask him whether or not there would be child

7  pornography on the tablet?

8  A.   I did.

9  Q.   What did he say?

10 A.   He said there shouldn't be.

11 Q.   Did he say anything else?

12 A.   No.  But he said -- well, yeah, he did.  He actually

13 said, "If there was anything on there, if it popped up, I

14 didn't dwell on it."

15 Q.   And were those his words or yours?

16 A.   Those are his words.

17 Q.   Did you notice anything about his demeanor?

18 A.   When he was saying that, I noticed, like, it looked like

19 his eyes started watering, like tears were welling up in his

20 eyes a little bit.

21 Q.   So did you take the tablet?

22 A.   I did.

23 Q.   Did you get a search warrant for the tablet?

24 A.   I did.

25 Q.   Did the search warrant authorize you or someone with

JA204

1　Iredell County Sheriff's Office to, what we call, dump the
2　tablet?
3　A.　It did.
4　Q.　And who did that?　Who dumped the tablet or recovered the
5　data from the tablet?
6　A.　At that time it was Detective Sergeant Jason Lowrance.
7　Q.　And did you talk with Detective Lowrance about the case
8　in depth?
9　A.　At that point in time I did, yeah.　I just told him what
10　was allegedly supposed to be on it, what we were looking for.
11　And -- I wouldn't say in-depth.　It was just kind of a
12　briefing, I guess, of what we were looking for.
13　Q.　And once the data was extracted from the tablet, did
14　someone go through that data to see if there was any child
15　pornography?
16　A.　I did.
17　Q.　Was there any child pornography?
18　A.　I did not find any child pornography in and of itself.
19　There was adult pornography, but I did not find any child
20　pornography.
21　Q.　And what happened with the case?
22　A.　When I didn't discover anything that I was looking for in
23　reference to child pornography at that time, we -- I contacted
24　Mr. Glass and let him know that we were going to -- well, I
25　returned the search warrant first and then I contacted

1   Mr. Glass and let him know that he could come retrieve his
2   tablet.  At that point I closed the case out as unfounded.
3   Q.   And why did you use the word unfounded?
4   A.   On the North Carolina SBI report that most agencies use
5   for reporting, that's one of the dispositions that you can use
6   if you didn't find any particular evidence that the crime you
7   were investigating at that time occurred.
8   Q.   Did you close the case because you came to believe that
9   the tipster was lying?
10  A.   No.
11  Q.   Did you close the case because you thought the tipster
12  did not give you credible information?
13  A.   No.
14  Q.   Do you have any opinion on the tipster April's
15  credibility?
16  A.   No.
17  Q.   So that was in May of 2017, correct?
18  A.   Correct.
19  Q.   Fast forward to December of 2017.
20  A.   Okay.
21  Q.   Do you remember getting a phone call from Heather Brown
22  with the Virginia State Police?
23  A.   I do not.
24  Q.   And you said you mainly investigated property crimes at
25  that time?

1 A.   At that time, yes.

2 Q.   Were you part of the Internet Crimes Against Children

3 Task Force at the Iredell County Sheriff's Office?

4 A.   No.

5        MS. FORD:  Nothing further, Your Honor.

6        THE COURT:  You may cross examine.

7        MR. JOHNSON:  Thank you, Your Honor.

8                    CROSS EXAMINATION

9 BY MR. JOHNSON:

10 Q.   Mr. Lowrance -- Mr. Lamberth, I'm sorry.

11 A.   That's okay.

12 Q.   You originally became involved in this case because a

13 Detective Boyd sent you out to do kind of a knock-and-talk

14 with Mr. Glass, correct?

15 A.   After receiving the tip, yes.

16 Q.   Okay.  And you got an anonymous tip through an email that

17 you've identified previously, correct?

18 A.   Correct, yes, sir.

19 Q.   And you knew that the tipster was April Glass, correct?

20 Or April Nester.

21 A.   According to the paper, it said April Nester, yes.

22 Q.   And that was -- you knew that to be Mr. Glass's wife,

23 correct?

24 A.   After reading that, yes.

25 Q.   Okay.

JA207

CHRIS LAMBERTH - CROSS

1   A.   At that point in time.

2   Q.   And so you went out and did the knock-and-talk and you

3   ran into Mr. Lee Glass outside the house.

4   A.   I did.

5   Q.   And you told him that you were there to look at a tablet.

6   A.   Correct.

7   Q.   And he gave you the tablet.

8   A.   Absolutely.

9   Q.   And you looked through his web browser and saw something

10   that said young dominatrix.

11   A.   Correct.

12   Q.   Now, young has a lot of different determinations,

13   correct?

14   A.   Fair.

15   Q.   Young to a 65-year-old may be different than young to a

16   25-year-old, correct?

17   A.   That is fair.

18   Q.   Okay.  So based upon that browser search, you seized the

19   phone.

20   A.   The tablet, yes.

21   Q.   The tablet, okay.

22      Now, when you went to the house, there was not only an

23   allegation from the tipster of child pornography, but an

24   allegation that there were drugs in the house, correct?

25   A.   Correct.

CHRIS LAMBERTH - CROSS

1  Q.   And so two of your -- the two officers that accompanied
2  you, Detective Griffiths and Detective Clodfelter, they gained
3  consent to search the residence, correct?
4  A.   Correct.
5  Q.   And they went in there looking for more electrical
6  devices.
7  A.   And the drugs too, yes.
8  Q.   And drugs.
9  A.   Yes.
10 Q.   Okay.  And so they searched the house, correct?
11 A.   Correct.
12 Q.   And they didn't find any drugs.
13 A.   To my recollection, no, they did not.
14 Q.   And they didn't find any additional electronic devices.
15 A.   Correct.
16 Q.   They didn't find any more computers.
17 A.   No.
18 Q.   Or phones.
19 A.   No.
20 Q.   Or thumb drives.
21 A.   No.
22 Q.   Or anything that they would -- that could be used to
23 store electronic images, correct?
24 A.   Correct.
25 Q.   Correct?

CHRIS LAMBERTH - CROSS

1  A.    Correct, yes.

2         MR. JOHNSON:  Ms. Palmer, could you pull up Defense

3  Exhibit Number 14.

4         And would you go to the last page.

5  Q.    Now, Mr. Lamberth, I pulled up a document that has been

6  identified as Defense Exhibit 14.  And it appears to be notes

7  from your investigation, correct?

8  A.    Correct.

9  Q.    That's something that you wrote as you were working

10 through this case, correct?

11 A.    Correct.

12 Q.    And that confirms all the information that we just talked

13 about about Detective Griffiths and Detective Clodfelter

14 getting consent to search the house.

15 A.    Yes.

16 Q.    And that the search did not produce any more computers of

17 any kind or drugs.

18 A.    Correct.

19 Q.    And then the last statement that is in there is, "I spoke

20 with Detective Sergeant J. Lowrance and he said that he would

21 assist me in the search warrant tomorrow."

22 A.    Correct.

23 Q.    Now, there was no execution of a search warrant in this

24 case because the thing that was eventually searched was the

25 tablet that you already had in your possession, correct?

1  A.    The search warrant was executed to search that tablet and
2  do the dump, yes.
3  Q.    Okay.  But it wasn't like you had to go back to the house
4  or needed a team of people to search --
5  A.    Oh, no, yeah.
6  Q.    -- once you got the search warrant.
7  A.    No, we didn't go back to the house, no.
8  Q.    So when you said, "I spoke with Detective Sergeant J.
9  Lowrance and he said that he would assist me in the search
10 warrant tomorrow," he was going to assist you in drafting the
11 search warrant for the search of the tablet, correct?
12 A.    That and then execute the -- assist with executing it,
13 yes.
14 Q.    Okay.  So that would have meant that he would have
15 been -- had full knowledge about the case, correct?
16 A.    At that point in time he didn't have full knowledge.  I
17 gave him a briefing on it and I was going to discuss it with
18 him at the time.
19 Q.    And one of the things you briefed him about was the fact
20 that the tipster in this case was April Nester, April Glass,
21 Mr. Glass's wife, correct?
22 A.    It probably come up in that conversation.  I don't
23 remember our exact conversation.  But yeah, I would give him a
24 briefing on the case.
25 Q.    And that would have made sense that he would have known

1   that in 2017 when he helped draft the search warrant?

2   A.   I can't speak on his behalf on what he would have known,

3   but -- can you repeat the question.

4   Q.   Well, it seems logical that if you gave him a briefing on

5   the case, you would have told him who the tipster was,

6   correct?

7   A.   Yeah, that would be fair, yes.

8   Q.   Now, he was the person -- Detective Lowrance was the

9   person that performed a search on the phone, correct?

10  A.   Correct.

11  Q.   On the tablet, excuse me.

12  A.   Tablet, yes, correct.

13  Q.   Because your area was more fraud investigation, correct?

14  A.   At that point in time, I was more property crimes and

15  fraud, but yes.

16  Q.   And Detective Lowrance was more involved in child

17  pornography and those type of investigations, correct?

18  A.   Yes, correct.

19  Q.   So you tasked him or gave him the task of looking through

20  the tablet, correct?

21  A.   Correct.

22  Q.   And he looked through the tablet and they found no images

23  on the tablet that were child pornography.

24  A.   I'm not a hundred percent if he actually looked through

25  the tablet or forwarded everything to me to look through.  I

1   can't speak on what he saw prior to giving me the information;
2   I just know what I saw.
3   Q.   Okay.  Well, the bottom line is what you saw was that
4   there were no CP images on the tablet that was seized.
5   A.   Correct.
6   Q.   And after this was all said and done, the computer was --
7   the tablet was actually returned to Mr. Glass, correct?
8   A.   Correct, yes, sir.
9        MR. JOHNSON:  Ms. Palmer, would you turn to page 3
10  of that same document, Exhibit Number 14.
11  Q.   The middle entry dated 5/23/2017 confirms that there was
12  no child pornographic images on the tablet, correct?
13  A.   Correct.
14  Q.   Nothing appeared to be of anyone under the age of 18,
15  correct?
16  A.   Correct.
17       MR. JOHNSON:  Okay.  Can we go to the next
18  paragraph, please.
19  Q.   And this indicates that on the same day you made contact
20  with Mr. Glass and notified him that he could pick up the
21  tablet.
22  A.   Correct.
23  Q.   You thanked him for his cooperation and you let him know
24  that you didn't find anything that they were concerned about.
25  A.   Correct.

1 Q.   Correct?

2 A.   I did.

3 Q.   And the case was closed as unfounded, correct?

4 A.   Correct.

5 Q.   Unfounded means that you found no evidence to

6 substantiate the tip or the allegation of a crime, correct?

7 A.   Correct.

8 Q.   So the case was dead because you didn't have any evidence

9 to indicate that there were CP images involved with that

10 tablet.

11 A.   Correct.

12 Q.   Okay.  Now, just so I'm clear on something, you worked at

13 the sheriff's department from what year?

14 A.   2007.

15 Q.   Until when?

16 A.   Until -- what did I say?  2020.

17 Q.   Okay.

18 A.   It was right before COVID and all that mess.

19 Q.   So you think that was sometime in the middle of 2020?

20 A.   It was somewhere in there.  I don't remember the exact

21 date.

22 Q.   Okay.  So you would have been working for the sheriff's

23 department in December of 2019 and -- through February of

24 2020.

25 A.   I know I was there in 2019.  Pretty sure I was there in

1  February, yeah.  It was -- it was later into the 2020 era that
2  I left.
3  Q.   So were you still a detective and working with Detective
4  Sergeant Lowrance in 2019, 2020?
5  A.   Yes.  Actually, I transitioned back to the road, but I
6  was back to detective right before I left my position, yes.
7  Q.   Did you have any involvement in the 2019, 2020
8  investigation of Mr. Glass?
9  A.   I don't recall investigating or working on that at all.
10  Q.   Okay.  Did Detective Lowrance ever come to you and talk
11  to you about the fact that there was a new investigation?
12  A.   I don't recall talking to him about anything.
13  Q.   Okay.  So you weren't aware that there was an
14  investigation that occurred in 2019 and 2020 concerning
15  Mr. Glass.
16  A.   Correct.
17         MR. JOHNSON:  One moment, Your Honor.
18         (Defense counsel conferred.)
19  BY MR. JOHNSON:
20  Q.   Mr. Lamberth, I'm going to have -- show to you Exhibit --
21  Defense Exhibit Number 15.
22       And that is the tip that you have previously identified,
23  correct?
24  A.   Correct.
25  Q.   And this tip says that there was marijuana at the 749

CHRIS LAMBERTH - CROSS

1  Shiloh Road, Statesville address as part of the tip.

2  A.   Correct.

3  Q.   Did they find marijuana?

4  A.   No.

5  Q.   Possibly other meds non-prescribed.  Did they find any

6  other meds during that search?

7  A.   No.

8  Q.   And they said there were tablets full of child

9  pornography.  Did they find child pornography on the tablet

10 that Mr. Glass voluntarily turned over to you?

11 A.   No.

12 Q.   Did they find any other electronic device that contained

13 any images?

14 A.   No.

15 Q.   They didn't actually find any more devices, correct?

16 A.   Correct.

17         MR. JOHNSON:  Your Honor, at this time we'd move to

18 introduce Defense Exhibit 15.

19         THE COURT:  It's admitted.

20         (Defendant's Exhibit Number 15 was received into

21 evidence.)

22         MR. JOHNSON:  And Defense Exhibit 14.

23         THE COURT:  Admitted.

24         (Defendant's Exhibit Number 14 was received into

25 evidence.)

CHRIS LAMBERTH - CROSS

1  Q.  Now, when you started your investigation of Mr. Glass,
2  did you run an NCIC check or any type of electronic check to
3  see what his record was?
4  A.  I don't remember if I did it before or after.  I know at
5  one point I did do the CJLEADS, is what we were using at the
6  time.  I can't remember right off the top of my head.  I don't
7  know if I did it before I went out there or after.  I don't
8  know the time frame on it.
9  Q.  Okay.  And CJLEADS would just give you what their record
10  was in North Carolina, correct?
11  A.  I believe so.  I don't know the exact -- I'm pretty sure.
12  I'm not a hundred percent on that.  I don't want to answer yes
13  on that.
14  Q.  Okay.  Because that's important to know when you're
15  investigating somebody, correct?
16  A.  Correct.  I just don't recall if it does.  It's been two
17  years or so since I've used it so...
18  Q.  I understand.
19      Now, let me ask you this.  Did you run a CJLEADS or NCIC
20  check on April Nester or April Glass to find out what her
21  criminal record was?
22  A.  I honestly don't recall.
23  Q.  Did you -- before you did your knock-and-talk, as I'm
24  calling that, did you contact the state of Virginia to see
25  about the child pornography charges that were alleged in this

1  tip?

2  A.   No.

3       MR. JOHNSON:  Your Honor, nothing further.  Thank

4  you.

5       THE COURT:  Any redirect?

6       MS. FORD:  No, sir.  And may he be excused?

7       THE COURT:  You may stand down.

8       Without objection he may be released.

9       THE WITNESS:  Thank you, Your Honor.

10      (Witness stepped down.)

11      MS. FORD:  The government calls Jason Lowrance.

12      JASON LOWRANCE, GOVERNMENT WITNESS, SWORN,

13              DIRECT EXAMINATION

14  BY MS. FORD:

15  Q.   Please tell us your name.

16  A.   Detective Jason Lowrance.

17  Q.   And where do you currently work?

18  A.   Brunswick County Sheriff's Office.

19  Q.   How long have you worked for the Brunswick County

20  Sheriff's Office?

21  A.   Since 2021.  The beginning of 2021.

22  Q.   And before that did you used to work for the Iredell

23  County Sheriff's Office?

24  A.   Yes, ma'am.

25  Q.   How long did you work for the Iredell County Sheriff's

JASON LOWRANCE - DIRECT

1  Office?

2  A.    Since 2007.

3  Q.    And did you work there from 2007 to 2021?

4  A.    Yes, ma'am.

5  Q.    And so you were working there in late 2019, early 2020?

6  A.    Yes, ma'am.

7  Q.    And in late 2019, early 2020, what was your title?

8  A.    Detective sergeant.

9  Q.    And how long had you been a detective at that point?

10 A.    Roughly two to three years.

11 Q.    And what types of cases were you working at that time?

12 A.    Worked in child abuse, missing persons, ICAC cases,

13 sexual assault.

14 Q.    What are ICAC cases?

15 A.    Internet crimes against children.

16 Q.    And how long had you been working those types of cases at

17 that time?

18 A.    Probably around two years.

19 Q.    And in late 2019 or early 2020, did you investigate a

20 child pornography case involving Jessie Glass, Jr.?

21 A.    Yes, ma'am.

22 Q.    And how did you get involved in that investigation?

23 A.    I got information that was sent to me from a -- I believe

24 it was from a tip.

25 Q.    And what did the tip say?

JA219

1  A.   That Mrs. Glass had overseen several images of child
2  pornography on Mr. Glass's phone at the end of December of
3  2019.
4  Q.   And did you get this tip in early January 2020?
5  A.   Yes, ma'am.
6  Q.   And what did you do when you got the tip?
7  A.   Got the tip and then initiated a police report, written
8  report on the information that I received on the tip.
9  Q.   And what did you do next?
10  A.   I tried to reach out to Mrs. Glass by email and also
11  other means.
12  Q.   Did you know anything about her whereabouts at that time?
13  A.   I learned that she was -- went back to Virginia.
14  Q.   And at some point were you able to get in contact with
15  her?
16  A.   Yes.
17  Q.   About how long after you first got the tip?
18  A.   I want to say roughly about a month.
19  Q.   And how were you able to get in contact with her?
20  A.   I was able to reach out to her by telephone and speak to
21  her.
22  Q.   And did you talk to her on the phone?
23  A.   Yes.
24  Q.   And what did she tell you on the phone?
25  A.   Basically, I recall her saying that, you know, she was --

1  had Mr. Glass's phone; and whenever she had it, she opened it
2  up and saw several images of child pornography.
3  Q.    Did she tell you anything else?
4  A.    Other than that she was residing in Virginia at the time.
5  Q.    And what did you do next?
6  A.    I reached out to Agent Brown with Virginia State Police
7  and had her go out and meet Mrs. Glass and do a formal
8  in-person interview.
9  Q.    How did you know to reach out to Heather Brown?
10 A.    I had run his name and her name in LInX and saw that
11 there was a previous incident in 2012 and also 2016.
12 Q.    What's LInX?
13 A.    LInX is a -- it's owned by, I think it's NCIS which is
14 part of the Navy.  They own the program.  And it's a program
15 where law enforcement agencies can share information between
16 agencies.  It is kind of up to that law enforcement agency if
17 they wish to share their records or information.  And once
18 they do -- are willing to participate in the information
19 sharing, then that agency has -- you know, can grant access to
20 the investigators.
21 Q.    So if an agency is sharing things in LInX, what type of
22 things can you see when you go into the LInX database?
23 A.    That's based on the agency itself.  They have -- they can
24 do just reports, incident reports or investigation reports or
25 they can share just wreck reports.  It varies from agency to

JASON LOWRANCE - DIRECT

1  agency what information that they want to share.

2  Q.   So if an agency is sharing reports, can you get those

3  reports through LInX?

4  A.   No.  You can only view it and read what you have on the

5  screen.

6  Q.   So to get the actual report, you have to go to the

7  agency, correct?

8  A.   That's correct.  You have to reach out to that agency and

9  request the report.

10  Q.   And so did you go to the LInX database and type in Jessie

11  Glass's name?

12  A.   Yes.

13  Q.   And that's how you got into contact with Special Agent

14  Brown in 2016?

15  A.   Yes.

16  Q.   And what happened once you got in contact with Special

17  Agent Brown?

18  A.   I reached out to Agent Brown.  Spoke to her that I had a

19  tip of information -- or I had an investigation down here

20  concerning information that Mr. Glass had child pornography on

21  his phone that she saw, and I saw that she had a previous

22  investigation concerning similar...

23  Q.   Did you talk with her about her 2016 investigation?

24  A.   Yes.

25  Q.   And did she share her reports and summaries of interviews

JA222

JASON LOWRANCE - DIRECT

1  from 2016 with you?

2  A.    Yes.

3  Q.    I'm going to show you what's already been marked and

4  introduced as Government's Exhibit 2.

5        Does that look familiar?

6  A.    Yes.

7  Q.    Is that a report of an interview with April Glass that

8  Agent Brown shared with you?

9  A.    Yes, ma'am.

10 Q.    And then Government's Exhibit 1, does that look familiar?

11 A.    Yes.

12 Q.    And is it a summary of an interview with Sandra Cox that

13 Agent Brown shared with you?

14 A.    Yes.

15 Q.    And then Government's Exhibit 3, does that look familiar?

16 A.    Yes.

17 Q.    And is it a summary of an interview that Agent Brown

18 shared with you?

19 A.    Yes.

20 Q.    Did you ask Agent Brown to assist you with your case?

21 A.    I did.

22 Q.    Why did you need her assistance?

23 A.    Due to Glass -- Mrs. Glass, I'm sorry.  Due to Mrs. Glass

24 residing in Virginia.

25 Q.    And what did you ask Agent Brown to do?

JASON LOWRANCE - DIRECT

1  A.    If she would go out and do an in-person interview with
2  Mrs. Glass to get a good statement from her for my
3  investigation of what she saw on Mr. Glass's phone.
4  Q.    Why did you ask Agent Brown to meet with her in person?
5  A.    Due to -- whenever a person is being interviewed, you
6  know, a person, a detective, or anybody can -- whenever you're
7  talking to a person, you can pick up on, like, body language,
8  you know, whenever you're talking, do follow-up questions.  I
9  know Agent Brown had met with her before and had a rapport
10  with her, so I asked her to go out and do an interview on the
11  information that was given to me.
12  Q.    And was it important to you that an interview be done in
13  person?
14  A.    Yes.
15  Q.    Did you run April Glass's name in CJLEADS?
16  A.    Yes.
17  Q.    What is CJLEADS?
18  A.    I can't recall who actually maintains the system, but
19  CJLEADS will have DMV information in North Carolina only and
20  it will also have a person's criminal history here in North
21  Carolina.
22  Q.    I'm showing you what I've marked as -- well, it's marked
23  as Defense Exhibit 6 because it was attached to their motion
24  so I'm just going to keep it as Defense Exhibit 6.  It looks
25  like it's four pages.

1     Do you recognize Defense Exhibit 6?

2  A.  Yes, ma'am.

3  Q.  Is this part of your CJLEADS information that you got

4  when you ran April Glass's name?

5  A.  Yes, ma'am.

6  Q.  And did you run her in CJLEADS before you attempted to

7  get a search warrant?

8  A.  Yes.

9  Q.  And on the last page here, you said that CJLEADS has

10 information about people's criminal history.

11 A.  Yes.  In North Carolina.

12 Q.  In North Carolina.

13     Did you -- did CJLEADS show that April Glass at the time

14 that you were investigating Jessie Glass, Jr., that she had a

15 pending misdemeanor larceny charge?

16 A.  Yes, ma'am.

17 Q.  And here it says the offense date is 4/12/2019.

18 A.  Yes, ma'am.

19 Q.  And it lists the status as pending at the time, correct?

20 A.  Yes, ma'am.

21 Q.  Did you -- do you know anything or did you at the time

22 know anything about this misdemeanor larceny?

23 A.  No, ma'am.

24 Q.  And did you run her name through, like, an internal

25 Iredell County Sheriff's Office database?

JASON LOWRANCE - DIRECT

1   A.   Yes.

2   Q.   Why did you do that?

3   A.   To see if there was any -- our agency has had any kind of

4   involvement with her.

5   Q.   And did anything come back?  Did you find anything else

6   about her?

7   A.   I don't recall, no.

8   Q.   And did you make any attempts to figure out where Jessie

9   Glass, Jr., was living?

10  A.   Yes.

11  Q.   What did you do to try and figure out where he was

12  living?

13  A.   I saw that in, you know, CJLEADS there was an address

14  attached to Mr. Glass, Jr., residing at the target location of

15  my search warrant and also a previous investigation that was

16  back in 2017.

17  Q.   You mentioned earlier that when you -- that through LInX

18  you determined that Mr. Glass had been involved in an incident

19  in Virginia in 2012, correct?

20  A.   Yes.

21  Q.   Did you make any efforts to find anything more about

22  that?

23  A.   I did.

24  Q.   What did you do?

25  A.   I reached out to that agency in Virginia to request to

JASON LOWRANCE - DIRECT

1  speak to the investigator who actually handled the case.

2  Q.   And that wasn't Heather Brown, correct?

3  A.   No.

4  Q.   That was a totally different agency.

5  A.   Yes.

6  Q.   Were you able to talk with anyone who had investigated

7  the case in 2012?

8  A.   Yes.  I was able to speak to the investigator that

9  actually investigated the case.  She was no longer working for

10 the agency.  She was a reserve officer.  She was actually a

11 school teacher now.

12 Q.   And what, if anything, did she tell you?

13 A.   She basically told me that there was an investigation

14 done concerning Mr. Glass, Jr., and that he was charged with

15 some hands-on offenses, I believe, and also some CP.

16 Q.   Did you ever get any reports or anything in relation to

17 that?

18 A.   I tried to get the agency to send me reports a couple

19 times but never actually received -- she actually said that

20 she was going to reach out to the agency herself and try to

21 get the senior detective over that unit to send the

22 information, the reports, but I never received it.

23 Q.   When you say "she," who are you talking about?

24 A.   She as the investigator at the time that handled the case

25 in 2012.

1  Q.   And you said she was no longer working there by the time
2  you had reached out to her.
3  A.   Correct.  She was on the reserves, but she was a school
4  teacher.
5  Q.   After taking the steps that you just described, did you
6  draft an affidavit or a search warrant for Jessie Glass,
7  Jr.'s, residence at 749 Shiloh Road in Statesville?
8  A.   Yes.
9  Q.   And again, this is a defense exhibit because it was
10  attached to their motion.  I'm showing you what I've marked as
11  Defendant's Exhibit Number 1.
12       Do you recognize it?
13  A.   Yes, ma'am.
14  Q.   And it's got multiple pages.
15       And do you recognize Defense Exhibit 1 as the search
16  warrant that you drafted and got signed by a state superior
17  court judge?
18  A.   Yes, ma'am.
19  Q.   And whose signature is that there at the bottom?
20  A.   That is my signature.
21          MS. FORD:  Your Honor, move to introduce and publish
22  Defense Exhibit 1.
23          THE COURT:  It's admitted.
24          (Defendant's Exhibit Number 1 was received into
25  evidence.)

JASON LOWRANCE - DIRECT

1  Q.   And so this was sworn in front of the judge on
2  February 10, 2020?
3  A.   Yes, ma'am.
4  Q.   And what type of judge was it?
5  A.   It was the resident superior court judge.
6  Q.   And it was for -- right there it's blacked out, but is
7  that Jessie Glass, Jr.'s, residence --
8  A.   Yes.
9  Q.   -- at 749 Shiloh Road?
10      All right.  Moving to what I'll call the probable cause
11 section of the affidavit, that first paragraph.  It says, "On
12 January 2, 2020, the affiant received a report that was filed
13 on the Iredell County Sheriff's Office website by April Glass.
14 In the report, April Glass wrote that Jessie Glass, Jr., who
15 lives at 749 Shiloh Road in Statesville, has child pornography
16 on his cell phone.  In the report, April wrote that she picked
17 up Jessie's cell phone recently and saw the images on his cell
18 phone.  She added that he keeps the images in his Google
19 photos trash bin, and Jessie's Google account is
20 ramsD4D@gmail.com and she thinks the password is
21 LeeGlass2019$.  April stated that she left around the end of
22 December and went to an unknown location."
23      Is that what it says?
24 A.   Yes.
25 Q.   So from the second sentence that starts with "in the

1 report" to the end of the paragraph, where did that
2 information come from?
3 A.   That was information that came from the tip.
4 Q.   And the second sentence, that reflects what you've
5 described as your efforts to look up Jessie Glass in LInX?
6 A.   Yes.
7 Q.   The third paragraph says, "On January 22, 2020, the
8 affiant spoke with April Glass concerning the report she had
9 filed.  April stated that when she was looking through
10 Jessie's cell phone around the end of December of 2019, she
11 discovered several images and videos of child pornography.
12 April stated the juveniles appeared to be around 10 years old
13 or younger and they were engaged in sex acts or they were
14 nude."
15      Is that what it says?
16 A.   Yes.
17 Q.   And where did that information that I just read, where
18 did that come from?
19 A.   That came from Mrs. Glass.
20 Q.   In what type of conversation?
21 A.   Phone call.
22 Q.   The next paragraph says, "The affiant spoke with Virginia
23 State Police Agent Heather Brown concerning an investigation
24 she had done involving Jessie Glass, Jr., having child
25 pornographic images or videos back in 2016.  Agent Brown

JASON LOWRANCE - DIRECT

1  agreed to help the affiant with the investigation by obtaining

2  a statement from April Glass due to her living in Virginia."

3       Is that what it says?

4  A.   Yes.

5  Q.   "On January 28, 2020, Agent Heather E. Brown with

6  Virginia State Police interviewed April Glass in person at her

7  mother's address in Virginia.  Agent Brown met with April

8  Glass at an address in Max Meadows, Virginia.  Agent Brown

9  interviewed April in her vehicle due to the nature of the

10  complaint.  Agent Brown asked April Glass to provide her as

11  much detail as possible about the images she saw.  April Glass

12  stated she last saw the child pornography images on Jessie

13  Glass's cell phone at the end of December 2019 and provided

14  Agent Brown with the following description of the images."

15       Is that what that says?

16  A.   Yes.

17  Q.   And where did that information in that paragraph I just

18  read come from?

19  A.   That came from Heather Brown.

20  Q.   All right.  Continuing on the next page.  I'm not going

21  to read all those descriptions, but in the paragraphs numbered

22  1 through 7, would you agree that there are descriptions of

23  child pornography images?

24  A.   Yes, ma'am.

25  Q.   And videos.

JASON LOWRANCE - DIRECT

1  A.    Yes, ma'am.

2  Q.    And where does the description of the images and videos

3  come from?

4  A.    That came from Agent Brown speaking to Mrs. Glass.

5  Q.    And then underneath the descriptions there's a paragraph

6  that says, "April Glass stated that she saw at least 50 photos

7  on Jessie Glass's phone.  April said she was unsure how many

8  because she didn't want to look anymore.  April stated she was

9  in his account more than one time and saw that new photos were

10 added."

11      Is that what it says?

12 A.    Yes.

13 Q.    And where did that information come from?

14 A.    Agent Brown.

15 Q.    Then it says, "April said Jessie Glass, Jr, uses Tumblr

16 and coaxes young girls on to Wickr and asks them for photos.

17 April said she found the exchanges on his phone when he went

18 into the store and Jessie left his phone in the car.  April

19 said Jessie makes up different emails by using weird letter

20 and number combinations.  She said in the aforementioned video

21 where the adult male was making an 8/9 year old girl put his

22 penis in her vagina it appeared to be a video taken on a cell

23 phone and she was concerned that Jessie Jr. was the adult male

24 in the video."

25      Is that what it says?

JASON LOWRANCE - DIRECT

1  A.   Yes, ma'am.

2  Q.   And where did that information come from?

3  A.   Agent Brown.

4  Q.   From her interview with April Glass?

5  A.   Yes.

6  Q.   "April said Jessie has a Samsung Galaxy S9 cell phone.

7  There are also two laptops at the residence.  The laptops are

8  normally kept out in the open.  She thinks both are silver

9  gray.  There is one kept behind the couch on the table that is

10 used by Jessie Glass, Sr., but Jessie may use it as well.  The

11 other computer is used only by Jessie Jr. as far as she knows.

12 April Glass said she asked Jessie Glass, Jr., about the child

13 pornography that was on his phone.  She said Jessie told her

14 that the photos downloaded to his phone for no reason.  April

15 said she knew that wasn't how it happened."

16      Is that what that paragraph says?

17 A.   Yes.

18 Q.   And where did that information come from?

19 A.   Agent Brown with the interview of Mrs. Glass.

20 Q.   Now, the affidavit mentioned -- said that "April said

21 that Jessie Glass, Jr., uses Tumblr and coaxes young girls on

22 to Wickr and asks them for photos."

23      Did you make any attempts to find out if Jessie Glass,

24 Jr., has a Tumblr -- or had a Tumblr and/or Wickr account?

25 A.   No, ma'am.

JASON LOWRANCE - DIRECT

1  Q.   Why not?

2  A.   I did not have the information as in a user name

3  connected to Tumblr or Wickr.

4  Q.   Can a person open up an account on Tumblr or with Wickr

5  and use someone else's name?

6  A.   Yes.

7  Q.   Can they open an account and use a bunch of numbers and

8  symbols and letters?

9  A.   Yes.

10 Q.   Can a person open up an account or establish an account

11 on Tumblr and on Wickr and not include any identifying

12 information in their user name?

13 A.   Yes.

14 Q.   April Glass also gave you and/or Agent Brown a Gmail

15 account that she said was Jessie's.

16 A.   Yes.

17 Q.   Did you make any attempts to figure out if that Gmail

18 account belonged to Jessie Glass?

19 A.   No.

20 Q.   Why not?

21 A.   I had no information that the email was connected to

22 anything.  The images itself were on his phone, not seen in an

23 email.

24 Q.   So you didn't pursue that because April didn't say that

25 the email was connected with any child pornography activity?

JASON LOWRANCE - DIRECT

1 A. Correct.

2 Q. Once you got the search warrant, did you execute it?

3 A. Yes.

4 Q. And did you execute it at the Shiloh Road residence on

5 February 11, 2020?

6 A. Yes, ma'am.

7 Q. Were you the law enforcement officer in charge at the

8 scene?

9 A. Yes, ma'am.

10 Q. Who else was at the scene?

11 A. Myself, other Iredell County Sheriff's Office detectives,

12 along with HSI.

13 Q. Now, we've discussed that you were aware of a 2012

14 investigation involving Jessie Glass in Virginia.

15 A. Yes.

16 Q. And at the time of the affidavit, did you know that he

17 had been charged with sodomy?

18 A. Yes.

19 Q. And did you know that those charges had been dismissed?

20 A. Yes.

21 Q. Why did you not put in the affidavit that the charges had

22 been dismissed?

23 A. I didn't find it relevant to put in my search warrant. I

24 was going based on the probable cause of the information that

25 Mrs. Glass saw at the time in 2019.

1    Q.   But you did in your affidavit reference a 2012
2    investigation.
3    A.   Yes.
4    Q.   Why didn't you put in that the charges had been
5    dismissed?
6    A.   Again, I didn't see the relevance of putting the outcome
7    of a case in my search warrant.
8    Q.   Why not?
9    A.   Um...
10   Q.   Well, as a law enforcement officer, does it mean anything
11   to you -- what does it mean to you, I should ask, that a case
12   was dismissed?
13   A.   A case can be dismissed for various reasons.  I don't --
14   I don't have the actual reason why this case was dismissed
15   other than it was showing as dismissed.  A case can be
16   dismissed because of a witness backing out.  There's numerous
17   reasons.
18   Q.   And did you not mention in the affidavit that the case
19   had been dismissed because you didn't want the superior court
20   judge to know that?
21   A.   No, ma'am.
22   Q.   And with regard to the 2016 Virginia incident that
23   Heather Brown investigated, you obviously knew that that
24   involved an allegation that Jessie Glass, Jr., had child
25   pornography, correct?

JA236

1  A.   Yes, ma'am.

2  Q.   And you were aware at the time of the affidavit that no

3  charges resulted from that investigation, correct?

4  A.   Yes, ma'am.

5  Q.   And at the time of your affidavit, you knew that Agent

6  Brown had written in her report that she wasn't able to get

7  anyone in North Carolina to take it, correct?

8  A.   Yes.

9  Q.   Now, before 2019/2020, were you aware of the 2016

10 investigation in Virginia?

11 A.   I'm sorry, what?

12 Q.   Before 2019 and 2020, were you aware of the 2016

13 investigation in Virginia?

14 A.   No.

15 Q.   Had anyone contacted you before 2019 or 2020 about that

16 investigation in Virginia?

17 A.   No.

18 Q.   Why did you not include in your affidavit that Special --

19 that Agent Brown had said she wasn't able to get anyone in

20 North Carolina to pursue the case?

21 A.   I'm not sure.  I don't know.

22 Q.   Why did you not include in your affidavit that no charges

23 were brought as a result of that investigation?

24 A.   Again, I didn't see that that investigation was relevant

25 to my ongoing investigation that was seen in 2019.

JASON LOWRANCE - DIRECT

1  Q.   But you did mention in your affidavit that there was a
2  2016 investigation, but you didn't mention that no charges
3  resulted.
4  A.   Correct.
5  Q.   Why?
6  A.   I just didn't see that it was relevant to my current
7  investigation.
8  Q.   Did you leave out that information, the information that
9  Heather Brown said she couldn't get anyone in North Carolina
10 to take the case and that there were no charges brought as a
11 result of that investigation because you didn't want the state
12 superior court judge to know?
13 A.   Absolutely not.
14 Q.   With regard to 2016 and that investigation, were you
15 aware of any allegation that April provided false or
16 unreliable information in that investigation?
17 A.   No.
18 Q.   And did Agent Brown tell you that she found April to be
19 not credible?
20 A.   No.
21 Q.   Now, moving on to a 2017 incident involving Detective
22 Chris Lamberth.  Are you familiar with that incident?
23 A.   Yes.
24 Q.   What did you know about that incident at the time of your
25 affidavit?

JASON LOWRANCE - DIRECT

1  A.   I saw a previous report that was investigated by
2  Detective Chris Lamberth concerning a tip.
3  Q.   How did you -- how did you see that in a report?
4  A.   Whenever I ran Mr. Glass, Mr. Glass or her, I can't
5  recall which name I ran, but a previous report popped up from
6  our agency in 2017 concerning an investigation done.
7  Q.   And are you talking about running his or her name through
8  the internal Iredell County Sheriff's Office database at the
9  time you were investigating the 2019, 2020 matter?
10 A.   Yes.
11 Q.   And what, in anything, did you find out about that
12 investigation once you saw the report?
13 A.   I noticed in the report that there was a tip that was
14 submitted concerning Mr. Glass having CP on a device located
15 at his address on Shiloh Road.
16 Q.   And did you know who the tipster was?
17 A.   It was Ms. Glass.
18 Q.   Did you know at the time of the affidavit that it was
19 Ms. Glass?
20 A.   Yes.
21 Q.   Did you actually read the tip?
22 A.   I read it in the case narrative.
23 Q.   And did you have anything to do with that 2017 incident
24 back in 2017?
25 A.   I believe I'm the one that did the search or the

1  forensics on the device that was seized by Detective Lamberth.

2  Q.   Do you remember much more about the 2017 incident and

3  your involvement?

4  A.   No.

5  Q.   Now, the 2017 incident isn't mentioned at all in your

6  affidavit, correct?

7  A.   Correct.

8  Q.   Why didn't you include anything about the 2017 incident

9  in your affidavit?

10  A.   Again, at the time I didn't see that it was relevant to

11  the new information that I was receiving in 2019.

12  Q.   Did you leave that information out because you didn't

13  want the state superior court judge to know about it?

14  A.   No, ma'am.

15  Q.   And are you, or were you at the time you were writing

16  this affidavit, aware of any allegation that April Glass had

17  provided false or unreliable information during that 2017

18  investigation?

19  A.   No, ma'am.

20  Q.   To your knowledge, was there any other 2017 incident

21  involving Jessie Glass, Jr.?

22  A.   No.

23  Q.   And child pornography, I should say.

24  A.   No.

25  Q.   Now, we went through your CJLEADS information that you

1  got on April Glass.  And you said that you're aware she had
2  been charged with misdemeanor larceny for an offense that
3  occurred on or about April 12, 2019, correct?
4  A.   Yes.
5  Q.   You did not include that in the affidavit, that she had a
6  pending misdemeanor larceny charge, correct?
7  A.   Correct.
8  Q.   Why not?
9  A.   I was more -- I was working a CP case, not a larceny
10 case, and I didn't see it being relevant to my probable cause
11 concerning child pornography photos.
12 Q.   Why wouldn't it -- why didn't you think it was relevant?
13 A.   Just because the person, you know, steals something
14 doesn't, you know, make them a liar or anything.
15 Q.   Did you ever discuss with April helping her out with that
16 pending charge?
17 A.   No.
18 Q.   At the time of the affidavit, were you aware of any other
19 pending charge against April?
20 A.   No.
21 Q.   Was April what you would call an informant?
22 A.   No.
23 Q.   What's an informant?
24 A.   An informant is a person who is being paid by the agency
25 for information to work off a charge or a plea.

JASON LOWRANCE - DIRECT

1  Q.   Does an informant always have to be paid?

2  A.   No.

3  Q.   Can they get a benefit in some other way aside from

4  money?

5  A.   Correct.

6  Q.   Like what?

7  A.   They can get a reduced sentence or possibly even a charge

8  dismissed.

9  Q.   Did you agree to pay April for her information?

10  A.   Absolutely not.

11  Q.   Are you aware of anyone else within the Iredell County

12  Sheriff's Office having ever agreed to pay April anything for

13  her information?

14  A.   No, ma'am.

15  Q.   And did you or anyone else with Iredell County Sheriff's

16  Office agree to help her with any pending charges?

17  A.   No.

18  Q.   Now, what, if anything, did you know about her

19  relationship with Jessie Glass?

20  A.   I knew they were separated as husband and wife.

21  Q.   Did you know anything more than that?

22  A.   No.

23  Q.   Did you ask April any questions about their relationship?

24  A.   Nope.

25  Q.   Why not?

JA242

JASON LOWRANCE - DIRECT

1  A.   Again, you know, I was focusing on getting information on
2  the images itself that she reported in 2019.
3  Q.   Now, going back to the day that the search warrant was
4  executed on February 11.  When you got to the residence there
5  at 749 Shiloh Road, was Jessie Glass, Jr., home?
6  A.   No, ma'am.
7  Q.   Where was he?
8  A.   At work.
9  Q.   So what, if anything, did you do when you learned he was
10 at work?
11 A.   I sent an HSI agent along with Detective John Aponik to
12 the workplace.
13 Q.   For what purpose?
14 A.   To make contact with Jessie Glass, Jr., concerning my
15 search warrant at the residence.
16 Q.   And what, if anything, did you tell them to say?
17 A.   Ask him about his cell phone.
18 Q.   So did you want them to find out if he had a cell phone;
19 and if he did, could they search it?
20 A.   Correct.
21 Q.   Are you aware of anyone else going with the HSI agent and
22 Detective Aponik to Jessie Glass, Jr.'s, workplace?
23 A.   No.
24 Q.   Were you there --
25 A.   No.

JA243

JASON LOWRANCE - DIRECT

1  Q.   -- at the workplace at all?

2       Now, what happened -- did you come to learn what happened

3  at Jessie Glass, Jr.'s, workplace when the two investigators

4  got there?

5  A.   Yes, ma'am.

6  Q.   And how did you get that information?

7  A.   From Detective John Aponik.

8  Q.   And did Detective Aponik talk to Mr. Glass at the

9  workplace?

10 A.   Yes.

11 Q.   And did he receive a phone?

12 A.   Yes.

13 Q.   And what did Detective Aponik tell you about the phone?

14 A.   They made contact with Mr. Glass, Jr., there at his

15 workplace and they explained to him the reason they were there

16 and if he had a cell phone.  And Mr. Glass, Jr., voluntarily

17 turned his cell phone over to Mr. Aponik and advised him there

18 was no CP on his phone.

19 Q.   And I'm showing you what's marked as Defense Exhibit 2.

20      Do you recognize Defense Exhibit 2?

21 A.   Yes, ma'am.

22 Q.   And again, like the other one, it's multiple pages,

23 correct?

24 A.   Yes.

25 Q.   This search warrant involves a black in color Samsung S9

JASON LOWRANCE - DIRECT

1  cell phone from Jessie Glass, Jr., correct?

2  A.   Yes.

3  Q.   And so did you swear out an affidavit and get a search

4  warrant for the phone that Detective Aponik got from Jessie

5  Glass, Jr.?

6  A.   Yes, ma'am.

7  Q.   And is this the search warrant?

8  A.   Yes.

9        MS. FORD:  Your Honor, I move to introduce and

10  publish Defense Exhibit 2.

11        THE COURT:  It's admitted.

12        (Defendant's Exhibit Number 2 was received into

13  evidence.)

14  Q.   Now, the probable cause section of this search warrant

15  starting here -- I mean, would you agree that it's pretty much

16  the same -- it is the same probable cause as in the

17  residential search warrant, correct?

18  A.   Yes.

19  Q.   At least on this page at the bottom, it says page 4 of 8,

20  correct?

21  A.   Yes, ma'am.

22  Q.   Then on the second page it continues on and there's more

23  of the information from the residential search warrant,

24  correct?

25  A.   Yes, ma'am.

1  Q.   And I'm looking at page 5.

2       Then on page 6 at the top, it appears there's some new

3  information that's not in the residential search warrant,

4  correct?

5  A.   Yes, ma'am.

6  Q.   And at the top it says, "On February 10, 2020, the

7  affiant typed up a search warrant for the residence located at

8  the Shiloh Road address in Statesville.  The affiant went

9  before Resident Superior Court Judge Joe Crosswhite where the

10 search warrant was approved and signed at 14:20 hours."

11      Is that what it says?

12 A.   Yes, ma'am.

13 Q.   Then it says, "On February 11, 2020, the affiant along

14 with other detectives with the Iredell County Sheriff's Office

15 and Homeland Security executed the search warrant at the

16 target residence located at the Shiloh Road residence in

17 Statesville.  During the search of the residence, Jessie

18 Glass, Jr., was found not at the property.  It was learned

19 that Jessie Glass, Jr., was at work at the time per his

20 father, Jessie L. Glass, at the residence.  During the search

21 of the residence, there were several cell phones and laptop

22 computers found inside the residence that were seized."

23      Is that what it says?

24 A.   Yes, ma'am.

25 Q.   The next paragraph says, "Detective A. Aponik and

JASON LOWRANCE - CROSS

1  Homeland Security Officer John Pavlovic went to Jessie Glass,
2  Jr.'s, workplace here in Statesville called Amesbury Truth.
3  They were able to speak with Jessie Glass, Jr., concerning the
4  investigation and the search warrant at his residence.  Jessie
5  voluntarily turned his cell phone over to Detective Aponik to
6  be searched.  Jessie told Detective Aponik that there should
7  not be any child pornography on his cell phone."
8       Is that what it says?
9  A.   Yes, ma'am.
10 Q.   That paragraph, where did the information in it come
11 from?
12 A.   Detective Aponik.
13 Q.   And did you have any reason to doubt what Detective
14 Aponik was telling you?
15 A.   No.
16          MS. FORD:  No further questions, Your Honor.
17          THE COURT:  Cheryl, do you need a break?
18          THE COURT REPORTER:  I'm okay.
19          THE COURT:  Okay.  You may cross examine.
20          MR. JOHNSON:  Thank you, Your Honor.
21                    CROSS EXAMINATION
22 BY MR. JOHNSON:
23 Q.   Detective Lowrance, you received the tip that was from
24 April Glass on January the 2nd, 2020, correct?
25 A.   I'm sorry?

JA247

JASON LOWRANCE - CROSS

1  Q.   You received the tip from April Glass on January the 2nd,
2  2020?
3  A.   I believe that's correct, yes.
4  Q.   Okay.  And there was a delay in reaching Ms. Glass,
5  correct?
6  A.   Yes, sir.
7  Q.   And part of the problem could have been a phone number
8  problem?
9  A.   Yes.
10 Q.   And part of it was she just -- was just not responding to
11 messages that you sent out, correct?
12 A.   It's possible.
13 Q.   Okay.  Well, you knew that Ms. -- from the tip and in
14 subsequent conversations, you knew that Ms. Glass was not
15 residing with Jessie Glass or Lee Glass anymore, correct?
16 A.   Yes, sir.
17 Q.   You knew that they were estranged.
18 A.   They were separated.
19 Q.   They were separated.
20      And she had sent numerous emails to you, which we're
21 going to get to later, detailing that they were having marital
22 difficulties, correct?
23 A.   I can't recall.
24 Q.   Okay.  Well, I believe that she sent you emails, and
25 we're going to look at them eventually, on January 22 and on

JA248

JASON LOWRANCE - CROSS

1  February 4 and on February 10 where she detailed problems that
2  she was having with Mr. Glass and why she was no longer
3  residing with him.
4  A.   Okay.
5  Q.   Is that fair?
6  A.   Yes.
7  Q.   Okay.  Now, you finally spoke to her on January 22,
8  correct?
9  A.   I believe that's correct.
10 Q.   And that was a telephone call?
11 A.   Yes.
12 Q.   Now, you told the Court that it's important for someone
13 to interview a prospective witness in person so you can pick
14 up on important information, correct?
15 A.   Yes.
16 Q.   Like body language.
17 A.   Yes.
18 Q.   Physical cues that they may give.
19 A.   Yes.
20 Q.   And also to follow up on questions that you want to know
21 about, correct?
22 A.   Yes.
23 Q.   But you chose not to interview Ms. Glass in this case,
24 didn't you?
25 A.   Correct.

JASON LOWRANCE - CROSS

1   Q.   As a matter of fact, you never sat down in a room with
2   her and talked about this, did you?
3   A.   Correct.
4   Q.   Now, did you ever run an NCIC check or an RCIC check on
5   April Glass?
6   A.   A what kind of check?
7   Q.   Did you run a National Crime Information Center check on
8   her or record check?
9   A.   Are you talking about her criminal history?
10  Q.   Correct.
11  A.   No, not a national, no.
12  Q.   Okay.  Now, you ran one for Jessie Glass, Jessie Lee
13  Glass, Jr., as soon as you got the file.  Does that make sense
14  to you?
15  A.   I can't remember when, but, yes, I remember running a
16  criminal history.
17  Q.   You would have run one of those before you got the search
18  warrant, obviously.
19  A.   Yes.
20  Q.   And you ran one for his father, Jessie Glass, Sr.,
21  correct?
22  A.   I can't recall if I ran one on senior.
23  Q.   Okay.  We're going to get to that in a second.
24         MR. JOHNSON:  Can you put up Defense Exhibit 6,
25  please.

JA250

JASON LOWRANCE - CROSS

1  Q.   Now, one -- you didn't have any prior contact with April

2  Glass, correct?

3  A.   Correct.

4  Q.   Okay.  You didn't talk -- other than -- until you got

5  this tip, you had never spoken to her.

6  A.   No.

7  Q.   Interviewed her?

8  A.   No.

9  Q.   Had any contact with her?

10  A.   I don't recall, no.

11  Q.   Even during the 2017 case you didn't have any contact

12  with her, correct?

13  A.   Correct.

14  Q.   Okay.  Now, one of the things that you do when you're

15  dealing with a new tipster, because we're not using the term

16  informant, a tipster, is to find out if they have any criminal

17  past or criminal record, correct?

18  A.   Not necessarily.

19  Q.   Okay.  But in this case you -- in Exhibit 6 you ran a

20  CJLEADS report on April Glass, correct?

21  A.   Yes.

22  Q.   And we know that it's you because at the bottom of the

23  first page it says printed by Jason Lowrance.

24  A.   That's correct.

25  Q.   And we know that that was done on Wednesday, January 22,

JASON LOWRANCE - CROSS

1   2020.

2   A.   Yes.

3   Q.   And that was the first day that you actually got to talk

4   to April Dawn Glass, correct?

5   A.   I can't remember the dates, but, yes, I remember talking

6   to her.

7   Q.   Okay.  Because you wanted to check her record before you

8   actually talked to her, correct?

9   A.   Not check her record.  Just to get information on her.

10          MR. JOHNSON:  Can you go to page 4, please.

11  Q.   Now, when you looked at her CJLEADS form on the 22nd of

12  January, you knew that she had a pending charge in Iredell

13  County, correct?

14  A.   Yes.

15  Q.   And that was for misdemeanor larceny.

16  A.   Yes, sir.

17  Q.   And the offense had occurred on April the 12th, 2019,

18  correct?

19  A.   Yes, sir.

20  Q.   And that was disposed of on September the 9th, 2019?

21  A.   Yes.

22  Q.   And it looks like she had a deferred prosecution in that

23  case.

24  A.   Yes, sir.

25          MR. JOHNSON:  Now, can you go to -- I think we've

1  already introduced this exhibit, Your Honor --

2        THE COURT:  I thought so.

3        MR. JOHNSON:  -- as part of the exhibit -- part of

4  the motion.

5        Can you place on the screen Exhibit Number 9.

6        And go to the last page, please.

7  Q.  Now, Detective Lowrance, I'm showing you what has been

8  marked as Defense Exhibit 9.  That appears to be a uniform

9  citation from North Carolina, correct?

10 A.  Yes, sir.

11 Q.  And that's for April Dawn Glass?

12 A.  Yes.

13 Q.  And that's April 12, 2019?

14 A.  (No response.)

15 Q.  What your attorney has --

16 A.  Oh, yes, I see it now.  April 12th, yes, I'm sorry.

17 Q.  Thank you.

18      And that was an investigation that was done by the

19 Statesville Police Department?

20 A.  Yes, sir.

21 Q.  And there was -- looks like the officer in charge was

22 Officer D.W. Lowery?

23 A.  Yes, sir.

24 Q.  Do you know D.W. Lowery?

25 A.  The name doesn't ring a bell.  If he walked in the

JASON LOWRANCE - CROSS

1 courtroom maybe, but...

2 Q.   That's fair.  You don't know every police officer in

3 Iredell County, I'm sure.

4      But this is -- this is the complaint that talks about

5 the -- that charges Ms. Glass with stealing, taking, and

6 carrying away books, pens, dog food, deli food, and a drone

7 from Walmart, correct?

8 A.   That's what it says, yes.

9 Q.   Okay.  So this is a crime about theft.

10 A.   Yes.

11 Q.   Somebody stealing things, doing something false to get

12 property, correct?

13 A.   Somebody stealing stuff.

14 Q.   Okay.  So this is the complaint to the case that we know

15 about, correct?

16 A.   It appears to be, yes.

17 Q.   Okay.  Now, did you -- can you turn to page 6 of that

18 document, please.  I'm looking for the judgment.

19      Okay.  And this is in that same document.  This is the

20 judgment.  You're familiar with judgments, aren't you?

21 A.   Yes, sir.

22 Q.   Okay.  This is the judgment indicating that she had been

23 found guilty of larceny.

24 A.   Yes.

25 Q.   And this appears to be the same case that we talked about

1  before.

2  A.  Appears to be.

3  Q.  Okay.  And this is -- this conviction is based upon the

4  fact that she violated the terms of her deferred prosecution,

5  correct?

6  A.  What was your question, I'm sorry?

7  Q.  This is a judgment, correct?

8  A.  Yes.

9  Q.  And this -- are you aware that this was for a conviction

10  that occurred because she violated her deferred prosecution

11  agreement?

12  A.  I'm not sure if it was a violation of...

13  Q.  Okay.  Well, let's go back -- let's go back to something.

14      When you started your investigation, you knew that she

15  had this pending charge.

16  A.  Yes.

17  Q.  Okay.  Did you ever contact the Statesville Police

18  Department and ask them about this case?

19  A.  No.

20  Q.  Did you go back to the officer and ask him what he

21  thought about this individual?

22  A.  No.

23  Q.  Now, when I -- I recently had an opportunity to meet with

24  Adam Dillard and Captain Wyatt of the sheriff's office.  You

25  know Captain Wyatt, correct?

1  A.   Yes.

2  Q.   They said that you can run records for investigations

3  within the Iredell County Sheriff's Department.  You can run

4  like a name search, correct?

5  A.   Yes.

6  Q.   And you indicated that you ran a name search for April

7  Glass, correct?

8  A.   Yes.

9  Q.   And were you aware that at about the same time that you

10 were doing your investigation or a short time before your

11 investigation began, that larceny charges were filed against

12 April Glass by a woman named Angela Calderon?

13 A.   No.

14      MR. JOHNSON:  Can you pull up Exhibit 8, please.

15      Can you go to the first page, please.  Next page.

16 Q.   This is an investigation report that we received from the

17 Iredell County Sheriff's Office pursuant to a consent

18 agreement.  This appears to be an incident report, correct?

19 A.   Yes, sir.

20 Q.   And you're familiar with these incident reports.

21 A.   Yes, sir.

22 Q.   You filled them out regularly when you were working at

23 the Iredell County Sheriff's Office, right?

24 A.   Yes, sir.

25 Q.   And this is for an incident report up in the right-hand

1   corner dated July the 8th, 2019.

2   A.   That is correct.

3   Q.   Okay.  And this report indicates that Ms. Calderon

4   alleges that an iPhone and iPhone charger were stolen at the

5   bottom.

6   A.   Yes, sir.

7        MR. JOHNSON:  Can you go to the next page, please.

8   Next page.

9   Q.   Now, this is a report or a narrative that was given by

10  the officer involved in this case, correct?  Or appears to be.

11  A.   Yes, sir.

12  Q.   And that's Officer J.J. Scott.

13  A.   Yes.

14  Q.   Did you know Officer J.J. Scott?

15  A.   I'm sure I did probably at the time.

16  Q.   Okay.  So we have no reason to believe this isn't

17  accurate, correct?

18  A.   No.

19  Q.   Okay.  And as part of this report -- and you can read

20  through it with me, please.  Ms. Calderon indicated that her

21  disabled father-in-law's cell phone had been stolen and that

22  they believed that the perpetrator was April Glass, correct?

23  A.   Yes.

24        MR. JOHNSON:  Next page, please.  Next page.  Go to

25  the next one, please.

JASON LOWRANCE - CROSS

1  Q.  And starting at page 7 and going through a number of
2  other pages, that's a case supplemental report, correct?
3  A.  Yes.
4  Q.  And that's where you can provide information about an
5  individual and what their -- more information about an
6  investigation as you proceed through the investigation.
7  A.  Yes.  That would be where we type in case notes.
8        MR. JOHNSON:  Next page, please.  Next page.
9  Q.  And it appears that Officer Scott that we talked about
10  called -- had a conversation with April Glass sometime around
11  July the 7th, 2019.
12  A.  July the...
13  Q.  July the 9th, 2019.
14  A.  Where it says, "I called the victim"?
15  Q.  Yes.
16  A.  That would be -- that will be the investigator.
17  Q.  Okay.  So in the paragraph starting, "April Glass called
18  my cell phone," that would be typed by the investigator,
19  correct?
20  A.  That's correct.
21  Q.  And that would have been -- the investigator then was...
22  A.  Dyson.
23  Q.  Officer Dyson, excuse me.
24        MR. JOHNSON:  Can you highlight that paragraph.
25  Q.  This paragraph indicates that "April Glass called my cell

1  phone while I was on my way out of town.  I spoke with

2  Ms. Glass about the case and I told her I knew she had the

3  phone and charger and I needed them turned back over.  At

4  first Glass wanted to deny that she had the items.  I told her

5  she was the only person in the house that night other than the

6  patient and he couldn't steal his own phone.  I then told

7  Glass as of right now the victim did not want her charged, but

8  if she denied it any further, that I would charge her.  Glass

9  then admitted over the phone that she took the phone and still

10  had it.  I told her I would call her back in a few minutes and

11  have someone call her."

12     Correct?

13  A.   Yes, sir.

14  Q.   So it indicates here that Ms. Glass admitted she had

15  stolen a phone several months before your investigation.

16  A.   Appears to be, yes.

17  Q.   Okay.  And if you look further into this file, you would

18  see that the charges were eventually dropped when Ms. Glass

19  turned over the phone to the police and the police returned it

20  to the owner.  Okay?

21  A.   Okay.

22  Q.   Now, that's information that you would have liked to have

23  known about your search warrant, correct?  Or did you not care

24  about that?

25  A.   This is the first time I'm learning about this report.

JA259

JASON LOWRANCE - CROSS

1  Q.   Okay.  Now, we were provided this report by the sheriff's
2  office when they did the same check that you would have done
3  by checking the name of April Glass.  Okay?
4  A.   Okay.
5  Q.   You don't recall ever receiving this?
6  A.   No.
7  Q.   Did you do a check --
8  A.   Yes.
9  Q.   -- in the internal system for Iredell County Sheriff's
10 Office with the name April Glass?
11 A.   Yes.
12 Q.   But you didn't get it.
13 A.   I don't recall seeing it.
14 Q.   Let's talk about another incident.  Now, you were having
15 some difficulty finding Ms. Glass to get her interviewed,
16 correct?
17 A.   Yes.
18 Q.   And you had contacted Sergeant Brown and had made a
19 request that they put out a be-on-the-lookout for April Glass
20 because you needed to contact her, correct?
21 A.   Not a be-on-the-lookout, no.
22 Q.   Okay.  What would you call it, then?  You had made a
23 request that if somebody had contact with Ms. Glass, that you
24 needed to talk to them.
25 A.   I called Agent Brown due to her past investigation

1  involving Mr. Glass and asked her if she might know where
2  she's actually staying at, at her mom's address or another
3  address, due to her previous investigation back in 2016.  And
4  she said that she knew where her mom lives and that's more
5  than likely where she's going to be at.
6          MR. JOHNSON:  Can you go to Exhibit 11, please.
7  Q.   Now, based upon this request, eventually you got a call
8  from a deputy in Wythe County, Virginia, correct?
9  A.   Yes.
10 Q.   Now, the document before you is Defense Exhibit 11.
11 A.   Yes.
12 Q.   And it is a supplemental case report that you prepared.
13 A.   Yes.
14 Q.   And it was part of your investigation concerning
15 Mr. Glass.
16 A.   Yes.
17          MR. JOHNSON:  Your Honor, we'd ask to admit this
18 exhibit.
19          THE COURT:  It's admitted.
20          (Defendant's Exhibit Number 11 was received into
21 evidence.)
22 Q.   Okay.  The very last paragraph you write, "Later I
23 received a phone call from Wythe County Sheriff's Office
24 dispatcher telling me that she had a deputy out with April
25 Glass and he was wanting to talk to us."  Okay?

1   A.   Yes.

2   Q.   And that would have been because you had requested that

3   if anybody had any contact with Ms. Glass, to have her contact

4   you, correct?

5   A.   Yes.

6   Q.   And the next line says, I patched -- "I was patched to

7   the deputy and he told me that he was out with April on a

8   traffic stop concerning a larceny at Walmart there.  He saw

9   that I was wanting to talk to April.  I told him that I had

10   already spoken with April and was able to get the information

11   I needed."  Okay?

12   A.   Yes, sir.

13   Q.   So you were told by the officer at that time that she had

14   been stopped for a larceny investigation in Wythe County --

15   A.   Yes.

16   Q.   -- correct?

17   A.   Yes, sir.

18   Q.   Now, did you check back with the deputy or with Wythe

19   County authorities to see if a charge was filed?

20   A.   No.

21   Q.   And so this was on -- this was a short time before you

22   swore out your search warrant affidavit, correct?

23   A.   Yes, sir.

24         MR. JOHNSON:  And can you put up Exhibit 10, please.

25   Q.   Now, Officer Lowrance, this is an NCIC record check,

1  correct?

2  A.   Yes, sir.

3  Q.   Okay.  And we can find that the date that was run on that

4  was 9/26/2022, correct?

5  A.   Yes.

6       MR. JOHNSON:  Would you go to page 3, please.

7  Q.   Now, when we look at the record for -- this is a record

8  for April Glass, correct?

9  A.   Appears to be, yes.

10 Q.   Okay.  There's a charge on April -- excuse me, on

11 February 8, 2020, for Ms. Glass, correct?

12 A.   Yes.

13 Q.   And it's the same date as the call that you were talking

14 to the sheriff's deputy from Wythe County.

15 A.   Yes, sir.

16 Q.   And it appears to be a charge for shoplifting, concealing

17 goods valued at less than $500.

18 A.   Yes, sir.

19 Q.   So it would make sense that this criminal charge right

20 here is the same one that the deputy told you about when he

21 called you after he had stopped her, correct?

22 A.   Appears to be, yes.

23 Q.   Okay.  So that's the third case that you knew about that

24 Ms. Glass was either recently charged or during your

25 investigation was charged with a theft case.

1  A.   I knew that she was stopped, but I didn't know she was
2  charged.
3  Q.   Did you ever follow up with the deputy about whether she
4  was charged?
5  A.   No.
6  Q.   Did you ever follow up with Wythe County and find out if
7  she was charged for that contact with police that you knew
8  about?
9  A.   No, sir.
10 Q.   Did you contact your good friend Sergeant Brown and ask
11 her to look into this for you?
12 A.   No, sir.
13 Q.   Now, at least we knew about the case in Iredell County
14 involving the Walmart shoplifting.  You admit that you knew
15 about that during your investigation, correct?
16 A.   Are you referring to the one in April?
17 Q.   Correct.
18 A.   Yes.
19 Q.   And then you knew about this one where the officer in
20 Wythe County told you that they had stopped her for a
21 shoplifting investigation, correct?
22 A.   That's correct.
23 Q.   Okay.  And you knew that April was living in a variety of
24 different places.
25 A.   Correct.

1  Q.   Okay.  She was bouncing around from place to place,
2  right?
3  A.   It was either her mom's or another location.
4  Q.   Okay.  Now, you're an experienced officer, correct?
5  A.   I think.
6  Q.   You've been working as a police officer since 2007.
7  A.   Since 2000.
8  Q.   2000, excuse me.  So 22 years.
9       Now, somebody bouncing around like that and picking up
10 shoplifting charges, as an experienced officer, that would be
11 indicative of somebody who had a drug habit, correct?
12 A.   No.
13 Q.   It wouldn't be?
14 A.   I don't think, no.
15 Q.   Okay.  Three theft-type cases in an eight-month period,
16 you don't think that's indicative of a person that has a need
17 to steal things to support a habit?
18 A.   No.
19 Q.   Okay.  What about somebody that had mental health issues?
20 A.   No.
21 Q.   Would you at least agree with me that it's not someone
22 who you would consider to be trustworthy or reliable if they
23 had three theft-type cases in -- around the time that you were
24 doing an investigation?
25 A.   No, sir.

1  Q.   Okay.  Did you do anything to follow up to see if
2  Ms. Glass had a drug issue?
3  A.   No, sir.
4  Q.   Did you do anything to follow up to see if Ms. Glass had
5  a mental health issue?
6  A.   No, sir.
7  Q.   And did you speak to any officers in this -- in Iredell
8  County or Statesville or anywhere else about the multiple
9  cases that she was involved in?
10 A.   Agent Brown in Virginia.
11 Q.   Okay.
12 A.   And Chris Lamberth.
13 Q.   Okay.  You talked to Chris Lamberth?
14 A.   Yeah, on the 2017 occasion.
15 Q.   Did you talk to him in 2020 about the 2017 investigation?
16 A.   I think I did briefly.
17 Q.   Okay.  And did he refresh your recollection when you
18 talked that you'd done the search on the phone or did you
19 already remember that?
20 A.   I'm sorry, can you repeat that.
21 Q.   When you talked to Detective Lamberth in 2020 about the
22 2017 case, did you remember that you had been the person who
23 had drafted -- helped draft the search warrant for the 2017
24 case?
25 A.   I believe so, yes.

1  Q.   Okay.  And did you recall that you had done the forensic
2  search on the tablet?
3  A.   I believe so, yes.
4  Q.   And did you recall that there was nothing found on the
5  tablet that was contraband?
6  A.   Correct.
7  Q.   No child pornographic images located on it?
8  A.   Correct.
9  Q.   And that it had been returned back to Mr. Glass?
10 A.   Correct.
11 Q.   Okay.  Let's talk about the 2012 case.  Now, you actually
12 spoke to the investigator who was involved in the 2012 case in
13 Wythe County, correct?
14 A.   Yes, sir.
15 Q.   And this is the 2012 case that you specifically
16 referenced in your search warrant affidavit, correct?
17 A.   I believe so, yes.
18 Q.   And you were obviously aware of the 2012 investigation
19 concerning Mr. Glass.
20 A.   Yes.
21 Q.   And obviously, your notes from talking to the officer
22 from -- the reserve officer now would have indicated that you
23 knew about those charges.
24 A.   Yes, sir.
25 Q.   Okay.  Now, you ran an NCIC report -- or NCIC check for

JA267

1  Mr. Glass on January 31, 2020, correct?

2  A.    I can't recall the date, but yes.

3         MR. JOHNSON:  Would you pull up Defense Exhibit 4,

4  please.

5  Q.    This appears to be an NCIC report that you ran on Jessie

6  Leroy Glass, Jr.

7  A.    Yes, sir.

8  Q.    And we can see right above Mr. -- two lines above

9  Mr. Glass's name that you ran that report, correct?  It says

10 Detective J. Lowrance.

11 A.    That is attention to my -- that is my -- me requesting

12 somebody to run it.  I did not physically run it.

13 Q.    I understand that.

14 A.    Yes.

15 Q.    You requested somebody to do it.

16 A.    Yes.

17 Q.    You initiated the NCIC check, so you wanted to get this

18 report, correct?

19 A.    Yes.

20 Q.    Okay.  And you can see from his NCIC report -- can you go

21 to the meat of the report, please.  Right there.  Second page.

22     You can see there that Mr. Glass had charges in 2012,

23 correct?

24 A.    Yes, sir.

25 Q.    And it indicates on the first charge there that was a

1  sodomy of a victim, that that was nolle pros'd.

2  A.    It said that he was charged, yes.

3  Q.    He was charged.  And you also see that the result or the

4  resolution of the case was that he was nolle pros'd.  Do you

5  see that?

6  A.    Yes.

7  Q.    Okay.  And you know that to mean that the prosecutor

8  chose not to pursue the case.

9  A.    That is correct.

10 Q.    And then if we go to the charge that's below there,

11 there's another charge of sodomy of a victim under 13 years of

12 age, correct?

13 A.    Yes.

14 Q.    And that was dismissed, correct?

15 A.    Yes.

16        MR. JOHNSON:  Your Honor, we'd move for the

17 introduction of this exhibit.

18        THE COURT:  It's admitted.

19        (Defendant's Exhibit Number 4 was received into

20 evidence.)

21        MR. JOHNSON:  Now, can we go to Exhibit 7, please.

22 Q.    Now, Detective Lowrance, in anticipation of this hearing,

23 we got a copy of the judgment entry on those criminal charges

24 that happened in 2012, and Defendant's Exhibit 7 is the entry

25 from the Court.

JASON LOWRANCE - CROSS

1   A.   Okay.

2   Q.   And that was provided to us by the United States.

3   A.   Okay.

4        MR. JOHNSON:  Your Honor, we'd move for the

5   introduction of Defense Exhibit 7.

6        THE COURT:  Admitted.

7        (Defendant's Exhibit Number 7 was received into

8   evidence.)

9        MR. JOHNSON:  Now, would you highlight the last

10  paragraph.

11  Q.   Now, this document indicates that the Commonwealth

12  attorney in Virginia nolle pros'd the first charge, correct?

13  A.   I believe so, yes.

14  Q.   Okay.  But the last paragraph indicates that the judge

15  just didn't dismiss the charge, correct?

16  A.   No.

17  Q.   That means that there was a trial, correct?

18  A.   (No response.)

19  Q.   Let's go through it.

20  A.   Okay.

21  Q.   The highlighted paragraph says, "Having heard the

22  evidence and the argument of counsel, the Court finds the

23  defendant not guilty of the charge contained in the

24  indictment; therefore, it is ordered that the case be

25  dismissed and stricken from the docket of this Court and the

JASON LOWRANCE - CROSS

1  defendant is allowed to depart."
2      So that indicates that he wasn't -- the charge wasn't
3  dismissed, correct?  It means he went to trial, correct?
4  A.   I'm assuming, yes.
5  Q.   And he was found not guilty.
6  A.   Yes.
7  Q.   Now, you said that there are a lot of reasons why a
8  charge can get dismissed, correct?
9  A.   Yes, sir.
10 Q.   And that could be because you can't find a witness or
11 there's other technical issues, correct?
12 A.   Yes.
13 Q.   But the reason that you find a person not guilty is
14 because the government wasn't able to prove their case,
15 correct?
16 A.   Yes, sir.
17 Q.   And it appears here that was the situation.
18 A.   Appears to be.
19 Q.   Okay.  And that's very different than a dismissed charge,
20 correct, a person being found not guilty by a bench trial?
21 A.   I'm assuming, yes.
22 Q.   Now, you had said before that the prosecutor in Wythe
23 County decided that they would pursue charges that were actual
24 touching offenses, correct?
25 A.   (No response.)

JASON LOWRANCE - CROSS

1 Q.   It was your understanding that the prosecutor in Wythe

2 County in the 2012 case pursued charges that related to

3 physical touching offenses, correct?

4 A.   That was the information I got from the investigator.

5 Q.   Okay.  And not -- and not possession of child pornography

6 offenses, correct?

7 A.   If I recall correctly, he was investigated by the

8 detective that was the school teacher.

9 Q.   Okay.

10 A.   And she said that there was charges -- he was

11 investigated for CP and hands-on offenses.

12 Q.   Okay.  But from what we see here, it doesn't appear to

13 have charged him with a CP offense, does it?

14 A.   No, sir.

15 Q.   They didn't go through with those charges, did they?

16 A.   Evidently not.

17 Q.   Okay.  And you -- you talked to the investigator in 2012

18 so she would have known that the charges against him had been

19 thrown out after a jury trial, correct -- or after a bench

20 trial, correct?

21 A.   I'm assuming.

22 Q.   Did she tell you that?

23 A.   She made mention that the charges were dismissed, but she

24 didn't recall the reason why.

25 Q.   Now, when you completed the affidavit for search warrant

JA272

JASON LOWRANCE - CROSS

1    on February 20 -- February 10, 2020, you knew that the first

2    count in the 2012 charges had been nolle'd, correct?

3    A.    Yes.

4    Q.    And you knew that the second charge had been dismissed.

5    A.    Correct.

6    Q.    And you chose to include that reference in your 2012 --

7    you chose to include the reference to the 2012 charge in your

8    affidavit for search warrant, correct?

9    A.    I put in they're similar, yes.

10   Q.    And you chose not to include the case dispositions in

11   your affidavit for search warrant, correct?

12   A.    Yes.

13   Q.    And you -- did you -- you didn't also include the fact

14   that he was found not guilty on those charges.

15   A.    Correct.

16   Q.    And you admitted those -- you didn't include them because

17   they wouldn't have been helpful to you getting a search

18   warrant, correct?

19   A.    I didn't find it relevant with my evidence or tip that I

20   was going on in 2019.

21   Q.    You didn't find charges that were dismissed or charges

22   where a person was found not guilty relevant to a

23   determination?

24   A.    Correct.

25   Q.    Well, you knew that if you put that in there, that would

1  have hurt your chances to get a search warrant, right?

2  A.   No.

3  Q.   You didn't know that.

4  A.   No.

5  Q.   Okay.  Let's go to the 2016 case.  Now, you were

6  obviously aware of the 2016 investigation in Wythe County --

7  A.   Yes.

8  Q.   -- concerning Mr. Glass.

9       Because one of the first persons you contacted was

10 Sergeant Brown, correct?

11 A.   Yes.

12 Q.   I mean, you had extensive information about that case,

13 correct?

14 A.   Yes.

15 Q.   One of the first persons that you contacted was Sergeant

16 Brown, correct?

17 A.   Yes.

18 Q.   And she helped you locate April Glass when she -- when

19 April Glass didn't respond to your inquiries.

20 A.   I remember finally getting ahold of her and speaking to

21 her by telephone.

22 Q.   Okay.  And she did the initial interview with Ms. Glass.

23 A.   She did at my request.

24 Q.   And she helped you find a police officer that was able to

25 help locate her.  We talked about the shoplifting case.

1  A.   That was later, yes.

2  Q.   Okay.

3  A.   But I reached out not to her to find her that day.  I

4  reached out to dispatch to have a deputy go out by the address

5  that was -- where she was staying at to have her call me.

6  Q.   Okay.  Well, you also knew that the information that you

7  also had was that Sergeant Brown shared her investigative file

8  with you.

9  A.   Yes, sir.

10  Q.   And she sent you a CD that included all of her

11  investigative information.

12  A.   Yes.

13  Q.   And she even drove all the way down from Virginia to

14  share the images that she had, correct?

15  A.   Yes.

16  Q.   Because she didn't know how to send those safely other

17  than to drive down.

18  A.   Correct.

19  Q.   So her driving two or three hours down to visit you, you

20  obviously had to have some conversation with her, correct?

21  A.   Briefly.

22  Q.   And talk about the investigation that she had done in

23  2016.

24  A.   Briefly, yes.

25  Q.   And you knew that April Glass was the source of

JA275

1  information that led to the 2016 investigation, correct?

2  A.   Yes.

3  Q.   Now, you were also aware that no charges were brought

4  based upon the Virginia State Police investigation.

5  A.   Yes.

6  Q.   And Sergeant Brown's information confirmed that the

7  allegations led to no charges being filed against Mr. Glass.

8  A.   Correct.

9  Q.   Okay.  Now, we now know after Sergeant Brown testified

10  that she went to two people in your office to ask if they

11  would take over the case.  Were you aware of that?

12  A.   No.

13  Q.   Were you aware that she contacted Detective Boyd and

14  Detective Boyd never got back to her?

15  A.   No.

16  Q.   Were you aware that sometime in late 2017 that she had

17  contacted Detective Lamberth to see if he would take over the

18  case?

19  A.   No.

20  Q.   Were you aware that Iredell County declined to prosecute

21  that case based upon the 2016 information?

22  A.   No.

23  Q.   Okay.  Were you aware that she contacted multiple other

24  agents in North Carolina including some ICAC investigators who

25  also chose not to pursue the case?

JASON LOWRANCE - CROSS

1   A.   No.

2        MR. JOHNSON:  Can you go to Exhibit 3, please.

3   Q.   Now, this is -- appears to be the Virginia State Police

4   investigative report that was provided to you by Sergeant

5   Brown, correct?

6   A.   Yes, sir.

7   Q.   And at the top of the report Sergeant Brown states, "I

8   request this case be closed.  The evidence has been destroyed

9   with approval of the Carroll County Circuit Attorney Nathan

10  Lyons.  I wasn't able to get anyone in North Carolina to take

11  the case.  There were no violations that occurred in

12  Virginia."

13       Correct?

14  A.   Yes, sir.

15  Q.   So when you started your investigation and you got the

16  information from Detective -- excuse me, Sergeant Brown, you

17  knew that nobody in North Carolina would touch this case.

18  A.   I didn't know it until whenever I got this.

19  Q.   Okay.  But when you got it from her, you knew that they

20  would not pursue charges in North Carolina against Mr. Glass

21  based upon the 2016 allegations.

22  A.   Correct.

23  Q.   Okay.  Now, we found out on Friday that there was a

24  search warrant obtained by Sergeant Heather Brown as part of

25  her investigation, and that's Exhibit 13.

1    MR. JOHNSON:  Can you pull that up, please.
2    Q.   Did you ever receive a copy of this search warrant?
3    A.   I can't recall if I did or not.
4    Q.   Okay.  It would have been important to you -- would it
5    have been important to you that the -- that in the 2016 case
6    there was a search warrant executed and they found no CP
7    images?
8    A.   Would I find it what?
9    Q.   Would it have been important to you that in the 2016 case
10   that they had executed a search warrant and they had found no
11   images on materials that were provided by Ms. Glass?
12   A.   Not necessarily, no.
13   Q.   That didn't make any difference to you that she had
14   previously provided information to get a search warrant and
15   the search warrant didn't yield any CP images?
16   A.   No.
17   Q.   Why?
18   A.   I mean, you can search, you know, one device, but did
19   they search all the devices?  I mean, a person can have CP on
20   one thing and you search it and it be the wrong device.
21   Q.   Now, when you completed your affidavit for search warrant
22   on December 10, 2020, you knew that the case had been closed
23   in the 2016 investigation by Virginia, correct?
24   A.   Yes, sir.
25   Q.   And you chose to include the reference to the 2016

JASON LOWRANCE - CROSS

1  investigation in the affidavit, correct?

2  A.   Yes, sir.

3  Q.   And you knew that Sergeant Brown was unable to get any

4  police agency in North Carolina to take or pursue this case,

5  correct?

6  A.   Yes.

7  Q.   And you chose not to include the fact that the case was

8  closed in your affidavit for search warrant, correct?

9  A.   Correct.

10 Q.   And you chose not to include the fact that no law

11 enforcement agencies would take or pursue the charges in North

12 Carolina in your affidavit for search warrant.

13 A.   Correct.

14 Q.   And you'll agree with me that whether you knew it or not,

15 because you can't recall right now, you didn't include the

16 fact that there was an affidavit for search warrant in

17 January 2017 to search a SIM card and no pornographic images

18 were found, correct?

19 A.   Correct.

20 Q.   And you didn't include that because that's information

21 that wouldn't have been helpful for you to get a search

22 warrant, correct?

23 A.   I didn't find it relevant, no.

24 Q.   And if you'd been completely truthful, that might have

25 even been -- might have even hurt your efforts to get a search

JASON LOWRANCE - CROSS

1  warrant?

2  A.   No.

3  Q.   Do you think it would have been helpful if you told the

4  magistrate or the judge in your affidavit that the 2016 case

5  yielded no pornographic images?

6  A.   No.

7  Q.   Let's go on to the 2017 case.  You were aware of the 2017

8  case concerning Mr. Glass, correct?

9  A.   Yes.

10 Q.   Because you participated in that case, right?

11 A.   Yes.

12      MR. JOHNSON:  Would you pull up Exhibit 12, please.

13 Q.   Now, this is a report that we obtained from the United

14 States Attorney's Office about when you were interviewed by

15 them in anticipation of this case on November 29, 2022.  Okay.

16 And in this report you indicate in the last paragraph -- if

17 you'd highlight that, please.  "During this" -- well, they

18 indicate, "During this incident, Lowrance assisted former

19 Iredell County Sheriff's Detective Chris Lamberth in reviewing

20 a computer seized from Mr. Glass."

21      Correct?

22 A.   Yes.

23 Q.   And that's accurate.

24 A.   Yes.

25 Q.   And that was the tablet that we talked about.

JASON LOWRANCE - CROSS

1  A.   I believe so, yes.

2  Q.   Well, that was at least the tablet that you talked about

3  with Ms. Ford.

4  A.   Yes.

5  Q.   And that was the tablet that you looked at that was

6  seized from Mr. Glass and that was a tablet where they found

7  no pornographic images, correct?

8  A.   Yes, sir.

9  Q.   Okay.  And again, that's consistent with the last

10  sentence that says, "Lowrance recalled while there was

11  pornography observed on the computer, no child pornography was

12  observed during the review."

13  A.   That is correct.

14  Q.   Okay.  So based upon your review of that tablet, there

15  weren't any charges, correct?

16  A.   That is correct.

17  Q.   And as we've talked about it before, they gave the tablet

18  back to Mr. Glass.

19  A.   Yes, sir.

20  Q.   Okay.  Now, in addition to that search in 2017, there's

21  also an indication that you might have participated in

22  drafting the search warrant in 2017.

23         MR. JOHNSON:  And would you go to Exhibit 14, page

24  2.  It's the last full sentence.

25         THE WITNESS:  Yes.

1  Q.   "I spoke with Detective Sergeant J. Lowrance and he said
2  that he would assist me in a search warrant tomorrow."
3  A.   Correct.
4  Q.   That would be the drafting of the search warrant,
5  correct?
6  A.   Yes.
7  Q.   Because this is not a situation where you need to put a
8  team together to go search a location.  You already had the
9  tablet, correct?
10  A.   Yes.
11  Q.   And so you helped him draft the search warrant with the
12  Court to -- the affidavit for search warrant to get a search
13  warrant, correct?
14  A.   I assisted him on the search warrant as in the language
15  that would be needed for the evidence that a person would be
16  collecting from that device.
17  Q.   And Mr. Lamberth indicated that he would have given you
18  information about the case.
19  A.   He would have spoke to me about it.
20  Q.   And you knew that April Glass, Mr. Glass's wife, was the
21  tipster or the person that provided the information that led
22  to the 2017 search warrant in Iredell County.
23  A.   Yes, sir.
24  Q.   Okay.  Do you remember how you became originally aware of
25  the 2017 investigation?

JASON LOWRANCE - CROSS

1   A.   How I became aware?

2   Q.   Of the investigation.

3   A.   I remember Lamberth coming up to me and saying that, you

4   know, he had a tip and he had to go out and do a

5   knock-and-talk and he had seized a tablet and he had never did

6   a search warrant concerning searching a tablet and needed, you

7   know, my help with the language.

8   Q.   And you helped him with that.

9   A.   I provided him the language to put into his search

10  warrant as in just the evidence to be collected.

11  Q.   And you're also aware that no charges were brought in

12  this investigation.

13  A.   Yes, sir.

14          MR. JOHNSON:  Can you pull up Exhibit 5, page 306,

15  please.

16  Q.   And this appears to be the affidavit that you helped

17  prepare for Detective Lamberth, correct?

18  A.   Yes, sir.

19  Q.   And this references a tip that they had received about

20  Mr. Glass.

21  A.   Yes, sir.

22  Q.   Now, this affidavit doesn't identify April Glass,

23  correct?

24  A.   I don't believe so.

25  Q.   Okay.  Because she didn't want to be identified, correct?

1  A.   I'm not sure.

2  Q.   Now, the tip that she provided -- and that's Exhibit 15,

3  please.

4       This is what has been previously identified as the tip

5  for the 2017 case from Ms. Glass.  There was an allegation

6  that there was marijuana and other drugs that were in the

7  residence and tablets full of child porn, correct?

8  A.   Correct.

9  Q.   Based upon what you know of that investigation, they

10 didn't find any drugs at the house, did they?

11 A.   Not that I'm aware of.

12 Q.   And there weren't tablets full of child pornography found

13 at the location, correct?

14 A.   There was only one tablet seized that I'm aware of.

15 Q.   Okay.  And that tablet that you looked at didn't contain

16 any child pornography, correct?

17 A.   Yes, sir.

18 Q.   Now, unlike the 2012 and 2016 investigations, you didn't

19 list the 2017 investigation in your affidavit for search

20 warrant in 2022, did you?

21 A.   No, sir.

22 Q.   Okay.  Now, when you completed the affidavit for search

23 warrant on February 10, 2020, you knew that the case had been

24 closed in the 2017 investigation.

25 A.   Correct.

1   Q.   And that you knew that April Glass had provided

2   information in the 2017 investigation which led to

3   Mr. Lamberth obtaining a search warrant to search a tablet.

4   A.   Yes, sir.

5   Q.   And that you knew that the information that April Glass

6   had provided was not true or at least not accurate.

7   A.   I would say no.

8   Q.   You would say that it was accurate?

9   A.   She reported that there was possible child pornography on

10  a tablet.  You know, did they search all the tablets?  Did

11  they search all the computers inside the house?  No.  They

12  only searched one tablet that was turned over by Mr. Glass.

13  Q.   That's actually inconsistent with what Mr. Lamberth

14  says --

15          MS. FORD:  Objection.

16          THE COURT:  Sustained.  You can ask him what he

17  knows.

18  Q.   Is that what you know?

19          THE COURT:  But he doesn't need to be told what

20  somebody else knows.

21          THE WITNESS:  Sorry, Judge.

22          THE COURT:  You didn't do anything wrong.

23          MR. JOHNSON:  Your Honor, if I can have a second,

24  I'll go back and pull that for him.

25          (Pause.)

1  BY MR. JOHNSON:

2  Q.   Here we go.  I'm going to show you what's been previously

3  marked as Defense Exhibit 14.

4       And in your experience, this would be the notes from the

5  investigator.

6  A.   Yes, sir.

7  Q.   And this would be Mr. Lamberth or Detective Lamberth at

8  that time.

9  A.   Yes, sir.

10 Q.   Okay.  And in the report towards the bottom it indicates,

11 While on scene Detective Griffiths and Detective Clodfelter

12 gained consent to search the residence for more computers and

13 narcotics from both Jessie, Sr., and Jessie, Jr.  Okay.  And

14 the search did not produce any more computers -- any more

15 computers of any kind or drugs period.

16      Can we assume that this report is probably more accurate

17 than your memory?

18 A.   Yes, sir.

19 Q.   Okay.  So going back to my question, the -- in your

20 investigation the information that Ms. Glass provided you was

21 inaccurate, correct?  Because the information said there was a

22 computer -- there was a tablet -- or there were tablets that

23 had CP images.  Okay.  And they didn't find any tablets that

24 had CP images, correct?

25 A.   Correct.

1  Q.   And the only tablet that they found and brought to you
2  was the one tablet that you searched.
3  A.   Correct.
4  Q.   And you can confirm that that didn't have any CP images.
5  A.   That is correct.
6  Q.   Okay.  And now I think you can -- we'll go back to this.
7       When you did your affidavit for search warrant, you chose
8  not to include any reference to the fact that Ms. Glass had
9  been the informant in a 2017 investigation.
10 A.   Correct.
11 Q.   And you didn't include information that Ms. Glass had
12 been the informant in a 2017 investigation where she said
13 there were tablets and drugs -- tablets that contained child
14 pornography and drugs in the residence, correct?
15 A.   Correct.
16 Q.   And you didn't include the fact that when they did a
17 search, they only found one electronic device that they
18 seized, correct?
19 A.   Yes, sir.
20 Q.   And you didn't include the fact in your affidavit that in
21 that one device, you searched it and found no CP images.
22 A.   Correct.
23 Q.   Okay.  And you didn't include in there that although
24 Ms. Glass had indicated that there would be marijuana or other
25 drugs in there -- in the residence, they didn't find any.

JASON LOWRANCE - CROSS

1   A.   Correct.

2   Q.   And again, you didn't include that because that wasn't

3   helpful to you trying to get another search warrant, was it?

4   A.   Correct.

5   Q.   And if you had been completely truthful about the 2017

6   investigation, that might have hurt your efforts to get a

7   search warrant, correct, in 2020?

8   A.   No.

9   Q.   Let's talk about the 2020 investigation, and we're just

10  going to do something rather quickly.

11       In her tip in 2020, which is Defense Exhibit 19, isn't it

12  true that Ms. Glass told you that this is the third time that

13  I've reported him?

14  A.   I believe I recall that, yes.

15  Q.   So this was not the first time she had come forward with

16  information; this was the third time.

17  A.   I believe so, yes, sir.

18  Q.   Okay.  Let's talk a little bit about the domestic

19  situation with Mr. Glass.  I'm not going to belabor it.  I

20  think you would agree with me that Mr. and Mrs. Glass had a

21  lot of marital problems and were living separate and apart in

22  January 2022.

23  A.   They were not living together.  They were --

24  Q.   In 2020.

25  A.   Correct.

1  Q.   Okay.  Because you knew that in January 2020 that

2  Ms. Glass was living with her mother in Virginia.

3  A.   Yes.

4  Q.   Okay.  And there were other instances of times where

5  there's information in the record that indicated that they

6  were not getting along, correct?

7  A.   I knew that they were separated.

8  Q.   Okay.  And did you discuss the fact that -- with Sergeant

9  Brown that in 2016 that they were not living together?

10 A.   I can't recall if I did.

11 Q.   In 2017 in the tip, which again is Exhibit Number --

12 excuse me.

13      In the 2017 anonymous tip that we got, there's indication

14 that she's not living with him, correct?

15 A.   Correct.

16 Q.   Okay.  And in 2020 you not only got information from her

17 in the tip that Ms. Glass was not living with her husband, but

18 you also got additional information in the form of emails that

19 she sent to you, correct?

20 A.   Yes, I recall emails, yes.

21 Q.   And she sent you a number of emails during the -- during

22 this case, correct?

23 A.   Yes.

24 Q.   Okay.  And let's just go over those quickly, okay?

25 A.   Yes, sir.

1  Q.   In --

2          THE COURT:  Mr. Johnson, how much longer do you

3  have, do you think?

4          MR. JOHNSON:  I probably have five minutes.

5          THE COURT: Okay.  Go ahead.

6  Q.   Exhibit 20, that's an email that April Glass sent to you

7  on January 22, correct?

8  A.   Yes, sir.

9  Q.   And she gave you information.

10 A.   Yes.

11 Q.   And she told you she was currently staying with her mom

12 in Virginia.

13 A.   Yes, sir.

14 Q.   "And I haven't went back home due to all the issues going

15 on down there," correct?

16 A.   Yes, sir.

17 Q.   So you knew from that email that she was living separate

18 and apart and there was marital issues with Mr. Glass,

19 correct?

20 A.   Appeared to be, yes.

21 Q.   Okay.  And then in Exhibit 21, that's another email that

22 you got from April Glass on February the 4th, 2020.

23 A.   Yes.

24 Q.   Okay.  And she indicates also that Mr. Glass is driving

25 her insane and calls him narcissistic.

JASON LOWRANCE - CROSS

1   A.   Yes.

2   Q.   And that he's verbally and emotionally abusive.

3   A.   That is correct.

4   Q.   And then in paragraph -- and then in Exhibit 22, that is

5   also another email that you received from April Glass on

6   February the 10th, correct?

7   A.   Yes, sir.

8   Q.   And that was right about the time that you were preparing

9   the affidavit for search warrant, correct?

10  A.   Yes, sir.

11  Q.   And she provides you information about him being charged

12  with two counts of sodomy.

13  A.   Correct.

14  Q.   And she claims that he's a level 1 sex offender.

15  A.   Yes.

16  Q.   But you knew that was not true, correct?

17  A.   I mean...

18  Q.   Well, you'd run his NCIC record and it didn't indicate

19  that he was a convicted sex offender.

20  A.   He was found not guilty, correct.

21  Q.   Okay.  And the NCIC report didn't indicate that Mr. Glass

22  was required to register as a sex offender.

23  A.   That is correct.

24  Q.   And then as a matter of fact, if we go to Exhibit 4, and

25  that's the -- well, excuse me.

JA291

1    MR. JOHNSON:  Your Honor, one moment, please.  I'm
2  sorry.
3    Can you pull up Exhibit 23, please.
4  Q.   That is the CJLEADS report that you pulled for Mr. Glass,
5  correct?
6  A.   Yes, sir.
7  Q.   And again, you pulled that, according to the front page,
8  on January 22, 2020.
9  A.   I believe so, yes.
10  Q.   Okay.  Now, one of the things that's reported in here is
11  whether someone is required to participate in a sex offender
12  registry.  And if we go to page 4, that's indicated there,
13  correct?
14  A.   Yes.
15  Q.   He's not a pending registrant.
16  A.   Active or prior, correct.
17  Q.   Okay.  So that information that she provided in there was
18  true -- was untrue, correct, about him being a sex offender?
19  A.   Correct.
20  Q.   Now, even after Lee Glass was arrested, you still
21  continued to have communications with April Glass, correct?
22  A.   Yes.
23  Q.   She sent you a variety of emails.  I think one about a
24  dog.
25  A.   Yes.

1    Q.   And she sent you one about assistance on matters about
2    her personal property or getting personal property from a
3    location.
4    A.   I believe so.  I recall, yes.
5    Q.   Now, the last contact that you had with her was on
6    July 29, 2020, correct?
7    A.   I can't recall the date, but...
8            MR. JOHNSON:  Can you pull up Exhibit 24, please.
9    Q.   That's the email that April Glass sent to you on July 29,
10   2020, correct?
11   A.   Yes, sir.
12   Q.   And in this email Ms. Glass indicates to you that she
13   doesn't think that Mr. Glass --
14           MS. FORD:  Objection, Your Honor.  This is July 29,
15   2020.
16           THE COURT:  I'm wondering what the relevance of this
17   is as well.
18           MR. JOHNSON:  Your Honor, we're just presenting to
19   the Court the fact that Ms. Glass eventually has recanted her
20   story and said that she doesn't think that Mr. Glass was
21   involved in this.
22           THE COURT:  Of no moment to this issue.  Move on to
23   something else or finish up.
24           MR. JOHNSON:  One moment, Your Honor.
25           (Defense counsel conferred.)

1    MR. JOHNSON:  Your Honor, I just have a couple of
2  follow-ups.
3    Can you post Defense Exhibit 27.  Now it's 27.
4  Q.  Officer Lowrance, this is a narrative report that you
5  prepared as part of your investigation in this case, correct?
6  A.  It's a front copy of an initial report, yes.
7  Q.  Okay.  On page 2 there's a confirmation -- in the second
8  paragraph there's a confirmation that she's left Mr. Glass and
9  is no longer living at the address with him.
10 A.  Correct.
11 Q.  And she wants the -- wants to be left anonymous and that
12 Mr. Glass did not know that she was the one making the report.
13 A.  She wanted to be left anonymous, correct.
14 Q.  And also, the third paragraph indicates that you had
15 pulled the sheriff's office case number 17-2643.  And is
16 that -- do you remember what that case was about?  I'm
17 assuming it's the case where you did the search on the tablet
18 and found nothing, correct?
19 A.  I believe so.
20 Q.  So you pulled that report on December 27, 2019.
21 A.  I pulled up the incident report on the computer.
22 Q.  Okay.  And made it part of your file.
23 A.  As in printing it out later, yes.
24    MR. JOHNSON:  Your Honor, I have referenced a lot of
25 exhibits but I've not moved to admit them.  I would ask to

JASON LOWRANCE - REDIRECT

1  move into evidence Exhibits 9, 8, 10, 3, 12, 5, 18, 19, 20,
2  21, 22, 23, 24, 27.
3          THE COURT:  All of those are admitted, but I believe
4  24 was the one that the Court found was irrelevant so that
5  will not be admitted.
6          (Defendant's Exhibits Nos. 3, 5, 8, 9, 10, 12, 18,
7  19, 20, 21, 22, 23, and 27 were received into evidence.)
8          MR. JOHNSON:  Your Honor, I understand we don't
9  want -- the Court is not going to admit it.  We'd like to have
10 it made part of the record.
11         THE COURT:  Well, I'm wondering how to do that since
12 it's not admissible.  We'll figure that out later.
13         MR. JOHNSON:  Your Honor, we can proffer it into the
14 record at some point in time.
15         THE COURT:  All right.  Redirect?
16         MS. FORD:  Yes, sir.
17         Can I see your Exhibit 22, please.
18                   REDIRECT EXAMINATION
19 BY MS. FORD:
20 Q.   Can you see that, Detective Lowrance?
21 A.   Yes, sir -- I mean yes, ma'am.  Sorry.
22 Q.   Now, defense counsel asked you whether or not April said
23 that Jessie Glass, Jr., was a sex offender, didn't he?
24 A.   Correct.
25 Q.   Do you see anywhere in there where she says that he's a

1  sex offender?

2          THE COURT:  What exhibit number is this, Ms. Ford?

3          MS. FORD:  Defense Exhibit 22.  Thank you, Your

4  Honor.

5          THE WITNESS:  The word sex offender, no.

6  Q.   Do you see that sentence in the middle that says, "During

7  all of this CPS in Carroll County I had no idea they had to

8  get his written permission to release info to me that he is a

9  level 1 pedophile on their records and not allowed around kids

10  for I'm not sure how long."

11        Do you see that?

12  A.   Yes, ma'am.

13  Q.   Does CJLEADS report when someone is considered by Child

14  Protective Services in another state to be a level 1

15  pedophile?

16  A.   No, ma'am.

17  Q.   So she didn't say in there that he was a sex offender,

18  right?

19  A.   Correct.

20  Q.   So she wasn't lying about him being a sex offender

21  because she never said it, right?

22  A.   Correct.

23  Q.   Let's go back to the misdemeanor larcenies.  You

24  testified that you were aware of the April 2019 pending

25  misdemeanor larceny charge, correct?

JASON LOWRANCE - REDIRECT

1  A.    Yes, ma'am.

2  Q.    And you didn't put it in the affidavit.

3  A.    Yes, ma'am.

4  Q.    And you were aware of potentially another incident at

5  Walmart in Virginia, correct?

6  A.    Yes, ma'am.

7  Q.    And that's not included in the affidavit.

8  A.    Yes, ma'am.

9  Q.    But there was another incident -- another misdemeanor

10 larceny that you were not aware of, correct?

11 A.    Correct.

12 Q.    And even if you were aware of all three misdemeanor

13 larceny incidents, would you have put them all in your

14 affidavit?

15 A.    No, ma'am.

16 Q.    Why not?

17 A.    Just because somebody steals something doesn't mean

18 they're not telling the truth or a liar.

19 Q.    And defense counsel asked you to agree with him that

20 someone who has multiple shoplifting charges and who appears

21 to be bouncing around is someone who has a drug habit,

22 correct?  They asked you that, correct?

23 A.    They did.

24 Q.    Well, are there other things that having shoplifting

25 charges and bouncing around could indicate about a person?

JA297

1  A.   Yes, ma'am.

2  Q.   Could it indicate that the person has serious health

3  problems and isn't able to work?

4  A.   Yes, ma'am.

5  Q.   Could it indicate that someone is homeless?

6  A.   Yes, ma'am.

7  Q.   Okay.  Let's talk about 2012 and what you knew and what

8  you didn't know.

9        MS. FORD:  Could I see your Defense Exhibit -- the

10 NCIC of Mr. Glass that shows the nolle pros and the dismissal,

11 please.

12       Can I see the next page, please.  Thank you.

13 Q.   All right.  We've already gone over this and you've said

14 that this is in fact an NCIC that you had run of Mr. Glass,

15 correct?

16 A.   Yes, ma'am.

17 Q.   So you would have been aware at the time of the affidavit

18 that with regard to one of the sodomy charges, it was nolle

19 pros'd, correct?

20 A.   Correct.

21 Q.   And then with regard to the second sodomy charge, it was

22 dismissed.

23 A.   Correct.

24 Q.   And that's what you knew at the time of the affidavit.

25 A.   Yes, ma'am.

JASON LOWRANCE - REDIRECT

1  Q.   Did you get any records about 2012 from Wythe County,
2  Virginia?
3  A.   I attempted to several times but never got the records.
4        MS. FORD:  Can I see the judgment, please, Number 7.
5  Q.   All right.  We already went over this Defense Exhibit 7
6  which is a judgment regarding the 2012 Virginia case, correct?
7  A.   Yes, ma'am.
8  Q.   Did you have this document when you had the affidavit?
9  A.   No, ma'am.
10 Q.   So did you know that there had been a bench trial where
11 he was found not guilty?
12 A.   No, ma'am.
13 Q.   Do you know whether or not April Glass was even involved
14 in the 2012 incident?
15 A.   Other than speaking to the lead detective that handled
16 the case.
17 Q.   Do you know whether or not April Glass was a complainant
18 for the 2012 incident?
19 A.   No.
20 Q.   Do you know or you know that she wasn't?
21 A.   She was, I believe.  I recall she being the complainant,
22 yes.
23 Q.   Okay.  Well, I'm going to show you what I've marked as
24 Government's Exhibit 5.
25      Now, defense counsel showed you the judgment from Wythe

1  County and told you that the government had provided that to

2  him.  And this is a report that went along with that judgment.

3       Do you see at the top where it says Wythe County

4  Sheriff's Office?

5  A.  Yes, ma'am.

6  Q.  Do you see where it says on March 21, 2012, Jennifer

7  Glass came to the sheriff's office to speak about this

8  incident?

9  A.  Yes.

10      MS. FORD:  Your Honor, I'm going to move to

11  introduce and admit Government's Exhibit 5 which, as I said,

12  is a document that I turned over to defense counsel along with

13  the judgment that they introduced.

14      THE COURT:  All right.  It's admitted.

15      (Government's Exhibit Number 5 was received into

16  evidence.)

17  Q.  Okay.  The first sentence there says, "On March 21, 2012,

18  Jennifer Glass came to the sheriff's office to speak about

19  this incident.  At this time she brought her desktop eMachines

20  computer that she and Lee had shared while married."

21      Does that indicate to you that Jennifer Glass at one

22  point was married to Lee Glass?

23  A.  Yes.

24  Q.  "She advised that on multiple occasions she had seen Lee

25  view what she believed to be child pornography on his laptop

1    and on the eMachines desktop computer.  She said that there
2    were pictures and videos of juveniles."
3        I mean, would you agree that if you keep reading, it
4    talks about Jessie Leroy Glass, Jr., being involved with child
5    pornography?
6    A.    Yes.
7    Q.    And you were aware that the 2012 set of charges -- or
8    investigation was about child pornography as well as hands-on
9    offenses, correct?
10   A.    Yes.
11   Q.    And then further down in that paragraph, "She," being
12   Jennifer Glass, "advised that during the summer that XXXXX
13   said these things happened to her was when her husband had
14   begun to watch a lot of pornography.  She also told us that
15   XXXXX had mentioned to her that when her daddy licked her, he
16   told her that he wanted to make sure she had gotten her mess
17   clean."  Is that what it says?
18   A.    Yes.
19   Q.    And in 2012 Jessie Glass was charged with sodomy.
20   A.    Correct.
21   Q.    Do you know whether or not the victim continued to
22   cooperate in that case?
23   A.    I do not.
24   Q.    Do you see any reference in this report to April Glass?
25   A.    No, ma'am.

JA301

JASON LOWRANCE - REDIRECT

1  Q.   Now I'm going to show you what's already been admitted as
2  Government's Exhibit 2 and point you to this sentence right
3  here.  "Lee and I have been together since the end of 2014."
4        Is that what it says?
5  A.   Yes.
6  Q.   And the sodomy and child pornography investigation that
7  we've just been discussing happened in 2012, correct?
8  A.   Yes.
9  Q.   So do you now believe that April Glass was involved in
10 the 2012 incident?
11 A.   No.
12        MS. FORD:  No further questions, Your Honor.
13        THE COURT:  Thank you.  You may stand down.
14        THE WITNESS:  Thank you, Judge.
15        THE COURT:  And without objection be released.
16        Is there any additional evidence?
17        MS. FORD:  No, sir.
18        THE COURT:  For the defense?
19        MR. JOHNSON:  No, Your Honor.
20        THE COURT:  I assume you want another briefing
21 schedule.
22        MR. JOHNSON:  Yes, Your Honor.
23        THE COURT:  And I assume that that will also require
24 you ordering a transcript from our indefatigable court
25 reporter.

1        MR. JOHNSON:  Yes, Your Honor.

2        THE COURT:  Okay.

3        Cheryl, do you have a guess on what your schedule

4 allows for turn-around time on that?

5        THE COURT REPORTER:  I'm actually going on vacation

6 Saturday --

7        THE COURT:  Yes, you are.

8        THE COURT REPORTER:  -- and I will be out of town

9 for two weeks.  I am trying to finish up a trial transcript

10 from October before I leave.  I am not sure I can get this

11 done before I leave on vacation.

12        THE COURT:  Well, don't worry about that.

13        So what we'll do is -- obviously, put in your order

14 for the transcript and your brief will be due -- is two weeks

15 sufficient from receipt of the transcript?

16        MR. JOHNSON:  Yes, Your Honor.

17        THE COURT:  So the defense's brief with respect to

18 this motion will be due two weeks after receipt of the

19 transcript, whenever that is.  I'm not putting a deadline on

20 that.  And a 10-day response.

21        Will that be sufficient, Ms. Ford?

22        MS. FORD:  I'll say yes now, and if I --

23        THE COURT:  And then you'll move to extend.

24        MS. FORD:  Yes.

25        THE COURT:  Okay.  So for now, at least, we'll put

1  in the calendar a 10-day response time.  And I don't think

2  we'll need a reply.

3       All right.  Anything else we can profitably take up

4  while we're here?

5       MS. FORD:  No, sir.

6       MR. JOHNSON:  No, Your Honor.  Thank you.

7       THE COURT:  All right.  Thank you all for sticking

8  through this three and a half hours worth.  Especially you,

9  Cheryl.  Unbelievable.

10       All right.  The Court will be in recess.

11       (End of proceedings at 12:52 PM.)

12                    *****

13

14

15

16

17

18

19

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I, Cheryl A. Nuccio, Federal Official Realtime Court

7  Reporter, in and for the United States District Court for the

8  Western District of North Carolina, do hereby certify that

9  pursuant to Section 753, Title 28, United States Code, that

10 the foregoing is a true and correct transcript of the

11 stenographically reported proceedings held in the

12 above-entitled matter and that the transcript page format is

13 in conformance with the regulations of the Judicial Conference

14 of the United States.

15

16          Dated this 5th day of March 2023.

17

18

19                    s/Cheryl A. Nuccio

20                    Cheryl A. Nuccio, RMR-CRR
                      Official Court Reporter

21

22

23

24

25

SANDRA COX met with me at State Police Headquarters. She was transported by Trooper ELI HALLMAN who took the initial complaint. I introduced myself and stated the purpose of the interview. SANDRA COX provided the following information:

My daughter APRIL GLASS sent me pornographic photos that she found on her husband's phone. She was in Statesville, North Carolina, at her father-in-law's house when her husband, JESSIE "LEE" GLASS, left without his phone. APRIL said she went through his phone because she thought he was having an affair. She found the photos and sent them to me. I think she took a picture of his phone.

APRIL and LEE have been married for a year. They do not have kids together. APRIL has kids, but she only sees them on Sundays at my place. The children stay with their father. APRIL cannot take care of them right now due to her health. She has cancer. LEE is not allowed to be around her kids. LEE was charged with molesting his own children, but it was dismissed in court. I don't know the circumstances, but DSS does not allow him to be around his children.

APRIL is scared of LEE. I don't know that he ever hit her, but there is emotional abuse. I don't see him very much. He is a jerk. I know he has a gun. They do have a computer, but he does not use it. I know he had a tablet, but he beat it up and set it on fire.

APRIL and LEE went to North Carolina this weekend. That is where she found the pictures. I am not sure where the pictures came from. APRIL said she found a website "chapstep.com" and an email address. It was "wildbill" or "oldbill@gmx.us" or gmx.com. APRIL sent me a message before she got the pictures. It said, "Brace yourself." Then the pictures started popping up. I told her I was going to the State Police. The photos are disgusting and I don't want them on my phone. She was okay with me reporting it, but she does not want him to know she took the photos.

APRIL and LEE are usually home. LEE is not working right now. She has a doctor's appointment in Richmond tomorrow (11/28/2016) and he is taking her. They will not be home. She is coming over to see me on Tuesday. She comes alone and stays for a couple of hours. She can meet with you then.

I want APRIL to come stay with me. He knows where I am staying, but APRIL also has a friend in Princeton she can stay with.

SANDRA COX showed me the photos that were sent to her phone. It appeared to be a photo of a picture on a second phone. The pictures had "LEE GLASS" written in the top right corner. The photos showed children that were obviously underage engaged in sex acts, nude, and other photos of children clothed, but bound. I seized the phone and gave her a receipt for the phone. (SAMSUNG GALAXY S7 EDGE) SANDRA COX did sign the consent to search form and the phone was put in airplane mode, turned off, and placed in temporary storage. I have contacted Special Agent JOHN SINGLETON to analyze the phone.

000161

GOVERNMENT
EXHIBIT
|

JA306

APRIL GLASS arrived early at State Police Headquarters for the scheduled interview. She arrived with her mother, who was previously interviewed. I introduced myself and APRIL provided the following information regarding the complaint against her husband, JESSIE LEROY GLASS, JR.

LEE and I have been together since the end of 2014. We got married in 2015. LEE has been acting funny lately and I thought he was cheating on me. We were in Statesville and he took off with his dad to do something. I started going through his phone and I saw the downloaded pictures of kids. I saw that he had been on Chapstep.com and he had a new email address. The pictures were of naked kids and a 2 or 3 year-old tied up. I took a picture of the screen of his phone with the photos on it and sent it to my mom. I erased the pictures off my phone after that.

About three weeks ago I took a video of some pictures of naked kids on his tablet. He knew I had been in his tablet because I removed the passcode he had on it. He said I was, "Taking his privacy away." He said he was, "Interested in human nature." He took the tablet out and destroyed it. The pictures that I took a video of were different than the pictures I sent to mom on Sunday.

He knew I was going to meet with the police because he saw my text back and forth with my mom. I explained that I had to meet with the police because I was on his cell phone plan. I told him the police could not find his phone because it was turned off and that mom was interviewed because she is on his plan. I told him that is why the police needed to talk to me and that I had to bring my phone. I told him the website sent out an alert about him downloading the photos. I don't want him to know that I turned him in because I think I will be in danger.

He thinks I am on his side. He's being overly nice, which he normally is not. He wants me to take up for him. He told me this last time that someone must have piggybacked off his account. He wants me to tell the police that. He also wants me to say he cannot find his phone, even though I know he destroyed it. He either took it to his dad's or threw it out the window. I know his dad knows about what he has been doing. I said something to him about the naked photos and he said he told LEE to stop or he was going to get in trouble.

I told him that I was going to have to turn over my phone. He is at home now. If you go and talk to him, he will be nice to you. He gets high pitched and loud when he is lying. That is how you will know. He is going to say he lost his phone and can't find it and someone must have piggybacked off his account.

He told me that he must have hit a download and didn't know what it was. The last time I saw his phone was last night. He had hidden it in a basket under a bunch of stuff. I had looked for it. When he got it out, I did look on it and he had reset it back to factory. The pictures were not on there.

He had a big memory card with a bunch of pictures on it. It was over 200 gigabytes. He got it free from Sprint with the phone. I think it was just quotes and older women he downloaded pictures of. He left it out and I got it. I told him I took it down the road and threw it out. He thinks I am covering for him. I had the memory card last night and I hid it, but when I got up, I couldn't find it. I don't know if I dropped it somewhere or if he got it. He was up hours before me and it looked like my stuff had been moved around. I am going to look for it and if I find it, I will get it to you.

030167

GOVERNMENT EXHIBIT 2

We do have a computer, but he has not used it. I have it so I can put job applications in for him. He refuses to do it himself, but he has to for unemployment.

APRIL advised she was going to return home and tell LEE that I took her phone and that she relayed the information he asked her to. I advised I could locate assistance for her if she did not want to go home. Her mother offered for APRIL to come and stay with her, she refused. She stated she was going to return home and act like everything was okay. I explained this could become a dangerous situation for her and again asked if I could locate temporary housing for her. She said no and that she would get a plan together to leave. I clearly stated that her testimony would be required in court and if charges arise, he would know she was involved in reporting him. She stated she understood and would cooperate.

She said she was going to get a prepaid phone from Wal-Mart and would provide me with the number, which she did. That number is (276) 779-3732.

JA308

JESSIE LEROY GLASS, JR. (LEE) was interviewed at his residence, ███ █████████ ████, Hillsville, VA 24343 at approximately 9am on December 1, 2016. Special Agent CHAD BROWN was present for the interview. LEE GLASS met us at the door and invited us into his home. We identified ourselves and stated the purpose of the interview. APRIL GLASS, LEE'S wife, was also present and he stated he wanted her to stay during the interview. I advised LEE GLASS that I had information that child pornography was downloaded to his LG cell phone. He did not deny that the download occurred; he said, "Okay."

LEE GLASS provided the following information:

I have no concept of anything being downloaded to my phone. The last time I saw my phone, unfortunately I lost my phone and I had to search for it for a day and a half before I had to admit to her (APRIL) that I lost it. We are still paying for the phone. I lost it. I remember plugging it in to charge on Saturday night. (November 26, 2016) I went out to eat with my dad on Sunday and she was trying to contact us. Dad did not have his phone either. Sometime that evening, I hadn't heard from her and I went to look for the phone and I couldn't find it. I called around and no one turned it in. APRIL got insistent about where my phone was and I had to tell her I lost it. I told her I lost it sometime Sunday. I had it Saturday. I plugged it up at 8 o'clock. That is the last time I saw it. I don't know anything about how to use a tracking app. I can see it looks bad that I don't have the phone. It was gone a full day before she even told me. It's not like she told me and I lost it two minutes later. I don't know. I wish I did.

*I explained the photos were on the phone before he "lost" it. He did not deny this and said, "Okay."*

Sometimes I download things and I don't know what they are. I downloaded a photo of what I thought was a black woman who was heavy-chested. After I downloaded the set of photos, it turned out she had a pecker. I said, "Oh crap." I backed out of that. If something got downloaded by accident...sometimes I download things and I don't look at it. I go to Tumblr and I can't think of the other. *APRIL suggested ChapStep ond LEE emphatically replied, "No."* There is another that is free. UPorn and Red Tube is another one. I also like anime because some of it is so close to looking like actual photos. You can find just about anything you want on those sites. We do play in a little light spanking and bondage. I look up stuff like that. Some of the stuff she is way not into, some of the stuff we have tried. But I do not pass anything on. If I send a picture to my dad, every now and then I send a picture to him of women his age. Women his age are a little but out of my range for what I look at. Sometimes I send my dad a joke picture. I have nothing to hide. I leave my phone open for her (APRIL) to look through.

If I downloaded something to my phone that I did not intend to download, I would immediately erase it. I would not keep it. If I had known that guy had a tally whacker, it would not have been on my phone for her to find. When you download something that big, it takes a while to download a whole cache of them and you don't know what you are getting until you get it.

I didn't download anything that I would think is child porn. I have downloaded things that I thought they were 18, because you get barely legal. She told me that they looked younger. I don't know. They look a little flat-chested and you can't tell. She looks at them and says they look a little young. Immediately it's

000162

GOVERNMENT
EXHIBIT
3

gone. If she tells me they look younger than 18, it's off my phone. So, I can't say I never downloaded anything. *I explained the photos downloaded to his phone were not questionable as to the age of the children in the photos. I explained the photos were not of people who could be 15 or 16.*

If it came down in a whole set, I will erase the whole set. If she looks at the first one and says that isn't legal, the whole set is gone. I won't look at the rest of them. That is just asking for trouble. 18 is a little too young I realize, at my age. I know I don't have a shot at getting a 20 year old teenybopper behind a cash register, but I do like to look at 18 and above. If she looks at it and it looks questionable, it's gone. I don't care what is in the rest of it.

Sometimes you open up Red Tube or You Porn or whatever and it will say one through twenty pictures, so I download the whole set. All of it. I look at the first one and if it is questionable, it goes. If she says it is questionable, it goes. I don't even open the rest of them. There is no point in going any further. That is what I mean by set of pictures.

I'm not even going to get another Smartphone. When she told me that... I didn't this time; I got an "el cheapo phone" because I thought when I find my other phone... When she told me that, it's not even worth looking at, going to regular sites if that is the crap that is going to be on there. I told her I wasn't even going to go get another Smartphone. I don't need it. She said I didn't need to go to that extreme. I said it is not worth taking that chance. I said I have kids I have to worry about getting back. I have her health to worry about and a job I need to find. I have more stress than I need to worry about than this kind of stuff. That's the truth of the matter; I don't need that kind of...I got enough on me. I got a tooth knocked out. I got to worry about how to fix it.

If I downloaded a set and some of them was in there (child pornography photos) I was unaware. That is just not stuff I go after to look for.

*I asked if he downloaded child pornography, would he save it to the phone or keep them to look at later. He stated the following:* If I showed them to her and I know they are alright, I would have. *I clarified that I was talking about a child pornography picture.* He replied, "No I would not have saved them for a long period of time." *I asked if he downloaded one, what he would have done with it.* He said, "Immediately I would have erased it." He said it would not have stayed in his phone.

His statement continued:

Not to mention the fact that you never know, I don't know if you have or not, but I embarrassed somebody, I sent a picture of me to her. You never know who is going to pick up your phone. That's not something I want to deal with either.

*I directly asked if he had ever, either accidentally or on purpose, downloaded any picture that was child pornography.* He said if he knew it was beforehand, I would have never downloaded it. *I asked again, "Have you ever downloaded one and opened it up and saw it was?"* He replied, "Oh yes. Once or twice. And there again it come from a picture that was too small for me to realize it. And sometimes I'll open one up because, and it's just the way the eye works, I read several things on this. But you will

000163

look at the photo and it looks like an elbow and a goat head, and you'll be like what the... and you open it up and it will be the body part and that's somebody else. And sometimes you open it up and oh crap, knock that down, because you can't see it until you download it. If I done it, but there again, I didn't know until I opened it up."

I asked him to describe the child pornography photos he downloaded. He provided the following:

Different stuff. I've seen them, just naked kids, just naked kids. Some of it is like someone went to a nude beach and there were kids and adults there and they took them. Sometimes it's just different things; some of it's quite disturbing to tell you the truth. It's like why would someone do that?

***I asked if he had ever seen photos of kids engaged in sexual acts. He said he had once or twice.***

I've seen it with adults. I seen one that had a vibrator. This is just over the years. I mean it's probably 20 years of different stuff. I mean it's just different things and there again it's just get rid of that because it's not, you know, it's not... I don't think there is anyone out there that looks at porn that has unfortunately run across someone that is trying to sneak stuff in on a site that shouldn't be there. Tumblr is supposed to be safe for stuff like that. But I have heard reports that it is crawling with people. It's making it hard for people that just want to look at regular porn. You type in barely legal and the next thing you know, there is all kinds of perverts hanging around there. There is a barely legal site and even then, there is stuff that I have downloaded that is questionable. I don't care if she is right or wrong, if she thinks it is questionable, it's gone.

I asked if he had ever downloaded a picture of a female child performing oral sex on a male. He said, "No, not that I am aware of, no. I don't believe I have." I asked if that was something he would remember. He said, "Yeah. That's what I am saying, I don't, no, I don't remember."

I asked about ChapStep. He replied: I looked on there twice. It was bondage and humiliation. It was women and they write stuff on their chest. It was supposed to be chat. There is times my wife is down for days and I need a little bit of material. You talk to a girl or guy about their lover about tying them up and you are good to go for awhile. I don't send anything to anybody for any reason. If someone downloads a photo into the room, I will pull one down from there, because you can see what it is before you download it.

I stated there was evidence of child porn being downloaded to his phone along with photos of bondage that he described being interested in. He said: If it was downloaded to my phone, I did not realize it. I'm not one to go looking for that stuff. I don't know what to tell you other than that. I wish I knew. I wish I could have found it (phone). I looked for it for a day before I told her I lost it. If anything got downloaded by me, I was unaware. I know people can get a scanner and take over your phone. I wish I had it. That may have happened, it may have not. I am not computer savvy at all.

90% of the time I download things at home because I am here and not at work. If I tried to download a long file of someone getting their butt spanked, I might just leave the phone in the seat of the Jeep while I go pay a bill. Sometimes a 5 second clip takes 30 minute to download.

000164

JA311

I gave LEE an opportunity to provide me for an explanation. I told him that if he did it out of curiosity, he could explain that. He said, "Everything I do is out of curiosity for me, but I would never willingly look at a photo that I knew was going to be that kind of material before I downloaded it." If anything like that has been downloaded it was by accident or because I didn't know what it was before I downloaded it. If I did, it would be gone; erased immediately. I would not keep it on my devices, it would immediately be gone. I do not pass on...that is just degenerate to me. I would never pass that on to anyone for any reason. I do not keep it in my phone or any device I have.

APRIL GLASS asked if he did it out of curiosity. He said everything is out of curiosity. I'm curious about human nature. It's just unreal. Even in high school when everyone else was drinking, I didn't drink. I would just watch people come unglued. It is fascinating to see one person when they are sober and they get a little alcohol in them, they lose it. I used to love doing that.

I asked if he could have downloaded the photo out of curiosity over what people were doing. He said no. He said: There is a difference between human nature and degenerativeness. For example, snuff films. I heard there are movies out there where they kill people during a sex act. Why? To me there is no reason or rhyme. That's no human nature anymore. That is something else. I don't know how you leap from this feels good to I have to kill someone to get off. That is out of my realm of understanding.

I asked where he drew the line for what is acceptable. He said, "Consensual, of age, enjoyment for both people." I am into bondage and spanking. When she says stop I stop. It's all great if she's feeling good. If she is not getting off, I am not into it. "

I asked if he had seen photos of children in bondage. He said, "Once or twice. Most of the time it's just their hands tied together. There again I try not to keep those things in my memory. That's just something I don't want to be thinking about all day. I have seen one with a dog collar tied around her neck. Something like that. Just different things over time as you are downloading. My problem is when you get bored. If I am downloading 20 things, it may take an hour to download. If I see something like that, it immediately goes away. Immediately. But it's just nothing that I am aiming for." I have not kept a photo of a child in bondage. If it's questionable, I get rid of it. If she (APRIL) thinks it is questionable, I get rid of it. It may not be. They may have been 25. If she thinks it is questionable, it's gone.

I swear to you I have not passed anything on. If it was downloaded, it was not done on purpose. It was not something I saw and decided it was all good. If I do see stuff like that, I erase it immediately. The minute I see it, it is gone. That is just not something I keep. I know better. I am a Christian man and I should not be going to any porn sites.

I told him I would meet with the Commonwealth Attorney about the case and that can't operate off of "I could have" or "I might have" downloaded something. He said, "I told you I did. I have seen things that have come down. Nothing I have kept. Nothing that I have passed on. The minute I see it, it's gone. I don't leave them on there long enough to get a description. That is not something that I want in my head. I can't make love to my wife with that stuck in my head. I can't even get it up at that point in time."

000165

I asked if looking at child porn is something that would turn him on. He said, "No, God no. It has to be consensual, pleasurable fun. And children, unfortunately, cannot, no matter what they say, are not at the age, I don't mean unfortunately as it is a bad thing, what I am trying to say is you are never going to find a child that is going to be able to consent. Unfortunately, there are people out there that believe it happens, it's not. "

There have been things I have downloaded accidentally, just because they were on that site. I don't know why they were on that site. They come on everything. Tumblr had them on there, Red Tube had them on there, and I think ChapStep had one, but I don't think I downloaded it. It just came across scrolling. You scroll through with your finger and click on it to download. If something came across, I wouldn't keep it. I guarantee nothing got sent from my phone to anybody. I don't keep anybody's name. I only talk in open forum.

I don't have an email address to use the sites. LEE GLASS provided his personal email and stated he had an email for his phone, but was unsure about what it was.

## Andy Poteat

**From:** Darren Campbell
**Sent:** Tuesday, May 16, 2017 3:17 PM
**To:** Andy Poteat
**Subject:** FW: Anonymous tip

**From:** April Nester [mailto███████@gmail.com]
**Sent:** Tuesday, May 16, 2017 3:16 PM
**To:** ICSO Information <icsoinfo@co.iredell.nc.us>
**Subject:** Anonymous tip

███████ Statesville Va there is marijauna and possibly other meds non prescribed and the tablets are full of child porn they will be there about 7pm please keep my email anonymous or he will come after me jessie leroy glass jr is currently being investigated in the state of Virginia on child porn charges and possible rape of my daughter again please dont repeat my email he will come after me

1



JA314

# Wythe Co Sheriff's Office
245 S Fourth St
Wytheville VA, 24382
276-223-6000

<u>Case Number:</u> 20122004                    <u>ORI #:</u> VA0970000

Virginia State Police headquarters.

On March 21, 2012, Jennifer Glass came to the sheriff's office to speak about this incident. At this time she brought her desktop eMachines computer that she and Lee had shared while married. She advised that on multiple occasions she had seen Lee view what she believed to be child pornography on his laptop and on the eMachines desktop computer. She stated that there were pictures and videos of juveniles between the ages of 9-12 years (mostly female) of age engaged in sexual acts, some with adults with their faces blurred out. Jennifer said she ask Lee about these and he had told her he accidentally received them in an email and he would delete them. She stated that she removed them because he never did. She also stated that Lee had pictures of their 3 children on the computer with no clothing on, some in the bathtub and some outside of the bathtub in the bathroom. She said that some of the pictures of their children had been as recent as last year. She saw these pictures on his laptop. She believes his laptop is an Acer, gray in color. She advised that during the summer that F███ said these things happened to her was when her husband had began to watch a lot of pornography and he wanted to experiment sexually with Jennifer. She also told us that F███ had mentioned to her that when her daddy licked her he told her that he wanted to make sure he had her mess clean. Jennifer Glass advised that is how Jessie Leroy Glass Jr. would initiate oral sex with her. Jennifer Glass also advised me that during this time frame she remembered her husband became obsessed with the thought the girls would go to school and tell someone that he had touched them. She believes that Jessie Leroy Glass Jr. has done these things to their daughter, F███. At this time she gave us the eMachines desktop tower Model EL1200-05w, Serial # PTG100500384103BD93001, SNID# 84101532130. This item will be sent for analysis at a later date. Also, a search warrant was obtained on March 22, 2012 to take this item and have it analyzed off site for the content.

On March 21, 2012, I obtained a search warrant for the residence of Jessie Leroy Glass Jr., at ███████████ y ████, based upon the information given to us by Jennifer Glass about the contents of the laptop of Jessie Leroy Glass Jr. The search warrant was executed on this date at 1345 hours. 5 VHS videotapes were taken at this time. There was adult pornography located in the downstairs closet. There were rubber gloves and KY lubricating oil located in the bedroom of Jessie Glass on the dresser. The videos were located in a book bag in his bedroom along with women's lingerie. There was a book bag containing Gatorade employee manuals and a notebook belonging to F███ G███. In this book bag there were girls clothing, size 7, in a clear plastic bag. (shorts, underwear and shirt). Pictures were taken of these items. The bag to the laptop was located in the living room by the couch. The power cord was there but the laptop was missing. Lee told us three different stories concerning the laptop. He told Lt. Harrington that he had gotten rid of the laptop just the day before, he told me at first it had been gone for 2 months, then he advised that the laptop had gotten "fried" by lightning about 3-4 weeks ago. He advised that he had thrown the laptop in the trash receptacle at the recycling center. In Lee's bedroom in the floor was the connection for the internet, but no computer hooked up. He advised that there is still internet access at the home because he was going to purchase a new laptop. An administrative subpoena for records of internet service at the Glass residence at ████████████ has been sent to Century Link.

On March 26, 2012, the receptionist from Attorney Thomas Jackson's office contacted me at 1030 hours and stated that their client had been advised to not take the polygraph. Nothing further pending analysis of the eMachines computer.

On April 12, 2012 I was contacted by Louise Ferguson, DSS. She stated that she had went to visit the home of Jennifer Glass to do a follow up and when she arrived Jennifer advised she had located some disks that had been recorded by Lee Glass while he had lived in the home. She does not have a computer at this time to view these disks. The disks were taken by Louise Ferguson and given to me for analysis. There were two disks, one labeled Lee's and one labeled Young and Still too Young. When I put these CD's into my work computer it was obvious that they contained numerous photos of child pornography. These two disks were given to Sgt. Phillip Townley along with the eMachines desktop computer for analysis on April 13, 2012.

USA_00003611

JA315

<u>Case Number:</u> 20122004                    <u>ORI #:</u> VA0970000

On April 17, 2012, I contacted Jennifer Glass by telephone and she advised she had more disks at the house but they were not labeled so she did not know what was on them. I went to the residence and obtained these items as evidence. When I viewed the disks there were multiple disturbing photos of children in various states of undress and in sexual positions with adults. Also contained on these disks were instant messages that had been saved from the user name of gdrgnmg and gdrgnmg73 (both of these user names and email addresses belong to Jessie Leroy Glass, Jr. when I conducted a investigative check for email addresses on that subject.)

On April 18, 2012 I spoke with Nancy Longest, mother of Lee Glass. R██ G████ originally disclosed the information of sexual abuse to Longest. She advised that it had been just she and R███h at her home in Austinville when R██h said, "Nana I think I might have been molested one time." She stated that when R██ told her this she did not appear to be upset. She said R██ told her that she had not told her mom about this because she was afraid mom would yell, because mom yells a lot. R███ disclosed that one time when dad (Lee Glass) had been getting the girls out of the bath he reached down and licked her. when Longest ask what she meant R███ told her that her father had licked her vaginal area. When Jennifer Glass returned to pick up R██ Nancy made her come into the house and told her mother what her father had done to her. R██ was afraid to tell her mom so Nancy told her for R███ Nancy stated that Jennifer hugged R███ and cried a little bit, but really did not have a reaction to her daughter telling her this. Longest advised Jennifer to take R██h for counseling, and Longest said it was over a week before Jennifer contacted anyone about R██ disclosure.

Nancy Longest also went on to tell me that she is worried about Jennifer taking the 3 children to North Carolina to her mothers house because of Jennifer's brother Billy. Longest and Jennifer have both acknowledged that when Jennifer was younger she was molested by her brother Billy. Longest is afraid Jennifer will leave the three girls unsupervised with him. During the interview with Longest she was very negative about Jennifer's ability to parent. I ask her about Lee and the allegations of him looking at a lot of pornography. She advised me that they were aware of it at one time, but said that Lee had sought help from his pastor about it. I mentioned to Longest about some disturbing photos that were located and she immediately stated that the pictures probably belonged to Jennifer because Jennifer liked to go around the house nude. She said that in the past she had ask Jennifer when they visited her home to put more clothing on. I advised Longest that we were continuing our investigation.

On April 20, 2012, I spoke to Jennifer Glass at the DSS office. I advised Glass that we had sent the computer to be analyzed and there were numerous disturbing pictures on the disks that she had given to me. When ask why she did not report that Lee had been downloading and saving these images before now she advised me that she thought that by telling him that she did not like them he would quit. She thought she could help him with the problem of looking at these images. While speaking to her she told me that Lee had set up an account through yahoo that he used for email and chat that was "kimmie or kim something @yahoo."

When I spoke to Sgt. Townley, Christiansburg PD about the content of the computer, he ask if there was someone involved in our case named Kim. I told him of the yahoo account Jennifer Glass had advised me of at DSS and he said that yahoo name had been used in a lot of the instant messages and chats that he had located on this computer that was sent for analysis. He also advised that the chats were about incest between father/daughter.

I received the results back from the lab on the computer and they were unable to determine if semen was present from the swabs sent. This case will be set for grand jury on July 16, 2012. Glass was charged with two counts of Sodomy.

\*\* INDICTMENT SERVED 7/23/2012 BY JP tHOMPSON

USA_00003612

JA316

# Wythe Co Sheriff's Office
245 S Fourth St
Wytheville VA, 24382
276-223-6000

Case Number: 20122004                    ORI #: VA0970000

Virginia State Police headquarters.

On March 21, 2012, Jennifer Glass came to the sheriff's office to speak about this incident. At this time she brought her desktop eMachines computer that she and Lee had shared while married. She advised that on multiple occasions she had seen Lee view what she believed to be child pornography on his laptop and on the eMachines desktop computer. She stated that there were pictures and videos of juveniles between the ages of 9-12 years (mostly female) of age engaged in sexual acts, some with adults with their faces blurred out. Jennifer said she ask Lee about these and he had told her he accidentally received them in an email and he would delete them. She stated that she removed them because he never did. She also stated that Lee had pictures of their 3 children on the computer with no clothing on, some in the bathtub and some outside of the bathtub in the bathroom. She said that some of the pictures of their children had been as recent as last year. She saw these pictures on his laptop. She believes his laptop is an Acer, gray in color. She advised that during the summer that F█████ said these things happened to her was when her husband had began to watch a lot of pornography and he wanted to experiment sexually with Jennifer. She also told us that F████ had mentioned to her that when her daddy licked her he told her that he wanted to make sure she had got her mess clean. Jennifer Glass advised that is how Jessie Leroy Glass Jr. would initiate oral sex with her. Jennifer Glass also advised me that during this time frame she remembered her husband became obsessed with the thought the girls would go to school and tell someone that he had touched them. She believes that Jessie Leroy Glass Jr. has done these things to their daughter, R█████. At this time she gave us the eMachines desktop tower Model EL1200-05w, Serial # PTG100500384103BD93001, SNID# 84101532130. This item will be sent for analysis at a later date. Also, a search warrant was obtained on March 22, 2012 to take this item and have it analyzed off site for the content.

On March 21, 2012, I obtained a search warrant for the residence of Jessie Leroy Glass Jr., at ███████████ based upon the information given to us by Jennifer Glass about the contents of the laptop of Jessie Leroy Glass Jr. The search warrant was executed on this date at 1345 hours. 5 VHS videotapes were taken at this time. There was adult pornography located in the downstairs closet. There were rubber gloves and KY lubricating oil located in the bedroom of Jessie Glass on the dresser. The videos were located in a book bag in his bedroom along with women's lingerie. There was a book bag containing Gatorade employee manuals and a notebook belonging to F████ G███. In this book bag there were girls clothing, size 7, in a clear plastic bag. (shorts, underwear and shirt). Pictures were taken of these items. The bag to the laptop was located in the living room by the couch. The power cord was there but the laptop was missing. Lee told us three different stories concerning the laptop. He told Lt. Harrington that he had gotten rid of the laptop just the day before, he told me at first it had been gone for 2 months, then he advised that the laptop had gotten "fried" by lightning about 3-4 weeks ago. He advised that he had thrown the laptop in the trash receptacle at the recycling center. In Lee's bedroom in the floor was the connection for the internet, but no computer hooked up. He advised that there is still internet access at the home because he was going to purchase a new laptop. An administrative subpoena for records of internet service at the Glass residence at ███████████ has been sent to Century Link.

On March 26, 2012, the receptionist from Attorney Thomas Jackson's office contacted me at 1030 hours and stated that their client had been advised to not take the polygraph. Nothing further pending analysis of the eMachines computer.

On April 12, 2012 I was contacted by Louise Ferguson, DSS. She stated that she had went to visit the home of Jennifer Glass to do a follow up and when she arrived Jennifer advised she had located some disks that had been recorded by Lee Glass while he had lived in the home. She does not have a computer at this time to view these disks. The disks were taken by Louise Ferguson and given to me for analysis. There were two disks, one labeled Lee's and one labeled Young and Still too Young. When I put these CDs into my work computer it was obvious that they contained numerous photos of child pornography. These two disks were given to Sgt. Phillip Townley along with the eMachines desktop computer for analysis on April 13, 2012.

USA_00003611

JA317

Case Number: 20122004                    ORI #: VA0970000

On April 17, 2012, I contacted Jennifer Glass by telephone and she advised she had more disks at the house but they were not labeled so she did not know what was on them. I went to the residence and obtained these items as evidence. When I viewed the disks there were multiple disturbing photos of children in various states of undress and in sexual positions with adults. Also contained on these disks were instant messages that had been saved from the user name of gdrgnmrg and gdrgnmrg73 (both of these user names and email addresses belong to Jessie Leroy Glass, Jr. when I conducted a investigative check for email addresses on that subject.)

On April 18, 2012 I spoke with Nancy Longest, mother of Lee Glass. R█ G█ originally disclosed the information of sexual abuse to Longest. She advised that it had been just she and █████ at her home in Austinville when R█ said, "Nana I think I might have been molested one time." She stated that when R█ told her this she did not appear to be upset. She said R█ told her that she had not told her mom about this because she was afraid mom would yell, because mom yells a lot. R█ disclosed that one time when dad (Lee Glass) had been getting the girls out of the bath he reached down and licked her. when Longest ask what she meant R█ told her that her father had licked her vaginal area. When Jennifer Glass returned to pick up R█, Nancy made her come into the house and told her mother what her father had done to her. █████ was afraid to tell her mom so Nancy told her for R█. Nancy stated that Jennifer hugged R█ and cried a little bit, but really did not have a reaction to her daughter telling her this. Longest advised Jennifer to take █████ for counseling, and Longest said it was over a week before Jennifer contacted anyone about R█'s disclosure.

Nancy Longest also went on to tell me that she is worried about Jennifer taking the 3 children to North Carolina to her mothers house because of Jennifer's brother Billy. Longest and Jennifer have both acknowledged that when Jennifer was younger she was molested by her brother Billy. Longest is afraid Jennifer will leave the three girls unsupervised with him. During the interview with Longest she was very negative about Jennifer's ability to parent. I ask her about Lee and the allegations of him looking at a lot of pornography. She advised me that they were aware of it at one time, but said that Lee had sought help from his pastor about it. I mentioned to Longest about some disturbing photos that were located and she immediately stated that the pictures probably belonged to Jennifer because Jennifer liked to go around the house nude. She said that in the past she had ask Jennifer when they visited her home to put more clothing on. I advised Longest that we were continuing our investigation.

On April 20, 2012, I spoke to Jennifer Glass at the DSS office. I advised Glass that we had sent the computer to be analyzed and there were numerous disturbing pictures on the disks that she had given to me. When ask why she did not report that Lee had been downloading and saving these images before now she advised me that she thought that by telling him that she did not like them he would quit. She thought she could help him with the problem of looking at these images. While speaking to her she told me that Lee had set up an account through yahoo that he used for email and chat that was "kimmie or kim something @yahoo."

When I spoke to Sgt. Townley, Christiansburg PD about the content of the computer, he ask if there was someone involved in our case named Kim. I told him of the yahoo account Jennifer Glass had advised me of at DSS and he said that yahoo name had been used in a lot of the instant messages and chats that he had located on this computer that was sent for analysis. He also advised that the chats were about incest between father/daughter.

I received the results back from the lab on the computer and they were unable to determine if semen was present from the swabs sent. This case will be set for grand jury on July 16, 2012. Glass is charged with two counts of Sodomy.

** INDICTMENT SERVED 7/23/2012 BY JP tHOMPSON

USA_00003612

JA318

Case 5:21-cr-00060-KDB-DSC    Document 43-1    Filed 11/30/22    Page 1

File No. _____

# STATE OF NORTH CAROLINA

Iredell _____ County

In The General Court Of Justice
District/Superior Court Division

## SEARCH WARRANT

IN THE MATTER OF

Residence located at ████████ Statesville, NC
28677

Name Of Applicant
Detective Sgt Jason Lowrance

Name Of Additional Affiant(s)

To any officer with authority and jurisdiction to conduct the search authorized by this Search Warrant:

I, the undersigned, find that there is probable cause to believe that the property and person described in the application on the reverse side and related to the commission of a crime is located as described in the application.

You are commanded to search the premises, vehicle, person and other place or item described in the application for the property and person in question. If the property and/or person are found, make the seizure and keep the property subject to Court Order and process the person according to law.

You are directed to execute this Search Warrant within forty-eight (48) hours from the time indicated on this Warrant and make due return to the Clerk of the Issuing Court.

This Search Warrant is issued upon information furnished under oath or affirmation by the person(s) shown.

| Date Issued | Time Issued | | Name Of Magistrate (type or print) | Signature |
|---|---|---|---|---|
| 02/10/2020 | 2:20 | ☑AM ☐PM | J Castille | ☑District Ct. Judge |

☐Deputy CSC  ☐Assistant CSC  ☐CSC  ☐Magistrate  ☑Superior Ct. Judge

**NOTE:** When issuing a search warrant, the issuing official must retain a copy of the warrant and warrant application and must promptly file them with the clerk. G.S. 15A-245(b).

This Search Warrant was delivered to me on the date and at the time shown below when the Office of the Clerk of Superior Court is closed for the transaction of business. By signing below, I certify that I will deliver this Search Warrant to the Office of the Clerk of Superior Court as soon as possible on the Clerk's next business day.

| Date | Time | | Name Of Clerk (type or print) | Signature Of Clerk |
|---|---|---|---|---|
| 2/10/2020 | 9:43 | ☑AM ☐PM | Lori A. Goff | _____ | ☑Dep. CSC ☐Asst. CSC ☐CSC |

## RETURN OF SERVICE

I certify that this Search Warrant was received and executed as follows:

| Date Received | Time Received | |
|---|---|---|
| 02/10/2020 | 1508 | ☐AM ☑PM |

| Date Executing | Time Executed | |
|---|---|---|
| 2/11/2020 | 0907 | ☐AM ☑PM |

☑ I made a search of _Residence located_
_at_ ████████ _Statesville._
_NC 28677_

☑ I seized the items listed on the attached inventory.

☐ I did not seize any items.

☐ This Warrant WAS NOT executed within forty-eight (48) hours of the date and time of issuance and I hereby return it not executed.

_____, as commanded.

Name Of Officer Making Return (type or print)
Detective/Sgt Jason Lowrance

Signature Of Officer Making Return
_(signature)_

Department Of Agency Of Officer
Iredell County Sheriff's Office

| Incident Number | Date | Time | |
|---|---|---|---|
| 2020-00024 | 2/12/2020 | 9:43 | ☑AM ☐PM |

This Search Warrant was returned to the undersigned clerk on the date and time shown below.

| Date | Time | | Name Of Clerk (type or print) | Signature Of Clerk |
|---|---|---|---|---|
| | | ☐AM ☐PM | Lori A. Goff | _____ | ☑Dep. CSC ☐Asst. CSC ☐CSC |

AOC-CR-119, Rev. 6/19
© 2019 Administrative Office of the Courts

Original - File    Copy - For Search of a Person, to Person from Whom Items Taken    Copy - For Search of Vehicle/Premises, to Owner or Person in Apparent Control, if No Such Person Present, Leave Copy Affixed Thereon (Over)

DEFENSE EXHIBIT
1

000187

USA-00000582

JA319

# APPLICATION FOR SEARCH WARRANT

I, Detective Sergeant Jason Lowrance with Iredell County Sheriff's Office

*(Insert name and address; or if law enforcement officer, name, rank and agency)*

being duly sworn, request that the Court issue a warrant to search the person, place, vehicle, and other items described in this application and to find and seize the property and person described in this application. There is probable cause to believe that *(Describe property to be seized; or if search warrant is to be used for searching a place to serve an arrest warrant or other process, name person to be arrested)*
See attachments

_____

_____

_____

_____

_____

_____

constitutes evidence of a crime and the identity of a person participating in a crime. *(Name crime)*  NCGS 14-190.17, Second Degree Sexual Exploitation of a Minor; NCGS 14-190.17A, Third Degree Sexual Exploitation of a Minor;

and is located *(Check appropriate box(es) and fill in specified information)*

☒ in the following premises *(Give address and, if useful, describe premises)*
See Attachment

_____

_____

_____

_____

☐ on the following person(s) *(Give name(s) and, if useful, describe person(s))*
(and)

_____

_____

☐ in the following vehicle(s) *(Describe vehicle(s))*
(and)

_____

_____

☒ *(Name and/or describe other places or items to be searched, if applicable)*
(and)
See attachment

_____

The applicant swears or affirms to the following facts to establish probable cause for the issuance of a search warrant:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

☐ In addition to the affidavit included above, this application is supported by additional affidavits, attached, made by _____

☐ In addition to the affidavit included above, this application is supported by sworn testimony, given by _____

☐ This testimony has been *(check appropriate box)*  ☐ reduced to writing
☐ recorded,    and I have filed any such writing/recording with the clerk.

**NOTE:** *If more space is needed for any section, continue the statement on an attached sheet of paper with a notation saying "see attachment." Date the continuation and include on it the signatures of applicant and issuing official.*

SWORN/AFFIRMED AND SUBSCRIBED TO BEFORE ME:

| Name Of Applicant (type or print) | Date |
|---|---|
| Detective Sgt Jason Lowrance | 02/10/2020 |

| Signature | Signature Of Applicant |
|---|---|
| | |

Date  02/10/2020

☐ Magistrate   ☐ Dep. CSC   ☐ Asst. CSC   ☐ Clerk Of Superior Court   ☒ Judge

000188

Continuation page attached to the SEARCH WARRANT application, dated Monday, February 10, 2020

**CONTINUATION OF "PROPERTY / EVIDENCE TO BE SEIZED"**

Computers, tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disks drives, data disks, system disk operating systems, magnetic media floppy disks, secure digital disks, USB drives, solid state drives, digital cameras, cellular phones, hardware and software operating manuals, tape systems, hard drives, any any/all devices or equipment that could be used to store images, photos or video files. Also any evidence of the crime at this time unknown.

**CONTINUATION OF "PREMISES, PERSON, VEHICLE, OR OTHER ITEM (S) TO BE SEARCHED"**

Residence located at ████████ Statesville, NC 28677. The residence appears to be a single wide mobile home, beige in color with white under penning. The residence has a driveway on the right side of the residence which leads to the residence. The residence also appears to have covered shed in front of the residence. See attached photos.

The affiant would also like to search the person Jessy Leroy Glass Jr (North Carolina Driver's License # ████67, DOB: ████.973, White, Male) as well as any persons, vehicles and outbuildings located within the curtilage.

**CONTINUATION OF "PROBABLE CAUSE AFFIDAVIT"**

The affiant, Detective Sergeant Jason Lowrance, has been employed with the Iredell County Sheriff's office for thirteen years and is currently assigned as a Detective Sergeant to the Special Victims Unit. The affiant has logged in excess of 1,616 hours of continuing education and holds an Advanced Certificate from the NC Criminal Justice Training and Standards Division. In addition, the affiant worked at Alexander County Sheriff's office for seven years prior to current employment and has been a member of the FBI Cyber Task force for ten years. The affiant was awarded in 2018 a Professional Certificate in Digital Forensics through Central Piedmont Community College. In addition the affiant is a member of the North Carolina ICAC Task Force. The affiant has conducted investigations of child pornography and sexual crimes against children.

As a Detective of the Iredell County Sheriff's Office, this Affiant is authorized to investigate crimes involving the sexual exploitation of children pursuant to North Carolina General Statute (NCGS) 14.190.16, 14 190.17, and 14 190.17A.

NCGS 14-190.17A, known as Third Degree Sexual Exploitation of a Minor make it unlawful for a person if, knowing the character or content of the material, he possesses material that contains visual representation of a minor engaged in sexual activity.

Minor. - An individual who is less than 18 years old and is not married or judicially emancipated.

Sexual Activity. - Any of the following acts:

Sexual Activity. - Any of the following acts:

a.    Masturbation, whether done alone or with another human or an animal.

b.    Vaginal, anal, or oral intercourse, whether done with another human or with an animal.

SWORN AND SUBSCRIBED TO BEFORE ME:

_____            _____
Judge / Magistrate                                        Applicant(s)

2/10/20                                                          2/10/20
Date                                                              Date

000189

Continuation page attached to the SEARCH WARRANT application, dated Monday, February 10, 2020

c.      Touching, in an act of apparent sexual stimulation or sexual abuse, of the clothed or unclothed genitals, pubic area, or buttocks of another person or the clothed or unclothed breasts of a human female.

d.      An act or condition that depicts torture, physical restraint by being fettered or bound, or flagellation of or by a person clad in undergarments or in revealing or bizarre costume.

e.      Excretory functions; provided, however, that this sub-subdivision shall not apply to G.S. 14-190.17A.

f.      The insertion of any part of a person's body, other than the male sexual organ, or of any object into another person's anus or vagina, except when done as part of a recognized medical procedure.

g.      The lascivious exhibition of the genitals or pubic area of any person.

NCGS 14-190.17. Known as Second degree sexual exploitation of a minor make it unlawful for a person if, knowing the character or content of the material, he:

(1) Records, photographs, films, develops, or duplicates material that contains a visual representation of a minor engaged in sexual activity; or

(2) Distributes, transports, exhibits, receives, sells, purchases, exchanges, or solicits material that contains a visual representation of a minor engaged in sexual activity.


        On January 2, 2020, the affiant received a report that was filed on the Iredell County Sheriff's Office website by April Glass. In the report, April Glass wrote that Jessie L. Glass Jr, who lives at ███████████ Statesville, has child pornography on his cell phone.  In the report, April wrote that she picked up Jessie's cell phone recently and saw the images on his cell phone.  She added that he keeps the images in his Google Photos trash bin, and Jessie's Google Account is ramsd4d@gmail.com and she thinks the password is LeeGlass2019$.  April stated that she left around the end of December and went to an unknown location.

        The affiant looked up information for Jessie L. Glass in LINX and learned that Jessie had been investigated in Virginia for similar reports in 2012 and 2016.

        On January 22, 2020 the affiant spoke with April Glass concerning the report she had filed.  April stated that when she was looking through Jessie's cell phone around the end of December of 2019, she discovered several images and videos of child pornography.  April stated the juveniles appeared to around ten years old or younger and they were engaged in sex acts or they were nude.

        The affiant spoke with Virginia State Police Agent Heather Brown concerning an investigation she had done involving Jessie L. Glass Jr having Child Pornographic images or videos back in 2016.  Agent Brown agreed to help the affiant with the investigation by obtaining a statement from April Glass due to her living in Virginia.

        On January 28, 2020, Agent Heather E. Brown with Virginia State Police interviewed April Glass in person at her mother's address in Virginia.  Agent Brown met April Glass at ███████████ Max Meadows, Virginia.  Agent Brown interviewed April in her vehicle due to the nature of the complaint.  Agent Brown asked April Glass to provide her as much detail as possible about the images she saw.  April Glass stated she last saw the child pornography images on Jessie Glass' phone at the end of December 2019, and provided Agent Brown with the following descriptions of the images:

SWORN AND SUBSCRIBED TO BEFORE ME:

Judge / Magistrate _____          Applicant(s) _____ _____  _____

Date  2/10/20                                              Date  2/10/20

000190

USA-00000585

JA322

Continuation page attached to the SEARCH WARRANT application, dated Monday, February 10, 2020

1.) An image of a child 18 months-old or younger. There was a bag over the child's head and it looked like someone was touching the genital area.

2.) Photos of girls and boys described as 10 years-old or younger and the children were made to take their pants down.

3.) A photo depicting the completely nude vagina of a prepubescent girl.

4.) A video of an adult male making a prepubescent female appearing to be 8 or 9 years old put his penis in her vagina. They were on a bed.

5.) A photo of an infant child and an adult male forcing his penis in the infant's mouth. They were on a bed.

6.) Several photos of prepubescent females naked.

7.) A photo of a family. All family members were naked. The children were described as having "barely hit puberty."

April Glass stated that she saw at least 50 photos on Jessie Glass's phone. April said she was unsure how many because she didn't want to look anymore. April stated she was in his account more than one time and saw that new photos were added.

April said Jessie Glass, Jr. uses Tumblr and coaxes young girls onto Wickr and asks them for photos. April said she found the exchanges on his phone when he went into the store and Jessie left his phone in the car. April said Jessie makes up different emails by using weird letter and number combinations. She said in the aforementioned video, where the adult male was making an 8/9 year-old girl put his penis in her vagina, it appeared to be a video taken on a cell phone and she was concerned that Jessie, Jr. was the adult male in the video.

April said Jessie has a Samsung Galaxy S9 cell phone. There are also two laptops at the residence. The laptops are normally kept out in the open. She thinks both are silver/gray. There is one kept behind the couch on the table and that is used by Jessie Glass, Sr., but Jessie may use it as well. The other computer is used only by Jessie, Jr. as far as she knows. April Glass said she asked Jessie Glass, Jr. about the child pornography that was on his phone. She said Jessie told her that the photos downloaded to his phone for no reason. April said she knew that wasn't how it happened.

## PERSONS INVOLVED IN THE TRADING OF CHILD PORNOGRAPY

1. Based upon my training and experience in child sexual exploitation and child pornography investigations, and having worked with other experienced law enforcement officers in child exploitation investigations, I know the following:

SWORN AND SUBSCRIBED TO BEFORE ME:

_____
Judge / Magistrate

_____
Date   2/10/20

_____
Applicant(s)

_____
Date   2/10/20

000191

USA-00000586

JA323

Continuation page attached to the SEARCH WARRANT application, dated Monday, February 10, 2020

a.       Persons who are involved with child pornography generally also have other sexually explicit materials related to their interest in children, which may consist of photographs, motion pictures, videos, text material, computer graphics and digital or other images of children.  Such persons may also have images of children or text writing that do not rise to the level of child pornography but nonetheless fuel their deviant sexual fantasies involving minors. Such persons have been known to take and maintain photographs and video recordings of fully clothed children, not just in sexually provocative poses, but in public places and elsewhere.  I am aware that this sort of material can be used to prove such things as the possessor's knowledge, intent, motive and identity, as well as to prove the person has a sexual interest in minors.

b.       Individuals who maintain images of children as described above and child pornography often maintain these images on cameras, film, video cameras, videos, photographic equipment, computers, and other electronic mobile devices, such as cellular phones, portable media players, personal digital assistants, and tablet computers, which include iPads.  Such individuals have been known to connect their cameras, video cameras, and other photographic equipment to their computers and other electronic mobile devices in an effort to create added storage space for their images of children.

c.       Individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica.  They do this to gain status, trust, acceptance and support and to increase their collection of illicit images and child erotica.  The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, P2P, chat, and file sharing programs, e-mail, e-mail groups, bulletin boards, Internet Relay Chat ("IRC"), newsgroups, Internet clubs, and various forms of Instant Messaging such as Yahoo Messaging, and "chat" that is sometimes saved on the users' computer or electronic mobile device or other digital storage media.

d.       Besides photos of minors and child erotica, such individuals often produce and/or collect other written material on the subject of sexual activities with minors, which range from fantasy stories to medical, sociological, and psychological writings, which they save to understand and justify their illicit behavior and desires.

e.       Individuals who collect child pornography often collect, read, copy or maintain names, addresses, including e-mail addresses, phone numbers, and lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests, or have child pornography and child erotica for sale or trade.  These contacts are maintained for personal referral, exchange or, sometimes, commercial profit. They may maintain these names on computer and electronic mobile storage devices, web sites or other Internet addresses, and their discovery can serve as leads to assist law enforcement in proving the instant case and in apprehending others involved in the underground trafficking of child pornography.

f.       Individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials.  The known desire of such individuals to retain child pornography together with the sense of security afforded by using computers and electronic mobile devices, provides probable cause to believe that computer images, especially child pornography and erotic nudity involving minors, will be retained by the collector indefinitely. These individuals may protect their illicit materials by passwords, encryption, and other security measures.

SWORN AND SUBSCRIBED TO BEFORE ME:

_____
Judge / Magistrate

2/10/20
_____
Date

Applicant(s)  _____

2/10/20
_____
Date

000192

USA-00000587

JA324

These individuals may also protect their illicit materials by saving it on movable media such as memory cards, memory sticks, CD's, DVD's, flash memory, thumb drives, SIM cards, and removable hard drives, which can be very small in size, including as small as a postage stamp, and easily secreted, or sent to third party image storage sites via the Internet.

### COMPUTERS, ELECTONIC MOBILE DEVICES, CHILD PORNOGRAPHY, AND LAW ENFORCEMENT TOOLS

2.     Computers and Electronic Mobile Devices essentially serve four functions in connection with child pornography:  (1) production; (2) communication; (3) distribution; and (4) storage.

i.     Child pornographers can now easily transfer existing hard copy photographs into a computer-readable format with a scanner.  With the advent of digital cameras, images can be transferred directly from the digital camera onto a computer.  Moreover, a device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.  Through the Internet, electronic contact can be made to literally millions of computers around the world.

ii.     The internet affords collectors of child pornography several different venues for obtaining viewing and distributing child pornography in a relatively secure and anonymous fashion.  Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by internet portals such as Google, Yahoo!, and Hotmail, among others.  The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in a variety of formats.  A user can set up an online storage account from any computer with access to the internet.  Evidence of such online storage of child pornography is often found in the user's computer.

iii.     A computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years.  These drives can store hundreds of thousands of images at very high resolution.

With the advent of smart phones and advanced technology, cellular telephones and other electronic mobile devices function as "computers" in the sense that they can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  In fact, some cellular telephones are equipped with memory or SIM cards, which are compact removable storage devices commonly used to store images and other electronic data that can be inserted into a telephone's camera as well as other small digital devices such as tablet devices or hand held computers.  Much like "thumb drives," some memory cards have the ability to store large amounts of electronic data, including thousands of images or videos, and on occasion entire operating systems or other software programs.  Moreover, cellular telephones offer a broad range of capabilities.  In addition to enabling voice communications and containing a "call log" that records phone call details, cellular telephones offer the following capabilities:  storing names and phone numbers in electronic "address books;" sending receiving, and storing text messages and e-mails; taking, sending, receiving, and storing still photographs and moving videos; storing and laying back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.

SWORN AND SUBSCRIBED TO BEFORE ME:

Judge / Magistrate

Date  2/10/20

Applicant(s)

Date  2/10/20

000193

Tablets, another electronic mobile device, also function as mobile "computers." Tablets are typically larger than a phone yet smaller than a notebook and are primarily operated by touching a screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, "wi-fi" networks, or other similar networks. Tablets typically contain programs called "apps," which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving email, and participating in Internet social networks.

Communications made by way of computer or electronic mobile devices can be saved or stored on the items used for these purposes. Storing this information can be intentional, for example, by saving an e-mail as a file on the computer or electronic mobile device, or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally. For example, traces of the path of an electronic communication may be automatically stored in many places like temporary files or Internet Service Provider client software. In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner can often recover evidence which shows that a computer or electronic mobile device contains P2P software, when the computer was sharing files, and even some of the files which were uploaded or downloaded. Such information may be maintained indefinitely until overwritten by other data.

Computer and electronic mobile device users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer and electronic mobile device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer and electronic mobile device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."

By using steganography, a computer or electronic mobile device user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive or other electronic storage media, deleted or viewed via the Internet. Electronic files saved to a hard drive or electronic storage media can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer or electronic mobile device, the data contained in the file does not actually disappear; rather, that data remains on the hard drive or electronic storage media until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space (i.e., space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten).

SWORN AND SUBSCRIBED TO BEFORE ME:

Judge / Magistrate _____

Date    2/10/20

000194

Applicant(s) _____

Date   2/10/20

USA-00000589

JA326

In addition, a computer's (or electronic mobile device's) operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive or electronic storage media depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer or electronic mobile device habits. A substantial amount of time is necessary to extract and sort through data in this free or unallocated space.

Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), computers and electronic mobile devices can contain other forms of electronic evidence as well. In particular, records of how a computer or electronic mobile device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the computer and electronic mobile devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that can be neatly segregated from the hard drive image as a whole. Digital data on the hard drive or electronic storage media not currently associated with any file can provide evidence of a file that was once on the hard drive or electronic storage media but has since been deleted, edited, or deleted in part such as a word processing file with a deleted paragraph. Virtual memory paging systems can leave digital data on the hard drive or electronic storage media that show what tasks and processes on the computer or electronic storage media were recently used. Web browsers, e-mail programs, and chat programs store configuration data on the hard drive or electronic storage media that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer or electronic mobile device was in use. Computer file systems (or those on electronic mobile devices) can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.

### SPECIFICS OF SEARCH AND SEIZURE OF
### COMPUTER SYSTEMS AND OTHER ELECTRONIC DEVICES

Searches and seizures of evidence from computers and electronic mobile devices commonly require agents to download or copy information from the computers or electronic mobile devices and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others), as well as electronic mobile devices can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order and with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant.

SWORN AND SUBSCRIBED TO BEFORE ME:

Judge / Magistrate _____

Date 2/10/20

Applicant(s) _____

Date 2/10/20

000195

USA-00000590

JA327

This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this data search on site; and

Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis. The same applies for electronic mobile devices and electronic storage media.

In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit (CPU). In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. In addition, for both computers and electronic mobile devices, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media) as well as documentation, items containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate items, software or information seized or to activate specific equipment or software.

Your Affiant knows, from training and experience, that digital evidence is not limited to computers. Your Affiant has been involved in cases where persons with an interest in child exploitation materials can access the Internet, display and share images of child pornography and communicate with other individuals with the same interest using electronic mobile devices like cellular telephones, personal digital assistants (PDAs), and touch screen tablets, such as iPads. These devices are frequently found to contain chat communications in the form of short message service (SMS) messages as well as enabling Internet and digital cellular network access. Your Affiant also knows that there are P2P client applications for use on cellular telephones.

Your Affiant knows from training and experience that files related to the exploitation of children found on computers and other electronic storage media and mobile devices are usually obtained from the Internet or the wireless data networks using application software which often leaves files, logs or file remnants which would tend to show the method of location or creation of the images, search terms used, exchange, transfer, distribution, possession or origin of the files.

Your Affiant knows from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

Your Affiant knows from training and experience that computers and other electronic mobile devices used to access the Internet usually contain files, logs or file remnants which would tend to show ownership and use of the device as well as ownership and use of Internet service accounts used for the Internet or cellular data network access.

SWORN AND SUBSCRIBED TO BEFORE ME:

Judge / Magistrate _____    Applicant(s) _____

Date 2/10/20    Date 2/10/20

000196

USA-00000591

JA328

Continuation page attached to the SEARCH WARRANT application, dated Monday, February 10, 2020

Cellphones currently hold data similar to a computer storage device. Cellphones allow for an individual to collect items and more easily hide their collection from others. Based upon my training and experience and consultations with other law enforcement officers who have been involved in the search of cellphones, computers, storage devices and retrieval of data from computer systems, I know that searching and seizing information from cellphones, computers and storage devices often requires law enforcement officers to seize all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. That process is lengthy and time consuming and takes days or even weeks.

This is true because cellphones and computer storage devices (like hard disks, diskettes, tapes, laser disks, CD-ROMS) can store the equivalent of hundreds of thousands of pages of information. Searching authorities will be required to examine all the stored data to determine which particular files are evidence or instrumentalities of a crime. This sorting process can take weeks to months, depending on the volume of data stored, and it would be impractical to attempt this kind of full data search on site.

In North Carolina, Search Warrants are required to be served within a timely period. Searching cellphones and computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment and that search has to take place over a longer period of time after the initial search and seizure of the computer itself. The vast array of cellphone and computer hardware and software available requires even cellphone and computer experts to specialize in some systems and applications, so it is often times difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search protocols are precise scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files.

Since cellphone and computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources and from destructive code embedded in the system as a "booby trap"), a controlled environment is essential for complete and accurate analysis.

Therefore, removal from the premises of some or all cellphone or computer equipment and related storage media will be required for proper analysis and specific permission by this search and seizure warrant to remove the cell phone and computer equipment and search at a later date is sought.

Based upon the above information, the Affiant believes that Probable Cause exists to search the residence and any computer, cell phone or digital storage devices found within the residence located at 749 Shiloh Rd Statesville, NC 28677, for evidence of violations of sexual exploitation of children pursuant to North Carolina General Statute (NCGS) 14-190.16, 14-190.17, and 14-190.17A.

SWORN AND SUBSCRIBED TO BEFORE ME:

Judge / Magistrate

Date
000197

Applicant(s)

Date

USA-00000592

JA329

Continuation page attached to the SEARCH WARRANT application, dated Monday, February 10, 2020

**Images of the residence located at ███████ Statesville, NC 28677 in Iredell County.**





SWORN AND SUBSCRIBED TO BEFORE ME:

_____
Judge / Magistrate

_____
Date    2/10/20

12
_____
Applicant(s)

_____
Date    2/10/20

000198

USA-00000593

JA330

Continuation page attached to the SEARCH WARRANT application, dated Monday, February 10, 2020





SWORN AND SUBSCRIBED TO BEFORE ME:

Judge / Magistrate _____

Date 2/10/20

Applicant(s) _____

Date 2/10/20

000199

USA-00000594

JA331

Continuation page attached to the SEARCH WARRANT application, dated Monday, February 10, 2020



SWORN AND SUBSCRIBED TO BEFORE ME:

_____
Judge / Magistrate

2/10/20
_____
Date

_____
Applicant(s)

2/10/20
_____
Date

000200

Case 5:21-cr-00060-KDB-DSC   Document 43-1   Filed 11/30/22   Page 14 of 16

USA-00000595

JA332

**STATE OF NORTH CAROLINA**
**IREDELL COUNTY**

File No. _____

In The General Court Of Justice
☐ District ☐ Superior Court Division

IN THE MATTER OF

Name | Residence located at ████████
Statesville, NC 28677

**INVENTORY OF SEIZED
PROPERTY**

Date of Search
02/11/2020

G.S. 15A-254,-

I, the undersigned officer, executed a search of:
Residence located at ████████ Statesville, NC 28677

This search was made pursuant to:

☒ a search warrant issued by Superior Court Judge Joe Crosswhite

☐ a consent to search given by:

☐ other legal justification for the search:

The following items were seized:

1 SAMSUNG CELL PHONE
2 HP LAPTOP MODEL 15-BW032WM
3 TOSHIBA LAPTOP MODEL C6550-55338
4 LG CELL PHONE
5 LG TRACKPHONE
6 TCL CELL PHONE

000201

USA-00000596

JA333

Seized Items Continued:

☒ I am leaving a copy of this inventory with the person named below, who is:
  ☒ the owner of the placed searched.
  ☐ the owner of the vehicle searched.
  ☐ the person in apparent control of the placed searched.
  ☐ the person in apparent control of the vehicle searched.
  ☐ the person from whom the items were taken.

☐ As no person was present, I am leaving a copy of this inventory:
  ☐ in the place searched, identified previously.
  ☐ in the vehicle searched, identified previously.

Name and Address Of Person To Whom A Copy Of This Inventory was Delivered:

JESSIE L GLASS

749 Shiloh Rd Statesville, NC 28677

The law enforcement agency identified below will hold the seized property subject to court order.

| SWORN AND SUBSCRIBED TO BEFORE ME | Signature Of Law Enforcement Officer |
|---|---|
| Date 2/12/20 | Title Of Law Enforcement Officer Detective Sgt |
| Signature _Lori a. Neff_ | Name And Address Of Agency Iredell County Sheriff's Office 231 Constitution Ln Statesville NC 28677 |
| ☑ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court ☐ Magistrate | |

ACKNOWLEDGMENT OF RECEIPT

I, the undersigned, received a copy of this inventory

| Date | Signature Of Person Receiving Inventory |
|---|---|
| | |

000202

USA-00000597

JA334

## Virginia State Police Investigative Report – File No. 16-27159

### 1   INVESTIGATIVE FILE

**Title:** CHILD PORNOGRAPHY-CARROLL COUNTY-JESSIE GLASS
**Status:** Closed - Service
**Investigation Start Date/Time:** 11/28/2016 03:11:11
**Lead Agency:**   Virginia State Police
**Lead Unit:** BCI Division 4 GIS General Assignment
**File Manager:** Brown, Heather E SAGT
**Primary Incident Location:** ███████████████, Wytheville, Virginia 24382
**Jurisdiction:** Wythe

I REQUEST THIS CASE BE CLOSED.  THE EVIDENCE HAS BEEN DESTROYED WITH APPROVAL FROM CARROLL CO CA NATHAN LYONS.  I WAS UNABLE TO GET ANYONE IN NORTH CAROLINA TO TAKE THE CASE.  THERE WERE NO VIOLATIONS THAT OCCURRED IN VIRGINIA.

### 2   EVENTS

**Start Date/Time:** 11/27/2016  **End Date/Time:** 11/27/2016
**Statute:** 18.2-374.1:1(C)(i)
**Description:** CHILD PORN:REPRODUCE/TRANSMIT/SELL,ETC.,
**Status:** Pending
**Subject:** GLASS, JESSIE LEROY JR
**Property:** (Seized) Audio/Video/Digital Recording: SAMSUNG CELL PHONE GALAXY , $100.00; (Seized) Audio/Video/Digital Recording: SAMSUNG CELL PHONE GALAXY ..., $100.00

### 3   PERSONS

**Person Role:** Subject
**Title/Name:** GLASS, JESSIE LEROY JR  **Race:** White **Sex:** Male
**DOB:** ████973 **Age:** 46 Years
**Ethnicity:** Non - Hispanic **Resident Status:** Resident
**SSN:** ███2932 **Driver's License Number:** ████6706 **Issuer:** Virginia (U.S. State)
**Expire:**  **FBI Number:**  **VA SID:**
**Residential Address:** ███████████████, HILLSVILLE, Virginia 24343
**Height:** 5' 9" **Weight:** 225 lbs. **Build:** Size Small
**Hair Color:** Brown **Hair Length:**  **Hair Style:**
**Eye Color:** Brown **Skin Tone:**  **Facial Hair:**

CONFIDENTIAL

This document contains neither recommendations nor conclusions of the Virginia State Police. It is the property of the Virginia State Police and is loaned to your agency; and its contents are not to be distributed outside your agency.

030158

01/27/2020 02:23 PM

Case 5:21-cr-00060-KDB-DSC    Filed 11/30/22   Page 1 of 3

DEFENSE EXHIBIT
3

JA335

USA-00000553

**Virginia State Police Investigative Report – File No. 16-27159**

**Associations to Other Persons:** GLASS, APRIL DAWN, Spouse of

**Person Role:** Witness
**Title/Name:** COX, SANDRA KAY **Race:** White **Sex:** Female
**DOB:** ████ 1961 **Age:** 58 Years
**Ethnicity: Resident Status:**
**SSN:** ███ 7292 **Driver's License Number: Issuer: Expire: FBI Number: VA SID:**
**Residential Address:** ████████
**Personal Telephone:** ████ -8797
**Work Telephone:** ████ 8770
**Height: Weight: Build:**
**Hair Color: Hair Length: Hair Style:**
**Eye Color: Skin Tone: Facial Hair:**
**Associations to Property:** Audio/Video/Digital Recording: SAMSUNG CELL PHONE GALAXY , Owner of

**Person Role:** Witness
**Title/Name:** GLASS, APRIL DAWN **Race:** Black **Sex:** Female
**DOB:** ████ 982 **Age:** 37 Years
**Ethnicity: Resident Status:**
**SSN: Driver's License Number: Issuer: Expire: FBI Number: VA SID:**
**Residential Address:** ████████ Virginia 24343
**Personal Telephone:** ████ -0542
**Height: Weight: Build:**
**Hair Color: Hair Length: Hair Style:**
**Eye Color: Skin Tone: Facial Hair:**
**Associations to Other Persons:** GLASS, JESSIE LEROY JR, Spouse of
**Associations to Property:** Audio/Video/Digital Recording: SAMSUNG CELL PHONE GALAXY ..., Owner of

4   **ORGANIZATIONS**

5   **PROPERTY**
**Property Role:** Seized  **Type:** Audio/Video/Digital Recording
**Owner:** GLASS, APRIL DAWN
**Date Seized:** 11/29/2016 **Seized in Jurisdiction:** Wythe

CONFIDENTIAL

This document contains neither recommendations nor conclusions of the Virginia State Police. It is the property of the Virginia State Police and is loaned to your agency; and its contents are not to be distributed outside your agency.

D. 030159

01/27/2020 02:23 PM

USA-00000554

JA336

# Virginia State Police Investigative Report – File No. 16-27159

**Property Role:** Seized  **Type:** Audio/Video/Digital Recording
**Owner:** COX, SANDRA KAY
**Date Seized:** 11/27/2016  **Seized in Jurisdiction:** Wythe


**6    TELEPHONE NUMBERS**


**7    INTERNET ADDRESSES**


**8    OTHER LAW ENFORCEMENT AGENCIES**


**9    PROFESSIONAL CONTACTS**


**10   EVIDENCE MANAGEMENT**
Evidence is stored in Evidence Management System.

**11   AVAILABLE ATTACHMENTS**
SP 165 EVIDENCE LOG.pdf  SP 165 EVIDENCE LOG.pdf


**12   SPECIALTY**

CONFIDENTIAL

This document contains neither recommendations nor conclusions of the Virginia State Police. It is the property of
the Virginia State Police and is loaned to your agency; it and its contents are not to be distributed outside your
agency.

000160

01/27/2020 02:23 PM

USA-00000555

JA337

File No. _____

# STATE OF NORTH CAROLINA

Iredell County

In The General Court Of Justice
District/Superior Court Division

## SEARCH WARRANT

### IN THE MATTER OF

Black in color Samsung S9 cell phone Model:
SM-G960U1 From Jessie L. Glass Jr.

To any officer with authority and jurisdiction to conduct the search authorized by this Search Warrant:

I, the undersigned, find that there is probable cause to believe that the property and person described in the application on the reverse side and related to the commission of a crime is located as described in the application.

You are commanded to search the premises, vehicle, person and other place or item described in the application for the property and person in question. If the property and/or person are found, make the seizure and keep the property subject to Court Order and process the person according to law.

You are directed to execute this Search Warrant within forty-eight (48) hours from the time indicated on this Warrant and make due return to the Clerk of the Issuing Court.

This Search Warrant is issued upon information furnished under oath or affirmation by the person(s) shown.

| Name Of Applicant | | |
|---|---|---|
| Detective Sgt. Jason Lowrance | | |

| Name Of Additional Affiant(s) | | |

| Date Issued | Time Issued | Name (type or print) |
|---|---|---|
| 02/11/2020 | 12:05 ☐ AM ☒ PM | Cross.Jr. |

☐ Deputy CSC  ☐ Assistant CSC  ☐ CSC  ☐ Magistrate  ☐ District Ct. Judge  ☒ Superior Ct. Judge

Signature _____

NOTE: When issuing a search warrant, the issuing official must retain a copy of the warrant and warrant application and must promptly file them with the clerk. G.S. 15A-245(b).

## RETURN OF SERVICE

I certify that this Search Warrant was received and executed as follows:

| Date Received | Time Received |
|---|---|
| 02/11/2020 | 12:37 ☐ AM ☒ PM |

| Date Executed | Time Executed |
|---|---|
| 2/11/2020 | 12:41 ☐ AM ☒ PM |

☒ I made a search of Black in color Samsung S9 Cell Phone Model SN-G960U1 From Jessie L. Glass Jr.

_____ as commanded.

☒ I seized the items listed on the attached inventory.

☐ I did not seize any items.

☐ This Warrant WAS NOT executed within forty-eight (48) hours of the date and time of issuance and I hereby return it not executed.

| Name Of Officer Making Return (type or print) |
|---|
| Detective Sgt. Jason Lowrance |

| Signature Of Officer Making Return |
|---|

| Department Of Agency Of Officer |
|---|
| Iredell County Sheriff's Office |

| Incident Number |
|---|
| 2020-00024 |

This Search Warrant was returned to the undersigned clerk on the date and time shown below.

| Date | Time | Name Of Clerk (type or print) | Signature Of Clerk |
|---|---|---|---|
| 2/12/20 | 9:44 ☐ AM ☒ PM | Lori A. Goff | Lori A. Goff |

This Search Warrant was delivered to me on the date and at the time shown below when the Office of the Clerk of Superior Court is closed for the transaction of business. By signing below, I certify that I will deliver this Search Warrant to the Office of the Clerk of Superior Court as soon as possible on the Clerk's next business day.

| Date | Time | Name Of Magistrate (type or print) | Signature Of Magistrate |
|---|---|---|---|
| | ☐ AM ☐ PM | | |

AOC-CR-119, Rev. 6/19
© 2019 Administrative Office of the Courts

Original - File   Copy - For Search of a Person, to Person From Whom Items Taken
Copy - For Search of Vehicle/Premises, to Owner or Person in Apparent Control; If No Such Person Present, Leave Copy Affixed Thereon
(Over)

☐ DA/CSC  ☐ CSC
☐ Asst/CSC
☐

0002

DEFENSE EXHIBIT 2

USA-00000603

JA338

# APPLICATION FOR SEARCH WARRANT

I, Detective Sergeant Jason Lowrance with Iredell County Sheriff's Office

*(Insert name and address, or if law enforcement officer, name, rank and agency)*

☒ *(and)* *(Name and/or describe other places or items to be searched, if applicable)*
See attachment

being duly sworn, request that the Court issue a warrant to search the person,
place, vehicle, and other items described in this application and to find and
seize the property and person described in this application. There is probable
cause to believe that: *(Describe property to be seized, or if search warrant is to be used for
searching a place to serve an arrest warrant or other process, name person to be arrested)*
See attachments

The applicant swears or affirms to the following facts to establish probable cause for
the issuance of a search warrant:

constitutes evidence of a crime and the identity of a person participating in a
crime. *(Name crime)* NCGS 14-190.17; Third Degree Sexual Exploitation of a
Minor; NCGS 14-190.17A, Second Degree Sexual Exploitation of a
Minor.

and is located *(Check appropriate box(es) and fill in specified information)*

☒ in the following premises *(Give address and, if useful, describe premises)*
See Attachment

SWORN/AFFIRMED AND SUBSCRIBED TO BEFORE ME:

| Date | Name of Applicant (type or print) | Date |
| --- | --- | --- |
| 02/11/2020 | Detective Sgt. Jason Lowrance | 02/11/2020 |

Signature _____

☐ Magistrate ☐ Dep. CSC ☐ Asst. CSC ☐ Clerk Of Superior Court ☒ Judge

Signature Of Applicant

☐ In addition to the affidavit included above, this application is supported by
additional affidavits, attached, made by _____

☐ *(and)* on the following person(s) *(Give name(s) and, if useful, describe person(s))*

☐ In addition to the affidavit included above, this application is supported by sworn
testimony, given by _____

☐ *(and)* in the following vehicle(s) *(Describe vehicle(s))*

This testimony has been *(check appropriate box)* ☐ reduced to writing
☐ recorded,   and I have filed any such writing/recording with the clerk.

NOTE: If more space is needed for any section, continue the statement on an attached sheet of paper
with a notation saying "see attachment." Date the continuation and include on it the signature
of applicant and issuing official.

AOC-CR-119, Side Two, Rev. 6/19
© 2019 Administrative Office of the Courts

000209

USA-00000604

JA339

Continuation page attached to the SEARCH WARRANT application, dated Tuesday, February 11, 2020

**CONTINUATION OF "PROPERTY / EVIDENCE TO BE SEIZED"**

Cellular telephone's internal, removable, or other memory held within; to include but not limited to all data, subscriber information, email addresses, text messages made or received, outbound and inbound call detail, all call information, contacts, photographs, digital images, voice mails, videos, applications, social media content and messages, and all stored communications or files on the device as well as information stored from the cellular telephone in a secondary location, such as the Cloud; Any and all records and evidence that may relate to the crime of N.C.G.S. 14-190.17 or 14-190.17A.

Additionally, that item(s) seized may be submitted for analysis, examination, and comparison at a location to include but not limited to the Iredell County Sheriff's Office, N.C. S.B.I., F.B.I., Homeland Security and/or other designee.

**CONTINUATION OF "PREMISES, PERSON, VEHICLE, OR OTHER ITEM (S) TO BE SEARCHED"**

Black in color Samsung S9 cell phone Model: SM-G960U1 From Jessie L. Glass Jr

The above listed cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. In addition, cellular telephones offer a broad range of capabilities to include, but not limited to, the sending and receiving of text messages, the taking and storing of photographs and video, the accessing and downloading of information from the Internet, and the collection and storage of global positioning system (GPS) information.

**CONTINUATION OF "PROBABLE CAUSE AFFIDAVIT"**

The affiant, Detective Sergeant Jason Lowrance, has been employed with the Iredell County Sheriff's office for thirteen years and is currently assigned as a Detective Sergeant to the Special Victims Unit. The affiant has logged in excess of 1,616 hours of continuing education and holds an Advanced Certificate from the NC Criminal Justice Training and Standards Division. In addition, the affiant worked at Alexander County Sheriff's office for seven years prior to current employment and has been a member of the FBI Cyber Task force for ten years. The affiant was awarded in 2018 a Professional Certificate in Digital Forensics through Central Piedmont Community College. In addition the affiant is a member of the North Carolina ICAC Task Force. The affiant has conducted investigations of child pornography and sexual crimes against children.

As a Detective of the Iredell County Sheriff's Office, this Affiant is authorized to investigate crimes involving the sexual exploitation of children pursuant to North Carolina General Statute (NCGS) 14.190.16, 14 190.17, and 14 190.17A.

NCGS 14-190.17A, known as Third Degree Sexual Exploitation of a Minor make it unlawful for a person if, knowing the character or content of the material, he possesses material that contains visual representation of a minor engaged in sexual activity.

Minor. - An individual who is less than 18 years old and is not married or judicially emancipated.

Sexual Activity. - Any of the following acts:

SWORN AND SUBSCRIBED TO BEFORE ME:

Judge / Magistrate

Date 2/11/20

Applicant(s)

Date 2/11/20

000210

USA-00000605

JA340

Continuation page attached to the SEARCH WARRANT application, dated Tuesday, February 11, 2020

Sexual Activity. - Any of the following acts:

a.     Masturbation, whether done alone or with another human or an animal.

b.     Vaginal, anal, or oral intercourse, whether done with another human or with an animal.

c.     Touching, in an act of apparent sexual stimulation or sexual abuse, of the clothed or unclothed genitals, pubic area, or buttocks of another person or the clothed or unclothed breasts of a human female.

d.     An act or condition that depicts torture, physical restraint by being fettered or bound, or flagellation of or by a person clad in undergarments or in revealing or bizarre costume.

e.     Excretory functions; provided, however, that this sub-subdivision shall not apply to G.S. 14-190.17A.

f.     The insertion of any part of a person's body, other than the male sexual organ, or of any object into another person's anus or vagina, except when done as part of a recognized medical procedure.

g.     The lascivious exhibition of the genitals or pubic area of any person.

NCGS 14-190.17. Known as Second degree sexual exploitation of a minor make it unlawful for a person if, knowing the character or content of the material, he:

(1) Records, photographs, films, develops, or duplicates material that contains a visual representation of a minor engaged in sexual activity; or

(2) Distributes, transports, exhibits, receives, sells, purchases, exchanges, or solicits material that contains a visual representation of a minor engaged in sexual activity.

On January 2, 2020, the affiant received a report that was filed on the Iredell County Sheriff's Office website by April Glass. In the report, April Glass wrote that Jessie L. Glass Jr, who lives at ███████ Statesville, has child pornography on his cell phone. In the report, April wrote that she picked up Jessie's cell phone recently and saw the images on his cell phone. She added that he keeps the images in his Google Photos trash bin, and Jessie's Google Account is ramsd4d@gmail.com and she thinks the password is LeeGlass2019$. April stated that she left around the end of December and went to an unknown location.

The affiant looked up information for Jessie L. Glass in LINX and learned that Jessie had been investigated in Virginia for similar reports in 2012 and 2016.

On January 22, 2020 the affiant spoke with April Glass concerning the report she had filed. April stated that when she was looking through Jessie's cell phone around the end of December of 2019, she discovered several images and videos of child pornography. April stated the juveniles appeared to around ten years old or younger and they were engaged in sex acts or they were nude.

The affiant spoke with Virginia State Police Agent Heather Brown concerning an investigation she had done involving Jessie L. Glass Jr having Child Pornographic images or videos back in 2016. Agent Brown agreed to help the affiant with the investigation by obtaining a statement from April Glass due to her living in Virginia.

SWORN AND SUBSCRIBED TO BEFORE ME:

_____          _____
Judge / Magistrate                                      Applicant(s)

Date  2/11/20                                          Date  2/11/20

000211

USA-00000606

JA341

Continuation page attached to the SEARCH WARRANT application, dated Tuesday, February 11, 2020

On January 28, 2020, Agent Heather E. Brown with Virginia State Police interviewed April Glass in person at her mother's address in Virginia. Agent Brown met April Glass at ████████ in Max Meadows, Virginia. Agent Brown interviewed April in her vehicle due to the nature of the complaint. Agent Brown asked April Glass to provide her as much detail as possible about the images she saw. April Glass stated she last saw the child pornography images on Jessie Glass' phone at the end of December 2019, and provided Agent Brown with the following descriptions of the images:

1.) An image of a child 18 months-old or younger. There was a bag over the child's head and it looked like someone was touching the genital area.

2.) Photos of girls and boys described as 10 years-old or younger and the children were made to take their pants down.

3.) A photo depicting the completely nude vagina of a prepubescent girl.

4.) A video of an adult male making a prepubescent female appearing to be 8 or 9 years old put his penis in her vagina. They were on a bed.

5.) A photo of an infant child and an adult male forcing his penis in the infant's mouth. They were on a bed.

6.) Several photos of prepubescent females naked.

7.) A photo of a family. All family members were naked. The children were described as having "barely hit puberty."

April Glass stated that she saw at least 50 photos on Jessie Glass's phone. April said she was unsure how many because she didn't want to look anymore. April stated she was in his account more than one time and saw that new photos were added.

April said Jessie Glass, Jr. uses Tumblr and coaxes young girls onto Wickr and asks them for photos. April said she found the exchanges on his phone when he went into the store and Jessie left his phone in the car. April said Jessie makes up different emails by using weird letter and number combinations. She said in the aforementioned video, where the adult male was making an 8/9 year-old girl put his penis in her vagina, it appeared to be a video taken on a cell phone and she was concerned that Jessie, Jr. was the adult male in the video.

April said Jessie has a Samsung Galaxy S9 cell phone. There are also two laptops at the residence. The laptops are normally kept out in the open. She thinks both are silver/gray. There is one kept behind the couch on the table and that is used by Jessie Glass, Sr., but Jessie may use it as well. The other computer is used only by Jessie, Jr. as far as she knows. April Glass said she asked Jessie Glass, Jr. about the child pornography that was on his phone. She said Jessie told her that the photos downloaded to his phone for no reason. April said she knew that wasn't how it happened.

SWORN AND SUBSCRIBED TO BEFORE ME:

_____
Judge / Magistrate

_____
Date    2/11/20

_____
Applicant(s)

_____
Date    2/11/20

000212

USA-00000607

JA342

Continuation page attached to the SEARCH WARRANT application, dated Tuesday, February 11, 2020

On February 10, 2020, the affiant typed up a search warrant for the residence located at ████████ Statesville NC 28677. The affiant went before Resident Superior Court Judge Joe Crosswhite where the search warrant was approved and signed at 14:20 hrs.

On February 11, 2020, the affiant along with other detectives with the Iredell County Sheriff's Office and Homeland Security executed the search warrant at the target residence located at ██████ atesville NC 28677. During the search of the residence, Jessie L. Glass Jr was found not at the property. It was learned that Jessie Glass Jr was at work at time per his father Jessie L. Glass at the residence. During he search of the residence, there were several cell phones and laptop computers found inside the residence that were seized.

Detective A. Aponik and Homeland Security Officer Jon Pavlovic went to Jessie Glass Jr's work place here in Statesville call AmesburyTruth. They were able to speak with Jessie Glass Jr. concerning the invesigation and the search warrant at his residence. Jessie volentary turned his cell phone over to Detective Aponik to be searched. Jessie told detective Aponik that there should not be any child pornaraphy on his cell phone.

Cellular telephones are now being utilized by citizens, for the purposes of portable computing. Many cellular telephones have the ability to: type and store documents, take and store pictures/videos, access the Internet, deploy applications (which can be programmed to do almost anything), make phone calls, send and receive SMS/MMS messages, connect to social networks, remotely store data on the "cloud", store large amounts of data on the actual phone, sync with a computer, and show live video streaming. Once information is stored on a cellular phone or SD card, it can remain indefinitely.

There are three current processes for extracting information from cellular phones which have been described to me by forensic experts. First, by utilizing mobile device forensic software which is designed to extract data from certain devices by attaching a device to a data port in which the software communicates with the device and extracts its data. Second is a process commonly known as JTAG. This process involves removing the circuit board from the phone and soldering to points used by manufacturers. These points allow direct access to the memory on the phone. This process may cause damage to the phone, but typically the phone will remain intact and functional when put back together. The last method is a process commonly known as Chip-off. The process involves removing the flash memory chip on the phone that actually stores the data on the phone. Once the chip is removed, forensic experts can read the data directly from the chip. This process will result in the permanent destruction of the phone; however, it allows for access to the data that was located on the phone.

It is my training and experience that each of the methods described above for extraction will result in an accurate representation of some or all of the available data from the mobile device itself. The search will be conducted by a qualified computer examiner or designee to include, but not limited to, Iredell County Sheriff's Office, The NC State Bureau of Investigation, and/ or the FBI.

That I have recognized facts and circumstances indicating that evidence of a crime that took place at the above-described location can be found as described in this application. The affiant states that the information contained in this application for a search warrant are true and accurate to the best of the affiant's knowledge. The affiant prays that the court issue this search warrant to examine the above listed cell phone(s), furthermore authorize the search to be conducted by a law enforcement officer which is certified and/or trained to conduct such examinations. The affiant further prays that all items which tend to provide evidence of the crime(s), in violation of NCGS 14-190.17 and or 14-190.17A, and the identity of the crime and/or person(s) participating in a crime be seized and held subject to the disposition of the court

SWORN AND SUBSCRIBED TO BEFORE ME:

_____
Judge / Magistrate

_____
Date     2/11/20

_____
Applicant(s)

_____
Date     02/11/20

000213

USA-00000608

JA343

**STATE OF NORTH CAROLINA**
**IREDELL COUNTY**

File No. _____

In The General Court Of Justice
☐ District ☐ Superior Court Division

| | |
|---|---|
| **IN THE MATTER OF** | |
| *Name* Black in color Samsung S9 cell phone Model: SM-G960U1 From Jessie L. Glass Jr | **INVENTORY OF SEIZED PROPERTY** |
| *Date of Search* 02/11/2020 | G.S. 15A-254,- |

I, the undersigned officer, executed a search of:

Black in color Samsung S9 cell phone Model: SM-G960U1 From Jessie L. Glass Jr

This search was made pursuant to:

☒ a search warrant issued by Superior Court Judge Joe Crosswhite

☐ a consent to search given by:

☐ other legal justification for the search:

The following items were seized:

Cellular telephone's internal, removable, or other memory held within; to include but not limited to all data, subscriber information, email addresses, text messages made or received, outbound and inbound call detail, all call information, contacts, photographs, digital images, voice mails, videos, applications, social media content and messages, and all stored communications or files on the device as well as information stored from the cellular telephone in a secondary location, such as the Cloud; Any and all records and evidence that may relate to the crime of N.C.G.S. 14-190.17 or 14-190.17A.

000214

USA-00000609

JA344

Seized Items Continued

☐ I am leaving a copy of this inventory with the person named below, who is:
    ☐ the owner of the placed searched.
    ☐ the owner of the vehicle searched.
    ☐ the person in apparent control of the placed searched.
    ☐ the person in apparent control of the vehicle searched.
    ☐ the person from whom the items were taken.

☒ As no person was present, I am leaving a copy of this inventory:
    ☒ in the place searched, identified previously.
    ☐ in the vehicle searched, identified previously.

Name and Address Of Person To Whom A Copy Of This Inventory was Delivered:
Iredell County Sheriff's Office Evidence "With Cell Phone"
231 Constitution Ln
Statesville NC 28677

**The law enforcement agency identified below will hold the seized property subject to court order.**

| SWORN AND SUBSCRIBED TO BEFORE ME | Signature Of Law Enforcement Officer |
|---|---|
| Date   2/2/20 | Title Of Law Enforcement Officer<br>Detective Sgt |
| Signature   *Lori A. Goff* | Name And Address Of Agency<br>Iredell County Sheriff's Office<br>231 Constitution Ln<br>Statesville NC 28677 |
| ☒ Deputy CSC   ☐ Clerk Of Superior<br>☐ Assistant CSC   Court  ☐ Magistrate | |

**ACKNOWLEDGEMENT OF RECEIPT**

I, the undersigned, received a copy of this inventory

| Date | Signature Of Person Receiving Inventory |
|---|---|

000215

USA-00000610

JA345

```
Reference: 05NR000004
Msg Key  : QH
Date/Time: 20200131084550
Source   : III

05NR000004.III.QH.20200131084550.
  TO: IRA11  -036055 20200131 08:45:50   005D152717
FROM: III               20200131 08:45:50
7L01149400338D2QH
NC0490011
THIS NCIC INTERSTATE IDENTIFICATION INDEX RESPONSE IS THE RESULT OF YOUR
INQUIRY ON NAM/GLASS,JESSIE LEROY SEX/M RAC/W DOB/1973░░░ PUR/C
ATN/DET J LOWRANCE
NAME                          FBI NO.          INQUIRY DATE
GLASS,JESSIE LEROY JR         255177RD2        2020/01/31

SEX RACE BIRTH DATE  HEIGHT WEIGHT EYES HAIR PHOTO
M   W    1973░░░     506    200    BRO  BLK  Y

BIRTH PLACE
NORTH CAROLINA

FINGERPRINT CLASS       PATTERN CLASS

ALIAS NAMES
GLASS,JESSIE LEFROY JR

OTHER
BIRTH DATES SOCIAL SECURITY   MISC NUMBERS
1973░░░                       AS-227412732

IDENTIFICATION DATA UPDATED 2016/04/03

THE CRIMINAL HISTORY RECORD IS MAINTAINED AND AVAILABLE FROM THE
FOLLOWING:
  VIRGINIA    - STATE ID/VA2135227E

THE RECORD(S) CAN BE OBTAINED THROUGH THE INTERSTATE IDENTIFICATION
INDEX BY USING THE APPROPRIATE NCIC TRANSACTION.

END

*****************************************************************************
```

000110

DEFENSE EXHIBIT
4

JA346

USA-00000505

```
Reference: UNKNOWN
Msg Key  : CR
Date/Time: 20200131084741
Source   : NLETS

UNKNOWN.NLETS.CR.20200131084741.
  TO: IRA11   -038062 20200131 08:47:41   43802E6972
FROM: NLETS          20200131 08:47:41
CR.VAIII0000
06:47  00000
 01/31/2020 23754 NC0490011

TXT

TXT
HDR/2L01149400338E2QR
ATN/DET J LOWRANCE
THE FOLLOWING RECORD PERTAINS TO FBI/255177RD2
```

                                    VIRGINIA CRIMINAL RECORD          01/31/2020 PART  1

SID: VA2135227E FBI: 255177RD2

NAMES RECORDED IN VIRGINIA FILES:                        SEX RACE DATE OF BIRTH
        GLASS           JESSIE    LEFROY     JR  M   W    ███/1973
        GLASS           JESSIE    LEROY      JR  M   W    ███1973

HEIGHT  WEIGHT  EYES  HAIR   SCARS/MARKS/TATTOOS
5'10"   220     BRO   BRO

LAST REPORTED ADDRESS:      ████████████
                       HILLSVILLE, VA 24343

PLACE OF BIRTH: CARROLL CO

SOCIAL SECURITY NO(S):  ████████

CONTRIBUTOR/CASE       DATE      CHARGE/DISPOSITION
================================================================================
SO WYTHE CO VA        07/23/2012 FINGERPRINTED  PHOTO:Y
ORI:VA0970000
                      07/17/2012 CHARGED WITH
                       #001 FELONY 18.2-67.1                  RAP-1133-F9
OTN:197CR1200025001         SODOMY: VICTIM <13 YRS
                            WYTHE CO           06/01/2008
WYTHE CO CIRCUIT CT 11/12/2013 NOLLE PROSSED
ORI:VA097015J                                              RAP-1133-F9
CCN:197CR1200025001*
                            NOT IMPNLD    RETAINED ATTY
DCN:P994877
--------------------
SO WYTHE CO VA        07/23/2012 FINGERPRINTED  PHOTO:Y
ORI:VA0970000
                      07/17/2012 CHARGED WITH
                       #002 FELONY 18.2-67.1                  RAP-1133-F9
OTN:197CR1200025000         SODOMY: VICTIM <13 YRS
                            WYTHE CO           09/01/2008
WYTHE CO CIRCUIT CT 11/12/2013 DISMISSED
ORI:VA097015J                                              RAP-1133-F9
CCN:197CR1200025000*
                            NOT IMPNLD    RETAINED ATTY
DCN:P994878
--------------------
================================================================================
SO CARROLL CO VA     12/11/2015 FINGERPRINTED
ORI:VA0180000
                      10/29/2015 CHARGED WITH
                       #001 MSDMNR 18.2-137                   VAN-2922-M1
OTN:035GM1500004308         DESTRUCTION OF PROPERTY, MONUMENT
                            CARROLL CO         10/28/2015
CARROLL CO GEN DIST 03/04/2016 DISMISSED
ORI:VA018013J                                             VAN-2922-M1
CCN:035GC1502036700*
                            RETAINED ATTY
DCN:J625851
--------------------

                                    Page 1


000111
```

JA347

*DISPOSITION ELECTRONICALLY TRANSFERRED BY COURT OF JURISDICTION
        RECORD AUTOMATED: 07/23/2012  LAST RECORD UPDATE: 04/03/2016

ALL ARREST ENTRIES CONTAINED IN THIS RECORD ARE BASED ON FINGERPRINT COMPARISON
AND PERTAIN TO THE SAME INDIVIDUAL.

THIS INFORMATION MAY NOT CONTAIN THE CHARGE DATE AND/OR CHARGE ORI FOR FILES
SUBMITTED THROUGH THE SUPREME COURT OF VIRGINIA EMAGISTRATE INTERFACE.

                          *** CAUTION ***
  THIS RESPONSE IS BASED ON COMPARISON OF REQUESTOR FURNISHED INFORMATION
AGAINST DATA CONTAINED IN THE FILES OF THE VIRGINIA STATE POLICE CRIMINAL
RECORDS EXCHANGE ONLY AND DOES NOT PRECLUDE THE EXISTENCE OF OTHER CRIMINAL
HISTORY INFORMATION WHICH MAY BE CONTAINED IN THE REPOSITORY OF OTHER LOCAL,
STATE OR FEDERAL CRIMINAL JUSTICE AGENCIES.
  CHANGES TO THIS RECORD MAY BE IN PROCESS.  A NEW INQUIRY SHOULD BE MADE FOR
SUBSEQUENT USE.  THE RECIPIENT(S) IS RESPONSIBLE FOR MAINTAINING AN AUDIT
TRAIL OF ALL SECONDARY DISSEMINATION OF ANY OF THIS INFORMATION.
*** UNAUTHORIZED DISSEMINATION WILL SUBJECT THE DISSEMINATOR TO CRIMINAL AND
CIVIL PENALTIES. ***

THIS IS A SINGLE-SOURCE RECORD. NO ADDITIONAL CRIMINAL HISTORY INFORMATION IS
INDEXED IN NCIC-III FOR OTHER STATE OR FEDERAL OFFENSES.


END OF RECORD
**************************************************************************

0 0112

USA-00000507

JA348

```
Reference: 05NR000004
Msg Key : QSO
Date/Time: 20200131084549
Source  : SORINQ

05NR000004.SORINQ.QSO.20200131084549.
   TO: IRA11  -038054 20200131 08:45:49   007F23A672
FROM: SORINQ            20200131 08:45:49
TO:NC0490011
FROM:NC0490011
Completion Code: HIT000000
NO HIT  (QSO)
************************************************************************
This SOR Response Is Based On Input Of:
Name: GLASS,JESSIE LEROY
Birthdate: 07-██████   Race: W Sex: M
************************************************************************

**  END OF MESSAGE **

**************************************************************************
```

Page 1

030113

```
Reference: 05NR000004
Msg Key  : QCG
Date/Time: 20200131084548
Source   : CHPINQS

05NR000004.CHPINQS.QCG.20200131084548.
   TO: IRA11   -038053 20200131 08:45:48   3CDAC018C1
FROM: CHPINQS              20200131 08:45:48
TO:NC0490011
FROM:NC0490011
Completion Code: HIT000000
NO HIT   (QCG)
*********************************************************************
This Concealed Handgun Permit Response Is Based On Input Of:
Name:  GLASS,JESSIE LEROY
Date Of Birth: █████████1973
*********************************************************************


***************************END OF RECORD***************************

*********************************************************************
```

000114

JA350

USA-00000509

```
Reference: 05NR000004
Msg Key  : QH
Date/Time: 20200131084551
Source   : CCHINQ

05NR000004.CCHINQ.QH.20200131084551.
   TO: IRA11   -038056 20200131 08:45:51   189609B7B4
  FROM: CCHINQ          20200131 08:45:49
TO:NC0490011
FROM:NC0490011
Completion Code: HIT000000
NO HIT  (QH)
*********************************************************************
This Computerized Criminal History Response Is Based On Input Of:
ORI: NC0490011
Name: GLASS,JESSIE LEROY
Race:  White  Sex:  Male  Date of Birth: █████ 1973
Purpose Code: C  Operator Id: SA
Attention: DET J LOWRANCE  Attention: 20-00024
*********************************************************************

*************************************************************************
```

000115

```
Reference: 05NR000004
Msg Key  : QXS
Date/Time: 20200131084553
Source   : NC2K

05NR000004.NC2K.QXS.20200131084553.
  TO: IRA11   -038057 20200131 08:45:53   0006815756
FROM: NC2K              20200131 08:45:52
1L01149400338D1QXS
NC0490011

NO NCIC SEX OFFENDER FILE RECORD NAM/GLASS,JESSIE LEROY DOB/1973 ███

*************************************************************************
```

Page 1

000116

USA-00000511

JA352

```
Reference: 05NR00000D
Msg Key  : QR
Date/Time: 20200131084739
Source   : CCHINQ

05NR00000D.CCHINQ.QR.20200131084739.
   TO: IRA11  -038060 20200131 08:47:39   189609B7C9
FROM: CCHINQ            20200131 08:47:38
TO:NC0490011
FROM:NC0490011
Completion Code: HIT000000
NO HIT  (QR)

*********************************************************************
This Computerized Criminal History Response Is Based On Input Of:
ORI: NC0490011  Purpose Code: C
Attention: DET J LOWRANCE  Attention: 20-00024  Operator Id: SA
Name: GLASS,JESSIE LEROY
FBI Number: 255177RD2
*********************************************************************

*************************************************************************************
```

Page 1

JA353

USA-00000512

```
Reference: 05NR00000D
Msg Key  : QR
Date/Time: 20200131084740
Source   : III

05NR00000D.III.QR.20200131084740.
   TO: IRA11   -038061 20200131 08:47:40   005D15272F
FROM: III                  20200131 08:47:40
EL01149400338E2QR
NC0490011
THIS INTERSTATE IDENTIFICATION INDEX RESPONSE IS THE RESULT OF YOUR
RECORD REQUEST FOR FBI/255177RD2. THE FOLLOWING WILL RESPOND TO YOUR
AGENCY:
 VIRGINIA    - STATE ID/VA2135227E
END

********************************************************************************
```

Page 1

000118

JA354

USA-00000513

DEFENSE EXHIBIT

5

File No. _____

# STATE OF NORTH CAROLINA

Iredell County

In The General Court Of Justice
District/Superior Court Division

## SEARCH WARRANT

### IN THE MATTER OF

Black in color Pro-12 tablet belonging to Jessie Glass, Jr.

| | |
|---|---|
| Date Issued | Time Issued |
| 5-19-2017 | 10:22 ☑ AM ☐ PM |

Name Of Applicant
Detective C.D. Lamberth

Name Of Additional Affiant

Name Of Additional Affiant

To any officer with authority and jurisdiction to conduct the search authorized by this Search Warrant:

I, the undersigned, find that there is probable cause to believe that the property and person described in the application on the reverse side and related to the commission of a crime is located as described in the application.

You are commanded to search the premises, vehicle, person and other place or item described in the application for the property and person in question. If the property and/or person are found, make the seizure and keep the property subject to Court Order and process the person according to law.

You are directed to execute this Search Warrant within forty-eight (48) hours from the time indicated on this Warrant and make due return to the Clerk of the Issuing Court.

This Search Warrant is issued upon information furnished under oath or affirmation by the person(s) shown.

| Date | Name (type or print) | |
|---|---|---|
| 5-19-2017 | Lori J. Hamilton | Signature |
| ☐ Deputy CSC ☐ Assistant CSC ☐ CSC ☐ Magistrate ☐ District Ct. Judge ☑ Superior Ct. Judge | | ☑ (signature) |

NOTE: When issuing a search warrant, the issuing official must retain a copy of the warrant and warrant application and must promptly file them with the clerk. G.S. 15A-245(b).

### RETURN OF SERVICE

I certify that this Search Warrant was received and executed as follows:

| | |
|---|---|
| Date Received | Time Received |
| 05/19/2017 | 10:30 ☑ AM ☐ PM |
| Date Executed | Time Executed |
| 05/19/2017 | 10:55 ☑ AM ☐ PM |

☑ I made a search of the black in color
P-12 exhibit belonging to Jessie
Glass, Jr.

☑ I seized the items listed on the attached
inventory.

☐ I did not seize any items.

☐ This Warrant WAS NOT executed within
forty-eight (48) hours of the date and time of
issuance and I hereby return it is not executed.

as commanded.

Name Of Officer Making Return (type or print)
Detective C.D. Lamberth

Signature Of Officer Making Return

Department Of Agency Of Officer

Iredell County Sheriff's Office

| | Incident Number |
|---|---|
| | 2017-102643 |

This Search Warrant was delivered to me on the date and at the time shown below when the Office of the Clerk of Superior Court is closed for the transaction of business. By signing below, I certify that I will deliver this Search Warrant to the Office of the Clerk of Superior Court as soon as possible on the Clerk's next business day.

| Date | Time | |
|---|---|---|
| | | ☐ AM ☐ PM |

Name Of Magistrate (type or print)

Signature Of Magistrate

This Search Warrant was returned to the undersigned clerk on the date and time shown below.

| Date | Time | |
|---|---|---|
| | | ☐ AM ☐ PM |

Name Of Clerk (type or print)

Signature Of Clerk

AOC-CR-119, Rev. 3/17
© 2017 Administrative Office of the Courts

Original - File    Copy - For Search of a Person, to Person from Whom Items Taken
Copy - For Search of Vehicle/Premises, to Owner or Person in Apparent Control, if No Such Person Present, Leave Copy Affixed Thereon
(Over)

☐ Dep. CSC
☐ Asst. CSC
☐ CSC

000028

USA-00000426

JA355

# APPLICATION FOR SEARCH WARRANT

I, Detective C.D. Lamberth of the Iredell County Sheriff's Office

*(Insert name and address, or if law enforcement officer, name, rank and agency)*

being duly **sworn**, request that the Court issue a warrant to search the person, place, vehicle, and other items described in this application and to find and seize the property and person described in this application. There is probable cause to believe that *(Describe property to be seized, or if search warrant is to be used for searching a place to serve an arrest warrant or other process, name person to be arrested)* See Attachment Page.

☒ *(and)* *(Name and/or describe other places or items to be searched, if applicable)*
See Attachment Page.

constitutes evidence of a crime and the identity of a person participating in a crime, *(Name crime)* Possession of Child Pornography

and is located *(Check appropriate box(es) and fill in specified information)*

☒ in the following premises *(Give address and, if useful, describe premises)*
See Attachment Page.

*(and)*
☒ on the following person(s) *(Give name(s) and, if useful, describe person(s))*
See Attachment Page.

*(and)*
☒ in the following vehicle(s) *(Describe vehicle(s))*
See Attachment Page.

The applicant swears or affirms to the following facts to establish probable cause for the issuance of a **search warrant**:
See Attachment Page.

SWORN/AFFIRMED AND SUBSCRIBED TO BEFORE ME

| Date | Name Of Applicant *(type or print)* | Date |
|---|---|---|
| 5-10-2017 | Detective C.D. Lamberth | 05/10/2017 |

Signature | Signature Of Applicant
*(Thomason)* | C.B.L

☐ Magistrate   ☐ Dep. CSC   ☐ Asst. CSC   ☐ Clerk Of Superior Court   ☒ Judge

☐ In addition to the affidavit included above, this application is supported by additional affidavits, attached, made by

☐ In addition to the affidavit included above, this application is supported by sworn testimony, given by

☐ This testimony has been *(check appropriate box)*   ☐ reduced to writing
☐ tape recorded and I have filed each with the clerk.

**NOTE:** *If more space is needed for any section, continue the statement on an attached sheet of paper with a notation saying "See attachment." Date the continuation and include on it the signatures of applicant and issuing official.*

AOC-CR-119, Side Two, Rev. 3/17
© 2017 Administrative Office of the Courts

000029

USA-00000427

JA356

Continuation page attached to the SEARCH WARRANT application, dated Thursday, May 18, 2017

**CONTINUATION OF "PROPERTY / EVIDENCE TO BE SEIZED"**

Any and all electronic data contained in the memory or call history of the tablet computer, including any names, phone numbers, addresses, contact information, data, text messages, images, voice memos, photographs, videos, internet sites, internet access documents or other information, contained in the tablet computer's internal, external or removable memory or memories, which includes any smart cards, SIM cards or flashcards.

**CONTINUATION OF "PREMISES, PERSON, VEHICLE, OR OTHER ITEM (S) TO BE SEARCHED"**

Black in color Pro-12 Model: CT9223W97 with S/N# R6GH8Z0170D1 obtained from Jessie Leroy Glass, Jr. under case number 2017-I02643

**CONTINUATION OF "PROBABLE CAUSE AFFIDAVIT"**

This applicant, Detective C.D. Lamberth, is currently employed by the Iredell County Sheriff's Office and has been a sworn Law Enforcement Officer since January 2007. Detective Lamberth is currently assigned to the Criminal Investigations Division. Before being assigned to Criminal Investigations, this applicant was a Patrol Deputy, a Field Training Officer, and was also a K9 handler of a drug detection K9 for the Iredell County Sheriff's Office from 2010 through 2013. Detective Lamberth graduated from Mitchell Community College in 2010 and earned an Associate's in Applied Science Degree in Criminal Justice Technologies. Detective Lamberth has successfully completed the North Carolina Basic Law Enforcement Training and has successfully completed over 2,000 hours of law enforcement training during his career at the North Carolina Justice Academy and various other colleges in North Carolina. Detective Lamberth was awarded a Basic, Intermediate, and Advanced Law Enforcement Certificate from the North Carolina Sheriff's Education and Training Standards Commission. Throughout his career, Detective Lamberth has worked numerous criminal cases and is familiar with the elements of this crime. Detective Lamberth has applied for and been granted search warrants during his career which resulted in the successful recovery of evidence in criminal investigations.

On May 18, 2017, I was requested by Detective Lieutenant B. Boyd to go to ██████████ and make contact with Jessie Glass, Sr. and Jessie Glass, Jr. Upon my arrival, I met Jessie Glass, Jr. in the driveway. I told him that I was there because we received a tip that there is possibly a computer in the residence with child pornography on it. I then asked him if there are any computers in the house and he said that he owns a tablet. I asked him if I could search the tablet for any possible child pornography and he said that I could. He then went inside and got his tablet and brought it out to me. I asked him again if I could search it and he said that I could. I then began looking through the internet history on the device and located numerous pornography websites, and I saw one that read "young dominatrix". I felt that this could possibly be child pornography, so I informed Jessie that I was seizing the device for the possibility of there being child pornography on it. I also observed various other types on pornography titles on the computer including hentai and gore. There were also sites for purchasing adult sex toys in the history as well. Jessie then said that there should not be any underage pornography on it and if any had ever popped up on the screen that he did not dwell on it. This threw up a red flag for me, so I then asked him if there was anything on there that he wanted to tell me about and I could see tears welling up in his eyes and he said that there was not anything he wanted to tell me. I then filled out an evidence form and Jessie signed it, turning custody of the tablet over to me. There were children's toys and sex toys located in Jessie, Jr.'s bedroom.

I have recognized facts and circumstances indicating that evidence of a crime that took place at the above-described location can be found as described in this application. The affiant states that the information contained in this application for a search warrant is true and accurate to the best of the affiant's knowledge. The affiant prays that the court issue this search warrant to examine the above listed cell phone, furthermore authorize the search to be conducted by a law enforcement officer which is certified and/or trained to conduct such examinations. The affiant further prays that all items which tend to provide evidence of the crime(s) and the identity of the crime and/or person(s) participating in a crime be seized and held subject to the disposition of the court.

SWORN AND SUBSCRIBED TO BEFORE ME:

_____
Judge / Magistrate

_____
Date    5-18-2017    0C0030

3

_____
Applicant(s)

_____
Date    05/18/2017

USA-00000428

JA357

# STATE OF NORTH CAROLINA

_____ Iredell _____ County

File No.

In The General Court Of Justice
☐ District  ☐ Superior Court Division

### IN THE MATTER OF:

*Name*

Black in color Pro-12 tablet belonging to Jessie Glass, Jr.

## INVENTORY OF ITEMS SEIZED
## PURSUANT TO SEARCH

G.S. 15A-223, -254, -257

I, the undersigned officer, executed a search of:

*Person, Premises Or Vehicle Searched*

Black in color Pro-12 tablet belonging to Jessie Glass, Jr.

*Date Of Search*

05/21/2017

This search was made pursuant to

☒ 1. a search warrant issued by: Superior Court Judge Lori I. Hamilton _____

☐ 2. consent to search given by: _____

☐ 3. other legal justification for the search: _____

The following items were seized:

Data contained in the tablet. The tablet is being returned to the owner.

**Original - File**
Copy - For Search by Warrant of a Person, to Person from Whom Items Taken
Copy - For Search by Warrant of Vehicle/Premises, to Owner or Person in Apparent Control; if No Such Person Present, Leave Copy Affixed Thereon
Copies - For Search by Consent, to Person Giving Consent and Owner of Vehicle/Premises Searched, if Known
(Over)

AOC-CR-206, Rev. 3/16
© 2016 Administrative Office of the Courts

000031

USA-00000429

JA358

Items Seized Continued:

1. I left a copy of this inventory with the person named below, who is:
- [ ] a. the owner of the premises searched.
- [ ] b. the owner of the vehicle searched.
- [ ] c. the person in apparent control of the premises searched.
- [ ] d. the person in apparent control of the vehicle searched.
- [ ] e. the person from whom the items were taken.

2. As no person was present, I left a copy of this inventory:
- [ ] a. in the premises searched, identified on the reverse.
- [ ] b. in the vehicle searched, identified on the reverse.

*Name And Address Of Person To Whom A Copy Of This Inventory Was Delivered, If Any*

The law enforcement agency identified below will hold the seized property subject to court order.

| SWORN/AFFIRMED AND SUBSCRIBED TO BEFORE ME | *Name Of Law Enforcement Officer (type or print)* C.D. Lamberth |
|---|---|
| *Date* | *Name (type or print)* | *Signature Of Law Enforcement Officer* |
| [ ] Notary | *Signature* | *Title Of Law Enforcement Officer* Detective |
| SEAL | *Date My Commission Expires* | *Name And Address Of Agency* Iredell County Sheriff's Office 230 North Tradd Street Statesville, North Carolina 28677 |
| | *County Where Notarized* | |

[ ] Deputy CSC   [ ] Assistant CSC   [ ] Clerk Of Superior Court   [ ] Magistrate

**ACKNOWLEDGMENT OF RECEIPT**

I, the undersigned, received a copy of this inventory.

| *Date* | *Signature Of Person Receiving Inventory* |
|---|---|

AOC-CR-206, Side Two, Rev. 3/16
© 2018 Administrative Office of the Courts

0C0032

USA-00000430

JA359

# IREDELL COUNTY SHERIFF'S OFFICE

☐ RECOVERED / ☐ FOUND PROPERTY REPORT

| AGENCY Iredell County Sheriff's Office | ORI # NC0490000 | DATE/TIME REPORTED MO DAY YR 05 17 2017 | 24 Hr. Clock | OCA FILE NO. 2017 I 02643 |
| --- | --- | --- | --- | --- |

Owner: Jessie Leroy Glass, Jr.                                        Phone

Found in possession of: SAMS                     Statesville NC 28677 Phone 826-230-5604

Location from which property was obtained: from person                     SAMS

Collecting Officer: Det. C.D. Lamberth

| PROPERTY CONTROL NUMBER | DESCRIPTION OF ARTICLES (Include model, serial no., identifying marks, condition, etc.) | PROPERTY VALUE |
| --- | --- | --- |
| | Item 1 - one Pro-12 Nople CT9223L97 Tablet 2in1 S/N: R6GH8Z0170D9 | |

Narrative: Hold for Identification

| OFFICER'S NAME 4269 Det. C.D. Lamberth | DATE/TIME SUBMITTED MO DAY YR 05 17 17 24 Hr 21:00 | SUPERVISOR'S NAME Lt. B. Bow | CASE DISPOSITION ☐ UNFOUNDED ☐ CLEARED BY ARREST ☐ EXCEPTIONAL CLEARED - ADULT ☐ EXCEPTIONAL CLEARED - JUV. | PAGE 1 OF 1 |
| --- | --- | --- | --- | --- |
| OFFICER'S SIGNATURE | | CASE STATUS ☐ FURTHER INVESTIGATION ☐ INACTIVE ☐ CLOSED | | |

OCI FR.205     000033                     FIRST COPY                     REV. 8/05

# ORDER

VIRGINIA:    IN THE CIRCUIT COURT OF WYTHE COUNTY
                                    FEDERAL INFORMATION
                                    PROCESSING STANDARDS
                                    CODE: 197

HEARING DATE: **NOVEMBER 4, 2013**
JUDGE: **JOSIAH T. SHOWALTER, JR.**

## COMMONWEALTH OF VIRGINIA

V.

## JESSIE LEROY GLASS, JR. DEFENDANT

This day came the defendant, who appeared in person with his attorney, **Thomas M. Jackson Jr.** The Commonwealth was represented by **William Winters.**

The Attorney for the Commonwealth moved for the entry of a *nolle prosequi* as to Indictment No. CR12000250-01, to which motion the defendant consented. The Court, for good cause shown, entered the *nolle prosequi.*

Whereupon, the defendant was arraigned on the charge of **Forcible Sodomy** as charged in Indictment No. CR12000250-00, and after being advised by his counsel pleaded NOT GUILTY to the case, which plea was tendered by the defendant in person, and after being first advised by his counsel and by the Court of his right to trial by jury, the defendant in person, knowingly and voluntarily waived trial by jury, and with the concurrence to the Attorney for the Commonwealth and of the Court, the Court proceeded to try the case without the intervention of a jury as provided by law.

On the motion of the defendant by counsel moved the Court to strike evidence which motion was overruled.

Having heard the evidence and the argument of counsel, the Court finds the defendant not guilty of the charge contained in the Indictment, therefore, it is Ordered that this case be dismissed and stricken from the docket of this Court and the defendant is allowed to depart.

11·12·13
DATE

ENTER  _Josiah T. Showalter, Jr._
          Josiah T. Showalter, Jr., Judge

1

DEFENSE EXHIBIT 7

USA-00003606

# Iredell County Sheriff's Office

Incident Case Number:   19-03103

Reporting Agency:   Iredell County Sheriff's

Print Date/Time:   12/07/2022 11:08:17

**Disclaimer: The information contained within this report is reflective of the investigation at the date and time of its printing.**

DEFENSE EXHIBIT 8

USA-00003614

JA362

| | | | | |
|---|---|---|---|---|
| **Agency Name** | | **INCIDENT/INVESTIGATION** | **Case#** | *19-03103* |
| | *Iredell County Sheriff's Office* | **REPORT** | **Date / Time Reported** | *07/08/2019  14:13  Mon* |
| **ORI** | *NC0490000* | | **Last Known Secure** | *07/02/2019  05:15  Tue* |

<table>
<tr><td rowspan="2" style="writing-mode: vertical-lr">I N C I D E N T</td></tr>
</table>

**INCIDENT/INVESTIGATION REPORT**

**Agency Name** *Iredell County Sheriff's Office*
**ORI** *NC0490000*
**Case#** *19-03103*
**Date / Time Reported** *07/08/2019  14:13  Mon*
**Last Known Secure** *07/02/2019  05:15  Tue*

**Location of Incident** *174 FAIRHAVEN LN, Cleveland NC 27013*
**Gang Relat** NO
**Premise Type** *Residence/home*
**Zone/RptArea** SE, 2B
**At Found** *07/07/2019  09:00  Sun*

**#1 Crime Incident(s)** *Theft Property - All Other* (Com)
*TPAO* M
**Weapon / Tools** *Personal Weapons*
**Entry** | **Exit** | **Security**
**Activity** *N*

**#2 Crime Incident** ( )
**Weapon / Tools**
**Entry** | **Exit** | **Security**
**Activity**

**#3 Crime Incident** ( )
**Weapon / Tools**
**Entry** | **Exit** | **Security**
**Activity**

**MO** *Suspect Actions/Takes Personal Property From V*

**VICTIM**

**# of Victims** *1*  **Type:** INDIVIDUAL  **Injury:**  **Domestic:** N

**V1** Victim/Business Name (Last, First, Middle) *CALDERONE, ANGELA JULIE*
**Victim of Crime #** *1,*
**DOB** *09/30/1976*  **Age** *42*
**Race** *W*  **Sex** *F*
**Relationship To Offender**
**Resident Status** *Resident*
**Military Branch/Status**

**Home Address** *174 FAIRHAVEN LN, Cleveland NC 27013-*
**Email**
**Home Phone** *704-431-3133*

**Employer Name/Address** *MOORESVILLE GRADE  (SCHOOL TEACHER)*
**Business Phone** *- -*
**Mobile Phone**

**VYR** | **Make** | **Model** | **Style** | **Color** | **Lic/Lis** | **VIN**

**OTHERS INVOLVED**

**CODES:** V- Victim (Denote V2, V3)  WI = Witness  IO = Involved Other  RP = Reporting Person (if other than victim)

**Type:**  **Injury:**
**Code** | **Name (Last, First, Middle)** | **Victim of Crime #** | **DOB** / **Age** | **Race** | **Sex** | **Relationship To Offender** | **Resident Status** | **Military Branch/Status**
**Home Address** | **Email** | **Home Phone**
**Employer Name/Address** | **Business Phone** | **Mobile Phone**

**Type:**  **Injury:**
**Code** | **Name (Last, First, Middle)** | **Victim of Crime #** | **DOB** / **Age** | **Race** | **Sex** | **Relationship To Offender** | **Resident Status** | **Military Branch/Status**
**Home Address** | **Email** | **Home Phone**
**Employer Name/Address** | **Business Phone** | **Mobile Phone**

**PROPERTY**

1 = None  2 = Burned  3 = Counterfeit / Forged  4 = Damaged / Vandalized  5 = Recovered  6 = Seized  7 = Stolen  8 = Unknown
("OJ" = Recovered for Other Jurisdiction)

| VI # | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| *1* | *36* | *7* | *$200.00* | | *1* | *IPHONE* | *IPHONE/6s* | |
| *1* | *36* | *7* | *$40.00* | | *1* | *IPHONE CHARGER* | | |

**Officer/ID#** *SCOTT, J. J. (JS5512)*
Outstanding Stolen Val [Total Stolen]: $240.00  [$240.00]

**Invest ID#** *DYSON, J. V. (JD3216)*
**Supervisor** *YOUNTS, J. G. (JY0190)*

**Status**
**Complainant Signature**
**Case Status** *Except. Clear*  *07/22/2019*
**Case Disposition:** *Victim Refused To*  *07/22/2019*
**Page 2**

*R_CS1IBR*  Printed By: JW6037,  Sys#: 71821  12/07/2022 11:08

USA-00003615

**JA363**

# INCIDENT/INVESTIGATION REPORT

*Iredell County Sheriff's Office*

Case # *19-03103*

Status Codes    1 = None    2 = Burned    3 = Counterfeit / Forged    4 = Damaged / Vandalized    5 = Recovered    6 = Seized    7 = Stolen    8 = Unknown

| | IBR | Status | Quantity | Type Measure | Suspected Type | Up to 3 types of activity |
|---|---|---|---|---|---|---|
| D | | | | | | |
| R | | | | | | |
| U | | | | | | |
| G | | | | | | |
| S | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Assisting Officers

Suspect Hate / Bias Motivated:

# INCIDENT/INVESTIGATION REPORT

Narr. (cont.)  OCA: 19-03103

*Iredell County Sheriff's Office*

N A R R A T I V E

USA-00003616

JA364

| | | OCA |
|---|---|---|
| *Iredell County Sheriff's Office* | | *19-03103* |
| Victim | Offense | Date / Time Reported |
| *CALDERONE, ANGELA JULIE* | *THEFT PROPERTY - ALL OTHER* | *Mon 07/08/2019 14:13* |

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

angelajcanlderone@gmail.com

On 07/08/2019 approximately 1413hrs, I responded to 174 Fairhaven in reference to a larceny call. Upon my arrival, I spoke with Angela Calderone (Victim). Mrs. Calderone advised me that Interim Home Health Care watches over her farther in law, John Alexander. Mrs. Calderone stated she went out of town on 07/02/2019 and April (Suspect / Home Health Care / 704-437-9493) was staying there to watch Mr. Alexander while she is gone out of town. Mrs. Calderone stated Mr. Alexander has to be watch over 24/7 due to his health.

Mrs. Calderone advised me that she came home and noticed her cell phone and cell phone charger is missing. Mrs. Calderone told me that the cell phone charger was sitting on the kitchen island and the cell phone was on the counter beside the refrigerator. Mrs. Calderone advised me that April was the only one at the house with Mr. Alexander. Mrs. Calderone informed me that she did not have much information on the April subject. I tried calling Interim Health Care (704-658-0555) but I was unable to reach anyone. Due to the call volume I was unable to try calling again. There is no more information at this time. End of report.

USA-00003617

JA365

# Incident Report Suspect List

OCA: *19-03103*

| 1 | Name (Last, First, Middle)<br>*GLASS, APRIL DAWN* | | Also Known As | | Home Address<br>*749 SHILOH RD*<br>*STATESVILLE, NC 28677* |
|---|---|---|---|---|---|

Business Address *DISABLED*

| DOB<br>*04/19/1982* | Age<br>*37* | Race<br>*W* | Sex<br>*F* | Eth | Hgt<br>*503* | Wgt | Hair<br>*BRO* | Eye<br>*HAZ* | Skin | Driver's License / State<br>*41314151 NC* |
|---|---|---|---|---|---|---|---|---|---|---|

Scars, Marks, Tattoos, or other distinguishing features
*TATT NONS NECK / BACK OF NECK CHINESE DRAGON;  ARTI ARM  ARM / DRAGON AND SWORD;  ARTI ARM  ARM / BLUE FLOWER*

| *Reported Suspect Detail* | Suspect Age | | Race | Sex | Eth | Height | | Weight | | SSN<br>*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* |
|---|---|---|---|---|---|---|---|---|---|---|
| Weapon, Type | Feature | Make | | Model | | Color | Caliber | Dir of Travel | | |
| | | | | | | | | Mode of Travel | | |
| Veh Yr / Make / Model | | | Drs | Style | | Color | | Lic Plate / State | | VIN |

Notes

Physical Char
*Hair Style, Short*
*Build, SMALL*

USA-00003618

JA366

# Incident Report Related Property List

### 1

| Property Description | | | | | Make | | Model | | | Caliber |
|---|---|---|---|---|---|---|---|---|---|---|
| *IPHONE* | | | | | *IPHONE* | | *6S* | | | |

| Color | Serial No. | | Value | | Qty | | Unit | Jurisdiction | |
|---|---|---|---|---|---|---|---|---|---|
| *Black* | | | *$200.00* | | *1.000* | | *DU* | *Locally* | |

| Status | Date | NIC # | State # | Local # | OAN |
|---|---|---|---|---|---|
| *Stolen* | *07/07/2019* | | | | |

| Name (Last, First, Middle) | DOB | Age | Race | Sex |
|---|---|---|---|---|
| *CALDERONE, ANGELA JULIE* | *09/30/1976* | *42* | *W* | *F* |

Notes

### 2

| Property Description | | | | | Make | | Model | | | Caliber |
|---|---|---|---|---|---|---|---|---|---|---|
| *IPHONE CHARGER* | | | | | | | | | | |

| Color | Serial No. | | Value | | Qty | | Unit | Jurisdiction | |
|---|---|---|---|---|---|---|---|---|---|
| *White* | | | *$40.00* | | *1.000* | | *DU* | *Locally* | |

| Status | Date | NIC # | State # | Local # | OAN |
|---|---|---|---|---|---|
| *Stolen* | *07/07/2019* | | | | |

| Name (Last, First, Middle) | DOB | Age | Race | Sex |
|---|---|---|---|---|
| *CALDERONE, ANGELA JULIE* | *09/30/1976* | *42* | *W* | *F* |

Notes

USA-00003619

JA367

*Iredell County Sheriff's Office*

OCA: **1903103**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | | |
|---|---|---|---|
| **Case Status:** | *EXCEPT. CLEAR* | **Case Mng Status:** *EXCEPT CLEARED - ...* | **Occurred:** *07/02/2019* |
| **Offense:** | *THEFT PROPERTY - ALL OTHER* | | |

| | | | |
|---|---|---|---|
| **Investigator:** | *DYSON, J. V. (JD3216)* | **Date / Time:** | *07/22/2019 16:17:38, Monday* |
| **Supervisor:** | *WYATT, J. B. (JW6037)* | **Supervisor Review Date / Time:** | *07/22/2019 17:45:05, Monday* |
| **Contact:** | | **Reference:** | *Case Notes* |

Case Notes- Det. Jacob Dyson                    #19-03103

Victim:  Angela Julie Calderone
174 Fairhaven Ln.
Cleveland, NC 27013
(704) 431-3133

Ref: Larceny

Location: 174 Fairhaven Ln.

(**all times are approximate**)

07/09/2019
0800 hrs.

I got this case assigned to investigate further.

07/09/2019
0900 hrs.

I called the victim and spoke to her about the case. The victim stated that they left their residence on 07/02/2019 and returned on 07/06/2019. The victim hired Interim Healthcare to watch over her sick father in law. The victim stated that the when she returned she noticed a I-phone charger and I-phone was missing from the counter. The people who worked at the residence would text the victim while there were there. According to the victim one girl worked from 0700-1600 hrs and then another girl named Tasha worked from 1900-2300 hrs. The victim stated a new girl worked the evening shift on Tuesday and Wednesday evening named April Glass. The regular girl Jessica worked the day shift and found the charger was gone on 07/04/2019 and the phone on 07/06/2019. According to the victim Jessica was looking for the charger on 07/04/2019 and the phone was on the counter. Jessica told the victim that when she was looking for the charger only the phone was on the counter. The only other person in the residence other then Jessica was April Glass. Apparently the phone was found missing on 07/07/2019 and April was only one in residence.

07/09/2019
1044 hrs.

I called Interim Heathcare and spoke to Lisa & Sharon. Sharon advised that April Dawn Glass worked on the Tuesday-Wednesday from 4pm-11pm. Sharon also stated that Jessica Holt worked from 7am-4pm and has been

Investigator Signature                              Supervisor Signature

USA-00003620

JA368

*Iredell County Sheriff's Office*

OCA: *1903103*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *EXCEPT. CLEAR*     **Case Mng Status:** *EXCEPT CLEARED - ...*     **Occurred:** *07/02/2019*

**Offense:** *THEFT PROPERTY - ALL OTHER*

| | |
|---|---|
| **Investigator:** *DYSON, J. V. (JD3216)* | **Date / Time:** *07/22/2019 16:17:38, Monday* |
| **Supervisor:** *WYATT, J. B. (JW6037)* | **Supervisor Review Date / Time:** *07/22/2019 17:45:05, Monday* |
| **Contact:** | **Reference:** *Case Notes* |

at this residence for several weeks before the incident.  Apparently Jessica told Sharon and the victim there was only 1 phone on the counter after Thursday July 4th.  A third person worked at the residence on Thursday and Friday evening from 4pm-11pm and her name was Tylisa Parker (phone was gone as of Thursday morning).

Sharon gave me the following numbers for April Glass (704) 437-9493 and (704) 682-8894 ( Jessie Glass Jr number-husband).

07/09/2019
1100 hrs.

I ran April Dawn Glass through CJ Leads, TLO and also researched her on Leads on Line.  The suspect had pawned a gun recently in May of 2019.  All information was printed and placed in the case file.  I also saw a gun posted on her Facebook page.

07/09/2019
1115 hrs.

I tried calling Glass with no answer.  I left a voice message for her to call me.

07/09/2019
1400 hrs.

I went to the suspects residence on Shiloh Rd, but no one was at home.

07/09/2019
1415 hrs.

I called Interim Healtcare back and spoke to Sharon again.  Sharon advised that Glass was coming by work at 1500 hrs to drop on time sheets.  I told Sharon I was on the way and to call me when she arrives.

07/09/2019
1453 hrs.

I was called by Interim Healthcare and changed her time to 1600 hrs but was going home first.

07/09/2019
1520 hrs.

Investigator Signature                         Supervisor Signature

USA-00003621

JA369

*Iredell County Sheriff's Office*                                    OCA: **1903103**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *EXCEPT. CLEAR*     **Case Mng Status:** *EXCEPT CLEARED -...*     **Occurred:** *07/02/2019*

**Offense:** *THEFT PROPERTY - ALL OTHER*

| | | |
|---|---|---|
| **Investigator:** *DYSON, J. V. (JD3216)* | **Date / Time:** | *07/22/2019 16:17:38, Monday* |
| **Supervisor:** *WYATT, J. B. (JW6037)* | **Supervisor Review Date / Time:** | *07/22/2019 17:45:05, Monday* |
| **Contact:** | **Reference:** | *Case Notes* |

I went back to the suspects residence and waited across the street for her to come home.  I waited approximately 20 mins and the suspect never came home.

07/09/2019
1949 hrs.

April Glass called my cell phone (704) 437-9493 while I was on the way out of town.  I spoke to Glass about the case and I told her I knew she had the phone and charger and I needed them turned back over.  As first Glass wanted to deny she had the items.  I told her she was the only person in the house those night other then the patient and he can't steal his own phone.  I then told Glass as of right now that the victim did not want her charged, but if she denied any further, then I would charge her.  Glass then admitted over the phone that she took the phone and still had the phone.  I told her I would call her back in a few minutes or have someone call her.

07/09/2019
1954 hrs.

I called the victim (704) 431-3133 and advised her that Glass admitted to taking the phone. I told her I would get back with her ASAP about the phone.

07/19/2019
1956 hrs.

I called Sgt. Getz who was still working to see if he would go get the phone for me from the suspect.  Getz agreed to get same.

07/09/2019
2200 hrs.

Getz called back stating he went and got the phone and charger at the suspects residence.

07/12/2019
0820 hrs.

I contacted the victim about getting her phone back to her.  The victim stated that she would call in an hour of so to meet.  I went to Kathy with evidence and took the phone out of evidence so I could return to the owner.

07/12/2019
0928 hrs.

| | |
|---|---|
| Investigator Signature | Supervisor Signature |

USA-00003622

JA370

*Iredell County Sheriff's Office*
<span></span>OCA: **1903103**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *EXCEPT. CLEAR*     **Case Mng Status:** *EXCEPT CLEARED - ...*     **Occurred:** *07/02/2019*

**Offense:** *THEFT PROPERTY - ALL OTHER*

| | | |
|---|---|---|
| **Investigator:** *DYSON, J. V. (JD3216)* | **Date / Time:** | *07/22/2019 16:17:38, Monday* |
| **Supervisor:** *WYATT, J. B. (JW6037)* | **Supervisor Review Date / Time:** | *07/22/2019 17:45:05, Monday* |
| **Contact:** | **Reference:** | *Case Notes* |

The victim called me to meet her to return the phone.  I met the victim at BJ's Warehouse and returned the phone and charger to her.  All evidence forms are in the case file.

07/22/2019
1725 hrs.

This case will be listed as Closed/Victim refused to Cooperate.

Suspect Information:

April Dawn Glass
753 Shiloh Rd.
Statesville, NC 28677
W/F Dob: 04/19/1982

---

Investigator Signature        Supervisor Signature

USA-00003623

JA371

*Iredell County Sheriff's Office*

OCA: **1903103**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *EXCEPT. CLEAR*  **Case Mng Status:** *EXCEPT CLEARED - ...*  **Occurred:** *07/02/2019*

**Offense:** *THEFT PROPERTY - ALL OTHER*

---

**Investigator:** *DYSON, J. V. (JD3216)*  **Date / Time:** *07/22/2019 17:27:37, Monday*

**Supervisor:** *WYATT, J. B. (JW6037)*  **Supervisor Review Date / Time:** *07/22/2019 17:46:20, Monday*

**Contact:**  **Reference:** *Supplement*

---

This case will be listed as Closed/Victim refused to Cooperate. Waiver of prosecution signed.

Suspect Information:

April Dawn Glass
753 Shiloh Rd.
Statesville, NC 28677
W/F Dob: 04/19/1982

---

Investigator Signature  Supervisor Signature

USA-00003624

JA372

East 73015

# STATE OF NORTH CAROLINA

_____ IREDELL _____ County

| File No. | 19CR 704813 |
|---|---|
| Additional File Nos. | |

In The General Court Of Justice
☒ District ☐ Superior Court Division

### STATE VERSUS

*Name And Address Of Defendant*
APRIL DAWN GLASS
753 SHILOH RD
STATESVILLE, NC 28677

## NOTICE OF HEARING
## ON VIOLATION OF
## UNSUPERVISED PROBATION

G.S. 15A-1345, 143B-708

| Race | Sex | Date Of Birth | Date Of Judgment | Length Of Sentence |
|---|---|---|---|---|
| W | F | 04/19/1982 | 10/26/2020 | 45 DAYS |

| Defendant's Drivers License No. | State | Length Of Term Of Unsupervised Probation | Sentencing Judge |
|---|---|---|---|
| 41314151 | NC | 12 MONTHS | HON. H. THOMAS CHURCH |

*Name Of Complainant, If Any (Name, Address Or Department, Phone No.)*
IREDELL COUNTY CLERK OF SUPERIOR COURT
226 STOCKTON ST.
STATESVILLE, NC 28677

*Offense(s)*
(M) LARCENY

*(handwritten sideways in left margin)* 366-1 APRIL4-22-21 @ 0825, NO CONTACT MADE

---

### VIOLATIONS

**TO THE DEFENDANT NAMED ABOVE:**

You were placed on unsupervised probation pursuant to the judgment referred to above, which was entered in this case on the date shown. The undersigned hereby notifies you that there is reason to believe that you violated the condition(s) of your probation that you:

☒ 1. pay to the Clerk of Superior Court the costs of court and any additional sums set forth in that judgment, in that you failed to make in full and when due one or more required payments, with the result that you are in arrears as of this date as follows:

| Original Obligation | Other Costs | Paid To Date | Arrearage To Date | Total Balance Due |
|---|---|---|---|---|
| $ 425.00 | $ 55.00 | $ | $ 480.00 | $ 480.00 |

☐ 2. complete the number of hours of community service specified in that judgment in that you failed within the time provided to
  ☐ a. complete that service as directed by the judicial service coordinator.

| Hours Required | Hours Completed To Date | Hours Due |
|---|---|---|
| | | |

  ☐ b. pay the community service fee prescribed by law.

☐ 3. obtain a substance abuse assessment from a licensed facility and pay the fee prescribed by law, in that you failed, within the prescribed time, to
  ☐ a. obtain an assessment.
  ☐ b. pay the prescribed fee.

☐ 4. participate in a treatment program and pay all treatment fees prescribed by law, in that you failed to
  ☐ a. participate in a treatment program, as recommended in your treatment report, for the period provided in that report.
  ☐ b. pay all treatment fees prescribed by law.

AOC-CR-220, Rev. 2/21
© 2021 Administrative Office of the Courts

Original - File   Copy - Defendant
(Over)

DEFENSE EXHIBIT
9

USA-00003625

JA373

USA-00003626

☐ 5. complete an Alcohol and Drug Education Traffic School and pay the fee prescribed by law, in that you failed to
    ☐ a. complete an ADET School as required by G.S. 122C-142.1(c).
    ☐ b. pay the fee prescribed by law.

☐ 6. serve an active term of _____ ☐ days ☐ months   in the custody of the sheriff of this county, in that you
    failed to report as required on date(s) _____

☐ 7. Other: *(specify)*

This Notice is issued upon information supplied by the complainant listed on the reverse, if any, or upon the undersigned's own motion.

## NOTICE OF HEARING

PLEASE TAKE NOTICE THAT a hearing will be held on the violation(s) set forth above on the date, and at the time and location specified below.

If the Court finds that you have violated a condition of your unsupervised probation, the Court may revoke your unsupervised probation and order you to begin serving an active sentence. Whether or not the Court finds that you have violated a condition of unsupervised probation, it may continue you on probation, modify the conditions of your probation, and extend the term of your probation.

If you were ordered to perform community service work as a condition of probation imposed upon conviction of an offense not involving impaired driving, **the court will revoke your drivers license** if it finds that you willfully failed to comply with the community service requirements, and will do so **whether or not you appear at the hearing**. G.S. 143B-708.

If you were ordered to perform community service work as a condition of probation imposed upon conviction for impaired driving under G.S. 20-138.1, **the court will revoke your limited driving privilege** if it finds that you willfully failed to comply with the community service requirements, and will do so **whether or not you appear at the hearing**. G.S. 20-179.3(j1) *(G.S. 20-179.4 for offenses committed prior to December 1, 2009)* and 143B-708.

*(check one option)*
☒ If you fail to appear for this hearing, the Court may issue an order requiring you to show cause why you should not be held in contempt of court. In addition, the Court may issue an order for arrest for your failure to appear.
☐ An Order For Arrest has been issued and is attached.

| Date Of Hearing | Time Of Hearing | ☒ AM ☐ PM | Date |
|---|---|---|---|
| 04/26/2021 | 0900 | | 03/16/2021 |

| Location Of Hearing | Signature |
|---|---|
| IREDELL COUNTY HALL OF JUSTICE, CTRM 0002<br>226 STOCKTON ST.<br>STATESVILLE, NC 28677 | *(signature)* |

Name *(type or print)*
PAULETTE L. GALLEGOS
☐ Judge ☐ CSC ☒ Assistant CSC ☐ Deputy CSC
☐ Magistrate ☐ DA ☐ Assistant DA ☐ CSWP

## RETURN OF SERVICE

I certify that this Notice Of Hearing On Violation Of Unsupervised Probation was received and served as follows:

| Date Received | Date Served | Date Of Mailing |
|---|---|---|
| | | |

☐ By personally serving this Notice Of Hearing On Violation Of Unsupervised Probation on the defendant.
☐ By mailing this Notice Of Hearing On Violation Of Unsupervised Probation to the last known address available to the undersigned on the date of mailing shown above.
☐ This Notice Of Hearing On Violation Of Unsupervised Probation WAS NOT served for the following reason:

| Date Of Return | Name | Signature | Department Or Agency |
|---|---|---|---|
| | | | |

AOC-CR-220, Side Two, Rev. 2/21
© 2021 Administrative Office of the Courts

JA374

# STATE OF NORTH CAROLINA

_____ IREDELL _____ County

File No.
19CR 704813

Additional File Nos.

In The General Court Of Justice
☒ District ☐ Superior Court Division

## STATE VERSUS

Name And Address Of Defendant
APRIL DAWN GLASS
753 SHILOH RD
STATESVILLE, NC 28677

## NOTICE OF HEARING
## ON VIOLATION OF
## UNSUPERVISED PROBATION

G.S. 15A-1345, 143B-708

| Race | Sex | Date Of Birth | Date Of Judgment | Length Of Sentence |
|---|---|---|---|---|
| W | F | 04/19/1982 | 10/26/2020 | 45 DAYS |

| Defendant's Drivers License No. | State | Length Of Term Of Unsupervised Probation | Sentencing Judge |
|---|---|---|---|
| 41314151 | NC | 12 MONTHS | HON. H. THOMAS CHURCH |

Name Of Complainant, If Any (Name, Address Or Department, Phone No.)
IREDELL COUNTY CLERK OF SUPERIOR COURT
226 STOCKTON ST.
STATESVILLE, NC 28677

Offense(s)
(M) LARCENY

## VIOLATIONS

**TO THE DEFENDANT NAMED ABOVE:**

You were placed on unsupervised probation pursuant to the judgment referred to above, which was entered in this case on the date shown. The undersigned hereby notifies you that there is reason to believe that you violated the condition(s) of your probation that you:

☒ 1. pay to the Clerk of Superior Court the costs of court and any additional sums set forth in that judgment, in that you failed to make in full and when due one or more required payments, with the result that you are in arrears as of this date as follows:

| Original Obligation | Other Costs | Paid To Date | Arrearage To Date | Total Balance Due |
|---|---|---|---|---|
| $ 425.00 | $ 55.00 | $ | $ 480.00 | $ 480.00 |

☐ 2. complete the number of hours of community service specified in that judgment in that you failed within the time provided to
   ☐ a. complete that service as directed by the judicial service coordinator.

| Hours Required | Hours Completed To Date | Hours Due |
|---|---|---|
| | | |

   ☐ b. pay the community service fee prescribed by law.

☐ 3. obtain a substance abuse assessment from a licensed facility and pay the fee prescribed by law, in that you failed, within the prescribed time, to
   ☐ a. obtain an assessment.
   ☐ b. pay the prescribed fee.

☐ 4. participate in a treatment program and pay all treatment fees prescribed by law, in that you failed to
   ☐ a. participate in a treatment program, as recommended in your treatment report, for the period provided in that report.
   ☐ b. pay all treatment fees prescribed by law.

AOC-CR-220, Rev. 2/21
© 2021 Administrative Office of the Courts

Original - File    Copy - Defendant
(Over)

JA375

USA-00003627

☐ 5. complete an Alcohol and Drug Education Traffic School and pay the fee prescribed by law, in that you failed to
    ☐ a. complete an ADET School as required by G.S. 122C-142.1(c).
    ☐ b. pay the fee prescribed by law.

☐ 6. serve an active term of _____ ☐ days ☐ months   in the custody of the sheriff of this county, in that you
    failed to report as required on date(s)

☐ 7. Other: *(specify)*

This Notice is issued upon information supplied by the complainant listed on the reverse, if any, or upon the undersigned's own motion.

## NOTICE OF HEARING

PLEASE TAKE NOTICE THAT a hearing will be held on the violation(s) set forth above on the date, and at the time and location specified below.

If the Court finds that you have violated a condition of your unsupervised probation, the Court may revoke your unsupervised probation and order you to begin serving an active sentence. Whether or not the Court finds that you have violated a condition of unsupervised probation, it may continue you on probation, modify the conditions of your probation, and extend the term of your probation.

If you were ordered to perform community service work as a condition of probation imposed upon conviction of an offense not involving impaired driving, **the court will revoke your drivers license** if it finds that you willfully failed to comply with the community service requirements, and will do so **whether or not you appear at the hearing.** G.S. 143B-708.

If you were ordered to perform community service work as a condition of probation imposed upon conviction for impaired driving under G.S. 20-138.1, **the court will revoke your limited driving privilege** if it finds that you willfully failed to comply with the community service requirements, and will do so **whether or not you appear at the hearing.** G.S. 20-179.3(j1) *(G.S. 20-179.4 for offenses committed prior to December 1, 2009)* and 143B-708.

*(check one option)*
☒ If you fail to appear for this hearing, the Court may issue an order requiring you to show cause why you should not be held in contempt of court. In addition, the Court may issue an order for arrest for your failure to appear.
☐ An Order For Arrest has been issued and is attached.

| Date Of Hearing | Time Of Hearing | ☒ AM ☐ PM | Date |
|---|---|---|---|
| 04/26/2021 | 0900 | | 03/16/2021 |

| Location Of Hearing | Signature |
|---|---|
| IREDELL COUNTY HALL OF JUSTICE, CTRM 0002 226 STOCKTON ST. STATESVILLE, NC 28677 | *[signature]* |

Name (type-or-print)
PAULETTE L. GALLEGOS

☐ Judge   ☐ CSC   ☒ Assistant CSC   ☐ Deputy CSC
☐ Magistrate   ☐ DA   ☐ Assistant DA   ☐ CSWP

## RETURN OF SERVICE

I certify that this Notice Of Hearing On Violation Of Unsupervised Probation was received and served as follows:

| Date Received | Date Served | Date Of Mailing |
|---|---|---|
| | | |

☐ By personally serving this Notice Of Hearing On Violation Of Unsupervised Probation on the defendant.

☐ By mailing this Notice Of Hearing On Violation Of Unsupervised Probation to the last known address available to the undersigned on the date of mailing shown above.

☒ This Notice Of Hearing On Violation Of Unsupervised Probation WAS NOT served for the following reason:
    *Court Date Past*

| Date Of Return | Name | Signature | Department Or Agency |
|---|---|---|---|
| 4/27/21 | C. Caul | *[signature]* | Deputy |

AOC-CR-220, Side Two, Rev. 2/21
© 2021 Administrative Office of the Courts

USA-00003628

JA376

# STATE OF NORTH CAROLINA

_____ IREDELL _____ County

| File No. |
| --- |
| 19CR 704813 |

Additional File Nos.

In The General Court Of Justice
☒ District ☐ Superior Court Division

## STATE VERSUS

Name And Address Of Defendant
APRIL DAWN GLASS
753 SHILOH RD
STATESVILLE, NC 28677

## NOTICE OF HEARING
## ON VIOLATION OF
## UNSUPERVISED PROBATION

G.S. 15A-1345, 143B-708

| Race | Sex | Date Of Birth | Date Of Judgment | Length Of Sentence |
| --- | --- | --- | --- | --- |
| W | F | 04/19/1982 | 10/26/2020 | 45 DAYS |

| Defendant's Drivers License No. | State | Length Of Term Of Unsupervised Probation | Sentencing Judge |
| --- | --- | --- | --- |
| 41314151 | NC | 12 MONTHS | HON. H. THOMAS CHURCH |

Name Of Complainant, If Any (Name, Address Or Department, Phone No.)
IREDELL COUNTY CLERK OF SUPERIOR COURT
226 STOCKTON ST.
STATESVILLE, NC 28677

Offense(s)
(M) LARCENY

---

## VIOLATIONS

**TO THE DEFENDANT NAMED ABOVE:**

You were placed on unsupervised probation pursuant to the judgment referred to above, which was entered in this case on the date shown. The undersigned hereby notifies you that there is reason to believe that you violated the condition(s) of your probation that you:

☒ 1. pay to the Clerk of Superior Court the costs of court and any additional sums set forth in that judgment, in that you failed to make in full and when due one or more required payments, with the result that you are in arrears as of this date as follows:

| Original Obligation | Other Costs | Paid To Date | Arrearage To Date | Total Balance Due |
| --- | --- | --- | --- | --- |
| $ 425.00 | $ 55.00 | $ | $ 480.00 | $ 480.00 |

☐ 2. complete the number of hours of community service specified in that judgment in that you failed within the time provided to
    ☐ a. complete that service as directed by the judicial service coordinator.

| Hours Required | Hours Completed To Date | Hours Due |
| --- | --- | --- |
| | | |

    ☐ b. pay the community service fee prescribed by law.

☐ 3. obtain a substance abuse assessment from a licensed facility and pay the fee prescribed by law, in that you failed, within the prescribed time, to
    ☐ a. obtain an assessment.
    ☐ b. pay the prescribed fee.

☐ 4. participate in a treatment program and pay all treatment fees prescribed by law, in that you failed to
    ☐ a. participate in a treatment program, as recommended in your treatment report, for the period provided in that report.
    ☐ b. pay all treatment fees prescribed by law.

AOC-CR-220, Rev. 2/21
© 2021 Administrative Office of the Courts

Original - File   Copy - Defendant
(Over)

JA377

USA-00003629

☐ 5. complete an Alcohol and Drug Education Traffic School and pay the fee prescribed by law, in that you failed to
    ☐ a. complete an ADET School as required by G.S. 122C-142.1(c).
    ☐ b. pay the fee prescribed by law.

☐ 6. serve an active term of _____ ☐ days ☐ months   in the custody of the sheriff of this county, in that you
    failed to report as required on date(s) _____

☐ 7. Other: *(specify)*

This Notice is issued upon information supplied by the complainant listed on the reverse, if any, or upon the undersigned's own motion.

## NOTICE OF HEARING

PLEASE TAKE NOTICE THAT a hearing will be held on the violation(s) set forth above on the date, and at the time and location specified below.

If the Court finds that you have violated a condition of your unsupervised probation, the Court may revoke your unsupervised probation and order you to begin serving an active sentence. Whether or not the Court finds that you have violated a condition of unsupervised probation, it may continue you on probation, modify the conditions of your probation, and extend the term of your probation.

If you were ordered to perform community service work as a condition of probation imposed upon conviction of an offense not involving impaired driving, **the court will revoke your drivers license** if it finds that you willfully failed to comply with the community service requirements, and will do so **whether or not you appear at the hearing**. G.S. 143B-708.

If you were ordered to perform community service work as a condition of probation imposed upon conviction for impaired driving under G.S. 20-138.1, **the court will revoke your limited driving privilege** if it finds that you willfully failed to comply with the community service requirements, and will do so **whether or not you appear at the hearing**. G.S. 20-179.3(j1) *(G.S. 20-179.4 for offenses committed prior to December 1, 2009)* and 143B-708.

*(check one option)*
☒ If you fail to appear for this hearing, the Court may issue an order requiring you to show cause why you should not be held in contempt of court. In addition, the Court may issue an order for arrest for your failure to appear.
☐ An Order For Arrest has been issued and is attached.

| Date Of Hearing | Time Of Hearing | | Date |
|---|---|---|---|
| 04/26/2021 | 0900 | ☒ AM ☐ PM | 03/16/2021 |

| Location Of Hearing | Signature |
|---|---|
| IREDELL COUNTY HALL OF JUSTICE, CTRM 0002<br>226 STOCKTON ST.<br>STATESVILLE, NC 28677 | *Name (type or print)*<br>PAULETTE L. GALLEGOS<br>☐ Judge   ☐ CSC   ☒ Assistant CSC   ☐ Deputy CSC<br>☐ Magistrate   ☐ DA   ☐ Assistant DA   ☐ CSWP |

## RETURN OF SERVICE

I certify that this Notice Of Hearing On Violation Of Unsupervised Probation was received and served as follows:

| Date Received | Date Served | Date Of Mailing |
|---|---|---|
| | | |

☐ By personally serving this Notice Of Hearing On Violation Of Unsupervised Probation on the defendant.

☐ By mailing this Notice Of Hearing On Violation Of Unsupervised Probation to the last known address available to the undersigned on the date of mailing shown above.

☐ This Notice Of Hearing On Violation Of Unsupervised Probation WAS NOT served for the following reason:

| Date Of Return | Name | Signature | Department Or Agency |
|---|---|---|---|
| | | | |

AOC-CR-220, Side Two, Rev. 2/21
© 2021 Administrative Office of the Courts

USA-00003630

JA378

# STATE OF NORTH CAROLINA

IREDELL _____ County _____ STATESVILLE _____ Seat of Court

**NOTE:** Use AOC-CR-310 for DWI offenses.

File No. 19CR 7DA813

In The General Court Of Justice
☒ District ☐ Superior Court Division

## STATE VERSUS

**JUDGMENT SUSPENDING SENTENCE - MISDEMEANOR**
**PUNISHMENT:** ☒ COMMUNITY ☐ INTERMEDIATE
**(STRUCTURED SENTENCING)**
(For Offenses Committed On Or After Dec. 1, 2016)
G.S. 15A-1341, -1342, - 1343, -1343.2, -1346

Name Of Defendant
April Dawn Gloss

| Race W | Sex F | Date Of Birth 4-19-72 |
|---|---|---|

Attorney For State
Mahoney

☐ Def. Found Not Indigent  ☐ Def. Waived Attorney

Attorney For Defendant
Minor

☐ Appointed  ☐ Retained

Crt Rptr Initials

The defendant was found guilty/responsible, pursuant to ☒ plea ☐ pursuant to Alford ☐ of no contest) ☐ trial by judge ☐ trial by jury, of

| File No.(s) | Off. | Offense Description | Offense Date | G.S. No. | CL. | *Pun. CL. |
|---|---|---|---|---|---|---|
| 19CR 7DA813 | 1 | (m) larceny | 4-12-19 | 14-72(a) | 1 | |

***NOTE:*** *Enter punishment class if different from underlying offense class (punishment class represents a status or enhancement).*
The Court has determined, pursuant to G.S. 15A-1340.20, the number of prior convictions to be ___ **Level:** ☒ I (0) ☐ II (1-4) ☐ III (5+)

☐ 1. The Court finds: ☐ (a) enhancement for ☐ G.S. 90-95(e)(4) (drugs). ☐ G.S. 14-3(c) (hate crime). ☐ G.S. 14-50.22 (gang misdemeanor).
☐ (b) enhancement from required suspended sentence to Class 2 misdemeanor. G.S. 90-95(e)(7).
This finding is based on a determination of this issue by the trier of fact beyond a reasonable doubt or on the defendant's admission.
☐ 2. The Court imposes mandatory punishment pursuant to G.S. 14-33(d) (assault in the presence of a minor).
☐ 3. The Court finds the above-designated offense(s) is a reportable conviction under G.S. 14-208.6 and therefore imposes the special conditions of probation set forth on the attached AOC-CR-603D, Page Two, Side Two, and makes the additional findings and orders on the attached AOC-CR-615, Side Two.
☐ 4. The Court finds the above-captioned offense(s) involved *(check all that apply)* ☐ physical or mental ☐ sexual abuse of a minor. *(If No. 3 not found)* and therefore imposes the special conditions of probation set forth on the attached AOC-CR-603D, Page Two, Side Two.
☐ 5. The Court finds this is an offense involving assault, communicating a threat, or an act defined in G.S. 50B-1(a), and the defendant had a personal relationship as defined by G.S. 50B-1(b) with the victim.
☐ 6. The Court finds the above-designated offense(s) involved *(check one)* ☐ *(offenses committed Dec. 1, 2016 - Nov. 30, 2017)* criminal street gang activity *(offenses committed on or after Dec. 1, 2017)* criminal gang activity. G.S. 14-50.25.
☐ 7. The Court did not grant a conditional discharge under G.S. 90-96(a) because *(check all that apply)* ☐ the defendant refused to consent.
☐ the Court finds, with the agreement of the District Attorney, that the offender is inappropriate for a conditional discharge for factors related to the offense.
☐ 8. The Court finds that this was an offense involving child abuse or an offense involving assault or any of the acts as defined in G.S. 50B-1(a) committed against a minor. G.S. 15A-1382.1(a1).
☐ 9. The Court finds that the defendant refused to consent to conditional discharge under G.S. 14-204.

The Court, having considered evidence, arguments of counsel and statement of defendant, Orders that the above offenses, if more than one, be consolidated for judgment and the defendant be imprisoned for a term of ___ days in the custody of the: *(check only one)*
☒ Sheriff of Iredell _____ County. ☐ Other:
☐ Misdemeanant Confinement Program *(sentences greater than 90 days for which a facility is not otherwise specified above).*

☐ This sentence shall run at the expiration of the sentence imposed in file number _____

The defendant shall be given credit for ___ days spent in confinement prior to the date of this Judgment as a result of this/these charge(s), to be applied toward the ☒ sentence imposed above. ☐ imprisonment required for special probation set forth on AOC-CR-603D, Page Two.

## SUSPENSION OF SENTENCE

Subject to the conditions set out below, the execution of this sentence is suspended and the defendant is placed on ☐ supervised ☒ unsupervised probation for 12 months.
☐ 1. The Court finds that a ☐ longer ☐ shorter period of probation is necessary than that which is specified in G.S. 15A-1343.2(d).
☐ 2. The Court finds that it is NOT appropriate to delegate to the Section of Community Corrections the authority to impose any of the requirements in G.S. 15A-1343.2(e) for community punishment or G.S. 15A-1343.2(f) for intermediate punishment.
☐ 3. This period of probation shall begin ☐ when the defendant is released from incarceration ☐ at the expiration of the sentence in the case below.

| File No. | Offense | County | Court | Date |
|---|---|---|---|---|

☐ 4. The defendant shall comply with the conditions set forth in file number _____
☐ 5. The defendant shall provide a DNA sample pursuant to G.S. 15A-266.4. (AOC-CR-319 required)

## MONETARY CONDITIONS

The defendant shall pay to the Clerk of Superior Court the "Total Amount Due" shown below, plus the probation supervision fee if placed on supervised probation above, pursuant to a schedule ☐ determined by the probation officer. ☒ set out by the court as follows: pay by 1-29-21

| Costs $180 | Fine | Restitution* | Attorney's Fees $185 | Comm Serv Fee $waived | EHA Fee | SBM Fee | Appt Fee/Misc $60 | Total Amount Due $425 |
|---|---|---|---|---|---|---|---|---|

*See attached "Restitution Worksheet, Notice And Order (Initial Sentencing)" AOC-CR-611, which is incorporated by reference.
☐ The Court finds just cause to waive costs, as ordered on the attached ☐ AOC-CR-618.
☐ Upon payment of the "Total Amount Due," the probation officer may transfer the defendant to unsupervised probation.

Material opposite unmarked squares is to be disregarded as surplusage.
(Over)

AOC-CR-604D, Rev. 12/17, © 2017 Administrative Office of the Courts

USA-00003631

JA379

## REGULAR CONDITIONS OF PROBATION - G.S. 15A-1343(b)

**NOTE:** *Any probationary judgment may be extended pursuant to G.S. 15A-1342.* The defendant shall: (1) Commit no criminal offense in any jurisdiction. (2) Possess no firearm, explosive device, or other deadly weapon listed in G.S. 14-269. (3) Remain gainfully and suitably employed or faithfully pursue a course of study or vocational training, that will equip the defendant for suitable employment, and abide by all rules of the institution. (4) Satisfy child support and family obligations, as required by the Court. (5) Submit to the taking of digitized photographs, including photographs of the defendant's face, scars, marks, and tattoos, to be included in the defendant's records. If the defendant is on supervised probation, the defendant shall also: (6) Not abscond, by willfully avoiding supervision or by willfully making the defendant's whereabouts unknown to the supervising probation officer. (7) Remain within the jurisdiction of the Court unless granted written permission to leave by the Court or the probation officer. (8) Report as directed by the Court or the probation officer to the officer at reasonable times and places and in a reasonable manner, permit the officer to visit at reasonable times, answer all reasonable inquiries by the officer and obtain prior approval from the officer for, and notify the officer of, any change in address or employment. (9) Notify the probation officer if the defendant fails to obtain or retain satisfactory employment. (10) Submit at reasonable times to warrantless searches by a probation officer of the defendant's person and of the defendant's vehicle and premises while the defendant is present, for purposes directly related to the probation supervision, but the defendant may not be required to submit to any other search that would otherwise be unlawful. (11) Submit to warrantless searches by a law enforcement officer of the defendant's person and of the defendant's vehicle, upon a reasonable suspicion that the defendant is engaged in criminal activity or is in possession of a firearm, explosive device, or other deadly weapon listed in G.S. 14-269 without written permission of the court. (12) Not use, possess, or control any illegal drug or controlled substance unless it has been prescribed for the defendant by a licensed physician and is in the original container with the prescription number affixed on it; not knowingly associate with any known or previously convicted users, possessors, or sellers of any such illegal drugs or controlled substances; and not knowingly be present at or frequent any place where such illegal drugs or controlled substances are sold, kept, or used. (13) Supply a breath, urine, or blood specimen for analysis of the possible presence of prohibited drugs or alcohol when instructed by the defendant's probation officer for purposes directly related to the probation supervision. If the results of the analysis are positive, the probationer may be required to reimburse the Division of Adult Correction and Juvenile Justice for the actual costs of drug or alcohol screening and testing.

☐ 14. The Court finds that the defendant is responsible for acts of domestic violence and therefore makes the additional findings and orders on the attached AOC-CR-603D, Page Two, Side Two.

## SPECIAL CONDITIONS OF PROBATION - G.S. 15A-1343(b1)

The defendant shall also comply with the following special conditions which the Court finds are reasonably related to the defendant's rehabilitation:

☐ 15. Surrender the defendant's drivers license to the Clerk of Superior Court for transmittal/notification to the Division of Motor Vehicles and not operate a motor vehicle for a period of _____ or until relicensed by the Division of Motor Vehicles, whichever is later.

☐ 16. Successfully pass the General Education Development Test (G.E.D.) during the first _____ months of the period of probation.

☒ 17. Complete _~~JA~~_ hours of community service during the first _150_ days of the period of probation, as directed by the judicial services coordinator. The fee prescribed by G.S. 143B-708 is _to be done Privately_
  ☐ not due because it is assessed in a case adjudicated during the same term of court.
  ☒ to be paid ☒ pursuant to the schedule set out under Monetary Conditions above ☐ within _____ days of this Judgment and before beginning service.

☐ 18. Report for initial evaluation by _____ participate in all further evaluation, counseling, treatment, or education programs recommended as a result of that evaluation, and comply with all other therapeutic requirements of those programs until discharged.

☐ 19. Not assault, threaten, harass, be found in or on the premises or workplace of, or have any contact with _____ "Contact" includes any defendant-initiated contact, direct or indirect, by any means, including, but not limited to, telephone, personal contact, e-mail, pager, gift-giving, telefacsimile machine or through any other person, except _____

☐ 20. Abstain from alcohol consumption and submit to continuous alcohol monitoring for a period of _____ ☐ days, ☐ months, the Court having found that a substance abuse assessment has identified defendant's alcohol dependency or chronic abuse.

☐ 21. Other:

☐ 22. Comply with the Special Conditions Of Probation which are set forth on AOC-CR-603D, Page Two.

## ORDER OF COMMITMENT/APPEAL ENTRIES

☐ 1. It is ORDERED that the Clerk deliver **two** certified copies of this Judgment and Commitment to the sheriff or other qualified officer and that th officer cause the defendant to be delivered with these copies to the custody of the agency named on the reverse to serve the sentence imposed or until the defendant shall have complied with the conditions of release pending appeal.

☐ 2. The defendant gives notice of appeal from the judgment of the District Court to the Superior Court.

☐ 3. The current pretrial release order is modified as follows: _____

☐ 4. The defendant gives notice of appeal from the judgment of the trial court to the Appellate Division. Appeal ent___ nd ny condition_s of post conviction release are set forth on form AOC-CR-350.

## SIGNATURE OF JUDGE

| Date | Name Of Presiding Judge (type or print) | Signature Of Presiding Judge |
|---|---|---|
| 10/26/2020 | HON. H. THOMAS CHURCH | |

## CERTIFICATION

I certify that this Judgment and attachment(s) marked below is a true and complete copy of the original which is on file in this case.

☐ 1. Appellate Entries (AOC-CR-350)
☐ 2. Judgment Suspending Sentence (AOC-CR-603D, Page Two) (additional conditions of probation)
☐ 3. Restitution Worksheet, Notice And Order (Initial Sentence) (AOC-CR-611)
☐ 4. Judicial Findings As To Required DNA Sample (AOC-CR-319)

☐ 5. Judicial Findings And Order For Sex Offenders - Suspended Sentence (AOC-CR-615, Side Two)
☐ 6. Convicted Sex Offender Permanent No Contact Order (AOC-CR-620)
☐ 7. Additional File No.(s) And Offense(s) (AOC-CR-626)
☐ 8. Other: _____

| Date | Date Certified Copies Delivered To Sheriff | Signature Of Clerk | |
|---|---|---|---|
| | | | ☐ Deputy CSC ☐ Asst. CSC ☐ Clerk Of Superior Court |

**SEAL**

Material opposite unmarked squares is to be disregarded as surplusage.

AOC-CR-604D, Side Two, Rev. 12/17, © 2017 Administrative Office of the Courts

USA-00003632

JA380

## REQUEST TO ADD CASE TO CALENDAR

FILE NUMBER (S): _19CR 704813_

DEFENDANT: _April Dawn Glass_

OFFENSE (S): _Misd Larceny — Revied_

### THE UNDERSIGNED REQUESTS THAT THIS CASE(S) BE ADDED TO THE CALENDAR

REASON: _Defendant's Attorney on Designated Leave_

DATE OF REQUEST: _8-31-20_

DATED TO BE ADDED: _10.12.20_

THE REQUEST TO ADD ON THE ABOVE CASE(S) IS: (✗) GRANTED ( ) DENIED

AUTHORITY: _____

_____
(ASSISTANT DISTRICT ATTORNEY'S SIGNATURE)

### RECALL WARRANT/ORDER FOR ARREST AND /OR BOND FORFEITURE

PAPERS SENT TO: _____

NAME: _____

ADDRESS: _____

FILE NUMBER(S): _____

CHARGE(S): _____

DATE ISSUED: _____

AUTHORITY: _____

(JUDGE'S SIGNATURE)

AUTHORITY: _____

(ASSISTANT DISTRICT ATTORNEY'S SIGNATURE)

BOND FORFEITURE SURETY: _____

DATE RECALLED: _____

NEW COURT DATE: _____

HAND DELIVERED BY: _____

(ASSISTANT CLERK'S / DEPUTY'S SIGNATURE)

SHERIFF'S STAMP:

USA-00003633

JA381

# STATE OF NORTH CAROLINA

Iredell County    Statesville    Seat Of Court

File No.   19 CR 704813

In The General Court Of Justice
☑ District   ☐ Superior Court Division

## STATE VERSUS

Name Of Defendant   April Glass

| Race | Sex | Date Of Birth |
|------|-----|---------------|
| W | F | 4-19-82 |

| Drivers License No. | State |
|---------------------|-------|
| 41314151 | Nc |

Attorney For State   Megin M. Mahony
☐ Def. Found Not Indigent   ☐ Def. Waived Attorney

Attorney For Defendant   D. Minor
☑ Appointed   ☐ Retained

Ct Rptr Initials

## MOTION/AGREEMENT AND ORDER TO DEFER PROSECUTION (STRUCTURED SENTENCING)
### (For Deferrals Entered On Or After Dec. 1, 2011)

G.S. 15A-1341(a1)

The defendant, attorney for the defendant, and undersigned Prosecutor, request the Court to approve this Agreement to defer prosecution and place the defendant on probation on the following offense(s):

| File No.(s) | Off. | Offense Description | Offense Date | G.S. No. | F/M | CL. |
|-------------|------|---------------------|--------------|----------|-----|-----|
| 19cr 704813 | 1 | (M) Larceny | 4-12-19 | 14-72 | | 1 |

## CONDITIONS OF AGREEMENT TO DEFER PROSECUTION

☑ 1. With approval of the Court and consent of the defendant, prosecution will be deferred by the prosecutor for the purpose of allowing the defendant to demonstrate good conduct, and subject to the conditions set out below, the defendant is placed on:
(check one) ☑ unsupervised probation ☐ supervised probation   for   12   months (max. of 2 years, G.S. 15A-1342(a)), as provided for a
(check one) ☑ community punishment. ☐ intermediate punishment (NOTE: AOC-CR-603A, B, C, or D, Page Two, required; select the form appropriate to the date of offense for which prosecution is deferred.).

☐ 2. The Court finds that it is NOT appropriate to delegate to the Section of Community Corrections the authority to impose any of the requirements in G.S. 15A-1343.2(e) for community punishment or G.S. 15A-1343.2(f) for intermediate punishment.

☐ 3. The Court finds that a ☐ longer ☐ shorter period of probation is necessary than that which is specified in G.S. 15A-1343.2(d).

☐ 4. The defendant shall comply with the regular conditions of probation applicable to unsupervised or supervised probation, as imposed above, and which are set forth on the following form, incorporated herein by reference:
(NOTE: Select judgment form appropriate to the type and date of offense for which prosecution is deferred.)

| Offense: | Before 12/1/09 | 12/1/09-11/30/11 | 12/1/11-11/30/16 | On/After 12/1/16 |
|----------|----------------|------------------|------------------|------------------|
| Felony: | ☐ AOC-CR-603A | ☐ AOC-CR-603B | ☐ AOC-CR-603C | ☐ AOC-CR-603D |
| Misd.: | ☐ AOC-CR-604A | ☐ AOC-CR-604B | ☐ AOC-CR-604C | ☐ AOC-CR-604D |

☑ 5. The defendant shall comply with the following special conditions of probation that are set forth on the form cited in No. 4, above, and incorporated herein by reference:
and/or other Special Conditions:   Δ shall not go about the premises of Wal-Mart during period of probation

☑ 6. The defendant shall complete 24 hours of community service during the first 120 days of the deferral period, as directed by the judicial service coordinator. The fee prescribed by G.S. 143B-708 is
☐ (for offenses committed on or after December 1, 2009) not due because it is assessed in a case adjudicated during the same term of court.
☐ to be paid ☑ pursuant to the schedule set out below. ☐ within _____ days of this Order and before beginning service.

☐ 7. The defendant shall pay to the Clerk of Superior Court the "Total Amount Due" below, plus the probation supervision fee if placed on supervised probation above, pursuant to a schedule ☐ determined by the probation officer. ☑ set out by the Court as follows:

due on or before [?] Oct 97 2020 [?]   waive atty fee if successful

| Costs | Fine | Restitution* | Attorney's Fees | Community Service Fee | CHA Fee | Miscellaneous | Total Amount Due |
|-------|------|--------------|-----------------|-----------------------|---------|---------------|------------------|
| $ 180 | $ | $ | $ – | $ 250 | $ 70 | $ 600 | ▶ $ 510 — |

*See attached "Restitution Worksheet, Notice And Order (Initial Sentencing)," AOC-CR-611, which is incorporated by reference.

☐ 8. The Court finds just cause to waive costs, as ordered on the attached ☐ AOC-CR-618. ☐ Other: _____

☐ 9. The admission of responsibility given by me and any stipulation of facts shall be used against me and admitted into evidence without objection in the State's prosecution against me for this offense should prosecution become necessary as a result of these terms and conditions of deferred prosecution.

☐ 10. Regular reports will be made on my progress to the prosecutor's office.

☐ 11. The prosecutor will
☐ a. take a voluntary dismissal with leave upon the Court's approval of this Agreement, and a voluntary dismissal upon the defendant's compliance with this Agreement.
☐ b. take a voluntary dismissal upon the defendant's compliance with this Agreement.

AOC-CR-610, Rev. 4/18
© 2018 Administrative Office of the Courts

Material opposite unmarked squares is to be disregarded as surplusage.
(Over)

USA-00003634

JA382

| DEFENDANT'S OATH/AGREEMENT/MOTION |
|---|

The defendant after being duly sworn, states under oath:
1. I have not been previously convicted of any felony or of any misdemeanor involving moral turpitude.
2. I have not been previously placed on probation.
3. I hereby waive all of my rights to a speedy trial under the constitution and laws of the State of North Carolina and the United States of America with regard to the above listed charge(s).
4. I have reviewed a copy of this Motion/Agreement And Order To Defer Prosecution and all of the conditions of my probation and I agree to them, and request the Court to approve the agreement.
5. I understand that no person who supervises me or for whom I work while performing community or reparation service is liable to me for any loss or damage which I may sustain unless my injury is caused by that person's gross negligence or intentional wrongdoing.

| SWORN/AFFIRMED AND SUBSCRIBED TO BEFORE ME | Date 9-9-19 |
|---|---|
| Date 9-9-19 | Signature | Signature Of Defendant (under oath) |

☑ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court
☑ District Court Judge  ☐ Superior Court Judge

| ATTORNEYS' CERTIFICATION/AGREEMENT/MOTION |
|---|

The undersigned attorneys certify to the Court that each known victim of the crime has been notified of the motion for probation by subpoena or certified mail and has been given an opportunity to be heard and the undersigned request the Court to approve the agreement.

| Date 9-9-19 | Signature Of Lawyer For Defendant | Signature Of Prosecutor |
|---|---|---|

| FINDINGS |
|---|

Based upon the foregoing and a review of the record, the Court finds:
1. Prosecution has been deferred by the prosecutor pursuant to written agreement with the defendant, with the approval of the Court, for the purpose of allowing the defendant to demonstrate good conduct.
2. Each known victim of the crime has been notified of the motion to defer prosecution and place the defendant on probation and has been given an opportunity to be heard.
3. The defendant has not been convicted of any felony or of any misdemeanor involving moral turpitude.
4. The defendant has not previously been placed on probation and so states under oath.
5. The defendant is unlikely to commit another offense other than a Class 3 misdemeanor.

| ORDER |
|---|

THE COURT HAVING CONSIDERED the Motion and Agreement to Defer Prosecution, related documents and statements of counsel, finds that the prosecutor and defendant have entered into a written agreement to defer prosecution in this case for a period not to exceed two years, and said Motion and Agreement is in compliance with the conditions set forth in G.S. 15A-1341 and specified in the motion.

IT IS ORDERED that the Agreement to Defer Prosecution in this case is approved and all conditions of this Agreement as specified above adopted by the Court and made part of this Order. The defendant is to comply with all the regular conditions of probation and any special conditions as set forth above.

☑ Except as ordered to appear earlier for a hearing on alleged violation(s) or as otherwise ordered by the Court, the defendant shall return to this Court on (date) _____ for a hearing to determine fulfillment of the terms and conditions of probation.

NOTE TO COURT: Entry of this order terminates any bond currently securing the defendant's appearance, G.S. 15A-534(h)(5), and therefore may conflict with the terms of any release order still in effect. Unless the court intends that the defendant immediately post a new bond of the same type and amount to remain out of custody during the period of deferral, modification of the defendant's conditions of release may be appropriate.

| SIGNATURE OF JUDGE |
|---|

| Date 9/9/19 | Presiding Judge (type or print) Underwood | Signature Of Presiding Judge |
|---|---|---|

| CERTIFICATION |
|---|

I certify that this Motion/Agreement and Order and the attachment(s) marked below is a true and complete copy of the original which is on file in this case.
☐ 1. Restitution Worksheet, Notice And Order (Initial Sentencing) (AOC-CR-611)
☐ 2. Additional File No.(s) And Offense(s) (AOC-CR-626)
☐ 3. Other:

| Date | Name (type or print) | Signature Of Clerk | ☐ Deputy CSC  ☐ Asst. CSC | |
|---|---|---|---|---|
| | | | ☐ Clerk Of Superior Court | SEAL |

Material opposite unmarked squares is to be disregarded as surplusage.

AOC-CR-610, Side Two, Rev. 4/18
© 2018 Administrative Office of the Courts

USA-00003635

JA383

# STATE OF NORTH CAROLINA

_____IREDELL_____ County

7.24

File No. **19CR 704813**

In The General Court Of Justice
☒ District ☐ Superior Court Division

## STATE VERSUS

Name Of Defendant

April Glass

Additional File No.(s) And/Or Offense(s)

M) larceny

## WAIVER OF COUNSEL

G.S. 7A-457; 15A-1242

### ACKNOWLEDGMENT OF RIGHTS AND WAIVER

As the undersigned party in this action, I freely and voluntarily declare that I have been fully informed of the charges against me, the nature of and the statutory punishment for each such charge, and the nature of the proceedings against me; that I have been advised of my right to have counsel assigned to assist me and my right to have the assistance of counsel in defending against these charges or in handling these proceedings, and that I fully understand and appreciate the consequences of my decision to waive the right to assigned counsel and the right to assistance of counsel.

I freely, voluntarily and knowingly declare that:

_(check only one)_

☒ 1. I waive my right to assigned counsel and that I, hereby, expressly waive that right.

☐ 2. I waive my right to all assistance of counsel which includes my right to assigned counsel and my right to the assistance of counsel. In all respects, I desire to appear in my own behalf, which I understand I have the right to do.

| SWORN AND SUBSCRIBED TO BEFORE ME | Date |
| --- | --- |
| Date 06/11/2019 Signature | Signature Of Defendant 06/11/2019 |

☐ Judge  ☐ Clerk Of Superior Court  ☐ Asst. CSC  ☒ Deputy CSC  ☐ Magistrate

### CERTIFICATE OF JUDICIAL OFFICIAL

I certify that the above named defendant has been fully informed of the charges against him/her, the nature of and the statutory punishment for each charge, and the nature of the proceeding against the defendant and his/her right to have counsel assigned by the court and his/her right to have the assistance of counsel to represent him/her in this action; that the defendant comprehends the nature of the charges and proceedings and the range of punishments; that he/she understands and appreciates the consequences of his/her decision and that the defendant has voluntarily, knowingly and intelligently elected in open court to be tried in this action:

_(check only one)_

☒ 1. without the assignment of counsel.

☐ 2. without the assistance of counsel, which includes the right to assigned counsel and the right to assistance of counsel.

| **NOTE:** For a waiver of assigned counsel only, both blocks numbered "1" must be checked. For a waiver of all assistance of counsel, both blocks numbered "2" must be checked. | Date 06/11/2019 Signature Of Judicial Official |
| --- | --- |
| | Name Of Judicial Official (Type Or Print) HON.C.UNDERWOOD |

**NOTE:** _A magistrate may accept waivers of counsel if designated to do so by the Chief District Court Judge. See G.S. 7A-146(11) and G.S. 7A-292(15)._

AOC-CR-227, Rev. 10/15
© 2015 Administrative Office of the Courts

USA-00003636

JA384

(TYPE OR PRINT IN BLACK INK)

In The General Court Of Justice
☒ District ☐ Superior Court Division

File No. 19CR704813

Additional File Nos.

# STATE OF NORTH CAROLINA
IREDELL County

**AFFIDAVIT OF INDIGENCY**

G.S. 7A-450 et seq.

Name Of Applicant
April DawnGlass

Street Number And Street Name, Including Apartment Or Unit Number If Applicable
753 Shiloh Rd

City, State And Zip Code
Statesville NC ~~28077 28477~~ 28677

Full Permanent Mailing Address Of Applicant (If Different Than Above)
Same

Telephone Number Of Applicant
704-437-9493

Date Of Birth
04/8/1982

☒ Defendant  ☐ Parent/Guardian/Trustee  ☐

Offense(s)
Misdemeanor larceny of a hot meal
For ~~dog~~ a phone larger
Dog food & phone & dog food & pens

Applicant: Do you have other pending criminal charge(s) in which a lawyer has been appointed?  ☐ Yes  ☒ No
Name Of Lawyer

Full Social Security No. Of Applicant
242-91-25-12810 2   ☐ Has No Social Security No.

## MONTHLY INCOME (money you make)

Employment - Applicant  Abbott     part time

Name And Address Of Applicant's Employer
(If not employed, state reason; if self-employed, state trade)   address
Abbotts Cleaning Service   moms it I dont know the dressing
It's outside  in my car   Abbotts cleaning

Other Income (Welfare, Food Stamps, S/S, Pensions, etc.)  $ 0

Employment - Spouse  $ 2100

Name And Address Of Spouse's Employer
Celgard (Polly Feb)
Celgard - the address is in my car.

Total Monthly Income ▶ $

## MONTHLY EXPENSES (money you pay out)

| | |
|---|---|
| Number Of Dependents | 3 (we 3 kids) |
| Shelter ☐ Buying ☒ Renting | $ 350 mo |
| Food (including Food Stamps) | $ 200 mo |
| Utilities (power, water, heating, phone, cable, etc.) | phone $100 mo others $100 |
| Health Care | $ 50 |
| Installment Payments ☒ Vehicle ☐ Other | $420 mo & 35 mo |
| Car Expenses (gas, insurance, etc.) | gas 100 insurance 177 mnth |
| Support Payments | $ |
| Other: (specify) | $ |
| Total Monthly Expenses ▶ $ | |

## DESCRIPTION OF ASSETS AND LIABILITIES

| | ASSETS (things you own) | LIABILITIES (amounts you owe) |
|---|---|---|
| Cash On Hand And In Bank Accounts (List Name Of Bank & Account No.) | $ 0 | |
| Money Owed To Or Held For Applicant | $ 0 | |
| Motor Vehicles (List Make, Model, Year) In my husband's name | (Fair Market Value) 2010 Ford Plent EXE cabs $ 10,000 | (Balance Due) $ w Jetta 2000 ~~2015~~ 2015 |
| Real Estate | (Fair Market Value) $ | (Balance Due) $15,000 |
| Personal Property | (Fair Market Value) $ | (Balance Due) $ |
| Other Debts  Power, ~~gas~~ gas, insurance rent phone | $ | $ |
| Last Income Tax Filed 20 ~~able~~  ☐ Refund ☐ Owe | | |
| Other  Car payments x2 | $ 315 mo | $ 420. |
| Total Assets And Liabilities | $ 0 | $ |

Bond Type

Amount
$

By Whom Posted
10,50

NOTE: Read the notice on the reverse side before completing this form.

AOC-CR-226, Rev. 10/13
© 2013 Administrative Office of the Courts

(Over)

USA-00003637

JA385

# NOTICE TO PERSONS REQUESTING A COURT-APPOINTED LAWYER

1. When answering the questions on the Affidavit Of Indigency *(reverse side of this form)*, please do not discuss your case with the interviewer. The interviewer can be called as a witness to testify about any statements made in his/her presence. Please wait and speak with your lawyer. Do not ask the interviewer for any advice or opinion concerning your case.

2. **A court-appointed lawyer is not free. If you are convicted or plead guilty or no contest, you may be required to repay the cost of your lawyer as a part of your sentence. The Court may also enter a civil judgment against you, which will accrue interest at the legal rate set out in G.S. 24-1 from the date of the entry of judgment. Your North Carolina Tax Refund may be taken to pay for the cost of your court-appointed lawyer. In addition, if you are convicted or plead guilty or no contest, the Court must charge you an attorney appointment fee and may enter this fee as a civil judgment against you pursuant to G.S. 7A-455.1.**

3. The information you provide may be verified, and your signature below will serve as a release permitting the interviewer to contact your creditors, employers, family members, and others concerning your eligibility for a court-appointed lawyer. A false or dishonest answer concerning your financial status could lead to prosecution for perjury. See G.S. 7A-456(a) ("A false material statement made by a person under oath or affirmation in regard to the question of his indigency constitutes a Class I felony.").

---

Under penalty of perjury, I declare that the information provided on this form is true and correct to the best of my knowledge, and that I am financially unable to employ a lawyer to represent me. I now request the Court to assign a lawyer to represent me in this case. I authorize the Court to contact my creditors, employers, or family members, any governmental agencies or any other entities listed below concerning my eligibility for a court-appointed lawyer.

I further authorize my creditors, employers, or family members, any governmental agencies or any other entities listed below to release financial information concerning my eligibility for a court-appointed lawyer upon request of the Court.

*Governmental Agencies Or Other Entities Authorized To Be Contacted And/Or To Release Information*

Sign by the "X"

| SWORN/AFFIRMED AND SUBSCRIBED TO BEFORE ME | Date |
|---|---|
| Date 7·24·17   Signature | X  Signature Of Applicant |
| ☒ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court  ☐ Magistrate | Name Of Applicant (Type Or Print) |
| ☐ Notary     Date My Commission Expires | ☒ Defendant  ☐ Parent/Guardian/Trustee |
| SEAL   County Where Notarized | |

**NOTE:** *If you are less than 18 years old, or if you are at least 18 years old but remain dependent on and live with a parent or guardian, state name and address of parent, guardian or trustee below.*

| Name Of Parent/Guardian Or Trustee |
|---|
| Address |
| City, State, Zip |

AOC-CR-226, Side Two, Rev. 10/13
© 2013 Administrative Office of the Courts

USA-00003638

JA386

*(TYPE OR PRINT IN BLACK INK)*

## STATE OF NORTH CAROLINA

_____IREDELL_____ County

Name Of Defendant, Petitioner, Respondent
April Glass

Street Address Of Defendant, Petitioner, Respondent
753 Shiloh Rd Statesville
SBHC

Permanent Mailing Address Of Defendant, Petitioner, Respondent (If Different Than Above)

Telephone Number Of Defendant, Petitioner, Respondent
℅ 704-437-9493

☐ Check here if defendant is in jail

Full Social Security No.
2 3 9 - 2 9 - 2 8 0 2     ☐ Has No Social Security No.

| Date Of Offense | Most Serious Class Of Offense |
|---|---|

Offense(s) (List Offense(s) Only If File No. Has Not Been Assigned)
M. Larceny

File No.
19 CR 704813

Additional File Nos.

In The General Court Of Justice
☒ District  ☐ Superior Court Division

# ORDER OF ASSIGNMENT
# OR
# DENIAL OF COUNSEL

DOB: 4-19-82

G.S. 7A-146(11), 7A-292(15), 7A-450, 7A-451(a), 15A-1340.23(d)

**INSTRUCTIONS:** *The Court should complete Part I. or Part II. of this form. Do not use this form for first-degree murder cases or murder cases where the degree is undesignated, except for cases where the defendant was under 18 years of age at the time of the offense, or for capital post-conviction cases or appeals to the Court of Appeals or Supreme Court. For adult first-degree murder cases or murder cases where the degree is undesignated at the trial level, the Office of Indigent Defense Services will use form AOC-CR-624. For capital post-conviction cases, the Office of Indigent Defense Services will use form AOC-CR-625. For appellate cases, the Court will use form AOC-CR-350.*

### I. ASSIGNMENT OF COUNSEL

From the petition heard in this matter, the affidavit made by the applicant named above, and the inquiry made by the Court, which is documented in the record, it is determined that the applicant is **not** financially able to provide the necessary expenses of legal representation, and *(check one):*

☒ 1. is charged with a felony, a misdemeanor other than a Class 3, or a Class 3 misdemeanor that was committed before December 1, 2013, or is a petitioner or respondent in a proceeding or action listed in G.S. 7A-451(a); it is ORDERED that the applicant is indigent and is entitled to the services of counsel as contemplated by law; and that the attorney named below or the public defender in this judicial district shall provide representation.

☐ 2. is charged with a Class 3 misdemeanor that was committed on or after December 1, 2013, and *(check one):*
　　☐ a. the Court has found that the defendant has more than three prior convictions; it is ORDERED that the applicant is indigent and is entitled to the services of counsel as contemplated by law.
　　☐ b. the Court has **not** found at this time that the defendant has more than three prior convictions, the defendant is in custody, the Court does not intend at this appearance to modify the defendant's conditions of release to allow the defendant to be released pending trial without posting a secured bond, and the defendant has a constitutional right to meaningful access to the courts; it is ORDERED that the applicant is indigent and is entitled to the services of counsel as contemplated by law; and that the attorney named below or the public defender in this judicial district shall provide representation that is limited pursuant to G.S. 15A-141(3) and 15A-143 to the time period of the applicant's pretrial confinement on the Class 3 misdemeanor charge.

It is further ORDERED that the defendant shall be represented by:
　　☐ the attorney named below.　　☐ the public defender in this judicial district.

Name Of Appointed Attorney (If Applicable)
Minor

Next Court Date
9.9.19

| Date | Signature | | | | |
|---|---|---|---|---|---|
| 7/24/19 | Deborah Brown | ☒ Judge ☐ Clerk Of Superior Court ☐ Asst. CSC ☐ Deputy CSC ☐ Magistrate |

**NOTE:** *A magistrate may appoint counsel if designated to do so by the Chief District Court Judge. See G.S. 7A-146(11) and G.S. 7A-292(15).*

AOC-CR-224, Rev. 10/15
© 2015 Administrative Office of the Courts

Material opposite unmarked squares is to be disregarded as surplusage.
*(over)*

JA387

USA-00003639

## II. DENIAL OF COUNSEL

From the petition heard in this matter, the affidavit made by the applicant named above, and the inquiry made by the Court, which is documented in the record, it is determined that the applicant *(check all that apply)*:

- [ ] 1. is charged with a felony, a misdemeanor higher than a Class 3, or a Class 3 misdemeanor that was committed before December 1, 2013, but will not receive an active or suspended term of imprisonment if he/she is convicted of the offense(s) for which he/she is charged; it is ORDERED that the defendant's petition is denied.

- [ ] 2. is charged with a Class 3 misdemeanor that was committed on or after December 1, 2013, the Court has found that the defendant has fewer than four prior convictions, and the case shall proceed as a fine only case; it is ORDERED that the defendant's petition is denied.

- [ ] 3. will not receive an active or suspended term of imprisonment if he/she is found in contempt; it is ORDERED that the defendant's petition is denied.

- [ ] 4. is financially able to provide the necessary expenses of legal representation; it is ORDERED that the applicant is not indigent and his/her petition is denied.

| Date | Signature | | | | |
|------|-----------|---|---|---|---|
| | | ☒ Judge  ☐ Clerk Of Superior Court  ☐ Asst. CSC  ☐ Deputy CSC  ☐ Magistrate |

**NOTE:** *A magistrate may appoint counsel if designated to do so by the Chief District Court Judge. See G.S. 7A-146(11) and G.S. 7A-292(15).*

AOC-CR-224, Side Two, Rev. 10/15
© 2015 Administrative Office of the Courts

USA-00003640

JA388

## NORTH CAROLINA UNIFORM CITATION - COURT COPY

| STATE OF NORTH CAROLINA | Iredell | County District Court | File No. **2019CR 704813** | Citation No.<br>310G902 |
|---|---|---|---|---|

TO THE DEFENDANT NAMED BELOW: You have been charged with the misdemeanor(s) or infraction(s) specified below. Read this citation carefully.

### YOUR COURT DATE AND LOCATION

| Court Day<br>Wed | Date<br>05/15/2019 | Time<br>08:30AM - 01:00PM | Court Location<br>STATESVILLE | Courtroom<br>AM03 | Interpreter | Agency Case Number<br>19-16618 |
|---|---|---|---|---|---|---|

### THE STATE OF NORTH CAROLINA VS.

| Drivers License No.<br>41314151 | State<br>NC | Source<br>DL | Name Of Defendant<br>**GLASS, APRIL DAWN** | | Race<br>White |
|---|---|---|---|---|---|

| CDL<br>No | Class<br>ID | Address<br>753 SHILOH RD | | Gender<br>Female |
|---|---|---|---|---|

| Social Security No.<br>xxx-xx-2802 | City<br>STATESVILLE | State<br>NC | Zip<br>28677 | Date Of Birth<br>04/19/1982 | Age<br>36 |
|---|---|---|---|---|---|

### CHARGING OFFICER INFORMATION

| Date<br>04/12/2019 | Signature Of Officer<br>Officer D W LOWERY | No.<br>3075 | Law Enforcement Agency<br>STATESVILLE POLICE | Troop/Squad | District/Zone |
|---|---|---|---|---|---|

### WHAT YOU ARE CHARGED WITH

The officer named below has probable cause to believe that on or about **Friday**, the **12** day of **April**, **2019** at **03:30PM** in the county named above you did unlawfully and willfully

STEAL, TAKE, AND CARRY AWAY BOOKS, PENS, DOG FOOD, DELI FOOD & A DRONE, THE PERSONAL PROPERTY OF WAL MART, SUCH PROPERTY HAVING A VALUE OF $71.77. (G.S. 14-72(A))

and on or about _____, the ____ day of _____, ____ at _____ in the county named above you did unlawfully and willfully

### YOUR VEHICLE

| Vehicle License No.<br>U | State<br>U | Trailer Type | CMV<br>No | Vehicle Type<br>Unknown or Unreadable | Vehicle Make | Year | Haz. Mat.<br>No |
|---|---|---|---|---|---|---|---|

### OTHER INFORMATION

| Area<br>Business | Weather<br>Overcast | Visibility<br>Clear | Traffic | Accident<br>No | Speed | On Highway No./Street<br>OT CROSSROADS DR |
|---|---|---|---|---|---|---|

| ☐ Injury or Serious Injury<br>☐ Passengers Under 16 | SHP Code | In Vicinity/City Of<br>STATESVILLE | At/Near Intersection<br>1116 CROSSROADS DR |
|---|---|---|---|

### WITNESSES / OFFICER COMMENTS

| Witness #1<br>EDWARDS, THOMAS ELLIOTT<br>C/O 1116 CROSSROADS DR<br>STATESVILLE, NC 28625<br><br>704 871 9833 | Witness #2 | Witness #3 | OFFICER COMMENTS |
|---|---|---|---|

### COURT USE ONLY

| District Attorney | Attorney For Defendant At Time Of Trial Or Plea | ☐ Appointed<br>☐ Retained ☐ Waived | PRIOR CONVICTIONS<br>No./Level: 0 ☐ I (0) ☐ II (1-4) ☐ III (5+) |
|---|---|---|---|

PLEA: ☐ guilty/resp. ☐ no contest _____
☐ guilty/resp. ☐ no contest _____
☐ not guilty/resp. _____

VERDICT/PENDING: ☐ guilty/resp. _____
☐ guilty/resp. _____
☐ not guilty/resp. _____

M.CL. ☐ A1 ☐ 1 ☐ 2 ☐ 3
M.CL. ☐ A1 ☐ 1 ☐ 2 ☐ 3
☐ IVD _____

JUDGMENT: The defendant appeared in open court and freely, voluntarily and understandingly entered the above plea; on the above verdict/finding, it is ORDERED that the defendant: ☐ pay costs and a fine/penalty of $ _____ . ☐ be imprisoned for a term of _____ days in custody of the sheriff. Pretrial credit _____ days served. ☐ The Court finds that a longer ☐ shorter period of probation than specified in G.S. 15A-1343.2(d) is necessary. ☐ Execution of sentence is suspended and the defendant is placed on unsupervised probation for _____ months, subject to the regular conditions of probation and the following: ☐ (1) pay costs and a fine/penalty of $ _____ . ☐ (2) not operate a motor vehicle until properly licensed by DMV. ☐ (3) complete _____ hours of community service within _____ days and pay the fee. ☐ (4) Other: _____

It is ORDERED that this: ☐ Judgment is continued upon payment of costs. ☐ case is consolidated for judgment with _____
☐ sentence is to run at the expiration of the sentence in _____ ☐ The Court finds just cause to waive costs as ordered on attached ☐ AOC-CR-618. ☐ Other: _____
☐ COMMITMENT: It is ORDERED that the Clerk deliver two (2) certified copies of this Judgment and Commitment to the sheriff and that the sheriff cause the defendant to be retained in custody to serve the sentence imposed or until the defendant shall have complied with the conditions of release pending appeal.
☐ The defendant in open court gives notice of appeal to the Superior Court.
☐ The current pretrial release order is modified as follows:

| Date | Signature Of District Court Judge | I certify that this Judgment is a true copy. | Date | Signature Of Deputy/Assistant/CSC |
|---|---|---|---|---|

AOC-CR-500 (eCITATION®), Rev. 12/12 (Structured Sentencing), © 2012 Administrative Office of the Courts

JA389

USA-00003641

```
06EO000031.III.QH.20220926124041.
  TO: FBJ   -503509 20220926 12:40:41  005DCB86BC
FROM: III          20220926 12:40:29
3L010304016A892QH
NCFBICE01
THIS NCIC INTERSTATE IDENTIFICATION INDEX MULTIPLE RESPONSE IS THE
RESULT OF YOUR INQUIRY ON NAM/GLASS,APRIL SEX/F RAC/U DOB/19820419 PUR/C
ATN/ORNDORFF,WHITNEY
NAME                        FBI NO.        INQUIRY DATE
GLASS,APRIL DAWN            W4A0XN068      2022/09/26

SEX RACE BIRTH DATE  HEIGHT WEIGHT EYES HAIR PHOTO
F   W   1982/04/19  503    125    GRY  BRO  Y

BIRTH PLACE
VIRGINIA

FINGERPRINT CLASS       PATTERN CLASS

SCARS-MARKS-
TATTOOS       SOCIAL SECURITY
TAT L SHLD    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
TAT R SHLD
TAT R WRS

IDENTIFICATION DATA UPDATED 2020/11/11

THE CRIMINAL HISTORY RECORD IS MAINTAINED AND AVAILABLE FROM THE
FOLLOWING:
 VIRGINIA       - STATE ID/VA2576983T

END - 1ST NCIC III RECORD OF MULTIPLE RESPONSE

NAME                        FBI NO.        INQUIRY DATE
GLAZE,APRIL                 EPXJVAD54      2022/09/26

SEX RACE BIRTH DATE  HEIGHT WEIGHT EYES HAIR PHOTO
F   W   1981/04/19  504    120    HAZ  BRO  Y

BIRTH PLACE
UNITED STATES

FINGERPRINT CLASS       PATTERN CLASS

OTHER
BIRTH DATES SOCIAL SECURITY
1987/04/19  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

IDENTIFICATION DATA UPDATED 2018/08/02

THE CRIMINAL HISTORY RECORD IS MAINTAINED AND AVAILABLE FROM THE
FOLLOWING:
 INDIANA        - STATE ID/IN02116234

END - LAST NCIC III RECORD OF MULTIPLE RESPONSE

THE RECORD(S) CAN BE OBTAINED THROUGH THE INTERSTATE IDENTIFICATION
```

DEFENSE EXHIBIT 10

USA-00003214

INDEX BY USING THE APPROPRIATE NCIC TRANSACTION.

END


06EO00003A.III.QR.20220926124119.
  TO: FBJ   -503515 20220926 12:41:19   005DCB86C4
FROM: III         20220926 12:41:19
EL010304016A8A2QR
NCFBICE01
THIS INTERSTATE IDENTIFICATION INDEX RESPONSE IS THE RESULT OF YOUR
RECORD REQUEST FOR FBI/W4A0XN068. THE FOLLOWING WILL RESPOND TO YOUR
AGENCY:
 VIRGINIA      - STATE ID/VA2576983T
END


06EO00003A.CCHINQ.QR.20220926124121.
  TO: FBJ   -503516 20220926 12:41:21   189662E44C
FROM: CCHINQ        20220926 12:41:20
TO:NCFBICE01
FROM:NCFBICE01
Completion Code: HIT000000
NO HIT   (QR)

*********************************************************************
This Computerized Criminal History Response Is Based On Input Of:
ORI: NCFBICE01  Purpose Code: C
Attention: ORNDORFF,WHITNEY  Attention: 305I-CE-3381369  Operator Id: NSB
Name: GLASS,APRIL
FBI Number: W4A0XN068
*********************************************************************


06EO00003A.NLETS.CR.20220926124121.
  TO: FBJ   -503517 20220926 12:41:21   438007B3A2
FROM: NLETS        20220926 12:41:21
CR.VAIII0000
09:41 09/26/2022 52286
09:41 09/26/2022 32254 NCFBICE01

TXT


TXT
HDR/2L010304016A8A2QR
ATN/ORNDORFF,WHITNEY
THE FOLLOWING RECORD PERTAINS TO FBI/W4A0XN068

                         VIRGINIA CRIMINAL RECORD       09/26/2022 PART
1

SID: VA2576983T FBI: W4A0XN068

NAMES RECORDED IN VIRGINIA FILES:              SEX RACE DATE OF
BIRTH
     GLASS        APRIL      DAWN       F   W   04/19/1982

USA-00003215

JA391

```
HEIGHT  WEIGHT  EYES  HAIR  SCARS/MARKS/TATTOOS
 5'03"   130    GRY   RED   TAT R SHLDTAT L SHLDTAT R WRS
```

LAST REPORTED ADDRESS:  753 SHILOH RD.
                        STATESVILLE, NC 28677

PLACE OF BIRTH: WYTHE CO

SOCIAL SECURITY NO(S): 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

```
CONTRIBUTOR/CASE     DATE       CHARGE/DISPOSITION
==================  =========
=================================================
PD WYTHEVILLE VA    02/08/2020 FINGERPRINTED  PHOTO:Y
ORI:VA0970100
                               CHARGED WITH
                               #001 MSDMNR 18.2-103          LAR-2337-M1
OTN:197GM2000000829            SHOPLIFT: CONCEAL GOODS VALUED LESS THAN $500
                               WYTHE CO          02/08/2020
WYTHE CO GEN DIST   07/20/2020 GUILTY
ORI:VA097013J                  MSDMNR 18.2-103          LAR-2337-M1
CCN:197GC2000205000*           SHOPLIFT/ALTR PRICE/CONCEAL/XFER GOODS $500
                                 30 DAYS              IMPOSED
                                 30 DAYS              SUSPENDED
                                          PUBLIC DEFENDER    FINE
IMPOSED
                               UNSUPERVISED PROBATION     RESTITUTION
IMPOSED
DCN:Q630597
--------------------
============================
PD WYTHEVILLE VA    02/08/2020 FINGERPRINTED
ORI:VA0970100
                               CHARGED WITH
                               #001 MSDMNR 18.2-103          LAR-2338-M9
OTN:197GC2000165700            SHOPLIFT: ALTER PRICE TAGS/ETC  $500 (2ND OFF)
                               WYTHE CO          01/30/2020
WYTHE CO GEN DIST   07/20/2020 GUILTY
ORI:VA097013J                  MSDMNR 18.2-103          LAR-2337-M1
CCN:197GC2000165700*           SHOPLIFT/ALTR PRICE/CONCEAL/XFER GOODS $500
                                 30 DAYS              IMPOSED
                                 30 DAYS              SUSPENDED
                                          PUBLIC DEFENDER    FINE
IMPOSED
                               UNSUPERVISED PROBATION     RESTITUTION
IMPOSED
DCN:Q630751
--------------------
============================
PD GALAX VA         11/11/2020 FINGERPRINTED  PHOTO:Y
ORI:VA1100000                  OCA:2020028597
                               CHARGED WITH
                               #001 MSDMNR 18.2-103          LAR-2337-M1
OTN:640GM2000002116            SHOPLIFT/ALTR PRICE/CONCEAL/XFER GOODS $1000
                               GALAX             11/11/2020
GALAX GEN DIST CT   01/13/2021 GUILTY
```

USA-00003216

JA392

```
ORI:VA110011J              MSDMNR 18.2-103              LAR-2337-M1
CCN:640GC2000177700*       SHOPLIFT/ALTR PRICE/CONCEAL/XFER GOODS $1000
                             12 MOS                IMPOSED
                             12 MOS                SUSPENDED
                                       COURT APPOINTED     FINE
IMPOSED
                           UNSUPERVISED PROBATION     RESTITUTION
IMPOSED
DCN:L508958
-------------------
PD GALAX VA       11/11/2020 FINGERPRINTED  PHOTO:Y
ORI:VA1100000              OCA:2020028597
                           CHARGED WITH
                  #002 FELONY 18.2-104              LAR-2339-F6
OTN:155CR2000084200        LARCENY: THIRD OR SUBSEQUENT CONVICTION
                           PULASKI CO          03/28/2020
PULASKI CO CIRCUIT  05/18/2021 GUILTY
ORI:VA077015J              MSDMNR 18.2-103              LAR-2337-M1
CCN:155CR2000084200*       SHOPLIFT/ALTR PRICE/CONCEAL/XFER GOODS $500
                             12 MOS                IMPOSED
                             12 MOS                SUSPENDED  JAIL
                           NOT IMPNLD    PUBLIC DEFENDER
                           SUPERVISED PROBATION     RESTITUTION
IMPOSED
DCN:L508959
-------------------

*DISPOSITION ELECTRONICALLY TRANSFERRED BY COURT OF JURISDICTION

        RECORD AUTOMATED: 02/08/2020  LAST RECORD UPDATE: 05/30/2021

ALL ARREST ENTRIES CONTAINED IN THIS RECORD ARE BASED ON FINGERPRINT
COMPARISON
AND PERTAIN TO THE SAME INDIVIDUAL.

THIS INFORMATION MAY NOT CONTAIN THE CHARGE DATE AND/OR CHARGE ORI FOR FILES
SUBMITTED THROUGH THE SUPREME COURT OF VIRGINIA EMAGISTRATE INTERFACE.

                       *** CAUTION ***
 THIS RESPONSE IS BASED ON COMPARISON OF REQUESTOR FURNISHED INFORMATION
AGAINST DATA CONTAINED IN THE FILES OF THE VIRGINIA STATE POLICE CRIMINAL
RECORDS EXCHANGE ONLY AND DOES NOT PRECLUDE THE EXISTENCE OF OTHER CRIMINAL
HISTORY INFORMATION WHICH MAY BE CONTAINED IN THE REPOSITORY OF OTHER LOCAL,
STATE OR FEDERAL CRIMINAL JUSTICE AGENCIES.
 CHANGES TO THIS RECORD MAY BE IN PROCESS.  A NEW INQUIRY SHOULD BE MADE FOR
SUBSEQUENT USE.  THE RECIPIENT(S) IS RESPONSIBLE FOR MAINTAINING AN AUDIT
TRAIL OF ALL SECONDARY DISSEMINATION OF ANY OF THIS INFORMATION.
*** UNAUTHORIZED DISSEMINATION WILL SUBJECT THE DISSEMINATOR TO CRIMINAL AND
CIVIL PENALTIES. ***

THIS IS A SINGLE-SOURCE RECORD. NO ADDITIONAL CRIMINAL HISTORY INFORMATION IS
INDEXED IN NCIC-III FOR OTHER STATE OR FEDERAL OFFENSES.


END OF RECORD
```

USA-00003217

JA393

USA-00003218

JA394

*Iredell County Sheriff's Office*                                    OCA: *2000024*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *CBA- CLEARED BY ARREST*      Case Mng Status: *CLOSED BY ARREST*      Occurred: *01/01/2019*

Offense: *THIRD DEGREE SEXUAL EXPLOITATION OF MINOR*

Investigator: *LOWRANCE, J. D. (JL9395)*            Date / Time: *01/22/2020 13:33:08, Wednesday*

Supervisor: *DYSON, A. E. (AD1298)*          Supervisor Review Date / Time: *01/22/2020 13:33:00, Wednesday*

Contact:                                     Reference: *Case Notes*

I tried finding a phone number to April's mother Sandra Kay Cox after trying to calling the phone number to April several times and it going straight to voicemail.

I then called and spoke with Heather Brown concerning the post that April made about finding a place to live with her husband.  Heather told me that when she was talking to April getting the statement for me that April talked like she was going to leave Jessie.  She told me that it did not make sense due to the way she was talking to her about Jessie. Heather told me that she would see about getting the images to me and maybe even driving them down to me tomorrow if needed but was going to check first.  I told Heather that I needed to speak to April about this post and tried but was not getting any luck.  Heather told me that she does not have a phone number to April's mother or another number to reach April at.  She added hat she would send April an email telling her to call me.

1240 hrs

I sent an email to April asking her to call me ASAP after trying the phone number again.

1400 hrs

I called Wythe County Sheriff's Office and spoke with communications.  I asked to have a deputy go out to the address and see about making contact with April Glass and have her call me.  The female dispatcher told me that she would have a deputy call me.

I received a phone call from a deputy with Wythe County Sheriff's Office later where he was able to go out to the address and get another phone number to speak with April.  276-613-3298  He told me that the phone number is her mother's phone number and it is the phone number she is using.

I called and spoke with April and I asked her if Jessie knew anything about the investigation.  She told me No and that Jessie did not know anything about the report that she made.  I asked her about the Facebook post she made about Jessie her husband coming up to Virginia on Monday.  She told me that she made the post about a week ago and that she thought he had changed but she had changed her mind now.  She added that Jessie was not coming up there and that she was not going to have anything to do with him and was going to seek a protection order there in Virginia.  I asked her again if Jessie knew anything about the investigation and had she told him anything about it.  She told me no.

Later I received a phone call from Wythe County Sheriff's Office Dispatch telling me that she had a Deputy out with April Glass and he was wanting to talk to me.  I was patched to the Deputy and he told me that he was out with April

000270

Investigator Signature                    Supervisor Signature

DEFENSE EXHIBIT
11

*Supplements [Edit]*                                                      Page 6

JA395

*Iredell County Sheriff's Office*                                OCA: **2000024**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CBA- CLEARED BY ARREST*   **Case Mng Status:** *CLOSED BY ARREST*   **Occurred:** *01/01/2019*

**Offense:** *THIRD DEGREE SEXUAL EXPLOITATION OF MINOR*

---

**Investigator:** *LOWRANCE, J. D. (JL9395)*            **Date / Time:** *01/22/2020 13:33:08, Wednesday*

**Supervisor:** *DYSON, A. E. (AD1298)*        **Supervisor Review Date / Time:** *01/22/2020 13:33:00, Wednesday*

**Contact:**                                    **Reference:** *Case Notes*

---

on a traffic stop concerning a larceny at Wal-Mart there. He saw that I was wanting to talk to April. I told him that I had already spoken with April and was able to get the information I needed.

02/03/2020 1600 hrs

I called and asked April if Jessie had contacted her any over the weekend. She told me that he had called her and sent her a text message but she told him off and that was it. She added he is made at her for something about him getting arrested for assault in Yadkin County. I told her that I would look into this and if I needed anything I would call her. I asked if she thinks he is still here in Statesville. She told me yes.

1608 hrs

I called Yadkin County Sheriff's Office and had them run the name Jessie Glass to see if they had any involments with Jessie Glass. The female told me that they did not have any records.

02/04/2020 1018 hrs

I received an email from April Glass. I printed the email off for the case file. See email for full details.

02/07/2020

Heather Brown from Virginia State Police came to the office with the information and files from the case that she worked in 2016. The files and information was placed on a USB and turned into evidence due to the images that were in the report. The report contained images of Child Porn that April had taken screen shots from Jessie's cell phone.

02/10/2020 0849 hrs

I received an email from April Glass. The following is the email that was sent by April Glass.

I believe he is staying at his grandma house during the night. Her name is Peggy Mitchell. So it's either there 749 Shiloh RD Statesville 28677 if you're standing at the church facing the road his dad which is 749 Shiloh RD and his granny looking at his dad's house there are 2 mobile homes between his dad's house and his grandma Mitchell house his dad has a metal car port with a silver/grey Mustang and in less his granny is out paying pills or her or doc she she's home and a little 2 door Lexus (red in color in her carport..m obviously I'm not a law enforcement agent but I'd have

000271

---

Investigator Signature                          Supervisor Signature

*Supplements [Edit]*                                                Page 7

JA396

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry        11/29/2022

On November 28, 2022, Jason Lowrance, hereafter Lowrance, former Iredell County Sheriff's Detective, was telephonically interviewed by writer and Assistant United States Attorney Kimlani Ford. After being advised of the identity of the interviewing personnel and the nature of the interview, Lowrance provided the following information:

Joel Todd Mitchell, hereafter Mitchell, originally contacted Lowrance sometime in 2020 after Lowrance arrested JESSIE GLASS JR. Mitchell told Lowrance of several issues including a land dispute between Mitchell and Glass. Mitchell further provided information to Lowrance regarding JESSIE GLASS JR. which was documented in Lowrance's case file.

Prior to speaking with Mitchell, Lowrance was previously aware of an incident regarding JESSIE GLASS JR. in 2017. During this incident, Lowrance assisted former Iredell County Sheriff's Detective Chris Lamberth in reviewing a computer seized from JESSIE GLASS JR. Lowrance recalled while there was pornography observed on the computer, no child pornography was observed during the review.

---

Investigation on   11/28/2022   at   Charlotte, North Carolina, United States (Phone)

File #   305I-CE-3381369                                          Date drafted   11/29/2022

by   Scott H. Atwood

This document contains neither recommendations nor conclusions of t[...]FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

DEFENSE EXHIBIT 12

USA_00003644

JA397

2052

FILE NO. _____

**SEARCH WARRANT**

**COMMONWEALTH OF VIRGINIA**

*v.In re*

Jessie Leroy Glass Jr.

DEFENSE EXHIBIT
13
SWN: 035CM1700000379
USA_00003699

# SEARCH WARRANT
Commonwealth of Virginia    VA. CODE §§ 19.2-56, 19.2-57

**TO ANY AUTHORIZED OFFICER:**

You are hereby commanded in the name of the Commonwealth to forthwith search the following place, person or thing either in day or night

Cellular Phone Micro SD card that belongs to Jessie Leroy Glass, Jr.,

SSN 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. The card was provided to this agent by April Glass, wife of Jessie Glass, Jr. The card is described as a Samsung 256 gigabyte EVO memory card-red, white, and black in color (micro SD). Card is currently being stored as evidence at Division 4 State Police Headquarters.

for the following property, objects and/or persons:

SMS and MMS messages including their content sent and received, all stored photographic or video images, any data,pictures/videos or documents downloaded and/or stored to the SD card.

You are further commanded to seize said property, persons, and/or objects if they be found and to produce before the _____ Carroll _____ Circuit Court an inventory of all property, persons, and/or objects seized.

This SEARCH WARRANT is issued in relation to an offense substantially described as follows:

18.2-374.1:1. Possession, reproduction, distribution, solicitation, and facilitation of child pornography; penalty. A. Any person who knowingly possesses child pornography is guilty of a class 6 felony.

01/26/2017 03:07 PM
DATE AND TIME

FORM DC-339 (MASTER, PAGE ONE OF TWO) 07/01

I, the undersigned, have found probable cause and believe that the property or person constitutes evidence of the crime identified herein or tends to show that the person(s) named or described herein has committed or is committing a crime and further that the search should be made, based on the statements in the attached affidavit sworn to by

Brown, H.E. Special Agent,VSP
NAME OF AFFIANT

[ ] CLERK   [X] MAGISTRATE   [ ] JUDGE

Susan E. Kinser

JA398

## SEARCH INVENTORY AND RETURN

The following items, and no others, were seized under authority of this WARRANT:

1. PHOTOS
2. VIDEOS
3. WEBSITE DATA
4. ............................................
5. ............................................
6. ............................................
7. ............................................
8. ............................................
9. ............................................
10. ...........................................
11. ...........................................
12. ...........................................

The statement above is true and accurate to the best of my knowledge and belief.

_H. E. Brown_
EXECUTING OFFICER

_2/1/17_
DATE

Subscribed and sworn before me this day

_2/1/17_
DATE

[ ] CLERK   [ ] MAGISTRATE   [ ] JUDGE

FOR NOTARY PUBLIC'S USE ONLY:

State of ..................... [ ] City [ ] County of .....................

Acknowledged, subscribed and sworn to before me this .......... day of ..................... , 20 ......

.....................................
NOTARY REGISTRATION NUMBER

.....................................
NOTARY PUBLIC

.....................................
(My commission expires: ..................... )

FORM DC-339 (MASTER, PAGE TWO OF TWO) 01/09

## EXECUTION

Executed by searching the within described place, person or thing.

_1/30/17   1300 H&S_
DATE AND TIME EXECUTED

_H. E. Brown_
EXECUTING OFFICER

Certified to _Carroll_
Circuit Court on _2/1/17_
DATE

_H. E. Brown_
EXECUTING OFFICER

Received [ ✓ ] in person   [ ] by certified mail
[ ] by electronically transmitted
facsimile
on _February 1, 2017_
DATE

by: _[signature]_
CLERK OF CIRCUIT COURT

USA_00003700

JA399

# AFFIDAVIT FOR SEARCH WARRANT

Commonwealth of Virginia    VA. CODE § 19.2-54

The undersigned Applicant states under oath:

1. A search is requested in relation to an offense substantially described as follows:
§ 18.2-374.1:1. Possession, reproduction, distribution, solicitation, and facilitation of child pornography; penalty.
A. Any person who knowingly possesses child pornography is guilty of a Class 6 felony.

☐ CONTINUED ON ATTACHED SHEET

2. The place, person or thing to be searched is described as follows:
Cellular Phone Micro SD card that belongs to JESSIE LEROY GLASS, JR. SSN 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.
The card was provided to this Agent by APRIL GLASS, wife of JESSIE GLASS, JR.

The card is described as a Samsung 256 gigabyte EVO memory card-red, white, and black in color (micro SD).
Card is currently being stored as evidence at Division 4 State Police Headquarters.

☐ CONTINUED ON ATTACHED SHEET

3. The things or persons to be searched for are described as follows:

SMS and MMS messages including their content sent and received, all stored photographic or video images, any data, pictures/videos or documents downloaded and/or stored to the SD card.

☐ CONTINUED ON ATTACHED SHEET

(OVER)

FORM DC-338 (MASTER, PAGE ONE OF TWO) 7/08

---

CASE NO. _____

## AFFIDAVIT FOR
## SEARCH WARRANT

APPLICANT:

Heather E. Brown
NAME

Virginia State Police Special Agent
TITLE (IF ANY)

1185 E. Lee Highway
ADDRESS

Wytheville, VA 24382

Certified to Clerk of

Carroll _____ Circuit Court
CITY OR COUNTY

on  2/1/17
DATE

Special Agent
TITLE

SIGNATURE

Original Delivered  ☑ in person  ☐ by certified mail
☐ by electronically transmitted facsimile

to Clerk of  Carroll County _____ Circuit Court
CITY OR COUNTY WHERE EXECUTED

Dep Clerk
TITLE

SIGNATURE

Complete only if different from above:

Original Delivered  ☐ in person  ☐ by certified mail
☐ by electronically transmitted facsimile

to Clerk of _____ Circuit Court
CITY OR COUNTY WHERE EXECUTED

_____
TITLE

_____
SIGNATURE

CIRCUIT COURT
CLERKS OFFICE

2017 FEB -1 P 1:09

USA_00003701

JA400

USA_00003702

4. The mate    facts constituting probable cause that the search should be m  s are:
SANDRA COX contacted the Virginia State Police after receiving child pornography photos that were sent to her cell phone by APRIL GLASS, her daughter. APRIL GLASS, who resides in Carroll County, states she was looking through her husband, JESSIE LEROY GLASS, JR.'s cell phone when she came across pornographic photos that had been downloaded to his phone. APRIL GLASS took a photograph of the images on her husband's phone and forwarded the photos to her mother. After, forwarding the photos, APRIL GLASS deleted them off her phone. APRIL GLASS and SANDRA COX turned over their phones and signed consent forms for the phones to be searched. Both have agreed to cooperate in the investigation.
JESSIE "LEE" GLASS, JR. was interviewed at his residence. This Agent did not disclose how she knew the photos were on his phone. LEE GLASS stated he downloads a lot of pornography and "may" have accidentally downloaded child pornography photos in the past, but would immediately delete them. LEE GLASS said he uses his home internet (in Carroll County) to download pornography. LEE GLASS stated he "'lost" his phone. APRIL GLASS had previously provided me with information that he took the phone, left the residence, and destroyed the phone because he became aware she was scheduled to meet with me. Prior to leaving the residence, LEE removed the SD card and left it at the home located in Carroll County. APRIL GLASS hid the SD card to be used in the investigation. APRIL told LEE that she drove up the road to dispose of the SD card. LEE was very agitated about the fact he could not locate the card. APRIL GLASS said LEE GLASS made her promise that she had destroyed the SD card and was very concerned about the location of the card.

☐ CONTINUED ON ATTACHED SHEET

5. The object, thing or person searched for constitutes evidence of the commission of such offense.

6. ☒ I have personal knowledge of the facts set forth in this affidavit OR
   ☒ I was advised of the facts set forth in this affidavit in whole or in part, by an informer. This informer's credibility or the reliability of the information may be determined from the following facts:

This Agent personally saw the photos on Sandra Cox's phone. I interviewed April Glass about how she came across the photos.  She stated she was going through Jessie Glass' phone because she was concerned he was having an affair. She said she took photos of the pictures to document that they were on his phone.  She is still living with Jessie Glass and has continued to provide me with information regarding his behavior and is assisting in the investigation. She hid the SD card in her vehicle in order to provide it to me for the investigation.

☐ CONTINUED ON ATTACHED SHEET

The statements above are true and accurate to the best of my knowledge and belief.

_____
APPLICANT

Virginia State Police Special Agent
TITLE OF APPLICANT

☐ CLERK  ☐ MAGISTRATE  ☐ JUDGE

Subscribed and sworn to before me this day.

01/31/2017  3:00 pm
DATE AND TIME

FORM DC-338 (MASTER, PAGE TWO OF TWO) 8/07

JA401

**Lamberth**

# Incident/Investigation Report

| Agency Name: Iredell County Sheriff's Office | | OCA Number: 2017-102643 |
|---|---|---|

**ORI:** NC0490000

**Date/Time Reported** S☐ M☒ T☐ W☐ T☐ F☐ S☐
Month/Day/Year 05/17/2017  Time 15:17 Hrs.

| | Crime/Incident | | | |
|---|---|---|---|---|
| 1 | Suspicious Activity | ☐ Attempt ☒ Complete | At Found S☐ M☐ T☐ W☐ T☐ F☐ S☒ | Last Known Secure S☐ M☐ T☐ W☐ T☐ F☐ S☒ |
| 2 | Crime/Incident | ☐ Attempt ☐ Complete | Month/Day/Year 05/17/2017  Time 15:16 Hrs | Month/Day/Year 05/17/2017  Time 15:15 Hrs |
| 3 | Crime/Incident | ☐ Attempt ☐ Complete | Location of Incident 749 Shiloh Road Statesville, North Carolina 28625 | Offense Tract 03C |

**Premise Type** Home of Suspect

**Victim's Residence Type** ☒ Single Family ☐ Multi-Family

**Method of Operation** (Answer the questions of where and how)
By using tablet to acces possible child pornography

**Forcible** ☐ Yes ☒ No ☐ N/A

**Weapons/Tools** Computer/Tablet

| # of Victims | Type: ☒ Person ☐ Business | | |
|---|---|---|---|
| 1 | ☐ Society ☐ Government ☐ Financial Institute ☐ Religious ☐ LEO Officer Line of duty ☐ Other/Unk | Injury: ☒ None ☐ Minor ☐ Broken Bones ☐ Severe Lacerations ☐ Internal ☐ Unconscious ☐ Other Major Injury ☐ Loss of Teeth | Drug/Alcohol Use ☐ Yes Unknown ☒ No ☐ N/A |

| V1 | Victim/Business Name (Last, First Middle) State of North Carolina | Victim of Crime # 1 | Date of Birth | Age | Race | Sex | Relationship to Offender | Resident Status ☐ Resident ☐ Non-Resident ☐ Unknown |
|---|---|---|---|---|---|---|---|---|

**Home Address**

**Home Phone**

**Employer Name and Address**

**Business Phone**

| VYR | Make | Model | Style | Color | Lic/Lis | Vehicle Identification Number (VIN) |
|---|---|---|---|---|---|---|

**Codes:** V - Victim (Denote V2 or V3)   O - Owner (if other than the victim)   R - Reporting Person (if other than the victim)

**Type:** ☒ Person ☐ Business ☐ Society ☐ Government ☐ Financial Institute ☐ Religious ☐ LEO Line of Duty ☐ Other/Unknown

| Code | Name (Last, First Middle) | Victim of Crime # | Date of Birth | Age | Race | Sex |
|---|---|---|---|---|---|---|
| R | Lamberth, C.D. | | | | W | F |

**Home Address**

**Home Phone**

**Employer Name and Address** Iredell County Sheriff's Office 230 North Tradd Street Statesville, North Carolina 28677

**Business Phone** 704-878-3180

**Type:** ☐ Person ☐ Business ☐ Society ☐ Government ☐ Financial Institute ☐ Religious ☐ LEO Line of Duty ☐ Other/Unknown

| Code | Name (Last, First Middle) | Victim of Crime # | Date of Birth | Age | Race | Sex |
|---|---|---|---|---|---|---|

**Home Address**

**Home Phone**

**Employer Name and Address**

**Business Phone**

**Status Codes:** L - Lost   S - Stolen   R - Recovered   D - Damaged   Z - Seized   B - Burned   C - Counterfeit/Forged   F - Found
(Check " OJ " column if recovered for another jurisdiction)

| Victim # | DCI | Status | Value | OJ | Qty | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| 1 | | Z | $0.00 | | 1 | Black in color tablet | Pro-12/ CT9223W97 | R6GH8Z0170D1 |

*D. Moore 5-17-17*

**Number of Vehicles Stolen:** 0    **Number of Vehicles Recovered:** 0

| Officer Name Detective C.D. Lamberth | ID# 4769 | Officer Signature | Supervisor Signature |
|---|---|---|---|

**Complainant Signature** 000023

**Case Status**
☒ Further Investigation
☐ Inactive
☐ Closed/Cleared
☐ Closed/Leads Exhausted

**Case Disposition**
☐ Unfounded ☐ Juvenile/No Custody ☐ Extradition Declined
☐ Cleared by Arrest ☐ Refuse to Cooperate
☐ Cleared by Arrest by Another Agency
☐ Death of Offender ☐ Prosecution Declined

Page 1 of 2

DEFENSE EXHIBIT 14

JA402

USA-00000422

OCA Number: 2017-102643

Victim's Name: State of North Carolina

Status Codes: L - Lost  S - Stolen  R - Recovered  Z - Seized  B - Burned  C - Counterfeit/Forged  F - Found

| OCI | Status | Quantity | Type Measure | Suspected Type | Possess | Buy | Sale | Importing | Operating |
|---|---|---|---|---|---|---|---|---|---|
| ☐ | | | | | ☐ | ☐ | ☐ | ☐ | ☐ |
| ☐ | | | | | ☐ | ☐ | ☐ | ☐ | ☐ |
| ☐ | | | | | ☐ | ☐ | ☐ | ☐ | ☐ |

Check up to three (3) types of activity for each

**Offender Used:**

| | | Offender 1 | | | | Offender 2 | | | | Offender 3 | | | Primary Offender Resident Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alcohol/Drugs ☐ Yes ☐ No | | Age: | Race | Sex | Age: | Race | Sex | Age: | Race | Sex | | | ☐ Resident |
| ☒ Unknown ☐ N/A | | 43 | W | M | | | | | | | | | ☒ Non-Resident |
| Computer ☐ Yes ☒ No | | Offender 4 | | | | Offender 5 | | | | Offender 6 | | | ☐ Unknown |
| ☐ Unknown ☐ N/A | | Race | | | Age: | Race | | | Age: | Race | | | |

Name (Last, First, Middle): Glass, Jessie Leroy, Jr.

Alias or Nickname: Lee

Home Address: 749 Shiloh Road  Statesville, NC 28625

Occupation: McConnell Grading

Business Address: 1480 Wilkinson Road  Mooresville, NC 28117

| Date of Birth | Age | Race | Sex | Height | Weight | Build | Hair Color | Hair Style | Hair Length | Eye Color | Glasses |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/12/1973 | 43 | W | M | | | | | | | | |

Scars, Marks, Tattoos, or other distinguishing features (i.e. limp, foreign accent, voice characteristics):

| Hat | Jacket | Shirt/Blouse | Tie/Scarf | Coat/Suit | Pants/Dress/Shirt | Socks | Shoes |
|---|---|---|---|---|---|---|---|

Was Suspect Armed?  Yes ☐  No ☒

| | Type of Weapon | Direction of Travel | Mode of Travel |
|---|---|---|---|

| VYR | Make | Model | Style | Color | Lic/Lis | VIN |
|---|---|---|---|---|---|---|

| Witness Name: (Last, First Middle) | DOB | Age | Race | Sex | OCA |
|---|---|---|---|---|---|

| Home Address | Home Phone | Employer | Phone |
|---|---|---|---|

Suspect Hate/Bias Motivated:  Yes ☐  No ☒

**Narrative:**

I was requested by Detective Lieutenant B. Boyd to go to 749 Shiloh Road and make contact with Jessie Glass, Sr. and Jessie Glass, Jr. Upon my arrival, I met Jessie Glass, Jr. (listed as the suspect) in the driveway. I told him that I was there because we received a tip that there is possibly a computer in the residence with child pornography on it. I then asked him if there are any computers in the house and he said that he owns a tablet. I asked him if I could search the tablet for any possible child pornography and he said that I could. He then went inside and got his tablet and brought it out to me. I asked him again if I could search it and he said that I could. I then began looking through the internet history on the device and located numerous pornography websites, and I saw one that read "young dominatrix". I felt that this could possibly be child pornography, so I informed Jessie that I was seizing the device for the possibility of there being child pornography on it. Jessie then said that there should not be any underage pornography on it and if any had ever popped up on the screen that he did not dwell on it. This threw up a red flag for me. I then asked him if there was anything on there that he wanted to tell me about and I could see tears welling up in his eyes and he said that there was not anything he wanted to tell me. I then filled out an evidence form and Jessie signed it, turning custody of the tablet over to me. While on scene, Detective C. Griffiths and Detective D. Clodfelter gained consent to search the residence for more computers and narcotics from both Jessie, Sr. and Jessie, Jr. The search did not produce any more computers of any kind or drugs. There were children's toys and sex toys located in Jessie, Jr.'s bedroom. I spoke with Detective Sergeant J. Lowrance and he said that he would assist me in a search warrant tomorrow.

Please assign back to me.

000025

**Case Management (ICSO 17-02643) Tracking : Notes**

Detective C.D. Lamberth - Case Notes

Iredell County Sheriff's Office Case Number:  2017-I02643

Dates Reported:              05/16/2017

Incident:                          Possession of Child Pornography

Location of Incident:         749 Shiloh Road
Statesville, NC 28625

Victim Information:           State of North Carolina

Suspect Information:          Jessie Leroy Glass, Jr.
749 Shiloh Road
Statesville, NC 28625

05/19/2017 10:22
I presented the search warrant application to the Honorable Lori Hamilton and she found probable cause to grant the search warrant of the Pro-12 Tablet. I then delivered a copy to the Clerk of Court as well as Det. Lt. J. Wyatt, who said that she would hand it over to Capt. J. Gibson.

05/23/2017 14:15
I was able to review the information that was pulled from the tablet and there was pornography on it, but nothing that appeared to be of anyone under the age of 18. I will be making a return of service of the search warrant to the Clerk's Office and notifying Mr. Glass that he can retrieve his tablet from the Office.

05/23/2017 19:08
I made contact with Mr. Glass and notified him that he can pick up his tablet. I thanked him for his cooperation and let him know that I did not find anything that I was concerned about. I will be closing the case as unfounded.

05/23/2017 19:15
Closed/Cleared      Unfounded

JA404

USA-00000457

## Incident / Investigation  - Case #: 17-02643 : Off. Narr

Suspicious Activity
By using table to access possible child pornography
**************************************************************

I was requested by Detective Lieutenant B. Boyd to go to 749 Shiloh Road and make contact with Jessie Glass, Sr. and Jessie Glass, Jr. Upon my arrival, I met Jessie Glass, Jr. (listed as the suspect) in the driveway. I told him that I was there because we received a tip that there is possibly a computer in the residence with child pornography on it. I then asked him if there are any computers in the house and he said that he owns a tablet. I asked him if I could search the tablet for any possible child pornography and he said that I could. He then went inside and got his tablet and brought it out to me. I asked him again if I could search it and he said that I could. I then began looking through the internet history on the device and located numerous pornography websites, and I saw one that read ``young dominatrix``. I felt that this could possibly be child pornography, so I informed Jessie that I was seizing the device for the possibility of there being child pornography on it. Jessie then said that there should not be any underage pornography on it and if any had ever popped up on the screen that he did not dwell on it. This threw up a red flag for me. I then asked him if there was anything on there that he wanted to tell me about and I could see tears welling up in his eyes and he said that there was not anything he wanted to tell me. I then filled out an evidence form and Jessie signed it, turning custody of the tablet over to me. While on scene, Detective C. Griffiths and Detective D. Clodfelter gained consent to search the residence for more computers and narcotics from both Jessie, Sr. and Jessie, Jr. The search did not produce any more computers of any kind or drugs. There were children`s toys and sex toys located in Jessie, Jr.`s bedroom. I spoke with Detective Sergeant J. Lowrance and he said that he would assist me in a search warrant tomorrow.

Please assign back to me.

ASSIGNED:Lamberth

USA-00000458

JA405

**Andy Poteat**

From:          Darren Campbell
Sent:          Tuesday, May 16, 2017 3:17 PM
To:            Andy Poteat
Subject:       FW: Anonymous tip

**From:** April Nester [mailto:laurelchik368@gmail.com]
**Sent:** Tuesday, May 16, 2017 3:16 PM
**To:** ICSO Information <icsoinfo@co.iredell.nc.us>
**Subject:** Anonymous tip

749 Shiloh Rd Statesville Va there is marijauna and possibly other meds non prescribed and the tablets are full of child porn they will be there about 7pm please keep my email anonymous or he will come after me jessie leroy glass jr is currently being investigated in the state of Virginia on child porn charges and possible rape of my daughter again please dont repeat my email he will come after me

000047

DEFENSE EXHIBIT

15

1/28/2020

Statement

In December 2019, I noticed Jessie L. Glass, Jr. was acting strange. He started wanted to keep his phone very secret & also wanted to be dressed up in make up & women panties behind closed doors. His entire personality changed to where he would cut me down constantly, he even expected me to call him my "Master"! I looked into his phone curious about what he was hiding and found absolute horror that sent me into a panic when I saw all the nude children being molested & raped as young as infancy to very early teen girls & boys. I am so sorry for going into a panic describing the graphic details of what I saw as I, myself am a rape survivor & I have pretty severe PTSD & depression on a daily basis. I seek treatment though. Back in 2016 when he was first investigated he ran to NC & threw his phone into a river to hide the evidence. I also found a photo in his phone during 12/2019 where he was holding →

000171

DEFENSE EXHIBIT

18

JA407

USA-00000566

a knife knife to my neck while I slept as well as my crotch area. He mostly seeks young girls & their photos on Tumblr & then lures then onto the wikr app. His tumblr name is grlwchr grlwch grlwchr. All the photos he keeps are in his Google Photo App on his phone under user-ramsd4d at gmail.com in his trash bin the last I saw. Please let me know if you need anymore info.

April Glass
276-728-8500
1782 Rickey Rd
Max Meadows, VA
24360

000172

USA-00000567

| | |
|---|---|
| **From:** | noreply@civicplus.com |
| **Sent:** | Friday, December 27, 2019 9:46 AM |
| **To:** | Darren Campbell; Andy Poteat; Richard Todd Carver |
| **Subject:** | Online Form Submittal: Report Suspicious Activity |

## Report Suspicious Activity

| | |
|---|---|
| First Name | April |
| Last Name | Glass |
| Contact phone number | 9808265227 |
| Contact email | aglass.interim@gmail.com |
| ADDRESS OF SUSPICIOUS ACTIVITY | 749 Shiloh Rd |
| City | Statesville |
| State | NC |
| Zip | 28677 |
| First Name of suspect, if known | Jessie |
| Last Name of suspect, if known | Glass Jr |
| Nickname of suspect if known | Lee |
| What type of suspicious activity have you observed. | He has a massive amount of child porn saved on his phone. I picked it up one day to look for his resume and it popped up when I picked his phone up. He has them in his Google photos trash bin on his phone now. His Google acct is ramsd4d@gmail.com and I think the PW is LeeGlass2019$ he also has a Tumblr acct where he goes by grlwtchr and has ppl send him pics and talks about what he likes in the pics. His Wikr acct is DaddySpanx I believe but the bulk of it is in his Google photos on his phone in the trash bin... Plz look in the Google Photos and into the trash bin. There's even videos of someone having sex with a child in there but you cant see the face of either so idk who it is. Please please keep me |

*J4*

000019



1

DEFENSE EXHIBIT

19

USA-00000418

anonymous. He will or his dad will come at me hard. They've already lied on me a CPL times in the last week and I was able to break free and leave yesterday because his dad had my firearm and wouldn't give it back so I snuck it back and he wouldn't let me out of the house until I gave it to him and I finally had to threaten to call 911 and he let me go. Please don't give out even the location of where the report came from I'm scared of what they will do. Don't tell them a name or email or number of who made the report. They sent me to the store one day last week and I had a fender bender in the parking lot which me and the other driver just shared our info with each other and left. Then when the insurance called told them I took the truck unlawfully but I have text proof of a list of stuff they wanted while I was at the store. I did not take the truck without him knowing as a matter of fact I was making payments to his dad for the truck to buy it off him. Lee will claim that he will be just surfing websites and those pics download to his phone but I'm not stupid...there's got to be over 100, pics of children naked and being raped/molested in his Google Pics Trash bin. I got away and I'm staying with a friend. I don't think they know how to get here but pls tell them the report came from Tennessee or somewhere. I don't want them to try to find me and come at me in any way shape or form. I am Lee's wife and I pray I've given you enough info. He has Samsung Galaxy S9 and a laptop that is grey in color. There's two laptops in that house one above and behind his dad is his dad's and Lee should have his near him. They are both grey but Lee's is newer and will have on the desktop of it a file called Main Resume. That's how you'll know you have the correct laptop. I hope I've given enough info. I've wanted out for a while over the porn stuff that I found but didn't have anywhere to go and no way out honestly. If Lee isn't there don't let his dad call him or anyone before you have Lee in front of him cause this is the 3rd time I've reported him and he gets tipped off and hides or destroys his devices to keep the cops from having the proof. I had left him once and moved back to Va and reported him and he got tipped off and destroyed everything with any proof. Something has to be done he even took a pic of him holding a knife to my neck in my sleep so that is one reason I don't want them knowing cause it could put me in physical danger. You'll have the best chance of them both being there at about 630 or 7pm. His dad is Jesse Glass Sr so you don't mix them up ID them. Lee has shaved his head bald pretty much and he's about 230 lbs

| May we contact you for more information if needed? | YES |
| --- | --- |

USA-00000419

JA410

Email not displaying correctly? View it in your browser.

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails by clicking the "Report Phish" button.

000021                    3

USA-00000420

JA411

**Jason Lowrance**

| | |
|---|---|
| **From:** | April Glass <aglass.interim@gmail.com> |
| **Sent:** | Wednesday, January 22, 2020 2:06 PM |
| **To:** | Jason Lowrance |
| **Subject:** | Re: Tip |

Hello I am April. My number is 276-728-8500. I am currently staying with my mom in Virginia. I haven't went back home due to all of the issues going on down there. He still stays at his dad's and his grandma's but mostly at his dad's house.

On Wed, Jan 22, 2020, 1:31 PM Jason Lowrance <jlowrance@co.iredell.nc.us> wrote:

I am trying to get in contact with April Glass concerning a tip that she made. Please have her call me at 704-928-4676.

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Report suspicious email by clicking the "Report Phish" button.

1/22/20 1455 hrs
called April Glass
December Middle
December 25
Pictures people boat
2 years old
5
video
1
Gallery A 59

178a Rickiey RD
Max Meadows VA 24360

000122

DEFENSE EXHIBIT
20

JA412

USA-00000517

**Jason Lowrance**

| | |
|---|---|
| **From:** | April Glass <aglass.interim@gmail.com> |
| **Sent:** | Tuesday, February 04, 2020 10:18 AM |
| **To:** | Jason Lowrance |
| **Subject:** | Re-April Glass |

Good morning

I was just wandering if you had found out if he had really been arrested or not. He called yesterday blaming me for him having a ticket and losing his license and I cussed him out and hung up on him. He is driving me insane calling just to blame me for stuff he done he is very narcissistic. I'm just not letting him verbally or emotionally abuse me any longer. And when I saw that pic with the knife to my neck it scared the hell out of me. He sent a text asking me what my address is to forward mail to me but refused to say who it was from. He knows where I am at hes been here in the past. I told him I would get it when I go to my specialist appointment in Winston Salem and he threatened to send it back so I gave him the address in Hope's that he is filing divorce so he will have to pay for it but I do plan to go after alimony due to the abuse he put me through and due to him causing me to lose my kids. I hope y'all can get into his phone and get what you need before he gets another phone I feel that's coming because he asked me his pw to Google and to his FB. He never does that unless be does BUT THOSE PHOTOS WILL STILL BE IN HIS GOOGLE PHOTOS HIDDEN IN THE TRASH IN THE GOOGLE PHOTO APP. Please let me know if he gets picked up I fel8on edge after a cpl town police and a state trooper came here saying they think I'm in danger. He does have guns he has a 45 and there are also a 40 and a shotgun in the house. The day before I was kicked out his dad tried to hold me in his house until I gave in and gave him my gun which I refused to do so and told him I'd call the cops if he didn't let me leave and he backed off and I ran to my house as fast as I could and the next day he came in on me and got about an inch of my face screaming at me and throwing my stuff at me and gave me an hour to be out (His dad) I still have many precious things in that house and I'm not allowed on the property to get them. Is there a way I can get a police escort to go with me while I get the important stuff? Hes saying hes gonna take it to the dump. Thank you for all your help! And I'm sorry I had a very hard time explaining what I seen the first time you called I have been raped myself and just describing what I saw sometimes sends me into a panic

April Glass

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails by clicking the "Report Phish" button.

000124

DEFENSE EXHIBIT

21

USA-00000519

JA413

**Jason Lowrance**

| | |
|---|---|
| From: | April Glass <makeupguruva@gmail.com> |
| Sent: | Monday, February 10, 2020 8:49 PM |
| To: | Jason Lowrance |
| Subject: | April Glass |

I believe he is staying at his grandma house during the night. Her name is Peggy Mitchell. So it's either there 749 Shiloh RD Statesville 28677 if you're standing at the church facing the road his dad which is 749 Shiloh RD and his granny looking at his dad's house there are 2 mobile homes between his dad's house and his grandma Mitchell house his dad has a metal car port with a silver/grey mustang and in less his granny is out paying pills or her or doc she she's home and a little 2 door Lexus (red in color in her carport..m obviously I'm not a law enforcement agent but I'd have someone at each house the same time to there is no way he can run and I don't put it past him to try to hide it run out the back or something. The last time I turned him in he said he burned his tablet and idk how but he obtained a new phone during that as well they only had hearsay to on at that point and I understand... I feel he only chose me because I had small children as he was charged with 2 counts of forcible sodomy on a child under 13 ( his daughter and she was 8 and said he "licked her down there with his tongue") keep in mind my daughter was 8 yo and knew nothing about the case involving his daughter and told her dad that " tickled her down there" mine and kids went through extensive therapy and forensic physcology. Nothing happened with my kis a other than I lost custody other than 11 hrs a week. During all of this CPS in Carroll Co I had no idea that they had to get his written permission to release info to me that he us a level 1 pedophile on their records and not allowas around kids for I'm not sure how long now.

I would love to be able to some of my belongings from the place we were staying 753 Shiloh RD. If I do find a ride to NC would it be possible for my safe ty to have s an officer come out before he starts taking my things like the TV... The red desk in the living room lamp with butterflies as decor on it..kitchen table my make up blankets clothes I have that I really need I have 3 outfits now.idk what to do I am have no nice clothing for interviews and all I have are stretchy pants and such. And of course things that my kids made me and my elephant collection.
Thank you for everything!!!! Please let me know if he's been picked up or what not. Ive been trying to be nice to him if he does call or text I'm scared he will catch I on if not. There are several firearms between the two of them I don't think they would should shoot at y'all though idk what he is capable of. Thanks for your time! You can reaxh me a 276-728-7500
April Glass

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails by clicking the "Report Phish" button.

000125

1

DEFENSE EXHIBIT

22

JA414

USA-00000520

Customer Summary



# JESSIE LEROY GLASS JR ♥

| | | | |
|---|---|---|---|
| **Address:** | ▓▓▓ STATESVILLE, NC 286771752 | | |
| **County:** | IREDELL | **DL Status:** | ACTIVE |
| **DOB:** | ▓▓▓ | **Cust ID/DL:** | 000005119767 |
| **Age:** | 46 | **Orig. Issue Date:** | 05/20/1994 |
| **Race:** | CAUCASIAN | **Points:** | 00 |
| **Gender:** | MALE | **Non Resident Military:** | NO |
| **Height:** | 5'9" | **Active Duty Military:** | |
| **Eyes:** | BROWN | **Out-of-State License:** | VA - T63715706 |
| **Hair:** | BROWN | **Veteran:** | |

**Other DLs:**

| Customer ID | License Type | Status | Name | Address |
|---|---|---|---|---|
| 000005119767 | Primary | ACTIVE | JESSIE LEROY GLASS JR | 753 SHILOH RD, STATESVILLE, NC 286771752 |
| T63715706 | Out-of-State | State: VA | | |

## License Detail

| Class: | C | Status: | ACTIVE | CDL: | N | Limited Privilege: | N | Certificate Transaction Number: | 0019140225 |
|---|---|---|---|---|---|---|---|---|---|
| Group: | | Issuance Date: | 05/15/2017 | Disqualified: | N | Conditional Restriction: | N | Certificate Number: | |
| Type: | O | Expiration Date: | 07/12/2025 | Probation: | N | Endorsement: | | Certificate Expiration Date: | |

Restrictions:  0. NONE

| Class: | B | Status: | EXPIRED | CDL: | Y | Limited Privilege: | N | Certificate Transaction Number: | |
|---|---|---|---|---|---|---|---|---|---|
| Group: | P | Issuance Date: | 02/01/1999 | Disqualified: | N | Conditional Restriction: | N | Certificate Number: | |
| Type: | O | Expiration Date: | 08/01/1999 | Probation: | N | Endorsement: | | Certificate Expiration Date: | |

Restrictions:  10. ACCOMPANIED BY DRIVER LICENSED FOR CLASS DRIVEN

| Class: | C | Status: | EXPIRED | CDL: | N | Limited Privilege: | N | Certificate Transaction Number: | |
|---|---|---|---|---|---|---|---|---|---|
| Group: | | Issuance Date: | 08/12/1998 | Disqualified: | N | Conditional Restriction: | N | Certificate Number: | |
| Type: | R | Expiration Date: | 07/12/2003 | Probation: | N | Endorsement: | | Certificate Expiration Date: | |

**For use by authorized criminal justice professionals only. Unauthorized use or distribution is subject to legal action.
Printed By:    Jason  Lowrance
Printed For:   Jason  Lowrance
Printed Reason:    Criminal Justice - Purpose

000064

DEFENSE EXHIBIT

23

JA415

# Customer Summary

**Restrictions:** 0. NONE

| | | | | | |
|---|---|---|---|---|---|
| **Class:** C | **Status:** EXPIRED | **CDL:** | **Limited Privilege:** | **Certificate Transaction Number:** |
| **Group:** 4 | **Issuance Date:** 05/22/2017 | **Disqualified:** | **Conditional Restriction:** | **Certificate Number:** |
| **Type:** O | **Expiration Date:** 05/22/2018 | **Probation:** | **Endorsement:** | **Certificate Expiration Date:** |

**Restrictions:** 18. NO PASSENGER

## Driver's History

| Begin Date | End Date | Description |
|---|---|---|
| 02/01/1999 | 08/01/1999 | ORG ISS: CLS B CDL PRMT EN: |
| | | RSTR:10 ACCOMPANIED BY DRIVER LICENSED |
| 08/12/1998 | 07/12/2003 | REN ISS: CLS C    EN: |
| | | RSTR:0 NONE |
| 09/09/1995 | 10/02/1995 | CONV: (313)SPEEDING ( 64 MPH IN A 55)    3 |
| | | COURT: YADKIN COUNTY COURT, NC |
| | | COURT: AOC #: 95IF 003241    CITATION ID: 06463752 |
| 05/10/1995 | 07/12/1998 | DUP ISS: CLS C    EN: |
| | | RSTR:0  NONE |
| 05/20/1994 | 07/12/1998 | ORG ISS: CLS C    EN: |

## RDLSI/CDLIS

**RDLSI/CDLIS Withdrawal(s):**
Withdrawal Date   Eligibility Date   Reinstatement Date   Withdrawal Type   Withdrawal State

**RDLSI/CDLIS Conviction(s):**
Citation Date   Conviction Date   Court Type   Commercial Vehicle   Hazmat

**RDLSI/CDLIS Accident(s):**
Accident Date   Commercial Vehicle   Hazmat   Accident State   Accident Details

## Vehicle(s)

**For use by authorized criminal justice professionals only. Unauthorized use or distribution is subject to legal action.
Printed By:   Jason  Lowrance
Printed For:   Jason  Lowrance
Printed Reason:   Criminal Justice - Purpose

000065

USA-00000462

JA416

## Customer Summary

| Plate No | VIN | Year | Make | Model | Vehicle Stop Code | Body Style | Expiration Date | Last Inspection Date |
|---|---|---|---|---|---|---|---|---|
| | 1LNBP93F0BY627015 | 81 | LINC | | | 2 DOOR | | |
| | 3MABM1355KR649676 | 89 | MERC | TRACER | | STATION WAGON | | |
| | 1FTBR10C8HUD01778 | 87 | FORD | RANGER | | TRUCK | | |
| MVN4380 | 1FTCR10A5MPB01033 | 91 | FORD | RANGER | MULTI | TRUCK | 10/15/2000 | 10/31/2008 |
| FKH3259 | 1FTKR1EE2APA29937 | 10 | FORD | RANGER | | TRUCK | 02/15/2020 | 01/31/2020 |
| FLK4353 | 3VW2K7AJ5FM269410 | 15 | VOLK | JETTA BASE S | INSUR | 4 DOOR | 02/15/2020 | 01/31/2019 |

**For use by authorized criminal justice professionals only. Unauthorized use or distribution is subject to legal action.
Printed By:     Jason Lowrance
Printed For:    Jason Lowrance
Printed Reason:    Criminal Justice - Purpose

000066

USA-00000463

JA417

# Offender Summary



## JESSIE LEROY GLASS JR.

**Address(06/29/2018):** ███████ STATESVILLE NC 28677
**Most Recent Update:** 06/30/2018

**Other Names:**                                           **Birth Date:**          **DL:**
JESSIE LEROY GLASS JR                          ███ 973          NC-5119767
JESSIE LEROY GLASS JR.

**FBI ID:**          **SID:**          **SSN:**XXX-XX-2732

**DOC ID:**          **SRN ID:**          **Reference #:**36509188

| | | | |
|---|---|---|---|
| **Age:** | 46 | **Height:** | |
| **Race:** | WHITE | **Weight:** | |
| **Gender:** | MALE | **Eyes:** | UNKNOWN |
| | | **Hair:** | UNKNOWN OR COMPLETELY BALD |

## Employer Data

| Occupation | Employer | Employer Phone Number |
|---|---|---|
| | | |

| **Outstanding Processes** | **NC Court Records** | **Jail** |
|---|---|---|
| Unserved Processes - 0 | Pending - 0 | Current - No |
| Felony - 0 | Disposed - 2 | Previous - No |
| Misdemeanor - 0 | | Escaped - No |
| Infraction - 0 | | |
| Traffic - 0 | | |

| **Prison** | **Community Corrections** | **Sex Offender Registry** |
|---|---|---|
| Current - No | Current - No | Pending Registration - No |
| Previous - No | Previous - No | Active Registration - No |
| Escaped - No | Absconded - No | Prior Registration - No |
| | Warrant - 0 | |

| **Marks / Scars** | **Gang Affiliations** | **Domestic Violence** |
|---|---|---|
| Yes | No | Case(s) - 0 |



000067

**For use by authorized criminal justice professionals only. Unauthorized use or distribution is subject to legal action.
Printed By:    Jason Lowrance
Printed For:    Jason Lowrance
Printed Reason:    Criminal Justice - Purpose

USA-00000464

JA418

# Offender Address Summary



## JESSIE LEROY GLASS JR.

SSN: XXX-XX-2732    FBI ID:    SID:    Age: 46    DOC ID:    DL: NC-S119767    Reference #: 36509188

| Address | | Source | Date |
|---|---|---|---|
| ▮▮▮▮▮▮ STATESVILLE NC 28677 | | AOC | 06/29/2018 |
| ▮▮▮▮▮ STATESVILLE NC 28677 | | AOC | 05/05/1995 |

000068

**For use by authorized criminal justice professionals only. Unauthorized use or distribution is subject to legal action.
Printed By:    Jason Lowrance
Printed For:    Jason Lowrance
Printed Reason:    Criminal Justice - Purpose

USA-00000465

JA419

## Offender Images

 JESSIE LEROY GLASS JR.

SSN: XXX-XX-2732    FBI ID:    SID:    Age: 46    DOC ID:    DL: NC-5119767    Reference #: 36509188

————————

————————

————————

————————

000069

**For use by authorized criminal justice professionals only. Unauthorized use or distribution is subject to legal action.
Printed By:    Jason  Lowrance
Printed For:    Jason  Lowrance
Printed Reason:    Criminal Justice - Purpose                    13:43 Wednesday, January 22, 2020    Page 2

JA420

USA-00000466



# JESSIE LEROY GLASS JR.

SSN: XXX-XX-2732    FBI ID:    SID:    Age: 46    DOC ID:    DL: NC-5119767    Reference #: 36509188

| Offense Status | County | Court File # | Process Type | Offense Date | Charged Offense | Convicted Offense | Disposition | Disposition Date | Last Court Date |
|---|---|---|---|---|---|---|---|---|---|
| DISPOSED | ROWAN | 18CR703480 | Citation | 04/07/2018 | EXPIRED REGISTRATION CARD/TAG (5461) (T) | | VOLUNTARY DISMISSAL BY DA | 06/29/2018 | |
| DISPOSED | | | Citation | 04/07/2018 | EXPIRED/NO INSPECTION (4440) (I) | | VOLUNTARY DISMISSAL BY DA | 06/29/2018 | |
| DISPOSED | IREDELL | 95CR5242 | Citation | 04/07/1995 | DR/ALLOW REG PLATE NOT DISPLAY (5485) (T) | DR/ALLOW REG PLATE NOT DISPLAY (5485) (T) | Guilty | | 05/05/1995 |

000070

**For use by authorized criminal justice professionals only. Unauthorized use or distribution is subject to legal action.

USA-00000467

JA421

**Jason Lowrance**

**From:**      April Glass <aglass.interim@gmail.com>
**Sent:**      Wednesday, July 29, 2020 1:02 PM
**To:**        Jason Lowrance

Good Afternoon

This is April Glass; Jessie Glass Jr wife. I really don't want to be in court as a witness. I found out through some sources that there were several ppl staying there off and on using the phones and computer. I don't know which one of them downloaded those photos now. But if there was several ppl using the same devices it could have been any one of them. I only found them because he had me sending his emails out to potential jobs and I looked in the Google photos when something popped up and saw them. I really don't think it was him at this point because of the type of people that I do know was in and out of that residence of 749 Shiloh. I think one of them was arrested the day the search happened that lived next door and they were always in and out over there even before I had moved to VA. Just please do not make me be a witness in this case. Thank you for your time.

April

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails by clicking the "Report Phish" button.

DEFENSE EXHIBIT
24

336

1

USA-00000730

JA422

# VIRGINIA STATE POLICE ACTIVITY REPORT

CONFIDENTIAL This document contains neither recommendations nor conclusions of the Virginia State Police. It is the property of the Virginia State Police and is loaned to your agency; it and its contents are not to be distributed outside your agency.

**File Number:** 16-27159

**File Manager:**

**Activity Number:** 17-230730A

**Activity Title:** MEMO #7

**Activity Date/Time:** 12/27/2017 10:29

**Activity Lead Employee:** BROWN, HEATHER E 1stSGT

On 12/21/17, I spoke to Chris Lamberth, an investigator at Iredell County SO in North Carolina. Lamberth investigated a complaint that was sent in by April Glass anonymously. April's complaint was that Jessie Glass had pornography on a tablet in his father's home. Lamberth went to the home and got consent to search the house. He did identify a tablet, which was seized and downloaded, but no pornography was found. I went over the details of my case and asked if they would be interested in looking at the file. I cannot make any charges as the case stands, but there were crimes that were committed in North Carolina. He said he does not regularly work ICAC crime, but would ask someone in that specialty to contact me.

**Available Attachments:**



Page 21

JA423

# VIRGINIA STATE POLICE ACTIVITY REPORT

CONFIDENTIAL This document contains neither recommendations nor conclusions of the Virginia State Police. It is the property of the Virginia State Police and is loaned to your agency; it and its contents are not to be distributed outside your agency.

**File Number:** 16-27159

**File Manager:**

**Activity Number:** 17-220584A

**Activity Title:** MEMO #6

**Activity Date/Time:** 12/11/2017 11:09

**Activity Lead Employee:** BROWN, HEATHER E 1stSGT

I sent an email to Lt. Brian Boyd at Iredell County SO to see if they are familiar with Mr. Glass. I never heard back from North Carolina on whether they were familiar with him. I spoke to a ICAC agent when I first got this case, but they declined to take it after I went over the case facts.

**Available Attachments:**

Jessie Glass.msg



JA424

| | | |
|---|---|---|
| **Agency Name** Iredell County Sheriff's Office | | **Case#** 20-00024 |
| **ORI** NC0490000 | | **Date / Time Reported** 12/27/2019 09:46  Fri |

LOWRANCE

**Last Known Secure** 01/01/2019 12:00  Tue

| I N C I D E N T | **Location of Incident** ▮▮▮ Statesville NC 28677- | **Premise Type** Residence/home | **Zone/RptArea** EAST, 3C | **At Found** 12/27/2019 09:46  Fri |
|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| **#1** | **Crime Incident(s)** Pornography - Possessing / Concealing POPC | (Com) | **Weapon / Tools** | | | **Activity** P |
| | | | Entry | Exit | Security | |
| **#2** | **Crime Incident** | ( ) | **Weapon / Tools** | | | **Activity** |
| | | | Entry | Exit | Security | |
| **#3** | **Crime Incident** | ( ) | **Weapon / Tools** | | | **Activity** |
| | | | Entry | Exit | Security | |

**MO** Sex Acts/Pornography

| V I C T I M | **# of Victims** 1 | **Type:** SOCIETY/PUBLIC | **Injury:** | | | | | **Domestic:** N | |
|---|---|---|---|---|---|---|---|---|---|

| **V1** | **Victim/Business Name (Last, First, Middle)** State Of North Carolina | **Victim of Crime #** 1, | **DOB** **Age** | **Race** | **Sex** | **Relationship To Offender** | **Resident Status** | **Military Branch/Status** |
|---|---|---|---|---|---|---|---|---|
| | **Home Address** | | | | | | **Home Phone** | |
| | **Employer Name/Address** | | | | | **Business Phone** | | **Mobile Phone** |
| | **VYR** | **Make** | **Model** | **Style** | **Color** | **Lic/Lis** | | **VIN** |

**CODES:** V- Victim (Denote V2, V3)   O = Owner (if other than victim)   R = Reporting Person (if other than victim)

| O T H E R S I N V O L V E D | **Type:** INDIVIDUAL | | **Injury:** | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Code** RP | **Name (Last, First, Middle)** GLASS, APRIL DAWN | **Victim of Crime #** | **DOB** ▮▮/1982 **Age** 36 | **Race** W | **Sex** F | **Relationship To Offender** | **Resident Status** Resident | **Military Branch/Status** |
| | **Home Address** ▮▮▮ Statesville, NC 28677 | | | | | | | **Home Phone** | |
| | **Employer Name/Address** DISABLED | | | | | | **Business Phone** | **Mobile Phone** |
| | **Type:** | | **Injury:** | | | | | | |
| | **Code** | **Name (Last, First, Middle)** | **Victim of Crime #** | **DOB** **Age** | **Race** | **Sex** | **Relationship To Offender** | **Resident Status** | **Military Branch/Status** |
| | **Home Address** | | | | | | | **Home Phone** | |
| | **Employer Name/Address** | | | | | | **Business Phone** | **Mobile Phone** |

1 = None  2 = Burned  3 = Counterfeit / Forged  4 = Damaged / Vandalized  5 = Recovered  6 = Seized  7 = Stolen  8 = Unknown
("OJ" = Recovered for Other Jurisdiction)

| P R O P E R T Y | **VI #** | **Code** | **Status Frm/To** | **Value** | **OJ** | **QTY** | **Property Description** | **Make/Model** | **Serial Number** |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| **Officer/ID#** LOWRANCE, J. D. (JL9395) | | **Supervisor** DYSON, A. E. (AD1298) | |
|---|---|---|---|
| **Invest ID#** (0) | | | |
| **Status** **Complainant Signature** | **Case Status** Open-further  01/03/2020 | **Case Disposition:** | **Page 1** |

R_CS1IBR    Printed By: DM8269,    Sys#: 75607    01/03/2020 20:54

000007

DEFENSE EXHIBIT
25

JA425

USA-00000406

| *Iredell County Sheriff's Office* | | OCA<br>*20-00024* |
|---|---|---|
| Victim<br>*Society* | Offense<br>*PORNOGRAPHY - POSSESSING /* | Date / Time Reported<br>*Fri 12/27/2019 09:46* |

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Reporting Party Email: ████████@gmail.com

On January 2, 2020, I received a packet of information concerning a Suspicious Activity report that was emailed to our office on December 27, 2019 at 09:46 am EST. In the report, April Glass is reporting that Jessie L. Glass Jr that lives at █████████ Statesville has child porn on his cell phone. In the report, April stated that she picked up his cell phone one day and saw the images on his cell phone. She added that he keeps the images in his Google Photos trash bin. April added that Jessie's Google Account is ███████████ and she thinks the password is ██████████

In the report April stated that she has left Jessie and is no longer living at the address with him. She requested that she be left anonymous and that Jessie not to know that she is the one that made the report. April did not say where she is living at now. The report will be attached to this report for more information.

There was report made back in 2017 under OCA 17-02643, where the same information was report by April. Detectives were able to speak to Jessie and search the device. Adult porn was found on the device, but no Child Porn was located.

I tried calling the phone number in the report. The phone number was not working or had been disconnected. I sent and email to April that was in the report and had not heard anything back.

000008

| Reporting Officer: *LOWRANCE, J. D.*<br>*R_CS3NC* | Printed By: DM8269, | 01/03/2020 20:54 | Page 3 |
|---|---|---|---|

USA-00000407

JA426

# Incident Report Additional Suspect List

OCA: 20-00024

Additional Suspect List

Page 4

| SUSPECT | Name (Last, First, Middle) *Glass, Jessie Leroy Jr* | | Also Known As | | Home Address ▉▉▉ *STATESVILLE, NC 28677* | | |
|---------|---|---|---|---|---|---|---|
| | Empl/Occu *MCCONNELL GRADING, LABORER, 1480 WIKINSON RD MOORESVILLE* | | | Business Address *MCCONNELL GRADING, LABORER, 1480 WIKINSON* | | | |
| | DOB. / Age ▉▉ *1973* *46* | Race *W* | Sex *M* | Eth | Hgt | Wgt | Physical Char |
| | Scars, Marks, Tattoos, or other distinguishing features | | | | | | |
| | Type of Weapon | | | | | | |
| | Dir of Travel | | Mode of Travel | | | | |
| | Veh Yr/Make/Model | Style | | Color | Lic/Lis | | Vin |

JA427

USA-00000408